# No. 24-1279

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

BRIAN HUSSEY,
*Plaintiff-Appellant*,

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as
Commissioner of the Cambridge Police Department,
*Defendants-Appellees*,

BRANVILLE G. BARD, JR., in his individual capacity,
*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
Case No. 1:21-CV-11868
The Honorable Angel Kelley

## OPENING BRIEF OF PLAINTIFF-APPELLANT BRIAN HUSSEY

Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
hlichten@llrlaw.com
jbartholet@llrlaw.com

# TABLE OF CONTENTS

STATEMENT AS TO ORAL ARGUMENT ....................................................1

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUE................................................................2

STATEMENT OF THE CASE.................................................................3

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................5

SUMMARY OF THE ARGUMENT ......................................................11

STANDARD OF REVIEW ................................................................14

ARGUMENT ...............................................................................14

    A.    The *Pickering* Test Gives High Weight to the Plaintiff's Fundamental Right to Comment on Issues of Public Concern, Including Pending Legislation..............................................18

    B.    The Government Has Little, If Any, Legitimate Interest in Suppressing Such Commentary.......................................24

        1.    The Government's actions in this case are based on viewpoint discrimination and retaliation, neither of which constitutes a legitimate interest under *Pickering*. ...............................................................24

        2.    Speech implicating such a substantial public concern should be subject to an actual disruption standard, which Plaintiff's comments do not meet.................31

        3.    Even in the absence of an actual disruption standard, no reasonably foreseeable possibility of disruption existed as a result of Plaintiff's remarks.................36

CONCLUSION ...........................................................................40

i

# TABLE OF AUTHORITIES

## Cases

*Alves v. City of Gloucester*,
  594 F. Supp. 3d 315 (D. Mass. 2022) ...........................................15

*Bennett v. Metro. Govt. of Nashville & Davidson Cnty., Tennessee*,
  977 F.3d 530 (6th Cir. 2020) ...........................................................21

*Berger v. Battaglia*,
  779 F.2d 992 (4th Cir. 1985) ...........................................................39

*Brasslett v. Cota*,
  761 F.2d 827 (1st Cir. 1985) ..................................... 19, 25, 36, 39

*Bruce v. Worcester Regl. Transit Auth.*,
  34 F.4th 129 (1st Cir. 2022) ...................................... 16, 17, 28, 36

*Carey v. Brown*,
  447 U.S. 455 (1980)...................................................... 12, 14, 18

*Chung v. StudentCity.com, Inc.*,
  854 F.3d 97 (1st Cir. 2017) .............................................................14

*City of San Diego, Cal. v. Roe*,
  543 U.S. 77 (2004)...........................................................................19

*Cohen v. California*,
  403 U.S. 15 (1971)...........................................................................22

*Connick v. Myers*,
  461 U.S. 138 (1983)............................................................... passim

*Curran v. Cousins*,
  509 F.3d 36 (1st Cir. 2007) ......................................... 20, 21, 38

*Davignon v. Hodgson*,
  524 F.3d 91 (1st Cir. 2008) .......................................... passim

*Decotiis v. Whittemore*,
  635 F.3d 22 (1st Cir. 2011) ......................................... 13, 37

*Dible v. City of Chandler*,
515 F.3d 918 (9th Cir. 2008)...........................................................32

*Farmers Ins. Exch. v. RNK, Inc.*,
637 F.3d 777 (1st Cir. 2011)..........................................................14

*Feiner v. New York*,
340 U.S. 315 (1951).......................................................... 12, 23, 24

*Fenico v. City of Philadelphia*,
70 F.4th 151 (3d Cir. 2023)...................................... 25, 29, 32

*Flanagan v. Munger*,
890 F.2d 1557 (10th Cir. 1989)..................................................39

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)...................................................................17

*Garrison v. Louisiana*,
379 U.S. 64 (1964).....................................................................14

*Givhan v. W. Line Consol. Sch. Dist.*,
439 U.S. 410 (1979)...................................................................37

*Guilloty Perez v. Pierluisi*,
339 F.3d 43 (1st Cir. 2003) ...................................... 17, 32, 36, 39

*Gustafson v. Jones*,
290 F.3d 895 (7th Cir. 2002).......................................................26

*Hayes v. Massachusetts Bay Transportation Authority*,
498 F.Supp.3d 224 (D. Mass. 2020) ...........................................25

*Hernandez v. City of Phoenix*,
43 F.4th 966 (9th Cir. 2022).......................................................22

*Jordan v. Carter*,
428 F.3d 67 (1st Cir. 2005) ........................................................20

*Kincade v. City of Blue Springs, Mo.*,
64 F.3d 389 (8th Cir. 1995).......................................................32

*McGinest v. GTE Serv. Corp.*,
    360 F.3d 1103 (9th Cir. 2004)........................................................21

*McKinley v. City of Eloy*,
    705 F.2d 1110 (9th Cir. 1983) (same) ...........................................32

*Melton v. City of Oklahoma City*,
    879 F.2d 706 (10th Cir. 1989).......................................................32

*Melzer v. Bd. Of Ed. of City Sch. Dist. of City of New York*,
    336 F.3d 185 (2d Cir. 2003)................................................... 24, 38

*Mihos v. Swift*,
    358 F.3d 91 (1st Cir. 2004) ................................................... 12, 17

*Morrissey v. Boston Five Cents Sav. Bank*,
    54 F.3d 27 (1st Cir. 1995) .............................................................14

*Munroe v. C. Bucks Sch. Dist.*,
    |805 F.3d 454 (3d Cir. 2015) .........................................................24

*N. A. A. C. P. v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982).......................................................... 12, 14, 18

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964).......................................................................15

*O'Connor v. Steeves*,
    994 F.2d 905 (1st Cir. 1993)......................................................4, 39

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*,
    391 U.S. 563 (1968)............................................................... passim

*Pilkington v. Bevilacqua*,
    439 F. Supp. 465 (D.R.I. 1977), *aff'd* 590 F.2d 386 (1st Cir.
    1979) .................................................................................. 18, 38

*Rankin v. McPherson*,
    483 U.S. 378 (1987).............................................................. passim

*Reno v. Am. Civ. Liberties Union*,
    521 U.S. 844 (1997)........................................................................24

*Rosado v. Santiago*,
    562 F.2d 114 (1st Cir. 1977) ........................................................18

*Roseman v. Indiana U. of Pennsylvania, at Indiana*,
    520 F.2d 1364 (3d Cir. 1975)........................................................19

*Santos v. Miami Region, U. S. Cust. Serv.*,
    642 F.2d 21 (1st Cir. 1981) ..........................................................18

*Texas v. Johnson*,
    491 U.S. 397 (1989)......................................................................14

*Tindle v. Caudell*,
    56 F.3d 966 (8th Cir. 1995)..........................................................32

*Vojvodich v. Lopez*,
    48 F.3d 879 (5th Cir. 1995)..........................................................32

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)......................................................................14

*Waters v. Churchill*,
    511 U.S. 661, 663 (1994)......................................... 31, 32, 36, 38

**Statutes**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

42 U.S.C. § 1983 ..................................................................... 1, 3, 10

**Other Authorities**

Arelis R. Hernández,
    *A Knee on his Neck*, WASH. POST (Oct. 26, 2020),
    https://www.washingtonpost.com/graphics/2020/national/georg
    e-floyd-america/policing/ ...............................................................8

Claire McAnaw Gallagher, *For-Profit, Nonprofit, and Government Sector Jobs in 2022*, BUREAU OF LABOR STATISTICS (Oct. 2023), https://www.bls.gov/spotlight/2023/for-profit-nonprofit-and-government-sector-jobs-in-2022/home.htm ................................................33

*Druggie*, MERRIAM-WEBSTER.COM DICTIONARY, Merriam-Webster, https://www.merriam-webster.com/dictionary/druggie................................22

Freda Moon,
  *36 Hours: Cambridge, Massachusetts*, N.Y. TIMES (Dec. 22, 2011), https://www.nytimes.com/2011/12/25/travel/36-hours-cambridge-mass.html ..................................................................................13

Jade Lozzada,
  *Keeping it in the Bar Family: From the People's Republik to the New Republik*, THE HARVARD CRIMSON (March 31, 2022), https://www.thecrimson.com/article/2022/3/31/peoples-republik-new-republik/ .................................................................................13

Jonathan Abel, *Cop-"Like": The First Amendment, criminal procedure, and the regulation of police social media speech*, 74 STAN. L. REV. 1199 (June 2022) ....................................................34

Lilli Wofsy, *Will I get fired for posting this? Encouraging the use of social media policies to clarify the scope of the Pickering balancing test*, 51 SETON HALL L. REV. 259, 278 (2020)..............................34

Luis Andres Henao et. al,
  *For George Floyd, a complicated life and a notorious death*, ASSOCIATED PRESS (June 10, 2020), https://apnews.com/article/virus-outbreak-us-news-ap-top-news-hip-hop-and-rap-houston-a55d2662f200ead0da4fed9e923b60a7 ...........................................8

Madyson Hopkins, *Click at your own risk: Free speech for public employees in the social media age*, 89 GEO. WASH. L. REV. ARGUENDO 1 (March 2021)..........................................................34

Manny Fernandez & Audra D. S. Burch,
  *George Floyd, From 'I Want to Touch the World' to 'I Can't
  Breathe'*, N.Y. TIMES (April 20, 2021),
  https://www.nytimes.com/article/george-floyd-who-is.html ......................8

Rev. Irene Monroe,
  *Confronting Liberal Racism in Cambridge*, WGBH BOSTON
  (May 26, 2017),
  https://www.wgbh.org/news/commentary/2017-05-
  26/confronting-liberal-racism-in-cambridge ................................................13

Universal Hub, *People's Republic, The*,
  https://www.universalhub.com/glossary/peoples_republic_the.h
  tml ....................................................................................................................13

**Rules**

Fed. R. App. P. 4(a)(1)(A) ...........................................................................1

Fed. R. App. P. 43(c)(2) ..............................................................................3

Fed. R. Civ. Pro. 56 ...................................................................................27

## STATEMENT AS TO ORAL ARGUMENT

The Plaintiff requests oral argument. This case presents very important legal questions concerning the intersection between the First Amendment rights of public employees to comment on matters of public concern through their private social media accounts and a public employer's ability to limit such protected speech through disciplinary action. There is a considerable difference of opinion among the circuit, relevant treatises, and law review articles on the proper standard to employ, and these complicated issues would benefit greatly from robust argument.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331, which confers original jurisdiction to federal courts on all civil actions arising under the Constitution, laws, or treaties of the United States. This claim arises under 42 U.S.C. § 1983, a federal statute.

This Court has appellate jurisdiction over Plaintiff's appeal pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(A). The District Court entered summary judgment in favor of the City of Cambridge and Chief Bard on the claims at issue and entered final judgment for Defendants on March 12, 2024. Plaintiff filed a timely notice of appeal on March 20, 2024.

## STATEMENT OF THE ISSUE

Whether the District Court incorrectly applied the balancing test set out in *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968) by determining that the City of Cambridge's interest in suppressing plaintiff's speech on a clear matter of public concern based on its distaste for the speech without **any evidence of** disruption in operations outweighed the interest of Plaintiff and the public at large in free expression and robust public debate.

## STATEMENT OF THE CASE

This case raises fundamental questions about a state employee's right as a citizen to speak out on pending federal legislation — on his own time, at home, via his own private Facebook page, and in a manner that caused no disruption in the eight days before the post came to the attention of his superiors and two months before his suspension — under the First Amendment to the United States Constitution.

The plaintiff, Officer Brian Hussey, brought this action under 42 U.S.C. § 1983 against the City of Cambridge and Branville Bard,[1] individually and in his capacity as Commissioner of the Cambridge Police Department, alleging violation of his First Amendment rights following discipline for making a Facebook post on an issue of public import in his personal capacity. Under the *Pickering* balancing test, the Court must "balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968).

---

[1]    Because Christine Elow was sworn in as the Commissioner of the Cambridge Police Department on January 17, 2022, the Clerk of this Court substituted her for Branville G. Bard, Jr. as the defendant. Pub. Docket Notice (April 9, 2024) (citing Fed. R. App. P. 43(c)(2)).

3

On summary judgment, the district court found that Defendants' assertions that Hussey's Facebook post could offend some community members — theoretically undermining the trust of those community members in police — outweighed Plaintiff's admittedly significant right to comment on current political issues. In doing so, the lower court allowed the City of Cambridge to base its decision on the mere possibility of disruption, entirely ignoring the Supreme Court's directive that comments more substantially implicating public concerns require a stronger showing of disruption, *Connick v. Myers*, 461 U.S. 138, 151 (1983), as well as this Court's instruction that a public employer must meet "its burden of showing that the disruption was attributable to the exercise of [the employee's] First Amendment right to speak out on this subject, so as to warrant [disciplining] him on speech-related grounds" to prevail on summary judgment, *O'Connor v. Steeves*, 994 F.2d 905, 916 (1st Cir. 1993).

Instead, the district court digressed by delving into its own views on George Floyd's personal life before incorrectly suggesting that Plaintiff's accurate statements were entitled to less weight because they were unflattering in nature and carried negative connotations. The district court also ignored significant evidence that Defendants acted out of offense or disagreement with the viewpoints Plaintiff expressed in his speech rather than its potential to disrupt departmental operations. The district court's decision was thus legal error.

This Court should reverse the lower court's decision granting Defendants' motion for summary judgment; find that as a matter of law, Plaintiff's First Amendment interests outweigh Defendants' interest in the suppression of speech; and remand the case for further proceedings.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff Brian Hussey is a veteran police officer (and now Sergeant) who is a lifelong resident of the City of Cambridge. JA054. He has served as a Cambridge police officer for over 25 years. *Id.* During his tenure as an officer, Hussey spent approximately ten years assigned to the Special Investigations Unit, where "80 to 90 percent of" his time was spent investigating "drug crimes," including conducting roughly "a couple hundred" drug crime investigations. JA062.

In February 2021, Hussey re-posted a WHDH news article on his private Facebook page. JA295. The article, entitled "House Democrats reintroduce police reform bill named in honor of George Floyd," referenced proposed federal legislation on police reform —H.R. 7120, titled the "George Floyd Justice in Policing Act of 2020." *Id*. Hussey, believing that naming this landmark legislation after someone who had a long criminal and drug history was inappropriate, posted a comment along with the article's link (featuring a preview that included its headline), writing, "This is what its come to 'honoring' a career criminal, a thief and druggie … the future of this country is bleak at best." *Id*. (ellipsis in original).

Hussey did not identify himself as a Cambridge police officer on his Facebook page or in the post, nor did the post in any way reference his position with the police department. JA301. The post was visible only to Hussey's Facebook "friends," who consisted of approximately 600 individuals Hussey knew personally, including other Cambridge police officers. JA246 ¶¶ 8–10. Hussey was off duty and at home when he made the post using his personal mobile phone. JA246–47 ¶¶ 11–14. He deleted the post after a couple of hours because the post did not generate significant conversation or comments, as was his usual practice. JA247 ¶ 17. Paul Upton, former Deputy Chief of Police in the neighboring City of Somerville, posted a similar remark on his Facebook page at the time. JA320–JA321 at 32:15-33:16.

Eight days passed, and there was no mention of the then-deleted post. No one commented on the existence of the post or discussed it in the media, with city officials, or with Hussey. JA247 at 19. Then on March 3, 2021, Police Commissioner Branville Bard was contacted by a member of the Cambridge NAACP "to speak about an urgent matter." JA325 at 49:12. Bard and Cambridge City Manager Louis Depasquale then met with three NAACP members (one of whom was Cambridge's former mayor) via videoconference, during which they raised concerns about the post. Bard "asked for them to make a copy of the article or the post available to [him], and then [he] forwarded it to [the] Professional

6

Standards [Unit (PSU)] and asked them to open up an investigation." JA320 at 29:4-5.

The Department then placed Officer Hussey on administrative leave for approximately two months while it began an investigation into his post. JA011. The only person interviewed as part of this investigation was Officer Hussey, who was interviewed a single time. JA321 at 35:16-19. No efforts were made to interview anyone else from the department or community at large to discern the post's effects or potential effects on departmental operations or public perceptions, nor were any efforts made to identify the person who screenshotted the post, their reaction to it, or their motives for screenshotting it. *Id.*; JA321 at 36:15-23.

Importantly, during the PSU's lone interview, Officer Hussey emphasized that he fully supported the proposals underlying the George Floyd Justice in Policing Act and was horrified by the murder of George Floyd by Officer Derek Chauvin; he merely opposed naming important police reform legislation after someone with Floyd's criminal record and felt that the namesake did a disservice to the spirit of the bill.[2] In the interview, Officer Hussey expressed his heartfelt

---

[2]    At the time of his tragic murder, Floyd had a lengthy criminal record. "Floyd was stopped by police or charged at least 19 times in his adult life, according to records, friends, and family. In a handful of encounters, he was let go. Other times, the charges were serious and shaped the trajectory of his life." Arelis R. Hernández, *A Knee on his Neck*, WASH. POST (Oct. 26, 2020), https://www.washingtonpost.com/graphics/2020/national/george-floyd-

belief that "what happened to George Floyd on May 25, 3030 should never have happened," and that he is "100% in favor of police reform" to stop such incidents. JA249. At the same time, he also expressed his belief that there "are many other people of honor who could have been memorialized in the naming of this bill." *Id.*

Other than the early March meeting with the NAACP officials, Commissioner Bard testified that he did not believe he or anyone else received calls or complaints about the Facebook post, and that he did not receive any complaints from Police Department employees about the post. The only reaction from within the department appears to have been several text messages of support sent to Hussey by his fellow officers following initiation of the internal investigation. JA351–355. Despite the utter lack of any actual disruption, and despite Defendants making no efforts whatsoever to discern whether there was any potential for possible disruption, Defendants nevertheless placed Hussey on

---

america/policing/. Floyd served jail time for numerous crimes, including drug possession, theft, and trespass. Manny Fernandez & Audra D. S. Burch, *George Floyd, From 'I Want to Touch the World' to 'I Can't Breathe'*, N.Y. TIMES (April 20, 2021), https://www.nytimes.com/article/george-floyd-who-is.html. In 2007, he was charged with, pled guilty to, and was sentenced to five years in prison for aggravated robbery with a deadly weapon stemming from a robbery during which "[i]nvestigators said he and five other men barged into a woman's apartment, and Floyd pushed a pistol into her abdomen before searching for items to steal," ultimately serving five years in prison for this offense. Luis Andres Henao et. al, *For George Floyd, a complicated life and a notorious death*, ASSOCIATED PRESS (June 10, 2020), https://apnews.com/article/virus-outbreak-us-news-ap-top-news-hip-hop-and-rap-houston-a55d2662f200ead0da4fed9e923b60a7.

administrative leave for two months while they investigated (during which time he was deprived of all overtime and detail opportunities) and ultimately issued him a four-day suspension. JA454. The basis for this suspension was PSU's determination:

> that the Plaintiff violated Cambridge Police Department Rules and Regulations Chapter 2, Section III, Paragraph B, which prohibits "discourtesy, rudeness, or insolence to any member of the public" and Cambridge Police Department Policies and Procedures Policy 230, Section V, Paragraph A, Part 1 which orders the Plaintiff to "be courteous and act professionally at all times."

JA411 ¶ 70. The letter Hussey received from Bard announcing his suspension stated that the suspension was "an appropriate sanction for what I view as a violation of Department policy, but more importantly, to caution you against similar conduct." JA421 ¶ 2. Following his unlawful suspension, Officer Hussey was returned to duty and was soon thereafter promoted to the rank of sergeant. JA421 ¶5; JA446 n.1.

There have been other instances of more concerning statements by Cambridge Police officials for which no action was taken, including derogatory references to drug users. Then-Officer Christine Elow, who has since replaced Bard as Chief of the Cambridge Police Department, referred to drug users she policed as "crackheads" and indicated that the term was only problematic if said to someone's face. JA251 ¶ 48; JA252 ¶ 49. She did not face discipline for the comment. Moreover, a post by the Cambridge Police Patrol Officers' Association,

which represents current police officers in Cambridge and is comprised of members of the Department, responded to a bill proposing cuts to police funding by tweeting, "If you think seven civilians killed in seven days in Boston is bad, just wait for the purge that will come," implying that police officers would be less diligent in their duties and harm would come to the community in the event of a funding cut. JA357–JA360. Despite the threatening nature of the Officers' Association post and the strong likelihood that the poster was an officer with the Cambridge Police Department, neither Chief Bard nor the Department launched an investigation or attempted to discipline the individual responsible. JA250 ¶¶ 40-41. The Deputy Superintendent even made the news for using the Cambridge Police Department's official Twitter account to call a sitting Congressman a "liberal fucking jerk." JA250 ¶ 37. Deputy Superintendent Albert, whose post from the official Cambridge Police account made headlines across the city, was suspended, but Chief Bard does not recall whether he was placed on administrative leave or was actually subject to any penalty. JA250 ¶ 39. But here, Officer Hussey was singled out for expressing his views on pending legislation because his superiors and well-connected community members personally disagreed with his views.

Accordingly, Officer Hussey brought this action pursuant to 42 U.S.C. § 1983 for Defendants' violations of his First Amendment rights. Defendants filed a motion to dismiss, which the district court granted in part, dismissing the claims

against Bard in his individual capacity. JA032. At the same time, the court denied Defendants' motion as to the City and the Commissioner in his official capacity, writing that "[w]hile Hussey's post could undermine the community's trust in the CPD and relationships between officers… the Court cannot, based on the facts in the complaint before it, definitively resolve the close constitutional question of whether 'such a risk' outweighs the interests served by Hussey's speech." JA029. After discovery, both parties moved for summary judgment as to the question of whether Defendants violated Plaintiff's First Amendment rights. The district court granted summary judgment to Defendants, adopting their flawed argument that Hussey's speech was beyond the First Amendment's protections — despite the fact that the speech was in Hussey's capacity as a citizen on a matter of public concern and posed virtually no risk of disruption to government operations. Plaintiff filed a timely notice of appeal.

## SUMMARY OF THE ARGUMENT

The District Court erred when it granted summary judgment to Bard and the City of Cambridge on the issue of *Pickering* balancing. The *Pickering* test protects the fundamental right to comment on issues of public concern so long as it doesn't cause disruption to the government or community. *Pickering,* 391 U.S. at 573. Plaintiff made exactly the kind of comment that occupies the "highest rung on the

11

hierarchy of First Amendment values." *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

Contrary to the statements of the district court, Plaintiff's comments were not of the derogatory or vulgar nature afforded lower First Amendment protection. Rather, he made critical — but substantially true — remarks on an issue pertaining to pending legislation, and he did so from the vantage point of a law enforcement officer with particularly relevant experience in the field of policing drug crimes. His post, therefore, plainly overcomes the *Pickering* test's narrow exception to the usual First Amendment protections.

This conclusion is bolstered by the well-established backdrop that preventing the expression of unpopular views, or the "heckler's veto," is an impermissible use of government power. *Feiner v. New York*, 340 U.S. 315, 321 (1951). In evaluating free speech cases involving an employer, the Court looks to the "true motivation" of the employer in taking adverse action and does not permit adverse action on the basis of viewpoint or political expression. *Mihos v. Swift*, 358 F.3d 91, 103 (1st Cir. 2004). In this case, there is substantial evidence that Defendants' true motivations were the suppression of an unpopular viewpoint in this community, [3] and one that department leadership and well-connected

---

[3]     The City of Cambridge has a perception of embodying a uniformly liberal political orthodoxy such that is has earned the widespread nickname "The People's

community members personally disagreed with, rather than any actual potential for disruption to governmental operations.

Remarks implicating issues of substantial public importance, such as those made by the Plaintiff, require a stronger showing of disruption than those only tangentially impacting public concerns. *Connick*, 391 U.S. at 151. When speech implicates public concerns as directly as the Plaintiff's post, the government must be required to show actual disruption of government operations to justify an adverse action. No such disruption existed. Even if Plaintiff's strong free speech interest could be outweighed by a reasonable possibility of disruption, however, no such potential for disruption existed. Thus, Plaintiff's interest in free expression clearly outweighs the government's interest in suppression, and the District Court's grant of summary judgment should be reversed.

---

Republic of Cambridge." *See, e.g.*, Rev. Irene Monroe, *Confronting Liberal Racism in Cambridge*, WGBH BOSTON (May 26, 2017), https://www.wgbh.org/news/commentary/2017-05-26/confronting-liberal-racism-in-cambridge; Universal Hub, *People's Republic, The*, https://www.universalhub.com/glossary/peoples_republic_the.html; Freda Moon, *36 Hours: Cambridge, Massachusetts*, N.Y. TIMES (Dec. 22, 2011), https://www.nytimes.com/2011/12/25/travel/36-hours-cambridge-mass.html; Jade Lozzada, *Keeping it in the Bar Family: From the People's Republik to the New Republik*, THE HARVARD CRIMSON (March 31, 2022), https://www.thecrimson.com/article/2022/3/31/peoples-republik-new-republik/.

**STANDARD OF REVIEW**

A district court's entry of summary judgment is reviewed *de novo. Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). "On appeal from a grant of summary judgment, [this Court] view[s] the facts and all inferences that may fairly be drawn from them in the light most favorable to the non-moving party." *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 29 (1st Cir. 1995)*; see also Farmers Ins. Exch. v. RNK, Inc.*, 637 F.3d 777, 779 (1st Cir. 2011).

**ARGUMENT**

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "[E]xpression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *Claiborne Hardware Co.*, 458 U.S. at 913 (quoting *Carey*, 447 U.S. at 467). "Speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* (alteration omitted) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). "There is a 'profound

14

national commitment' to the principle that 'debate on public issues should be

uninhibited, robust, and wide-open.'" *Id.* (quoting *New York Times Co. v. Sullivan*,

376 U.S. 254, 270 (1964)).

"Public employees do not lose their right to First Amendment protection by

virtue of their employment." *Alves v. City of Gloucester*, 594 F. Supp. 3d 315, 330

(D. Mass. 2022) (citing *Pickering*, 391 U.S. at 574). Even as to public employees'

speech, the Supreme Court has explained that "[t]he public interest in having free

and unhindered debate on matters of public importance—the core value of the Free

Speech Clause of the First Amendment—is so great…. that statements by public

officials on matters of public concern must be accorded First Amendment

protection." *Pickering*, 391 U.S. at 573–74. The Supreme Court has elaborated:

> The determination whether a public employer has properly discharged
> an employee for engaging in speech requires "a balance between the
> interests of the [employee], as a citizen, in commenting upon matters
> of public concern and the interest of the State, as an employer, in
> promoting the efficiency of the public services it performs through its
> employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88
> S. Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461
> U.S. 138, 140, 103 S. Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). This
> balancing is necessary in order to accommodate the dual role of the
> public employer as a provider of public services and as a government
> entity operating under the constraints of the First Amendment. On the
> one hand, public employers are *employers,* concerned with the
> efficient function of their operations; review of every personnel
> decision made by a public employer could, in the long run, hamper the
> performance of public functions. On the other hand, "the threat of
> dismissal from public employment is ... a potent means of inhibiting
> speech." *Pickering, supra,* 391 U.S., at 574, 88 S. Ct., at 1737.
> ***Vigilance is necessary to ensure that public employers do not use***

15

> *authority over employees to silence discourse, not because it hampers*
> *public functions but simply because superiors disagree with the*
> *content of employees' speech.*

*Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (emphasis added) (alterations in original). Thus, "[t]o determine whether an adverse employment action against a public employee violated an individual's First Amendment free speech rights, [courts] employ a three-part inquiry" that looks to (1) "whether the public employee spoke as a citizen on a matter of public concern," (2) "whether, if the employee did so, the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public," and (3) "whether, if that government entity did not have an adequate justification, the protected expression was a substantial or motivating factor in the adverse employment decision." *Bruce v. Worcester Regl. Transit Auth.*, 34 F.4th 129, 135 (1st Cir. 2022) (internal quotations and citations omitted). Here, as the district court explained, "[t]here is no dispute as to the first and third prong," *i.e.*, Hussey did speak as a citizen on a matter of public concern and the protected expression was the sole motivating factor in the adverse employment decision. JA459. Thus, the only issue is the second prong of the balancing test.

In determining whether speech is protected under this second prong, this Court "balance[s] the value of an employee's speech -- both the employee's own interests and the public's interest in the information the employee seeks to impart --

16

against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *Bruce*, 34 F.4th at 139 (quoting *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52 (1st Cir. 2003)). In so doing, this Court requires the government to prove that they had adequate justification for treating the employee differently from any member of the general public based on the relationship between his expression and employment. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). While an employer is not required to "allow events to unfold to the extent that the disruption of the office and [. . .] working relationships is manifest before taking action," *Connick*, 461 U.S. at 152, this Court only gives weight to the government's interest in preventing disruption when the employee speech poses a reasonable threat of disruption and when the government's actual motive is addressing the disruption or threat of disruption. *Davignon v. Hodgson*, 524 F.3d 91, 105 (1st Cir. 2008); *Mihos v. Swift*, 358 F.3d 91, 103 (1st Cir. 2004).

Moreover, a more substantial showing of disruption is required when the speech substantially touches on matters of public concern. *Connick,* 391 U.S. at 152. Indeed, the Supreme Court has explained that "a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee." *Rankin*, 483 U.S. at 388. Here, where Plaintiff spoke out on pending legislation — speech given the highest weight in the *Pickering* balancing analysis

17

— and where there was virtually no threat of disruption to government operations, the speech in question was clearly protected by the First Amendment. Accordingly, the district court's decision must be reversed.

### A. The *Pickering* Test Gives High Weight to the Plaintiff's Fundamental Right to Comment on Issues of Public Concern, Including Pending Legislation.

The Supreme Court has repeatedly stated that speech on public issues, such as pending legislation or the integrity of public officials, occupies "the highest rung on the hierarchy of First Amendment values" and is entitled to a high degree of protection. *Claiborne Hardware Co*., 458 U.S. at 913; *Carey*, 447 U.S. at 467; *Connick*, 461 U.S. at 145. Vague allegations of misconduct, for example, are less protected than speech aimed at critiquing "specific inefficiencies affecting the public welfare" or "particular decisions which [the employee] thought were injurious to clients of the institution or agency." *Santos v. Miami Region, U. S. Cust. Serv.*, 642 F.2d 21, 25 (1st Cir. 1981); *see also Rosado v. Santiago*, 562 F.2d 114, 116 (1st Cir. 1977) (ascribing higher value to comments alleging specific problems in government program). When the speaker is particularly well-informed on a topic by nature of their experience or position in government, "it is essential that they be able to speak out freely on such questions." *Pickering* 391 U.S. at 572; *Pilkington v. Bevilacqua*, 439 F. Supp. 465, 474 (D.R.I. 1977), *aff'd* 590 F.2d 386 (1st Cir. 1979).

While speech inside the workplace can and often is protected by the First Amendment, public speech outside the workplace implicates "the public's interest in receiving [an] informed opinion," *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004), as well as "unrestrained public debate," *Brasslett v. Cota*, 761 F.2d 827, 844 (1st Cir. 1985); *see also Pickering* 391 U.S. at 570 (indicating that the public nature of teacher's criticism of Board was a significant factor in balancing); *Roseman v. Indiana U. of Pennsylvania, at Indiana*, 520 F.2d 1364, 1368 (3d Cir. 1975) (similar). The public nature of speech on a matter of public concern can give speech greater weight because of these interests. *Pickering,* 391 U.S. at 570.

Here, Hussey's speech falls into the highest rung of First Amendment protection. His Facebook post was on pending legislation at the federal level—clearly deep within the realm of issues of public concern and at the core of what the First Amendment is aimed at protecting. As a veteran law enforcement officer, Hussey had a unique and informed perspective to offer: The legislation was on reforms to his own profession and, to him, should have been named after someone who made significant contributions to public safety. His concerns were specific and well-defined. Rather than making vague allegations that public officials were anti-police or invoking some other generalized grievance, Hussey criticized the name of a specific piece of legislation and questioned its implications for the direction of the United States. Like the plaintiff in *Pickering*, Officer Hussey commented on a

particular proposal that was well within the realm of public concern and within his area of expertise, entitling his words to significant protection and requiring the government to overcome a higher bar in seeking to punish it. Like "Letters to the Editor," which often circulate among a relatively small specific readership, the post also implicated the public's interest in robust dialogue and debate. While limited to Facebook friends, Officer Hussey's post was intended to spark exactly the kind of dialogue that the First Amendment protects among members of the public and implicated the public's interest in unrestrained discussion and the free exchange of ideas.[4] Thus, Plaintiff's post falls squarely within the kind of speech this Court grants substantial protection.

Moreover, Hussey's speech was not entitled to lesser weight based on its criticism of George Floyd or its use of a colloquial term for drug users. While the First Amendment value of speech is reduced — but not eliminated — when the speech is "vulgar, insulting, and defiant" in nature, such was not the case here.[5]

---

[4]    Indeed, when it failed to generate this kind of discourse, Officer Hussey removed the post.

[5]    The district court remarked:

The value of Hussey's speech is lessened by the inflammatory and insulting manner in which his post was written. "Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance." Curran, 509 F.3d at 49 (citing Jordan v. Carter, 428 F.3d 67, 74 (1st Cir. 2005).... Even if the term ["druggie"] itself is not inherently derogatory, here it was used in a derogatory fashion. The

20

*Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007). For starters, it was substantially correct about Mr. Floyd's criminal history. Substantially correct statements on matters of public concern can never furnish grounds for discipline merely because the statements are "sufficiently critical in tone." *Pickering*, 391 U.S. at 570.

At the same time, in general, vulgarity in speech on matters of public concern must be far outside the bounds of socially acceptable discourse to be considered entitled to less First Amendment protection. *See, e.g.*, *Curran,* 509 F.3d at 49 (speech comparing public official to Hitler and coworkers to Nazis that openly encouraged defiance of supervisor orders); *Bennett v. Metro. Govt. of Nashville & Davidson Cnty., Tennessee*, 977 F.3d 530, 543 (6th Cir. 2020) (quoting *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1116 (9th Cir. 2004)) (speech involving use of racial slur that "evok[es] a history of racial violence, brutality, and subordination" and is universally considered highly offensive); *Hernandez v. City*

---

terms "thief" and "a career criminal" are similarly insulting, even though they reflect the fact that, for a ten-year period in Floyd's life from 1997 until 2007, he participated in criminal activity that included offenses related to theft and robbery. [Dkt. 43 at ¶¶ 54-55]. More relevant than the particular terms used was the fact that the thrust of the message disparaged George Floyd as being unworthy of being honored in that manner because of his past criminal conduct and substance abuse issues. It dismissed the reasons why George Floyd's life and tragic death inspired the legislation.

JA462. But this evinces disagreement with the viewpoint of the speaker, which does not transform a message from controversial political speech into vulgarity.

*of Phoenix*, 43 F.4th 966, 973-74 (9th Cir. 2022) (racially-charged posts associating an entire religion with gang rapes, suggesting adherents were wrongfully taking taxpayer dollars, denigrating the intelligence of adherents, and touching on matters of public concern "in only a most limited sense"). By contrast, the Supreme Court has time and time again explained that government cannot police speech simply by labeling it with the moniker "vulgar" or "offensive." *See generally*, *Cohen v. California*, 403 U.S. 15 (1971) (holding state's punishment of court attendee for wearing shirt with the phrase "Fuck The Draft" was unconstitutional under the First Amendment). Even comments by law enforcement personnel wishing a just-attempted assassination against the President of the United States had succeeded were deemed to have been entitled to such First Amendment protection that the Supreme Court held the employee's firing to have violated the First Amendment under the *Pickering* test). *Rankin*, 483 U.S. at 388–89.

Hussey's speech does not even come close to falling into the extreme type necessary for categorization as vulgar, insulting, and defiant. According to Merriam-Webster, the term "druggie" means "a person who habitually uses drugs." *Druggie*, MERRIAM-WEBSTER.COM DICTIONARY, Merriam-Webster, https://www.merriam-webster.com/dictionary/druggie. While Merriam-Webster labels most slurs or insults with the caption "usually offensive" or "often offensive," *see, e.g.*, entries for *Dyke, Bitch*, and *Cracker*, MERRIAM-

WEBSTER.COM DICTIONARY (Merriam-Webster), no such note occurs on the entry for the word "druggie." Defendants themselves acknowledge that the term carries no racial implications. In fact, Defendants concede Officer Hussey's post did not implicate race in any way and did not denigrate any population on the basis of a protected category. JA208 at 40:17-21; JA403 ¶ 27. The post contained no profane, threatening, or racially charged language whatsoever. Unlike the examples above, in which the subjects were attacked on the basis of a protected category or compared to one of the worst figures in history, Hussey merely expressed strong criticism — a core goal of the First Amendment. *See, e.g.*, *Feiner*, 340 U.S. at 330–331 (explaining core function of police is to protect speakers expressing contrary views from angry crowds disagreeing with such speech). The fact that speech on a matter of public concern expresses strong criticism does not make it "vulgar, insulting, and defiant" or subject it to lower protections, especially where the speech so strongly implicates the public's interest in open an unrestrained dialogue on the issues of the day. *Pickering,* 391 U.S. at 570 ("unequivocally reject[ing]" the proposition that comments "may furnish grounds for [adverse action] if they are sufficiently critical in tone").

**B.** **The Government Has Little, If Any, Legitimate Interest in Suppressing Such Commentary.**

> **1.** **The Government's actions in this case are based on viewpoint discrimination and retaliation, neither of which constitutes a legitimate interest under *Pickering*.**

A central rule of the Court's First Amendment jurisprudence is that public officials may not "allow[] the public, with the government's help, to shut down unpopular ideas that stir anger." *Munroe v. C. Bucks Sch. Dist.*, 805 F.3d 454, 475 (3d Cir. 2015) (quoting *Melzer v. Bd. Of Ed. of City Sch. Dist. of City of New York*, 336 F.3d 185, 199 (2d Cir. 2003). No matter how provocative the speech, the government may not become "an instrument for the suppression of unpopular views." *Feiner v. New York*, 340 U.S. 315, 321 (1951). This principle applies just as strongly to public employees. *Pickering*, 391 U.S. at 563; *Munroe*, 805 F.3d at 475 (quoting *Melzer,* 36 F.3d at 199) ("[W]e acknowledge the truism that community reaction cannot dictate whether an employee's constitutional rights are protected."). An outraged community cannot use government power to enact a "heckler's veto" to suppress unpopular speech. *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 847 (1997). Indeed, the Supreme Court has commented that "a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee," because doing so would amount to viewpoint discrimination. *Rankin*, 483 U.S. at 388.

In evaluating the government's interest in suppressing speech under *Pickering*, these principles are critical because the Court looks to the employer's "true motivation" in taking adverse action. *Mihos*, 358 F.3d at 103; *Davignon v. Hodgson*, 524 F.3d 91, 107 (1st Cir. 2008). Even when the speech is unquestionably offensive and could undoubtedly cause disruption to government operations, "operational efficiency objections must be real and important before they can serve as a basis for discipline or discharge of a public employee." *Brasslett,* 761 F.2d at 845. Dismissal cannot be based on offensiveness alone. *See, e.g.*, *Fenico v. City of Philadelphia*, 70 F.4th 151, 154 (3d Cir. 2023) (finding that even where speech has "the capacity to confirm the community's worst fears about bias in policing," the government must still show that discharge resulted from concerns about impact of speech rather than its content); *Hayes v. Massachusetts Bay Transportation Authority*, 498 F. Supp. 3d 224, 234 (D. Mass. 2020) (finding that even where "go back to Africa" comment caused "small commotion" in the office, dismissal must be because of the disruption caused and not another reason).

Even where the employer ostensibly acts because of potential disruption, the action is prohibited if the employer's actual motivation is a "retaliatory fit of pique." *Mihos,* 358 F.3d at 104. In determining the employer's motivation, the "mere incantation" of some government interest is insufficient to establish that the employer acted to protect that interest. *Davignon*, 524 F.3d at 105 (quoting

*Gustafson v. Jones*, 290 F.3d 895, 911(7th Cir. 2002). Instead, the Court looks at

the facts and circumstances around the adverse action. *Id.* For instance, in *Rankin*,

the Plaintiff was terminated by a supervisor who "did not even inquire whether the

remark had disrupted the work of the office" and testified that he was not

concerned about who had heard the comment because he found the comment

categorically offensive. *Rankin*, 483 U.S. at 389 (1987). The Court found that even

though the remark could be disruptive, the employer did not take adverse action

based on its reasonable prediction of disruption but because of the content of her

speech. *Id*. at 390. The Supreme Court explained:

> Interference with work, personnel relationships, or the speaker's job
> performance can detract from the public employer's function; avoiding
> such interference can be a strong state interest. From this perspective,
> however, petitioners fail to demonstrate a state interest that outweighs
> McPherson's First Amendment rights. While McPherson's statement
> was made at the workplace, there is no evidence that it interfered with
> the efficient functioning of the office. The Constable was evidently not
> afraid that McPherson had disturbed or interrupted other employees—
> he did not inquire to whom respondent had made the remark and testified
> that he "was not concerned who she had made it to," Tr. 42. In fact,
> Constable Rankin testified that the possibility of interference with the
> functions of the Constable's office had *not* been a consideration in his
> discharge of respondent and that he did not even inquire whether the
> remark had disrupted the work of the office.
>
> Nor was there any danger that McPherson had discredited the office by
> making her statement in public. McPherson's speech took place in an
> area to which there was ordinarily no public access; her remark was
> evidently made in a private conversation with another employee. There
> is no suggestion that any member of the general public was present or
> heard McPherson's statement. Nor is there any evidence that employees
> other than Jackson who worked in the room even heard the remark. Not

only was McPherson's discharge unrelated to the functioning of the office, it was not based on any assessment by the Constable that the remark demonstrated a character trait that made respondent unfit to perform her work.

*Rankin*, 483 U.S. at 388–89. Here, the same is true: Defendants never investigated the disruption, or even potential for disruption, that Officer Hussey's post caused, and indeed the only evidence in the record supports that it was Hussey's *disciplining* that concerned fellow officers, not his post. JA202–JA204 at 34:14–36:23; JA351–355. Instead, Officer Hussey was disciplined because his superiors and well-connected members of the community disagreed with his message and thus branded it disruptive. But "[t]he mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day." *Davignon*, 524 F.3d at 105–106 (quotations and citations omitted) ("If the plaintiffs' speech hinted at burgeoning signs of hostility toward officers unsympathetic to the union, Hodgson's concerns about potential disruption to workplace harmony would have substance. After an exhaustive review of the record, however, we find not even the specter of such harm…. Additionally, Hodgson's own actions and pattern of enforcement further undermine his claim of legitimate motives.").

In any event, because the actual motivation of the employer is a question of fact, summary judgment is inappropriate. *See* Fed. R. Civ. Pro. 56. Evidence as to employer motivation can also include the "timing" of a suspension, prior indication

27

of disapproval with the employee's position on a matter of public concern, the "pattern of enforcement" of prohibitions on other speech, and whether the employer actually investigated the speech's impact on operations and came to a reasonable conclusion. *See Davignon*, 524 F.3d at 105-107.[6]

Here, there is at least a substantial question of fact as to the Defendants' motivation. Significant evidence suggests that Officer Hussey's suspension resulted not from any actual or plausible disruption, but from his expression of an unfavorable political view in a city known for embracing contrary views. Bard himself testified that he found the use of the word "druggie" to be "derogatory" and that its derogatory nature had an impact on his later actions. JA403 ¶ 26; JA452. Like the defendant in *Rankin*, Defendants here made no inquiry into who was aware of the speech in question. Defendants took no statements from fellow officers or community members (other than Hussey) and did not look at the impact the comments had on his working relationships or community trust. Rather, Bard engaged in precisely the kind of "unadorned speculation" described in *Fenico v.*

---

[6]    To the extent the adverse action was based on departmental policies here that prohibit all sorts of speech on public matters (even when communicated using private devices while off-duty), "insofar as a juror could find that the policy is as broad as its terms indicate that it is, as we conclude such a juror could, we do not see how that policy is 'necessary' for [the public employers] 'to operate efficiently and effectively.'" *Bruce*, 34 F.4th at 138–39 (quoting *Garcetti*, 547 U.S. at 419). Thus, whether these policies were necessary for the department to operate efficiently and effectively are also ripe questions for a jury to properly decide.

*City of Philadelphia*, 70 F.4th 151, 154 (3d Cir. 2023). Without evidence, Bard speculated that Hussey's Facebook comments, published to a limited audience, could somehow reach members of the community with substance abuse issues *and* impact their overall willingness to work with the police. This stretches the "disruption" prong of the *Pickering* test beyond any confined bounds and would render "disruption" nothing more than an automatic pretext for viewpoint discrimination. *But see Rankin*, 483 U.S. at 384 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.").

Moreover, punishing Hussey for his speech is inconsistent with the Department's past pattern of enforcement on speech that could implicate harmony and community trust, further eschewing Defendants' purported motivations. *See Davignon*, 524 F.3d at 105–106 (quotations and citations omitted) (holding *Pickering* test's narrow exception to First Amendment protections was not satisfied because, inter alia, the defendant's "own actions and pattern of enforcement further undermine his claim of legitimate motives."). As discussed above, no disciplinary action was taken when a fellow officer (and now Chief) referred to drug users as "crackheads" *while on duty*, and no investigation was launched into the Police Union's post publicly suggesting potential violence. JA455–JA456. In response to

29

other inflammatory comments, Bard "could not recall" whether or how the speaker was punished—even where the comments in question made the local news. The lack of action on similar comments suggests that the motive for Hussey's suspension was not protecting a legitimate government interest but retaliating for the expression of an unpopular view. At the very least, there is more than enough evidence for a reasonable jury to reach such a conclusion, requiring reversal of the grant of summary judgment.

Had Bard truly believed that the post impacted Hussey's or his fellow officers' ability to work in the community, he would have taken specific measures to mitigate the disruption rather than simply punishing Hussey — two months later. Had Defendants actually and reasonably believed that Officer Hussey's post exhibited bias that interfered with a government function, it is highly unlikely that they would return Plaintiff to the same position after his four-day suspension. If Plaintiff's ability to work in the community without bias truly was at issue, a more effective remedy would have been moving him to a less public role, requiring sensitivity training, or the like. Likewise, some effort would have been made to identify whoever took the screenshot and to speak with purportedly offended community members to ascertain their concerns and work to repair any alleged damage to their relationships with the Cambridge Police Department. The complete failure to do anything of the sort buttresses the conclusion that Bard had

a political disagreement with Hussey`s post, or that he was just trying to mollify a particularly well-connected interest group in the City. The misalignment of Defendants' stated interests with their actions raises a substantial question of fact as to whether the real motive was retaliatory and prohibited under First Amendment jurisprudence. While Defendants claim some kind of disruption, much of the evidence points towards the government acting to suppress speech simply because of its disagreeableness in a classic application of the heckler's veto. This requires reversal and submission to a jury for a determination.

> **2.    Speech implicating such a substantial public concern should be subject to an actual disruption standard, which Plaintiff's comments do not meet.**

In *Connick*, the Supreme Court allowed an employer to take adverse action based on the risk of disruption in the workplace but cautioned that "a stronger showing may be necessary if the employee's speech more substantially involve[s] matters of public concern." *Connick*, 461 U.S. at 152. Since *Connick*, circuits have interpreted this remark in a variety of ways. While courts continue to give "substantial weight to government employers' reasonable predictions of disruption," *Waters v. Churchill*, 511 U.S. 661, 663 (1994), courts have been unclear on precisely when actual disruption is needed. *Compare Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968) (emphasizing absence of actual disruption rather than potential disruption);

31

*Guilloty Perez v. Pierluisi*, 339 F.3d 43 (1st Cir. 2003) (same); *Kincade v. City of Blue Springs, Mo*., 64 F.3d 389 (8th Cir. 1995) (same); *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983) (same) *with Waters v. Churchill*, 511 U.S. 661 (1994) (giving significant weight to reasonable predictions of disruption); *Davignon v. Hodgson*, 524 F.3d 91 (1st Cir. 2008) (same, but emphasizing absence of actual disruption as evidence as to lack of disruptive potential); *Tindle v. Caudell*, 56 F.3d 966 (8th Cir. 1995) (same); *Dible v. City of Chandler*, 515 F.3d 918, 928 (9th Cir. 2008) (same). The Tenth Circuit has found that the government must introduce evidence of actual disruption in all cases, stating that it is "an obvious *Pickering* requirement that the government show some ascertainable damage to its functioning as a result of the challenged speech." *Melton v. City of Oklahoma City*, 879 F.2d 706, 716 n.11 (10th Cir. 1989), *vacated and remanded on other grounds*, 928 F.2d 920 (10th Cir. 1991) (*en banc*). While the exact contours of when each Court requires actual disruption are hazy, there clearly exists a "sliding scale" under which speech that more substantially implicates public concerns is more likely to require evidence of actual disruption. *See Fenico,* 70 F.4th at 162; *Vojvodich v. Lopez*, 48 F.3d 879, 885 (5th Cir. 1995).

Requiring actual disruption for posts like Hussey's is necessary to protect the intent of the First Amendment. For starters, more than one in eight employed persons in America work for the government, subjecting 13.4% of American

workers to the sort of speech regulation at issue in this case. Claire McAnaw Gallagher, *For-Profit, Nonprofit, and Government Sector Jobs in 2022*, BUREAU OF LABOR STATISTICS (Oct. 2023), https://www.bls.gov/spotlight/2023/for-profit-nonprofit-and-government-sector-jobs-in-2022/home.htm. At the same time, the prevalence of social media and the issues these fora implicate bring into play other First Amendment consequences. Social media breaks down geographic and economic barriers to entry in the marketplace of ideas, facilitates free and open exchange of political information, and provides avenues for self-expression and fulfillment. *See generally* Lindsay Hitz, *Protecting Blogging: The Need for an Actual Disruption Standard in* Pickering, 67 WASH. & LEE L. REV. 1151 (2010). At the same time, though, permitting the ubiquity and availability of social media posts — evidently, even on pages restricted to a user's 600-or-so personally known followers — to justify the government's policing the speech of these tens of millions of governmental employee-users even when they are off-duty using personal devices to comment on such core political topics as pending legislation would make mincemeat of the First Amendment's axiomatic protections.

Allowing potential disruption to chill speech grants a wide range of discretion to employers, whose subjective beliefs about disruption are inherently colored by their own backgrounds and viewpoints. Lilli Wofsy, *Will I get fired for posting this? Encouraging the use of social media policies to clarify the scope of*

33

*the Pickering balancing test*, 51 SETON HALL L. REV. 259, 278 (2020). Online, where virtually any post could go viral and theoretically cause *some* disruption to *some* governmental mission or function of the poster's employer, this enormous discretion opens the door for selective enforcement based on viewpoint and makes it more likely that employees will avoid expressing views their supervisor may disagree with. Madyson Hopkins, *Click at your own risk: Free speech for public employees in the social media age*, 89 GEO. WASH. L. REV. ARGUENDO 1, 24 (March 2021). In practice, the potential disruption standard may even be counterproductive: wide discretion to the employer may just incentivize employees to post anonymously, obscuring the identities of speakers and muddying the channels of political discord. When anonymous posts cause actual disruption by calling for violence or disparaging fellow employees, the employer has very little recourse. Jonathan Abel, *Cop-"Like": The First Amendment, criminal procedure, and the regulation of police social media speech*, 74 STAN. L. REV. 1199, 1225 (June 2022).

Indeed, to adopt such a deferential standard as *potential* for disruption when it comes to core political speech would be to invite governmental abuses. Teachers in Florida, for example, could lawfully be disciplined for posting messages in opposition to bills aimed at restricting the rights of LGBTQ-identifying students for the disruption such messages could potentially cause due to the DeSantis

Administration's proffers that these messages could erode parents' faith in their children's educators or the insinuation that these teachers would inject politics into their classrooms. Correctional officers working in federal prisons could be fired for espousing views critical of mass incarceration on the basis prison officials view such messages to erode the public's trust that officers would adequately keep inmates confined. The guardrails established by *Pickering* — which itself is already an *exception* to the general rule that the First Amendment protects speakers from government-sponsored punishment for speech — would be eviscerated by such an expansive view of this second prong.

While granting employers the ability to punish *potentially* disruptive speech may be an acceptable trade-off when the speech does not substantially implicate public concerns, the increased import of speech like Hussey's illustrates precisely why the Supreme Court suggested in *Connick* that a stronger showing of disruption is needed when speech substantially implicates public concerns and why it wrote "that a purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee." *Rankin*, 483 U.S. at 388. Accordingly, in line with Supreme Court precedent and those of its sister circuits, this Court should make clear that where the primary purpose of speech is to discuss a matter of public concern, the government must show an actual disruption to justify infringing on highly protected speech.

35

Because Officer Hussey's post causes no actual disruption, this Court should reverse. And regardless, as discussed further below, because his post also did not cause the reasonable possibility of cognizable disruption to the Department's operations, the lower court's decision requires reversal in any event.

> ### 3. Even in the absence of an actual disruption standard, no reasonably foreseeable possibility of disruption existed as a result of Plaintiff's remarks.

Even under the "possibility of disruption" standard often applied to comments deserving of less protection under *Connick* and *Waters*, Plaintiff's remarks are protected under the *Pickering* balancing. The First Circuit has consistently held that the government must make some showing that disruption was a reasonably likely and direct potential result of a plaintiff's speech. *See Davignon*, 524 F.3d 104-105 (1st Cir. 2008) (requiring more than "scant evidence of actual disruption" when there is competing evidence of non-disruption); *Brasslett*, 761 F.2d at 846 (finding that where public mistrust "either predated the [speech] or continued after the [correction]," there is no evidence Plaintiff's speech itself threatened disruption); *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 54 (1st Cir. 2003) (lack of "link between any lack of faith in [Plaintiff] among his co-workers and [Plaintiff's speech]" indicates workplace harmony is not implicated). "We consider '(1) "the time, place, and manner of the employee's speech," and (2) "the employer's motivation in making the adverse employment decision."'" *Bruce*, 34

36

F.4th at 138 (quoting *Decotiis v. Whittemore*, 635 F.3d 22, 35 (1st Cir. 2011)).

Where the time, place, manner, and content of the speech are not reasonably likely

to cause disturbance, the speech is protected. *Connick*, 461 U.S. at 138.

When speech occurs at the workplace, the time, place, and manner of the

speech have the potential to be disruptive. *Givhan v. W. Line Consol. Sch. Dist*.,

439 U.S. 410, 417 n.4 (1979). However, absent evidence that comments disturbed

or interrupted other employees, workplace speech does not necessarily threaten

ordinary operations. *See, e.g.*, *Rankin*, 483 U.S. at 388-89. Here, the speech

occurred entirely away from the workplace while Plaintiff was off duty. His use of

his platform outside of working hours in no way inhibited the regular operation of

the Cambridge Police Department. As a result, nothing about the time, place, and

manner of Plaintiff's speech had the potential to be disruptive.

The content of Hussey's speech also posed no realistic threat of disruption to

government operations. "When employee speech concerning office policy arises

from an employment dispute concerning the very application of that policy to the

speaker," it is more likely to cause disruption because it interferes with a

manager's ability to run the office, *Connick*, 461 U.S. at 153. The same is true of

speech that threatens to "negatively affect the efficient functioning of government

services and the financial standing" of the agency. *Mihos*, 358 F.3d at 103. An

employer may reasonably anticipate disruption when an employee encourages

insubordination, *Curran*, 509 F.3d at 48, discourages people from working for a certain part of the agency, *Waters*, 511 U.S. at 680, encourages strikes or work stoppage, *Pilkington v. Bevilacqua*, 439 F. Supp. 465, 478 (D.R.I. 1977), *aff'd* 590 F.2d 386 (1st Cir. 1979), or indicates hostility towards fellow employees, *Davignon*, 524 F.3d at 105; *Curran*, 509 F.3d. at 49.

Here, none of these paradigmatic cases of workplace disruption are present. Instead, the employer relies on anticipated reactions of the broader community to Officer Hussey's post and Bard's subjective beliefs that the post would undermine community confidence in the Department. But the suggestion that officers would be supportive of honoring an individual with a lengthy history of serious offenses, including drug offenses, could similarly undermine community confidence in officers policing drug activity. In short, dry recitations of the potential for disruption could shut down *all* debate on the police reform bill at issue here from the very officers to which it would apply.

While an employer may also have an interest in preventing disruption that could arise from the public's reaction to the speech, particularly where the employee exercises a public-facing role, *Rankin*, 483 U.S. at 390, because adverse public reaction as a factor could easily lead to a "heckler's veto," mere public disapproval of the idea is insufficiently disruptive to justify adverse action. *See Melzer,* 36 F.3d at 199. Given this concern, the Fourth and Tenth Circuits have held

that speech must cause disruption to the *internal* functions of the workplace.

*Berger v. Battaglia*, 779 F.2d 992, 997 (4th Cir. 1985); *Flanagan v. Munger*, 890

F.2d 1557, 1566 (10th Cir. 1989). While the First Circuit has not explicitly adopted

this position, it has consistently required that the employee's speech *itself* cause

disruption. *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52-54 (1st Cir. 2003) (finding

that where workplace disharmony was due to other actions by plaintiff,

government had no interest in suppressing speech to prevent disharmony);

*O'Connor v. Steeves*, 994 F.2d 905 (1st Cir. 1993) (finding that government failed

to prove that "considerable disruption" was the result of plaintiff's statements

rather than defendant's misuse of public funds); *Brasslett*, 761 F.2d 827, 845 (1st

Cir. 1985) ("[D]efendants must show that... [plaintiff's] allegedly protected activity

had a detrimental impact" on government operations). Because disruption by

external parties *reacting* to the speech is not the result of the speech itself, the

government's interest in public perception and preventing unfavorable reactions is

limited to highly specific circumstances.

Here, the content of Plaintiff's speech created no reasonable possibility of

disruption. He did not encourage any of his coworkers or the public to defy the

law, any departmental policy, or any supervisor. He did not suggest that, if the

police reform bill passed, his coworkers should ignore its contents. He did not

personally attack any of his coworkers or anyone in the Cambridge community,

39

including those with substance use disorder (with whom he has been effectively working throughout his career). Even the defendants do not allege that Hussey's post created any negative response within the police department or inhibited harmony among coworkers; on the contrary, the only response within the Department consisted of expressions of support for Hussey.

Moreover, his post posed no reasonable risk of disruption to public perception or trust. It was removed after a few hours, garnered only two comments, and came to the attention of Chief Bard eight entire disruption-free days after its deletion. And throughout the course of Plaintiff's two-month administrative leave during Defendants' investigation of his post, there was no evident disruption either. Even in the event that the government *did* have an interest in preventing public disapproval, no widespread disapproval was remotely foreseeable. Hussey's post posed no risk of any outcome beyond mere offense—and, given the private nature of the post, limited offense at that. Thus, there was no reasonable expectation of disruption, providing further grounds for reversal.

## CONCLUSION

The interests of Plaintiff and the public in free speech and robust public debate wholly outweigh the government's interest in suppressing the speech at issue here. Officer Hussey's post was a civil expression of his views on a matter of great public significance and great significance to him personally. As such, his

40

views are accorded the highest degree of First Amendment protection and carry significant weight in a *Pickering* balancing inquiry. Given the extent to which the remarks implicate public concerns, the government ought to be required to show an actual disruption to its interests for those interests to be implicated under *Pickering*. Even if we allow reasonably foreseeable disruption to weigh against the Plaintiff, however, his comments posed no actual or reasonably foreseeable disruption of a legitimate government function—let alone a threat strong enough to outweigh the significant public value of his speech. Instead, his comments offended his superiors as well as possibly a few well-connected members of the community, and prompted the government, seeking to avoid criticism, to discipline Plaintiff on the basis of his views. Moreover, there exists a significant question of fact as to Defendants' actual motives: even if there were evidence that Plaintiff's speech threatened disruption, the facts of the case suggest that political retaliation is a far more likely motive than preserving public trust.

Accordingly, for all of the aforementioned reasons, Officer Hussey respectfully requests that this Court reverse the district court's decision and remand this matter for trial.

Dated: June 20, 2024            Respectfully submitted,

BRIAN HUSSEY,

By their attorneys,

/s/ Harold Lichten
Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Facsimile: (617) 994-5801
hlichten@llrlaw.com
jbartholet@llrlaw.com

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

_____

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

_____

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B) because this brief contains 9839 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this
brief has been prepared in a proportionally spaced typeface using Microsoft Word
in Times New Roman 14 point.

                                        _/s/ Harold Lichten_____
                                        Attorney for Plaintiff-Appellant

Dated: June 20, 2024

# ADDENDUM

## TABLE OF CONTENTS

The District Court's Memorandum and Order Granting Defendants'
    Motion for Summary Judgment and Denying Plaintiff's Motion
    for Partial Summary Judgment, Docket 61 (March 12, 2024)...........ADD001

Judgment in favor of Defendants, Docket 62 (March 12, 2024)..................ADD034

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| BRIAN HUSSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 1:21-CV-11868-AK |
| v. | ) | |
| | ) | |
| CITY OF CAMBRIDGE and | ) | |
| BRANVILLE BARD, in his capacity as | ) | |
| Commissioner of the Cambridge Police | ) | |
| Department | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**ANGEL KELLEY, D.J.**

On February 25, 2021, nine months after George Floyd's murder by a police officer, while the nation was still in a heated debate over racism and police brutality, Cambridge Police Officer Brian Hussey ("Hussey") reposted an article about a police reform bill called "the George Floyd Act" on his personal Facebook page. His comment accompanying the post said: "This is what its come to 'honoring' a career criminal, a thief and druggie . . . the future of this country is bleak at best." [Dkt. 1 ("Compl.") at ¶ 11]. Despite the post being deleted shortly thereafter, it was brought to the attention of then Police Commissioner Branville Bard ("Bard") by officers of the local National Association of Advancement of Colored People ("NAACP") chapter and a local community activist. Hussey was then placed on leave.

After being disciplined, Plaintiff Hussey brought this action pursuant to 42 U.S.C. § 1983, against the City of Cambridge and Bard (together "the Defendants"), alleging that the

**ADD001**

Defendants retaliated against him in violation of his First Amendment right to freedom of speech. [Compl.]. The Defendants then filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [Dkt. 9]. This Court denied the Defendants' Motion to Dismiss, except as to the claim brought against Commissioner Bard in his individual capacity. [Dkt. 25]. While the Court found that Hussey's post could have had a detrimental impact on the perception of the Cambridge Police Department internally and in the community, the Court could not dismiss the case on the question of whether the department's interest outweighed Hussey's interests without a more developed factual record. [Id. at 13]. The Court therefore allowed Hussey's claims to proceed against the City of Cambridge and Commissioner Bard in his official capacity.[1] [Id.].

On June 8, 2023, the City of Cambridge filed their Motion for Summary Judgment. [Dkt. 37]. The same day, Plaintiff filed his Motion for Partial Summary Judgment on the question of the Defendants' liability for violating his First Amendment right to free speech. [Dkt. 41]. The Court heard oral argument on January 29, 2024 and took the matter under advisement. [Dkt. 60]. The Court, having considered both of these motions, the parties' oppositions, and reply briefs, finds that Plaintiff has failed to create a material dispute of fact to survive Defendants' Motion for Summary Judgment. The Court also finds that because it has determined that Hussey's speech was not protected and because there is no factual dispute for a jury to resolve, the Defendants' Motion for Summary Judgment [Dkt. 37] is **GRANTED**, Plaintiff's Partial Motion for Summary Judgment [Dkt. 41] is **DENIED**, and his case is accordingly **DISMISSED**.

---

[1] In August 2022, after this lawsuit had already commenced, Hussey was promoted to the rank of Sergeant. [Dkt. 54 at II at ¶ 5]. The Court therefore denied as moot Plaintiff's request to amend his complaint to add a retaliation claim related to his denial of a promotion, after counsel reported his intentions to withdraw the motion. [Dkts. 14, 24].

**ADD002**

## I.    BACKGROUND

In evaluating the cross-motions for summary judgment, the Court relies on the parties' statements of material facts, responses thereto, and any attached exhibits the parties have submitted.  [See Dkts. 39, 43, 52, 54, 58-1].  The Court accepts as true each material fact to the extent it has not been disputed by the opposing party and considers contested each material fact that either party has disputed.  Unless otherwise noted, the facts below are undisputed.

Giving due respect to George Floyd, the Court notes he was born in North Carolina in 1973 and moved to Houston shortly thereafter.  [Dkt. 43 at ¶ 53].  He grew up in the Third Ward—one of Houston's most economically disadvantaged neighborhoods.  [Dkt. 44-10 at 2-3].  Floyd was a star athlete, briefly playing collegiate basketball at Texas A&M University-Kingsville, but returned to his old neighborhood in Houston without completing his degree.  [Id. at 3].  Thereafter, Floyd experienced a string of arrests and periods of incarceration.  Between 1997 and 2005, he served eight jail terms on charges that included drug possession, theft, and trespass.  [Dkt. 43 at ¶ 54].  In 2007, he was charged with aggravated robbery with a deadly weapon and was sentenced to five years in prison.  [Id. at ¶ 55].  He was released on parole in 2013.  [Id.].  Floyd thereafter turned his life around and appeared to live a law-abiding life.  [Dkt. 44-10 at 4].  In 2014, he had a daughter.  [Dkt. 44-12 at 9].  He became more involved in his church's program, which took men from Houston's Third Ward neighborhood to Minnesota to provide them with drug rehabilitation and job placement services.  [Dkt. 44-10 at 4].

Floyd soon made the permanent move to Minneapolis, Minnesota.  [Dkt. 44-11 at 8].  He found work first as a security guard for the Salvation Army and later as a bouncer for a nightclub.  [Id.].  When the pandemic forced the nightclub to close, Floyd was out of work.  [Id. at 9].  On Memorial Day 2020, Floyd was at a convenience store when one of the store

**ADD003**

employees thought he had paid for cigarettes with a counterfeit $20 bill and called the police. [Id.].  The events that followed are known to all due to the widely circulated cellphone video capturing Minneapolis Police Officer Derek Chauvin kneeling on Floyd's neck for 8 minutes and 46 seconds, Floyd's pleas that he could not breathe, and his body eventually going limp.  [Dkt. 44-12 at 3].  Floyd's last words "I can't breathe" echoed those of Eric Garner and the Black Lives Matter movement's call to action.  [Dkt. 44-9 at 4].  His killing ignited a national reckoning on issues of racism, police brutality, and accountability for police misconduct, in addition to local, national and global protests.  [Id.].  Officer Chauvin was subsequently convicted of second-degree murder; the three other officers who participated in the arrest were likewise convicted on related charges.[2]

**The National Climate**

The impact of Floyd's death was felt here in Massachusetts where, as in the rest of the country, protesters filled the streets by the thousands demanding an end to such violence. The City of Cambridge saw over 3,500 people in the streets in one such protest.[3]  In the neighboring City of Boston, the alleged wanton use of pepper spray and riot batons against protesters led to a

---

[2] Kiara Alfonseca, Derek Chauvin sentenced to 21 years on federal charges for violating George Floyd's civil rights, ABC news (July 7, 2022), https://abcnews.go.com/US/derek-chauvin-sentenced-federal-charges-violating-george-floyds/story?id=86366456. The Court takes judicial notice of the updated details of the criminal trial following Floyd's murder under Fed. R. Evid. 201(b).

[3] Marc Levy, Protest draws thousands to hear the challenges of reforming police, education, other institutions, Cambridge Day (June 7, 2020), https://www.cambridgeday.com/2020/06/07/protest-draws-thousands-to-hear-the-challenges-of-reforming-police-education-other-institutions/. The Court takes here and elsewhere judicial notice under Fed. R. Evid. 201(b) of articles describing the unrest that occurred in the aftermath of George Floyd's killing within Massachusetts between May 2020 and March 2021. See United States v. Griffin, 525 F.2d 710 (1st Cir. 1975) (taking judicial notice of the fact that forced busing in Boston "received substantial publicity and aroused widespread resentment.").

**ADD004**

lawsuit accusing the Boston Police Department of using excessive force.[4]  Protests were ongoing

when Hussey made his Facebook post, and many continued for months thereafter.[5]

## Officer Brian Hussey

Plaintiff Brian Hussey began working as a Cambridge police officer in 1998 and spent 10

years in the Special Investigations Unit (SIU) where he conducted roughly "a couple hundred"

drug crime investigations.  [Dkt. 43 at ¶ 4].  For the first decade of his career, he worked as a

patrol officer in lower Cambridge.  [Dkt. 39 at ¶ 12].  In June 2009, he applied to and joined the

SIU where he investigated drug and vice crimes.  [Id. at ¶ 14].  Hussey worked in the SIU for ten

years, taking part in hundreds of drug crime investigations, where he worked with confidential

informants and spoke to drug users throughout the City of Cambridge.  [Id. at ¶¶ 15-16].  To

secure the cooperation of these informants, Plaintiff had to reassure them that the police were

"going to protect them" and that "the police would do whatever [they] could to help them."  [Id.

at ¶ 17].  Much of Hussey's time in the SIU was spent convincing drug users to trust him.  [Id. at

¶ 18].

## The Facebook Post

On February 25, 2021, Hussey shared on his Facebook page a WHDH news article titled,

"House Democrats reintroduce police reform bill in honor of George Floyd."  [Dkt. 43 at ¶ 5].  In

a comment he shared alongside the article, Hussey wrote, "This is what its [sic] come to

'honoring' a career criminal, a thief and druggie . . . the future of this country is bleak at best."

---

[4] Huffman v. City of Bos., No. 21-CV-10986-ADB, 2022 WL 2308937 (D. Mass. June 27, 2022).

[5] Associated Press, Protesters at Boston Rallies Call for Justice for George Floyd, Action on Police Killing Cases (Mar. 6, 2021), https://www.nbcboston.com/news/local/rally-in-boston-to-call-for-action-on-police-killing-cases/2321508/.

**ADD005**

[Id. at ¶ 7].  The bill in question, which never passed,[6] proposed reforms to increase

accountability for police misconduct, enhance transparency and data collection, and to eliminate

discriminatory policing practices.  [Dkt. 44-3 at 4].  Hussey reports that the day he made that

Facebook post was a training day, and since he had previously completed his training online, he

spent the day taking his children to the New England Aquarium instead.  [Dkt. 43 at ¶ 12].  He

made the post at 8:08 AM using his personal phone while at home.  [Id. at ¶¶ 14, 18; Dkt. 44-3 at

3].  Around an hour after his post, two comments were posted, neither of which Hussey replied

to.  [Dkt. 43 at ¶¶ 15-16].  Hussey claims that he deleted the post a couple of hours after he

posted it.  [Id. at ¶ 17].

       The parties dispute whether the word "druggie" is inherently derogatory, but at minimum

it refers to someone who is a drug addict, and the parties agree that the term itself does not have

any racial connotation.  [Dkt. 43 at ¶¶ 50-51].  In Hussey's post, he did not identify himself as a

Cambridge police officer or reference his position in the police department.  [Dkt. 43 at ¶ 8].

Most of the people on his Facebook though would have been aware that he was a police officer.

He estimates that around 91 of his Facebook friends as of 2023 were either retired or active

members of the Cambridge Police Department, while only 30 may have been unaware of his

involvement with the Cambridge Police Department.  [Dkt. 39 at ¶ 10].  In April 2021, at the

time he made his post, Hussey had around 674 friends on his Facebook, of which a significant

number were Cambridge police officers.  [Id. at ¶ 10].[7]  His Facebook account is restricted;

---

[6] George Floyd Justice in Policing Act of 2020, H.R. 7120, 116th Cong. (2020).

[7] Plaintiff states that as of 2023, he has 535 Facebook friends. [Dkt. 54 at ¶ 9].

**ADD006**

therefore, only those who have accepted his "friend requests" are able to see his posts.  [Id. at ¶ 9].  Hussey does not accept friend requests from people he does not know.  [Id.].

**The Complaints**

Approximately six days later, on or around March 3, 2021, Commissioner Branville Bard became aware of Hussey's Facebook post after Richard Harding, who was then either the President or Vice-President of the Cambridge NAACP, contacted him.  [Dkt. 43 at ¶ 19; Dkt. 44-5 ("Bard Tr.") at 25:11-15].  According to Bard, the post was less than an hour old when a screenshot was shared with the NAACP, who then shared it with Bard.  [Bard Tr. at 31:2-15].

Bard was the police commissioner for the City of Cambridge from mid-2017 to August 2021.  [Dkt. 43 at ¶ 34].  Bard and Cambridge City Manager Louis Depasquale met with Harding, community activist Mo Barbosa, and former Mayor Ken Reeves (who was then an Officer with the Cambridge NAACP) to discuss Hussey's Facebook post via videoconference. [Id. at ¶ 20; Bard Tr. at 26:17-24].  The group wanted to speak urgently.  [Bard Tr. at 49:1-14] Bard described the three community leaders as "alarmed and concerned about the post."  [Id.]. The identity of the person who initially brought the post to the NAACP's attention was not disclosed to Bard in order to protect that person's anonymity.  [Bard Tr. at 31:7-12].  Former Mayor Reeves expressed his concern that Hussey's post called into question the ability of the Cambridge Police Department to serve in a biased-free manner and ran afoul of what the Department should embody.  [Dkt. 52 at ¶ 68].  At that meeting, Bard obtained a copy of the

7

Facebook post and shared it with the Professional Standards Unit (PSU) for investigation. [Id. at ¶ 69].

### Bard's Explanation

Bard considered the post "damaging to the reputation of the Cambridge Police Department" because it was "insensitive to individuals who've suffered from substance use issues." [Dkt. 43 at ¶ 22]. He considered the use of the word "druggie" derogatory and "dehumanizing" to people with substance abuse issues. [Id. at ¶ 26]. He did not think that race played a role in Hussey's post. [Id. at ¶ 27]. Still, Bard felt that the post disparaged George Floyd and would cause irreparable harm to the Cambridge Police Department's reputation. [Dkt. 39 at ¶ 24]. The Cambridge Police Department, as Bard describes it, disciplined Hussey for his Facebook post because:

> [I]t had negative connotations and it tore at the fabric of trust that we spent a long time building in the community. Folks viewed the Cambridge Police Department as one who favors prevention, intervention, and diversion over more serious or more punitive methods traditionally associated with the criminal justice system . . . we pride ourselves on the fact that we believe that individuals are better served through a social justice approach than through your traditional criminal justice approaches. And when you have that approach, that often means that you're often working hand in hand with individuals who have . . . fallen in life and are working towards better outcomes. Some of those individuals have substance use issues.

[Id. at ¶ 25]. Bard considered the post especially harmful "in the context of the national climate." [Id. at ¶ 26]. He added that "trust takes a lifetime to build and just a moment to tear down" and that "any individual associated with the Cambridge Police Department could in a moment tear down . . . trust we've spent a long time building with community." [Id.]. Bard asserts that the Cambridge Police Department needs to have the public's trust because the only way the police department can function and do its job is "to be seen as trustworthy and legitimate and bias free." [Id. at ¶ 27]. Bard could not recall whether he received any additional calls or

**ADD008**

complaints about the Facebook post, or if he received any additional complaints from Hussey's

fellow employees at the Cambridge Police Department.  [Bard Tr. at 31:2-5; 43:1-12].

**The Investigation**

　During the police department's investigation of the post, the Professional Standards Unit

("PSU") investigators only interviewed Brian Hussey.  [Dkt. 52 at ¶¶ 31, 45].  Hussey made the

following statement where he attempted to put his words into context:

> I have had many discussions with both coworkers and people in my personal life
> regarding the George Floyd incident and the subsequent police reform that has
> come about as a result of that incident. My thoughts and views are consistent and
> have never wavered.[] What happened to George Floyd on May 25, 2020 never
> should have happened . . . he did not deserve to die.  Derek Chauvin is a disgrace
> to the badge and probably never should have worn one in the first place. The same
> goes for the officers who stood by and did nothing. I am 100% in favor of police
> reform. I will be the first person to say there absolutely are rogue, questionable
> and dishonest police officers who are an embarrassment and a disgrace to the
> profession. That being said, the one thing I disagree with is naming a police
> reform bill in "honor" of George Floyd. I understand that this incident, the
> proverbial straw that broke the camel's back, led to the calls for police reform,
> hence the naming of the bill in his "honor." While George Floyd did not deserve
> to have his life taken away that day, he was still a violent criminal. I feel that
> attaching the name of a violent career criminal, in "honor," to a reform bill aimed
> at the betterment of policing is a disservice to the spirit of the bill. To take it a
> step further, I would feel this way if any career criminal of any race were to be
> "honored" in a such a manner. It wouldn't matter to me if the person were Black,
> White, Hispanic, Asian, or any other race – my feelings would still be the same. A
> police reform bill should not be named after a violent career criminal. There are
> many other people of honor who could have been memorialized in the naming of
> this bill.
>
> I am the author of my words and I am fully aware of their meaning and intent. My
> comment in no way endorses the manner in which the Minneapolis Police
> Officers dealt with George Floyd. Regardless of his background, he deserved to
> be treated with respect and with no more force than was necessary to gain
> compliance with lawful orders.
>
> Rather, my words reflect my opinion that legislators should have considered a
> more appropriate name for their bill. Any undertaking to interpret or portray them
> any differently than my intended meaning is misguided . . . As an American

**ADD009**

citizen, I should be able to voice an opinion and have constructive discussions on a wide variety of topics, covering many aspects of life.

[Id. at ¶ 32]. When asked about the above statement, in particular Hussey's condemnation of Derek Chauvin's actions, Bard said "I wish that was the content of his Facebook post because then we wouldn't be sitting here today." [Bard Tr. at 39:2-8]. At the same time, Hussey reported that he received text messages of support from around a dozen fellow Cambridge police officers. [Dkt. 52 at ¶ 33; Dkt. 44-7].

PSU conducted an investigation into the Facebook post and determined that it violated Cambridge Police Department Rules and Regulations Chapter 2, Section III, Paragraph B, which prohibits "discourtesy, rudeness, or insolence, to any member of the public" and Cambridge Police Department Policies and Procedures Policy 230, Section V, Paragraph A, Part 1, which requires officers to "be courteous and act professionally at all times." [Dkt. 52 at ¶ 70]. After two months of being placed on administrative leave, on April 30, 2021, Commissioner Bard informed Hussey that he was suspending him without pay for four days based on his Facebook post and the violation of Cambridge Police Department Rules and Regulations that it entailed. [Dkt. 54-1]. The letter from Bard announcing the suspension also stated that the suspension was "an appropriate sanction for what I view as a violation of Department policy, but more importantly, to caution you against similar conduct." [Id.].

**Other Social Media Posts and Statements Regarding Substance Abuse**

No policy prohibits Cambridge Police officers from posting on social media, although they are prohibited from posting on social media about non-work-related matters during work times. [Dkt. 43 at ¶ 35]. In a number of instances, the Cambridge Police Department is alleged to have disciplined officers differently than it did Hussey for provocative or offensive postings. For example, Jack Albert, a Deputy Superintendent with the Cambridge Police Department,

**ADD010**

posted a comment on the department's official Twitter page that Congressmen Joe Kennedy III was "another liberal [****]ing jerk." [Id. at ¶ 36-37]. Albert received a five-day suspension for his post, although Bard did not recall whether he was placed on administrative leave or whether he served his suspension. [Id. at ¶ 39]. Albert's post about Congressmen Kennedy was reported in the news. [Bard Tr. 14:17-24].

In July 2020, in response to a proposed bill redirecting police department funds toward social services, the Cambridge Police Patrol Officers' Association tweeted, "If you think seven civilians killed in seven days in Boston is bad, just wait for the purge that will come." [Dkt. 43 at ¶ 40]. The Cambridge Police Department did not investigate who wrote or posted the tweet. [Id. at ¶ 41]. Bard could not recall either whether the Cambridge Police Department disciplined another police officer who made a "deeply disturbing" social media post in praise of political violence while out on extended leave. [Id. at ¶ 43].

In April 2022, the Cambridge Police Department received a complaint from a community member that Hussey had said he "was tired of crackheads thinking they can get away with everything." [Id. at ¶ 46]. He was not placed on administrative leave following that complaint and was not the subject of any discipline as a result of the complaint. [Id. at ¶ 47]. Hussey asserts that in July of 2022, while he and now Commissioner Elow were on duty planning the arrests of drug users in Central Square via the use of informants, Elow said something along the lines of, "well they are just crackheads." [Id. at ¶ 48]. Elow admitted using the word "crackheads" to describe drug users in Central Square and conceded to Hussey that it was an inappropriate word to use. [Dkt. 44-6 ("Elow Tr.") 10:20-13:11]. Hussey recalled, and Elow disputes, that when Hussey brought up the fact that he was being investigated for using the

ADD011

word "crackheads" that Elow said "you just can't call them that to their face." [Dkt. 43 at ¶ 49; Elow Tr. 11:17-19].

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991) (citing <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment may be granted when the record, viewed in the light most favorable to the non-moving party, presents no "genuine issue of material fact," and the moving party is entitled to judgment as a matter of law. <u>Paul v. Murphy</u>, 948 F.3d 42, 49 (1st Cir. 2020) (citation omitted). The Court must consider (1) whether a factual dispute exists; (2) whether the factual dispute is "genuine," such that a "reasonable fact-finder could return a verdict for the nonmoving party on the basis of the evidence;" and (3) whether a fact genuinely in dispute is material, such that it "might affect the outcome of the suit under the applicable substantive law." <u>Scott v. Sulzer Carbomedics, Inc.</u>, 141 F. Supp. 2d 154, 170 (D. Mass. 2001); <u>see also</u> <u>Napier v. F/V DEESIE, Inc.</u>, 454 F.3d 61, 66 (1st Cir. 2006). Courts must evaluate "the record and [draw] all reasonable inferences therefrom in the light most favorable to the non-moving parties." <u>Est. of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010) (citing <u>Houlton Citizens' Coal. v. Town of Houlton</u>, 175 F.3d 178, 183-84 (1st Cir. 1999)). A non-moving party may "defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." <u>Paul</u>, 948 F.3d at 49 (citation omitted). When evaluating cross-motions for summary judgment, the court must "view each motion, separately, through this prism," and "may enter summary judgment only if the record, read in this manner, reveals that

**ADD012**

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Hevia, 602 F.3d at 40 (internal citations omitted).

## III.    DISCUSSION

The constitutional right to free speech is protected by the First Amendment's guiding principle that debate on public issues should be "uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).  The public interest in that "free and unhindered debate on matters of public importance" is "the core value of the Free Speech Clause of the First Amendment." Pickering v. Bd. of Educ., 391 U.S. 563, 573 (1968).  There is "universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs." Mangual v. Rotger-Sabat, 317 F.3d 45, 64-65 (1st Cir. 2003) (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)).  This principle also protects, albeit to a more limited degree, the speech of public employees. Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) ("Public employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees . . . [s]till, those rights are not absolute.").  "In general, government officials may not subject an individual to retaliatory actions . . . for speaking out." Gilbert v. City of Chicopee, 915 F.3d 74, 81 (1st Cir. 2019) (internal citations and quotations omitted).  However, when a citizen enters a public role, they must accept certain limitations on their freedoms. Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."); Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011) ("Government employees undoubtedly walk a tight rope when it comes to speaking out on issues that touch upon their fields of work and expertise.").  A government employee speaking as a citizen on a

13

matter of public concern can only be subject to "those speech restrictions that are necessary for their employers to operate efficiently and effectively." <u>Garcetti</u>, 547 U.S at 419.

Plaintiff brings his First Amendment claim pursuant to 42 U.S.C. § 1983 which provides that "[e]very person" acting "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia" who subjects or causes to subject someone "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" shall be liable to the injured party. 42 U.S.C. § 1983. An individual asserting a Section 1983 claim must show that the challenged conduct is "attributable to a person acting under color of state law" and that the conduct was a "denial of rights secured by the Constitution or by federal law." <u>Soto v. Flores</u>, 103 F.3d 1056, 1061 (1st Cir. 1997).

The First Circuit requires a three-step inquiry to determine whether an adverse employment action violated a public employees' First Amendment right to free speech. <u>Bruce v. Worcester Reg'l Transit Auth.</u>, 34 F.4th 129, 135 (1st Cir. 2022). This inquiry is modeled after the balancing test initially articulated in <u>Pickering</u>. First, the Court must evaluate whether the employee "spoke as a citizen on a matter of public concern." <u>Gilbert</u>, 915 F.3d at 82 (quoting <u>Curran</u>, 509 F.3d at 45). If the Court finds that the speech in question was made pursuant to the speaker's official duties, then there is no First Amendment claim as "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties." <u>Id.</u> (quoting <u>Garcetti</u>, 547 U.S. at 421-22). Second, if the employee did speak as a citizen on a matter of public concern, the Court must look to whether the government entity involved had an adequate justification, based on the impact to its own operations, for the action it took towards that employee. <u>Bruce</u>, 34 F.4th at 135 (quoting <u>Curran</u>, 509 F.3d at 45). Third, the

14

**ADD014**

Court looks to whether the protected speech was a substantial or motivating factor in the adverse employment action.  Id.

There is no dispute as to the first and third prong.  Hussey v. City of Cambridge, No. 21-CV-11868-AK, 2022 WL 6820717, at *2 (D. Mass. Oct. 11, 2022); [Dkt. 53 at 2 n.2]. Therefore, the Defendants' liability turns on balancing the interest of Hussey, as a citizen speaking on a matter of public concern, with the interests of the Defendants in restricting that speech to aid "the effective and efficient fulfillment of its responsibilities to the public." Connick v. Myers, 461 U.S. 138, 150 (1983).  The Court must "consider (1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision."  Bruce, 34 F.4th at 138 (quoting Decotiis, 635 F.3d at 35).  If these factors demonstrate that the employee only faced those speech restrictions that were "necessary for his employer to operate efficiently and effectively" then "the defendants' restrictions on speech were adequately justified."  Id.  How cautious an employee must be with the words they use "will vary with the extent of authority and public accountability the employee's role entails." Rankin v. McPherson, 483 U.S. 378, 390 (1987).

Since only the second prong is in dispute, and because the balancing of interests is a question of law the Court must decide, there is not a triable question of fact left for a jury.  See id. at 386 n.9 (describing test for whether speech is of public concern wherein "the ultimate issue—whether the speech is protected—is a question of law") (quoting Connick, 461 U.S. at 148 n.7); Davignon v. Hodgson, 524 F.3d 91, 100 (1st Cir. 2008) (describing Pickering balancing test's assessment of what the First Amendment protects as subject to de novo review whereas question of causation in retaliation claim presents a question of fact). But see Moser v. Las Vegas Metro. Police Dep't, 984 F.3d 900, 905 (9th Cir. 2021) ("While the Pickering

**ADD015**

balancing test presents a question of law for the court to decide, it may still implicate factual disputes that preclude the court from resolving the test at the summary judgment stage."); Weaver v. Chavez, 458 F.3d 1096, 1101 (10th Cir. 2006) (describing how "it is well-settled that the balancing assessment must be performed by the court, not the jury" although noting that circuits are split as to when Pickering test turns on disputed questions of fact).  Although there may be some factual disputes that remain outstanding, such as disagreements about how to interpret the words used and the degree to which the Facebook post was shared, the Court is not aware of any whose resolution is necessary to resolve the balance of interests.  Even if the Court resolved any such disputes in Plaintiff's favor, it would still find that Defendants' interest outweighed Plaintiff's here.

### A.  Interest in Hussey's Speech

At the motion to dismiss stage, this Court stated that "the value of Hussey's speech, including his use of derogatory, pejorative labels, was not particularly high, though it was also not without any value."  Hussey, 2022 WL 6820717, at *5; [Dkt. 25 at 10].  While the Court's determination at this stage is not dependent on its earlier assessment, the development of the factual record has not altered that conclusion.  Hussey's post was undoubtedly about a matter of public concern: the naming of an official act of Congress and his objections to the name chosen for it.  [Dkt. 43 at ¶¶ 5-7].  The proposed act sought to address police reform and racial inequality—issues of tremendous importance to the public.  [Dkt. 44-3 at 4].  Moreover, given the galvanizing role George Floyd's murder played in the widespread protests in 2020 and

**ADD016**

thereafter, there is value in the public's continued discussions of his life and legacy.  [See Dkt. 44-9 at 4].

The fact that Hussey is employed as a police officer is relevant as well, given that his comments were about the nature of a police reform bill.  Discouraging Hussey and other officers from participating as citizens in discussions about public safety, police brutality, and racial profiling would deprive the public of a valuable viewpoint.  Garcetti, 547 U.S. at 419 (acknowledging "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion" given the "the necessity for informed, vibrant dialogue in a democratic society" and "the widespread costs may arise when dialogue is repressed"); see also Pickering, 391 U.S. at 573 (rejecting attempt by school administrators to limit teachers' ability to participate in public debate partly because it was essential that teachers be able to speak freely given that they were more likely than members of the general public to have informed opinions on school operations and funding).

Hussey's post was made on his personal Facebook account from his personal phone. [Dkt. 43 at ¶¶ 14, 18].  However, the reach of his statement was amplified by it being on a social media platform.  Writing on Facebook is accurately compared to "writing a letter to a local newspaper" and "suggests an intent to 'communicate to the public or to advance a political or social point of view beyond the employment context.'"  Liverman v. City of Petersburg, 844 F.3d 400, 410 (4th Cir. 2016) (quoting Borough of Duryea v. Guarnieri, 564 U.S. 379, 398 (2011)).  Hussey argues that the post could not have had a disruptive impact since the post was only up for a couple of hours on his private Facebook profile.  [Dkt. 42 at 13].  This argument is not persuasive.  The post was screenshotted, its content was shared beyond Hussey's network, and it had begun to attract attention.  An individual like Hussey takes a "gamble . . .  in posting

17

content on the internet" as there is a "lack of control one has over its further dissemination." Duke v. Hamil, 997 F. Supp. 2d 1291, 1300, 1302 (N.D. Ga. 2014) (dismissing a veteran police officer's claim that his government employer violated the First Amendment by demoting him after he posted an image of the Confederate flag accompanied by the phrase, "It's time for the second revolution," on his private Facebook page). Hussey also shared his post with all his Facebook friends, who number in the hundreds, and most of whom were aware he was employed as an Officer in the Cambridge Police Department. [Dkt. 39 at ¶ 10]. Social media use in this context can be a double-edged sword. On one hand, social media can make any citizen "a town crier with a voice that resonates farther than it could from any soapbox," increasing the message's reach and Hussey's First Amendment interest along with it. Packingham v. North Carolina, 582 U.S. 98, 107 (2017) (quoting Reno v. Am. Civ. Liberties Union, 521 U.S. 844, 870 (1997). At the same time, such increased exposure amplifies the potential consequences to employers.

The value of Hussey's speech is lessened by the inflammatory and insulting manner in which his post was written. "Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance." Curran, 509 F.3d at 49 (citing Jordan v. Carter, 428 F.3d 67, 74 (1st Cir. 2005); see also Hernandez v. City of Phx., 43 F.4th 966, 979 (9th Cir. 2022) (police officer's social media posts that insulted racial and religious minorities occupied "a much lower rung on the First Amendment hierarchy" and "touched on matters of public concern in only the most limited sense" (citations omitted)). The post called George Floyd "a career criminal, a thief and druggie." [Dkt. 43 at ¶ 7]. The term "druggie" may be subject to differing interpretations; however, in both its common understanding and in the manner it was used in the Facebook post, the term is employed as a pejorative to disparage its subject as a person

18

**ADD018**

struggling with drug addiction. [Id. at ¶ 50]. Even if the term itself is not inherently derogatory, here it was used in a derogatory fashion. The terms "thief" and "a career criminal" are similarly insulting, even though they reflect the fact that, for a ten-year period in Floyd's life from 1997 until 2007, he participated in criminal activity that included offenses related to theft and robbery. [Dkt. 43 at ¶¶ 54-55]. More relevant than the particular terms used was the fact that the thrust of the message disparaged George Floyd as being unworthy of being honored in that manner because of his past criminal conduct and substance abuse issues. It dismissed the reasons why George Floyd's life and tragic death inspired the legislation.

However, the value of Hussey's post is not as diminished as it would have been had Hussey used lewd, vulgar, or obscene terms. See Curran, 509 F.3d at 49; see also Hernandez, 43 F.4th at 979; Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 977 F.3d 530, 538-39 (6th Cir. 2020) (use of n-word in social media post did not receive "highest rung" of protection and consequently required a lower showing of disruption to justify employer's adverse action). The term "druggie" may be a pejorative and offensive term, but it is neither profane nor obscene. Notably, both Commissioner Bard and Elow agreed that the term does not have any racial connotation. [Dkt. 43 at ¶ 51]. The other words used by Hussey are commonplace terms.

Hussey's speech could be categorized as insensitive, disparaging, or dehumanizing (as Bard described it) [id. at ¶ 26], particularly by those concerned with helping individuals with substance use challenges or those who sought to honor Floyd as an emblematic Black victim of police brutality. However, even if the Court agreed with that assessment, it would not diminish Hussey's interest in being able to share his opinion on the topic. Offensive speech can still be protected speech if an employer retaliates against the employee because of their objections to the content of that speech, rather than their concern for the speech's impact on public functions. See

**ADD019**

Hayes v. Mass. Bay Transp. Auth., 498 F. Supp. 3d 224, 234 (D. Mass. 2020) ("[V]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.") (quoting Rankin, 483 U.S. at 384).

However, the Court does not find in Hussey's favor because, even if it viewed his post in the light most favorable to him and resolved any factual disputes about its content or context in his favor, his interest would be outweighed by the strong interest the Cambridge Police Department had here in restricting his speech. The Court explains below.

### B. Cambridge Police Department's Interest in Restricting Hussey's Speech

While evaluating the government's interest, the Court considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388 (citing Pickering, 391 U.S. at 570-573). Plaintiff asserts there is no indication Hussey's speech would disrupt the functioning of the police department because of the lack of objections within the Cambridge Police Department, the Defendants' failure to address similarly offensive speech, and the lack of controversy in the public sphere that followed the post. [Dkt. 42 at 11-15]. The Defendants argue instead that Hussey's comments threatened the Cambridge Police Department's functions because his public disparagement of Floyd, who struggled with substance abuse and had a criminal history, could have jeopardized public trust in

the Department. [Dkt. 38 at 5-9]. Defendants' concerns are underscored by a national climate which placed a magnifying glass on the issue of bias within every police department.

The focus of the Court's inquiry here is whether the Cambridge Police Department and Commissioner Bard's "predictions of disruption" to the Department flowing from Hussey's post were "reasonable," rather than whether Hussey's comments caused "an actual adverse effect." Curran, 509 F.3d at 49. The nature of the inquiry reflects the fact that government employers must have "wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Connick, 461 U.S. at 146. The Court must give "substantial weight to government employers' reasonable predictions of disruption" and gives "greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." Waters v. Churchill, 511 U.S. 661, 673 (1994). Still, the Defendants' judgment must be based on some evidence and cannot rely on speculation alone to justify its actions. Moser, 984 F.3d at 909 ("[A]n employer must provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable" such as "evidence that the community it serves discovered the speech or would inevitably discover it."); Fenico v. City of Phila., 70 F.4th 151, 166 (3d Cir. 2023) ("[A]n employer must still establish likely disruption through record support, and courts have long required more than 'unadorned speculation as to the impact of speech.'") (quoting Hall v. Ford, 856 F.2d 255, 261 (D.C. Cir. 1988)).

Here, the Court is persuaded that the Defendants' strong interest in maintaining public trust outweighs the interest Hussey had in making his Facebook post. The timing here is a crucial factor—Hussey's statements came mere months after Floyd's killing galvanized public criticism of policing and racial disparities, including in the City of Cambridge and the greater

21

**ADD021**

Boston area.[8]  The vast majority of protests were peaceful, yet departments across the country

met many of those same protests with tear gas, arrests, flash grenades, and more—sometimes

with fatal consequences for demonstrators.[9]  Some of the protests turned violent and the ensuing

riots set ablaze local businesses, restaurants, news buildings, and even a police department

building.[10]  A number of police officers sustained injuries during such incidents.[11]  In the weeks

that followed, as the names of more Black persons, like Breonna Taylor, became synonymous

with police brutality and impunity, it poured fuel on the collective fury against police

departments and ignited new rounds of protests.[12]  These demonstrations were often

accompanied by calls to reform, defund, and even abolish police departments.[13]  It is thus

understandable that in the months that followed, the Cambridge's Police Department's sensitivity

to public perception was heightened, especially regarding discussions related to victims of police

violence.

        The effectiveness of the Cambridge Police Department, and any police department,

depends on the maintenance of public trust.  Acting in a biased manner, or creating a perception

---

[8] *Supra* note 3; Huffman, 2022 WL 2308937, at *1.

[9] Olalekan N. Sumonu, Shot in the Streets, Buried in Courts: An Assault on Protester Rights, 52 Seton Hall L. Rev. 1569 at 1573, 1575 (2022).  Around 570 of the 10,600 protests resulted in violence.  Id.  In Kentucky, the police response to a demonstration led to the death of a photographer named Tyler Gerth and a cook named David McAtee. Id.

[10] Id. at 1571-74.

[11] Id.

[12] Id.

[13] Id.

**ADD022**

thereof, undermines that trust.[14]  Locurto v. Guiliani, 447 F.3d 159, 182 (2d Cir. 2006).  In

Locurto, the Second Circuit articulated this challenge:

> The effectiveness of a city's police department depends importantly on the respect
> and trust of the community and on the perception in the community that it
> enforces the law fairly, even-handedly, and without bias. If the police department
> treats a segment of the population of any race, religion, gender, national origin, or
> sexual preference, etc., with contempt, so that the particular minority comes to
> regard the police as oppressor rather than protector, respect for law enforcement is
> eroded and the ability of the police to do its work in that community is impaired.
> Members of the minority will be less likely to report crimes, to offer testimony as
> witnesses, and to rely on the police for their protection. When the police make
> arrests in that community, its members are likely to assume that the arrests are a
> product of bias, rather than well-founded, protective law enforcement. And the
> department's ability to recruit and train personnel from that community will be
> damaged.

Locurto, 447 F.3d at 178 (quoting Pappas v. Giuliani, 290 F.3d 143, 146-47 (2d Cir. 2002)

(citations omitted)); see also Bennett, 977 F.3d 530, 544 (6th Cir. 2020) ("[D]iverse

constituents . . . need to believe that those meant to help them in their most dire moments are

fair-minded, unbiased, and worthy of their trust.").[15]  The centrality of trust is highlighted by the

---

[14] The facts in cases like Locurto and Bennett, and other cases that the Defendant relies upon, such as Grutzmacher v. Howard Cnty., 851 F.3d 332, 338 (4th Cir. 2017) feature speech that is significantly more likely to offend and cause disruption in a workplace than Hussey's Facebook post.  However, this Court does not cite those cases for their factual similarity but rather for their proposition that the effectiveness of a Police Department depends on their ability to build trust in the communities they serve and that incidents that undermine that trust, particular among communities where relationships with law enforcement is historically strained, can hamper a Police Department's ability to carry out its duties.

[15] In resolving this question, the Court finds that community members' objections regarding Hussey's post are not analogous to a "heckler's veto." A "heckler's veto" occurs when offensive speech is curtailed to prevent public disorder; the Supreme Court has held that the "heckler's veto" is an impermissible justification for the restriction of speech.  Bachellar v. Maryland, 397 U.S. 564, 567 (1970) ("it is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object to peaceful and orderly demonstrations" (internal citations omitted)). Previously, the Fourth Circuit and Tenth Circuit have extended this logic to prevent restrictions on the speech of police officers that were motivated by potential community backlash.  Berger v. Battaglia, 779 F.2d 992, 1001 (4th Cir. 1985) (rejecting community concerns about an officer's music performance in blackface because "the perceived threat of disruption [was] only to external operations and relationships, it was caused not by the speech itself but by threatened reaction to it by offended segments of the public"); Flanagan v. Munger, 890 F.2d 1557, 1566-67 (10th Cir. 1989) (citing Berger in its finding that the community's objections to a police officer's ownership of a video

---

23

Cambridge Police Department's Mission Statement, which describes the Department's mission as partnering "with the community to solve problems and improve public safety in a manner that is fair, impartial, transparent, and consistent."[16]

The Court must also provide greater deference to the Cambridge Police Department's assessments of the risk of disruption because of its status as a law enforcement agency.  See Curran, 509 F.3d at 50; see also Hughes v. Whitmer, 714 F.2d 1407, 1419 (8th Cir. 1983) ("More so than the typical government employer, the Patrol has a significant government interest in regulating the speech activities of its officers in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution.'") (quoting Gasparinetti v. Kerr, 568 F.2d 311, 315-16 (3rd Cir. 1977)); Oladeinde v. City of Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000) ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers."); O'Donnell v. Barry, 148 F.3d 1126, 1135 (D.C. Cir. 1998) (describing stronger government interest in regulating speech of police officers).  Following the national reckoning

---

store that included adult films was not a sufficient rationale to justify restrictions on his speech).  In both matters, these complaints were analogized to a "heckler's veto."  Berger, 779 F.2d at 1001; Flanagan, 890 F.2d 1567.  The Ninth Circuit and Second Circuit have found that such objections are permissible to consider when assessing disruption to an employer's function, such as 'an officer's job to safeguard public opinion of the police force. Locurto, 447 F.3d at 179 (2d Cir. 2006) (rejecting the analogy to a 'heckler's veto' because "[w]here a Government employee's job quintessentially involves public contact, the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations"); Dible v. City of Chandler, 515 F.3d 918 n.4, 7 (9th Cir. 2008) (acknowledging Flannagan and Berger, but finding that they have both been undermined by subsequent case law, including City of San Diego, Cal. v. Roe, 543 U.S. 77 (2004)). This Court similarly declines to follow Flannagan and Berger because of the now demonstrated connection between a police departments' efficiency and its public perception and because the social context, including as to importance of the relationship between police and the communities they serve, has changed since those cases.

[16] Mission Statement and Core Values, City of Cambridge Police Department, https://www.cambridgema.gov/Departments/cambridgepolice/missionstatementandcorevalues (last visited Mar. 5, 2024).

sparked by George Floyd's murder,[17] while police departments sought to rebuild trust in their

communities, the need for this deference was even greater.[18]

The community complaints about the Facebook post provide the necessary evidence to

justify Defendants' perception that Hussey's comments could have undermined public trust.

Less than one week after Hussey shared his Facebook post, Richard Harding of the Cambridge

NAACP, brought the post to Commissioner Bard's attention.  [Dkt. 43 at ¶ 19].  The NAACP

had been made aware of the post when a screenshot was shared with them by another individual

whose identity remains undisclosed.  [Bard Tr. at 31:7-12].  Bard and the Cambridge City

Manager then met with Richard Harding, Mo Barbosa, and former Mayor Ken Reeves—all of

whom were either in the leadership of the Cambridge chapter of the NAACP or involved

community figures in other capacities.  [Dkt. 43 at ¶ 20; Bard Tr. at 26:17-24].  Even though

Bard only met with three individuals, at least two were part of a larger organization, and one was

a former Mayor of that very city.  The political clout of those individuals made it reasonable for

Bard to assume that the post could cause damage to the Department's reputation in the eyes of

---

[17] See Huffman, 2022 WL 2308937, at *1 ("[Floyd's] unjust death at the hands of police sparked protests around the country that called attention to the disparate treatment of people of color by law enforcement and demanded justice and police reform.").

[18] This deference is why the Court is not persuaded by the counter-factual proposed by Plaintiff about an Officer suspended for a social media post criticizing the naming of a bill after President Donald Trump who also is the subject of several criminal misconduct allegations.  [Dkt. 58 at 3].  The distinction drawn here is not in regard to the speech's content, but rather its context.  Even in the context of government employees, the First Amendment is particularly sensitive to speech restrictions that target speech solely based on its content. See Rankin, 483 U.S. at 384.  However, the broader context regarding policing in America supports a heightened concern about breakdown of trust and disruption to the Department's functions, and thus justifies such a restriction.  The example Plaintiff provides is distinguishable as it does not indicate how such a post would detrimentally impact police operations.

**ADD025**

many others, especially among those who were concerned about bias within the Cambridge

Police Department.  [See Dkt. 52 at ¶ 68].[19]

       Since the primary question is whether the Police Department's prediction of disruption

was reasonable, the level of community feedback that is sufficient to justify such a prediction is

necessarily context dependent.  The case law does not identify any magic marker or bright line

wherein the level of community feedback is sufficient to justify a speech restriction.  The Court

also notes that the matter was presented to Bard as an urgent matter, with community members

"alarmed and concerned about the post."  [Bard Tr. at 49:1-14].  As Bard put it: "trust takes a

lifetime to build and just a moment to tear down" and "any individual associated with the

Cambridge Police Department could in a moment tear down . . . trust we've spent a long time

building with community."  [Dkt. 39 at ¶ 26].  With this in mind, Bard's actions appear

reasonable given the importance to the Department of maintaining the trust of its community

members and the concern, especially given the "context of the national climate," that the

Facebook post could have detrimentally impacted that trust.  [Dkt. 39 at ¶ 26]; see Locurto, 447

F.3d at 182; Bennett, 977 F.3d at 541.  The focus on the community impact renders it less

relevant that Hussey received messages of support from his peers in the police department.

[Dkt. 43 at ¶ 33; Dkt. 44-7].  The Court is also not persuaded by the fact that there is no evidence

that any drug users or individuals with loved ones struggling with substance abuse complained as

---

[19] The fact that the organization that Bard met with was the NAACP is noteworthy as it is an organization whose chapters advocate against bias in policing. The NAACP's mission is to "achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color." Mission-Vision, NAACP, https://naacp.org/about/mission-vision (last visited Mar. 5, 2024). In the wake of George Floyd's killing, the organization called for measures to be put in place to impose strict accountability for police misconduct. NAACP, Joint Statement by NAACP and The Links, Incorporated on Collective Outrage Regarding the Police Murder of George Floyd and other Victims of Law Enforcement, NAACP, https://naacp.org/articles/joint-statement-naacp-and-links-incorporated-collective-outrage-regarding-police-murder (last visited Mar. 5, 2024).

**ADD026**

Commissioner Bard was entitled to rely on his own judgment given the "significant weight" allotted to an employers' "reasonable predictions of disruption." Curran, 509 F.3d at 49.

Hussey's post was subject to multiple interpretations—including some which could undermine the non-punitive and rehabilitative approach that Bard and the Cambridge Police Department aimed to have. Bard saw it as "dehumanizing" and insensitive to individuals with substance abuse histories. [Dkt. 43 at ¶ 26]. The community members Bard met with saw it as evidence of bias within the Cambridge Police Department and counter to the spirit the Department should embody. [Dkt. 52 at ¶ 68]. The City of Cambridge's conclusion in its final report of its investigation was that Hussey's Facebook post implied he "does not believe in rehabilitation . . . is disrespectful of people suffering from substance abuse" and that it "can be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance abuse disorder." [Dkt. 44-3 at 12]. Hussey, for his part, asserts that his post had nothing to do with race, that his only objection was the naming of the bill (whose objectives he otherwise supported) in "honor" of someone who had a violent criminal past. [Dkt. 43 at ¶ 32]. The Defendants' arguments do not focus directly on concerns about an appearance of racial bias—even though George Floyd's death is inseparable from issues of racial bias in policing and the post was brought to the Department's attention by the NAACP, a racial justice organization.

The focus of the Court's inquiry, however, is not what the right interpretation of Hussey's language is, or even whether it was offensive or its conclusions objectionable, but rather whether its impact "impedes the performance" of or "interferes with the regular operation" of the Cambridge Police Department's work. Rankin, 483 U.S. at 388. In that regard, the Department's concerns are substantiated by the language Hussey used, the reasonable

**ADD027**

interpretation of the implications of his words, and by the objections Bard, and other community members, raised in response.

Bard was not obligated to wait until the issue developed into a broader controversy, particularly given his concerns about the backlash the Facebook post could generate and his assessment that its characterization of George Floyd undermined the Department's goals.  [See Dkt. 43 at ¶ 25; Bard Tr. at 40:7-19]; see Curran, 509 F.3d at 45 ("An employer need not 'allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'") (quoting Connick, 461 U.S. at 152).  According to Bard, the goals of the Cambridge Police Department when addressing drug abuse was to prefer "prevention, intervention, and diversion over more serious or more punitive methods traditionally associated with the criminal justice system," which often meant that officers had to work with individuals struggling with substance abuse issues.  [Dkt. 39 at ¶ 25].  Hussey, as a member of the SIU, would have been one of the officers working to implement those goals by attempting to build trust within communities where drug use was a widespread and serious challenge.  [Dkt. 39 at ¶¶ 11-16].  Bard's assessment is supported by the fact that Hussey's comments undermined the Department's stated goals.

The heightened scrutiny on Hussey's public comments is connected to the fact that a police officer is an especially public-facing role, and "[t]he more the employee's job requires . . . public contact, the greater the state's interest" in disciplining them for comments that are offensive.  Grutzmacher v. Howard Cnty., 851 F.3d 332, 346 (4th Cir. 2017) (quoting McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997) (citation omitted)).  The Fourth Circuit noted this in Grutzmacher, wherein a firefighter was terminated for several offensive comments he made on his Facebook page.  Grutzmacher, 851 F.3d at 346.  The court dismissed plaintiff's claim therein,

**ADD028**

in part, because the plaintiffs' job required him to safeguard public opinion about his role; by making comments which jeopardized the public's trust in firefighters, he frustrated the Fire Department's public safety mission.  Id.  This difference is also what separates Hussey's case here from the District of Massachusetts' decision in Hayes v. Mass. Bay Transp. Auth., which also addressed restrictions on government speech.  498 F. Supp. 3d at 236.[20]  Hayes concerned comments made in the workplace by a 911 operator, rather than someone in a public-facing role.  As a police officer, Hussey's work is public-facing and thus more scrutiny is placed upon his comments that are made in public, or in the semi-public sphere of social media.  Hussey's post may have been on his private Facebook page, but it was shared online with hundreds of people.  While he may have believed his post was only shared among his friends, it led to a community response, through NAACP officers, which then reached his police commissioner.

This Court's conclusion is reached as a matter of law, after weighing Hussey's interest in his post against his employer's interest in the potential damage it could have caused.  See Curran, 509 F.3d at 50.  Maintaining the public's confidence in the Cambridge Police Department is part of Hussey's job responsibilities; therefore, the Departments' objections to the content of Hussey's statement is invariably linked to their concern about its impact on their image.  On that issue, with greater deference afforded to law enforcement and with the record clear regarding the

---

[20] Additional factual differences further separate this case from Hayes.  In Hayes, 911 call center operator Mark Hayes was overheard saying "she should go back to Africa" in response to a news broadcast in which a naturalized citizen from the Democratic Republic of Congo criticized US immigration policy.  498 F. Supp. 3d at 227.  The remark caused a "ruckus" in the call center and plaintiff was fired thereafter; Hayes then sued alleging his First Amendment rights had been violated.  Id.  The court therein held that there was a jury question as to whether the motivation of the employer in terminating the employee was either based on their personal objection to his statement or on their concern for the workplace disruption it could cause.  Id. at 234.  The possibility that it was the former was supported in part by the fact that the manager did not speak with other employers before terminating Hayes and because Hayes did not receive an opportunity to apologize to his coworkers who heard the comment—which could have impacted the degree of workplace disruption.  Id.  Additionally, there was a question of fact as to whether Hayes's statement was made to himself or to others, which would have altered the degree of First Amendment protection it would have received.  Id. at 233.

ADD029

objections raised about Hussey's post by both Bard and members of the public, this case does not present a factual dispute which a jury need resolve.

Plaintiff draws an analogy here to Ninth Circuit and Third Circuit authority, but the cases he highlights do not control here because of the differences in procedural posture and the evidence demonstrating potential disruption. In Moser, a Las Vegas SWAT sniper was dismissed from his team because of a comment he made on his Facebook page, including that "it was a 'shame' that a suspect who had shot a police officer did not have any 'holes' in him." 984 F.3d at 902. The Ninth Circuit reversed the District Court's decision because there was a factual dispute over the meaning of his Facebook comments and because the Defendant did not provide sufficient evidence to show the comments would have caused disruption. Id. at 908, 910. However, there was no indication of disruption either internally or externally. Id. at 909-11. The post was brought to the department's attention through an anonymous comment, but otherwise the record failed to show that anyone else saw the comment. Id. at 910. Therefore, in Moser, "the public did not see or hear the offending comment, which lessen[ed] the potential impact on the agency's reputation or mission." Id. at 911. Not so here. Hussey's post may have been up for a short time, but it was put into the public sphere long enough to attract a controversy that could have negatively impacted the Cambridge Police Department. [See Dkts. 43 at ¶¶ 17, 19-21; 52 at ¶ 68; 39 at ¶¶ 24-26].

In Fenico, the Third Circuit reversed the dismissal of a First Amendment retaliation claim brought by a group of police officers who had made social media posts that were clearly "offensive, racist, and violent." Fenico, 70 F.4th at 153. That initial dismissal came at the motion to dismiss stage with an undeveloped factual record and wherein the appellate court had to view the allegations in the light most favorable to the officers. Id. at 155. Thus, the court had

to assume "that their posts had not and *would not* disrupt [Philadelphia Police Department] operations." Id. at 167 (emphasis in original).  This Court used similar reasoning when it denied the Defendants' Motion to Dismiss.  [Dkt. 25 at 13].  While the Court here must still evaluate Defendant' Motion for Summary Judgment by viewing "the record and [drawing] all reasonable inferences therefrom in the light most favorable" to Plaintiff, the facts it is evaluating are based on a developed factual record which details the reaction from community members.  Hevia, 602 F.3d at 40.  As such, the Court is no longer required to presume that no disruption would take place.

**Cambridge Police Department's Failure to Address Other Comments**

Finally, the government's claims are not weakened by their failure to take action in other instances where officers made similar comments.  Such evidence of the "failure to target equally disruptive speech is probative" of the legitimacy, or lack thereof, of Defendants' predictions of disruption.  Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 107 (3d Cir. 2022) (quoting Lodge No. 5 of Fraternal Ord. of Police ex rel. McNesby v. City of Phila., 763 F.3d 358, 384 (3d Cir. 2014)).  In other words, if Plaintiff demonstrates that Defendants failed to address similar comments by other employees, it calls into question whether the motivation for the disciplinary action was for reasons other than those provided—such as their personal disagreement with the Plaintiff's message.  The issue here, however, is that the examples cited by Plaintiff either differ in terms of the Department's authority over them or show that some disciplinary measures were indeed taken.  Jack Albert, who posted a tweet on the department's official Twitter page calling Congressmen Joe Kennedy III a "liberal [****]ing jerk" received a five-day suspension for his post, although he was not placed on administrative leave initially.  [Dkt. 43 at ¶¶ 37-39].  The Cambridge Police Department did, in fact, fail to

31

**ADD031**

investigate who wrote a tweet on the Cambridge Police Patrol Officers Association's account warning about a "purge" of killings it predicted would follow the passing of a proposed police reform bill.  [Dkt. 43 at ¶¶ 40-41].  However, the Patrol Officers Association is a separate and distinct entity.  Plaintiff has not persuaded the Court that the Police Department's failure to investigate the anonymous Association's tweet is comparable to Hussey's Facebook post, as there is no evidence provided in the record of any backlash, internally or externally, to the Association's tweet.  The same is true of an unnamed officer who made a "deeply disturbing" social media post in praise of political violence.  [See Dkt. 43 at ¶ 43].  These parallel examples the Plaintiff highlights are notable, but because details about them are so limited they are not sufficient to create a material dispute of facts as to the legitimacy of Defendants' predictions of disruption.  The Court reaches the same conclusion regarding the facts about both Hussey and Commissioner Elow using derogatory language, such as "crackheads," to describe drug users. [Dkt. 43 at ¶¶ 46, 48-49].

## IV.      CONCLUSION

Ensuring the free participation of the people in discussions of public affairs is of paramount importance—including for individuals who are employed by the public.  The Court recognizes a limited exception to that principle here because the Defendants' disciplinary actions were reasonably calculated to prevent disruption to the Cambridge Police Department, via a further breakdown of trust from community members, that Plaintiff's comments could have caused.  For this, and the additional reasons stated above, the Defendants' Motion for Summary Judgment [Dkt. 37] is **GRANTED** and Plaintiff's Partial Motion for Summary Judgment [Dkt. 41] is **DENIED**.  This matter is **DISMISSED**.

**SO ORDERED.**

**ADD032**

Dated: March 12, 2024                                    /s/ Angel Kelley
                                                         Hon. Angel Kelley
                                                         United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BRIAN HUSSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 1:21-CV-11868-AK |
| v. | ) | |
| | ) | |
| CITY OF CAMBRIDGE and | ) | |
| BRANVILLE BARD, in his capacity as | ) | |
| Commissioner of the Cambridge Police | ) | |
| Department | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>JUDGMENT</u>

**ANGEL KELLEY, D.J.**

In accordance with the Court's Memorandum and Order [Dkt. 61], granting Defendants'

Motion for Summary Judgment and denying Plaintiff's Partial Motion for Summary Judgment, it

is hereby OREDERED:

Judgment is entered for Defendants.

Dated: March 12, 2024                     /s/ Angel Kelley
                                          Hon. Angel Kelley
                                          United States District Judge

**ADD034**

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

_____

**Certificate of Service**

_____

I hereby certify that, on June 27, 2024, I electronically filed the foregoing

with the Clerk of the United States Court of Appeals for the First Circuit by using

the appellate CM/ECF system, which will send a notification of such filing to all

counsel of record.

_/s/ Harold Lichten_____
Attorney for Plaintiff-Appellant

Dated: June 27, 2024