No. 24-1279

**United States Court of Appeals**
**For the First Circuit**

_____

BRIAN HUSSEY,

Plaintiff – Appellant,

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as
Commissioner of the Cambridge Police Department,

Defendants – Appellees,

BRANVILLE G. BARD, JR., in his individual capacity,

Defendant.

_____

On Appeal From A Judgment Of The United States District Court
For The District Of Massachusetts In Civil Action 1:21-cv-11868-AK

_____

**BRIEF OF THE DEFENDANTS-APPELLEES CITY OF CAMBRIDGE;**
**CHRISTINE ELOW**

_____

Counsel for the Defendants-Appellees,
CITY OF CAMBRIDGE
Kate M. Kleimola
First Circuit Bar No. 1211887
Assistant City Solicitor
City of Cambridge Law Department
795 Massachusetts Ave.
Cambridge, MA 02130
(617) 349-4121
kkleimola@cambridgema.gov

Dated: July 29, 2024

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE CASE ...........................................................1

SUMMARY OF THE ARGUMENT........................................................8

ARGUMENT.............................................................................9

I.  Standard of Review. ...........................................................9

II.  The Plaintiff's Mocking, Derogatory, and Disparaging Comment That Evidenced Bias Against the Very Community He Serves Is Entitled to Less Weight in the *Pickering* Balancing Test. ...............................10

III.  In Contrast, the Defendants Have a Strong Interest in Maintaining a Police Department Free of Bias and Maintaining the Public's Trust. ...........14

    A. There Is No Genuine Dispute About the Defendants' Motivation. ..........16

    B. This Court Should Not Overrule Recent Precedent and Require Actual Disruption in Political Speech Cases and the Court Properly Found the Defendants' Prediction of Disruption Reasonable. .................20

CONCLUSION ......................................................................26

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ...............................................................28

CERTIFICATE OF SERVICE.................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986) ...........................................17

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.2d 530 (6th Cir. 2020)...................................................................................................12

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971 (9th Cir. 1998)...................................................................................................21

*Connick v. Myers*, 461 U.S. 138 (1983).....................................................12, 21, 22

*Curran v. Cousins*, 509 F.3d 36 (1st Cir. 2007)....................................10, 12, 14, 21

*Davignon v. Hodgson*, 524 F.3d 91 (1st Cir. 2008) ..........................................11, 16

*Fenico v. City of Philadelphia*, 70 F.4th 151 (2023).................................................20

*Garcetti v. Ceballos*, 547 U.S. 410 (2006).............................................................10

*Gerald v. Univ. of P.R.*, 707 F.3d 7 (1st Cir. 2013) ................................................16

*Hamdallah v. CPC Carolina PR, LLC*, 91 F.4th 1 (1st Cir. 2024) ..........................21

*Hernandez v. City of Phoenix*, 43 F.4th 966 (9th Cir. 2022)...................................12

*Hernandez v. Wilkinson*, 986 F.3d 98 (1st Cir. 2021) .............................................16

*Ithier v. Aponte-Cruz*, 105 F.4th 1 (1st Cir. 2024) ...................................................9

*Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016) ...............................16

*Locurto v. Giuliani*, 447 F.3d 159 (2nd Cir. 2008) ...........................................14, 24

*MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024) .................9, 11, 12, 13, 16, 20, 21

*Marquardt v. Carlton*, 2023 WL 395027 (6th Cir. 2023) ........................................26

*McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983).........................................21

*Melton v. City of Oklahoma City*, 879 F.2d 706 (10th Cir. 1989)............................21

*Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15 (1st Cir. 2003) ...................................17

*Noviello v. City of Boston*, 398 F.3d 76 (1st Cir. 2005) ..........................................17

*Pappas v. Guiliani*, 290 F.3d 143 (2nd Cir. 2002)..............................................23, 24

*Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968) ...................................................................................2

*Rankin v. McPherson*, 483 U.S. 378 (1987) .............................................22

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................17

*U.S. Civil Service Commission v. National Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548 (1973) ....................................................................22

*United States v. Griffin*, 525 F.2d 710 (1st Cir. 1975) ..............................3

*Waters v. Churchill*, 511 U.S. 661 (1994) .........................................22, 24

*Wilson v. Moulison N. Corp.*, 639 F.3d 1 (1st Cir. 2011) ........................17

**Statutes**

M.G.L. c. 150E ...........................................................................................19

**Other Authorities**

Associated Press, <u>Protestors at Boston Rallies Call for Justice for George Floyd, Action of Police Killing Cases</u> (Mar. 6, 2021), https://www.nbcboston.com/news/local/rally-in-boston-to-call-for-action-on-police-killing-cases/2321508/. ..........................................................7

Fed. R. Civ. P. 56(a) ..................................................................................13

Fed. R. Evid. 201(b) ....................................................................................6

<u>George Floyd Justice in Policing Act of 2020</u>, H.R. 7120, 116th Cong. (2020) .......................................................................................................7

<u>Huffman v. City of Bos.</u>, No. 21-CV-10986-ADB, 2022 WL 2308937 (D. Mass June 27, 2022) .................................................................................6

Marc Levy, <u>Protest draws thousands to hear the challenges of reforming police, education, other institutions</u>, Cambridge Day (June 7, 2020), https://www.cambridgeday.com/2020/06/07/protest-draws-thousands-to-hear-the-challenges-of-reforming-police-education-other-institutions/. ................6

Mission Statement and Core Values, City of Cambridge Police Department, https://www.cambridgema.gov/Departments/cambridgepolice/missionstatementandcorevalues (last visited Mar. 5, 2024) ....................................27

<u>Mission-Vision</u>, NAACP, https://naacp.org/about/mission-vision (last visited Mar. 5, 2024) .............................................................................................29

## JURISDICTIONAL STATEMENT

The Defendants-Appellees, the City of Cambridge and Christine Elow, in her capacity as Commissioner of the Cambridge Police Department, take no issue with the Appellant's Jurisdictional Statement.

## STATEMENT OF THE ISSUES

Whether the District Court properly granted the Defendants' Motion for Summary Judgment[1]?

## STATEMENT OF THE CASE

### A.    Procedural History

On November 17, 2021, the Plaintiff, Brian Hussey ("Hussey" or "Plaintiff"), filed a lawsuit against Defendants City of Cambridge and Dr. Branville Bard ("Bard"), the former Commissioner of the Cambridge Police Department, in his individual capacity and his capacity as the Commissioner of the Cambridge Police Department. RA 002[2]. Defendants filed a Motion to Dismiss on March 21, 2022. RA 002. The District Court allowed the Motion to Dismiss in part, and dismissed the complaint against Bard in his individual capacity on October 11,

---

[1] The Plaintiff now argues that there is a genuine dispute as to a material fact and asks this Court to remand this matter for trial. Therefore, Plaintiff only appeals the properly allowed Defendants' Motion for Summary Judgment.

[2] Defendants refer to the Record Appendix as "RA" followed by a page cite, to Plaintiff's Addendum as "Plf. Add." followed by a page cite, and to the Plaintiff's Brief as "Plf. Br." followed by a page cite.

2022. RA 002-3. The Plaintiff did not appeal that ruling. The Defendants answered the complaint on April 7, 2023. RA 005.

On June 8, 2023, Defendants moved for summary judgment on the Plaintiff's claim on the grounds that (i) the Plaintiff's claim failed under the *Pickering*[3] balancing test and (ii) Bard was not the final policymaking authority regarding the discipline of Cambridge Police Department employees. RA 038-39. The Plaintiff opposed. RA 007.

Also on June 8, 2023, the Plaintiff moved for partial summary judgment on the grounds that the Plaintiff's First Amendment rights outweighed the Defendants interests. RA 243. The Defendants opposed the Plaintiff's Partial Motion for Summary Judgment. RA 007.

On March 12, 2024, the Court (Kelley, J.) allowed the Defendants' Motion for Summary Judgment. RA 007. The Court entered judgment in favor of the Defendants that same day. RA 008. On March 20, 2024, the Plaintiff filed a Notice of Appeal. RA 008.

---

[3] *Pickering v. Board of Ed. Of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968).

**B.    Statement of Facts**

**George Floyd's May 2020 Murder at the Hands of a Police Officer Sparked Nationwide Protests That Continued into 2021.**

On Memorial Day 2020, Minneapolis Police Officer Derek Chauvin ("Chauvin") murdered George Floyd ("Floyd") by kneeling on his neck for more than eight minutes, despite Floyd's pleas that he could not breathe. RA 363. The murder of Floyd was captured on a cellphone video that was shared widely. Id.

Chauvin's murder of Floyd sparked nationwide protests and calls for police reform. RA 364. As the District Court noted, over 3,500 people attended one protest in the City of Cambridge.[4] A protest in the City of Boston on May 31, 2020, ended with accusations of police brutality and a lawsuit against the City of Boston alleging excessive force.[5]

Amid the nationwide protests, the U.S. House of Representatives introduced a bill to increase police accountability for misconduct, enhance transparency and

---

[4] The District Court, citing Fed. R. Evid. 201(b) and *United States v. Griffin*, 525 F.2d 710 (1st Cir. 1975), took judicial notice of the "unrest that occurred in the aftermath of George Floyd's killing within Massachusetts between May 2020 and March 2021." Plf. Add. 004, fn. 3. Marc Levy, Protest draws thousands to hear the challenges of reforming police, education, other institutions, Cambridge Day (June 7, 2020), https://www.cambridgeday.com/2020/06/07/protest-draws-thousands-to-hear-the-challenges-of-reforming-police-education-other-institutions/. This Court may too take judicial notice of these facts.

[5] Huffman v. City of Bos., No. 21-CV-10986-ADB, 2022 WL 2308937 (D. Mass June 27, 2022).

data collection, and eliminate discriminatory policing practices.[6] The bill was named the "George Floyd Justice in Policing Act of 2020."

**The Plaintiff Posted a Mocking, Derogatory, and Disparaging Facebook Post**

The Plaintiff maintained a private Facebook account; in April 2021, he had approximately 674 Facebook friends. RA 162. The Plaintiff estimated that only 30 of his Facebook friends may have been unaware of his employment as a Cambridge Police Officer, which meant that over 600 Facebook friends knew that the Plaintiff was a Cambridge Police Officer while reading his posts. RA 234-40. On February 25, 2021, the Plaintiff shared on his Facebook page a local news article titled, "House Democrats reintroduce police reform bill in honor of George Floyd." RA 159. The Plaintiff added the comment, "This is what its [sic] come to 'honoring' a career criminal, a thief and druggie…the future of this country is bleak at best." Id. At the time of the Plaintiff's Facebook post, protests were still ongoing in the City of Boston.[7]

Unsurprising to everyone, except perhaps the Plaintiff, the Plaintiff's post was made public. One of the Plaintiff's 674 friends took a screenshot of the post, which was then shared with the Cambridge NAACP. RA 193.

---

[6] George Floyd Justice in Policing Act of 2020, H.R. 7120, 116th Cong. (2020).

[7] Associated Press, Protestors at Boston Rallies Call for Justice for George Floyd, Action of Police Killing Cases (Mar. 6, 2021), https://www.nbcboston.com/news/local/rally-in-boston-to-call-for-action-on-police-killing-cases/2321508/.

**The NAACP Complained About the Plaintiff's Post to the City of Cambridge**

Within a week of the Plaintiff's post, on or around March 3, 2021, Richard Harding ("Harding"), an officer with the Cambridge NAACP, contacted then-Commissioner[8] Branville Bard ("Bard") about the Plaintiff's post. RA 193-94. Bard and then-City Manager Louis DePasquale ("DePasquale") met with Harding, Mo Barbosa ("Barbosa"), and former Cambridge Mayor Ken Reeves ("Reeves"), two of whom were affiliated with the NAACP, to discuss the Plaintiff's Facebook post. RA 194, 199. Harding, Barbosa, and Reeves brought the Plaintiff's post to Bard and DePasquale because they were concerned about the post and its impact on the Cambridge Police Department. RA 204. Bard recalled that Reeves expressed concerns that the post called into question the ability of the Cambridge Police Department to serve in a bias-free manner and ran "afoul of what we purport to embody." RA 217. Bard received a copy of the Facebook post and ordered the Professional Standards Unit (PSU) to investigate to determine whether the post violated Cambridge Police Department policies. RA 195-96.

---

[8] The Plaintiff's brief uses the terms "Commissioner" and "Chief" seemingly interchangeably throughout his brief. The Cambridge Police Department is led by a Commissioner and does not have the position of "Chief."

**The City of Cambridge Disciplined the Plaintiff for his Mocking, Derogatory, and Disparaging Facebook Post.**

The PSU investigation determined that the Plaintiff "did not treat George Floyd with respect by calling him a 'career criminal, a thief and a druggie.'" RA 166. The investigation concluded that the Plaintiff's post offended "a member of the community" and the NAACP, was "discourteous and unprofessional," and gave "the impression the [Plaintiff] does not believe in rehabilitation and is disrespectful of people suffering from substance use disorder." RA at 166-67. Most damningly for the Plaintiff, the investigation concluded that the Plaintiff's post could "be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance abuse disorder." Id.

Bard, in his letter to the Plaintiff notifying him of a four-day suspension, stated that the Plaintiff's post was:

> not only rude and discourteous, but also perpetuates stigmatizing and discriminatory practices that could be considered insensitive. Additionally, as this post was clearly disseminated outside your Facebook group, it can be viewed by people you have never met or spoken to; therefore they will only know you as a Cambridge Police Officer, which is potentially damaging to the Department, as it appears that your post represents the views, thoughts, and opinions of the majority of Cambridge Police Officers.

RA 421.

**The Plaintiff's History with the Cambridge Police Department**

The Plaintiff joined the Cambridge Police Department in 1998[9]. RA 054. For the first decade of his career as a Cambridge Police Officer, the Plaintiff worked as a patrol officer, primarily in sectors one, two, and three, encompassing lower Cambridge. RA 055-058. Once the Plaintiff had enough seniority to start getting assigned to his sector of choice, the Plaintiff chose to work in sector two, which encompassed Central Square and the public housing developments of Washington Elms and Newtowne Court. RA 059.

In June 2009, the Plaintiff applied to and joined the Special Investigations Unit ("SIU"), where he investigated drug and vice crimes. RA 060-061. For the ten years the Plaintiff was assigned to the SIU, he participated in hundreds of drug crime investigations. RA 061-062. During the Plaintiff's time in the SIU, he worked with confidential informants and otherwise spoke with drug users throughout the City of Cambridge. RA 061-062. To secure the cooperation of confidential informants and other drug users who provided information to the Cambridge Police Department, the Plaintiff "had to reassure them that…we were going to protect them, nothing would happen to them, we would do whatever we

---

[9] The Plaintiff is not a life-long resident of Cambridge as his brief claims. Plf. Br. 5, RA 423. While this is not a material fact, the Defendants believe accuracy is important.

could to help them." RA 066. The Plaintiff spent a lot of his time in the SIU convincing drug users to trust him. RA 067.

## SUMMARY OF THE ARGUMENT

The Plaintiff posted a comment to his Facebook account that "perpetuates stigmatizing and discriminatory practices that could be considered insensitive" and was "potentially damaging to the Department, as it appears that [the] post represents the views, thoughts, and opinions of the majority of Cambridge Police Officers." RA 424. The Plaintiff's post seems to have offended at least one of his Facebook friends, who took a screenshot of the post and released it. RA 193. The post made its way to the Cambridge NAACP, who, within one week of the post, connected it to the Cambridge Police Department and reached out to Bard and DePasquale. Id. For these reasons, the Plaintiff's argument that the Defendants did not have a legitimate interest in maintaining the public's trust in its Police Department, which clearly justified the Plaintiff's four-day suspension, fails.

In the District Court, the Plaintiff claimed that there was no genuine dispute as to a material fact and moved for summary judgment on the issue of whether the Plaintiff's right to make his post outweighs the Defendants' interest in efficiently operating its Police Department. RA 243. Now that the District Court ruled against him and allowed the Defendants' motion for summary judgment, the Plaintiff unavailingly claims for the first time that there is a genuine dispute as to a material

fact as to the Defendants' motivation for disciplining the Plaintiff. As all of the

competent evidence proves otherwise, the Plaintiff's argument fails.

The Plaintiff's argument, which he makes for the first time on appeal, that

this Court should create a new, more restrictive standard requiring employers to

show actual disruption, is waived. Furthermore, the argument is contrary to

decades of Supreme Court precedent and case law from throughout the circuits.

Indeed, this Court considered this argument and rejected it recently in *MacRae v.

Mattos*, 106 F.4th 122 (1st Cir. 2024). As Bard noted, "trust takes a lifetime to

build and just a moment to tear down," which is why courts have consistently held

that employers are not required to wait until a disruption occurs before disciplining

employees. RA 210. Additionally, because the Defendants demonstrated that their

predictions of disruption were reasonable, the Defendants substantial interest in

maintaining the public's trust outweighs the Plaintiff's interest in posting a

mocking, derogatory, and disparaging comment on Facebook.

## ARGUMENT

### I.      Standard of Review.

This Court reviews a District Court's grant of summary judgment *de novo*.

*Ithier v. Aponte-Cruz*, 105 F.4th 1, 6 (1st Cir. 2024). "A court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II.   The Plaintiff's Mocking, Derogatory, and Disparaging Comment That Evidenced Bias Against the Very Community He Serves Is Entitled to Less Weight in the *Pickering* Balancing Test.

While public employees do not lose their First Amendment rights to speak on matters of public concern, those rights are not absolute. *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007). This Court evaluates a claim of retaliation against an employee exercising their First Amendment rights with a three-step inquiry. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The first (that the employee was speaking as a private citizen on a matter of public concern) and third (that the employee's speech was a substantial or motivating factor in the adverse employment decision) steps are conceded by the Defendants. *Id.* The issue in this case is whether the Defendants "had an adequate justification for treating the employee differently from any other member of the general public." *Id.* The District Court properly found that the Defendants did.

In determining whether the Defendants had an adequate justification for treating the Plaintiff differently from any other member of the public, the Court, using the *Pickering* balancing test, "must balance the interests of the employee, as a citizen, in commenting upon matters of concern and the interest of the [Defendants], as an employer, in promoting the efficiency of the public services it

performs through its employees." *MacRae,* 106 F.4th at 133 (citing *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008)).

Viewing the facts in the light most favorable to the Plaintiff, his Facebook post touched upon the name of proposed legislation, which is an issue of public concern. However, the Plaintiff's Facebook post used mocking, derogatory, and disparaging language to describe a homicide victim who was murdered at the hands of police and whose murder sparked a national reckoning on the biases of the country's police. The Plaintiff's mocking, derogatory, and disparaging language was focused on Floyd's criminal history and substance abuse. The Plaintiff's post gave "the impression the [Plaintiff] does not believe in rehabilitation and is disrespectful of people suffering from substance use disorder." RA 166-67. And, given the Plaintiff's public-facing role as a police officer, the Plaintiff's post could "be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance abuse disorder." Id. Individuals with substance abuse are the same individuals that the Police Department worked closely with and whose trust the Police Department needed. RA 061-62; 066-67; and 208.

This Court has held, consistent with other jurisdictions, that an employee's interest can diminish in the *Pickering* balancing test when that speech is done in a "mocking, derogatory, and disparaging manner." *MacRae,* 106 F.4th at 133.

Recently, in *MacRae*, this Court held that an employee's interest in speech done in a "mocking, derogatory, and disparaging manner" weighs less than it normally would. *Id.* Similarly, in *Curran*, this Court ruled that "speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balancing." 509 F.3d at 49. This Court's holdings are consistent with the Sixth Circuit, which concluded that speech "couched in terms of political debate" "was not in the 'highest rung' of protected speech" in part because it involved an "offensive slur." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.2d 530, 538-39 (6th Cir. 2020). The Ninth Circuit likewise recognized limits on the protection speech deserves, even when the speech touched on matters of public concern, when it stated that a police officer's speech occupies "a much lower rung on the First Amendment hierarchy, and indeed they touched on matters of public concern 'in only a most limited sense'" because the officer's speech "expressed hostility toward, and sought to denigrate or mock, a major religious faith and its adherents." *Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022) (citing *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

There can be no question that the Plaintiff's Facebook post was done in a "mocking, derogatory, and disparaging manner" and is entitled to less weight in the *Pickering* balancing test. The Plaintiff argues that the term "druggie" is not derogatory and relies on the lack of a label on Merriam-Webster.com. Plf. Br. 22.

Merriam Webster is not the authority for defining derogatory language that is entitled to less weight when applying the *Pickering* balancing test. Here, context matters. Bard described the term "druggie" as derogatory towards people with substance abuse issues. RA 208. Bard also said, "for a police officer to use [druggie], you know, it dehumanizes, and it in some ways demonizes." RA 215. The Plaintiff's post gave "the impression the [Plaintiff] does not believe in rehabilitation and is disrespectful of people suffering from substance use disorder." RA at 166-67. And, given the Plaintiff's public-facing role as a police officer, the Plaintiff's post "can be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance abuse disorder." Id.

Contrary to the Plaintiff's argument, this Court does not require the Plaintiff's speech to be "extreme" to weigh less than it otherwise would. Plf. Br. 22, 23. In *MacRae,* this Court recently found that a meme was "clearly insulting and disparaging" when it included the text "'I'm an expert on mental health and food disorders.' …says the obese man who thinks he's a woman." 106 F.4th at 137. Even though that speech contained no vulgarity, profanity, or racially charged language, this Court ruled the plaintiff's speech was done in a "mocking, derogatory, and disparaging manner," and thus her interest was "not accorded the highest value by the First Amendment." *Id.* Likewise, Plaintiff's post in the instant action was mocking, derogatory, and disparaging of the very individuals the

Cambridge Police Department is often working hand-in-hand with and thus the Plaintiff's interest is entitled to less weight in the *Pickering* balancing test.

## III. In Contrast, the Defendants Have a Strong Interest in Maintaining a Police Department Free of Bias and Maintaining the Public's Trust.

The Defendants' interest in maintaining the public's trust in its police department cannot be overstated. Courts have long recognized the need for police departments to maintain the public's trust and regulate their officers' speech to maintain that trust. This Court recognizes a "heightening [of] the governmental interest…under our circuit precedent" when employers are a law enforcement agency. *Curran*, 509 F.3d at 50. The Second Circuit noted the importance of public trust in its police department:

> [t]he effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and *without bias*. If the police department treats a segment of the population… with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired. Members of the minority will be less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection. When the police make arrests in that community, its members are likely to assume that the arrests are a product of bias, rather than well-founded, protective law enforcement.

*Locurto v. Giuliani*, 447 F.3d 159, 178 (2nd Cir. 2008). (emphasis added).

Likewise, even the Plaintiff recognizes the importance of gaining the trust of the individuals the department serves. RA 066-67. The Plaintiff worked in SIU,

primarily investigating drug crimes for a decade. RA 060-61. The Plaintiff

acknowledged that gaining the trust of individuals was vital to their investigations,

and he spent "a lot of time" speaking with drug users. RA 066-67. The Plaintiff

testified that he "had to reassure them that…we were going to protect them…we

would do whatever we could to help them." RA 066.

> Former Commissioner Bard said it best when he stated:

> Folks viewed the Cambridge Police Department as one who favors prevention, intervention, and diversion over more serious or more punitive methods traditionally associated with the criminal justice system. You know, we pride ourselves on the fact that we believe that individuals are better served through a social justice approach than through your traditional criminal justice approaches. And when you have that approach, that means that you're often working hand in hand with individuals who have, you know, fallen in life and are working towards better outcomes. Some of those individuals have substance use issues.

RA 209. Former Commissioner Bard went on to say that the post:

> was disparaging, it was dehumanizing, and that it, particularly in the context of the national climate, tore at the fabric of the trust that we spent a long time building. You know, the old saying trust takes a lifetime to build and just a moment to tear down. Well, any individual associated with the Cambridge Police Department could in a moment tear down, you know, that trust we've spent a long time building with the community…

RA 209-10. Accordingly, the District Court properly found that the Defendants

have a strong interest in maintaining a police department free from bias and

maintaining the public trust.

**A. There Is No Genuine Dispute About the Defendants' Motivation.**

Having established the Defendants' important interest, this Court also considers "(1) the time, place, and manner of the employee's speech, and (2) the employer's motivation in making the adverse employment decision." *MacRae*, 106 F.4th at 136-37 (quoting *Davignon*, 524 F.3d at 104).

"A social media platform amplifies the distribution of the speaker's message – which favors the employee's free speech interests – but also increases the potential, in some cases exponentially, for departmental disruption." *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016). When the Plaintiff posted on Facebook, he lost all control over who further amplified or copied the post to share it beyond Facebook. As a result, the Plaintiff's speech was made in a place where the audience was limitless, and that audience was almost certainly going to, and did, connect it to the Cambridge Police Department.

This Court draws all reasonable inferences in favor of the Plaintiff to determine whether he "has put forward competent evidence to show a genuine dispute as to any material fact." *Hernandez v. Wilkinson*, 986 F.3d 98, 102 (1st Cir. 2021) (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 16 (1st Cir. 2013)). The "nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Noviello v. City of Boston*, 398 F.3d 76,

84 (1st Cir. 2005) (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986). "Moreover, the factual conflicts relied upon by the nonmovant must be both genuine and material." *Mulvihill*, 335 F.3d at 19. "For this purpose, 'genuine' means that the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and 'material' means that the fact is one that might affect the outcome of the suit under the applicable law." *Id.* "A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 6 (1st Cir. 2011). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Here, PSU investigators concluded that the Plaintiff's Facebook post could "be interpreted that the Cambridge Police have a bias against people who have committed felony crimes or have a substance use disorder." RA 167. In the letter

informing the Plaintiff of his four-day suspension, Bard stated that the Plaintiff's post:

> perpetuates stigmatizing and discriminatory practices that could be considered insensitive. Additionally, as this post was clearly disseminated outside of your Facebook group, it can be viewed by people you have never met or spoken to; therefore they will only know you as a Cambridge Police Officer, which is potentially damaging to the Department, as it appears that your post represents the views, thoughts, and opinions of the majority of the Cambridge Police Officers.

RA 424. Bard himself testified under oath that he was concerned that the Plaintiff's post was insensitive to individuals with substance use issues and would cause irreparable harm to the Cambridge Police Department's reputation. RA 198, 200.

In contrast, the Plaintiff misstates the record and uses those misstatements to support his assertion that the Defendants had some other motive to discipline him. In an attempt to create a dispute about the Defendants' motivation, the Plaintiff continues to argue that the Cambridge Police Department did not investigate a July 2020 tweet on the official Twitter account of the Cambridge Police Patrol Officers Association. The Plaintiff continues to ignore that the tweet was made on the official Twitter account of the Cambridge Police Patrol Officers Association, an independent union separate and distinct from the Cambridge Police Department. RA 359. The Plaintiff still provides no support for his contention that the Cambridge Police Department has the authority to investigate the official Twitter

account of an independent organization, which is likely covered under M.G.L. c. 150E as protected activity, short of investigating criminal conduct.

The Plaintiff also refers to other "inflammatory comments" that "made the local news." Plf. Br. 30. The Plaintiff's brief does not include a cite to the record, so it is unclear to what "comments" the Plaintiff is referring. If the Plaintiff is referring to retired Deputy Superintendent Albert ("Albert") misusing the Police Department's Twitter account and posting an inappropriate comment, the evidence is that Albert was disciplined with a five-day suspension. RA 181. Bard could not recall whether he placed Albert on paid administrative leave during an investigation or whether Albert served his suspension, rather than forfeiting vacation days. Id. Bard's lack of memory is not evidence that Albert was not placed on administrative leave and did not serve his suspension, especially since Bard could not remember if he placed this Plaintiff on paid administrative leave during the investigation into the Facebook post at issue here. RA 196. If the Plaintiff is referring to some social media post by Deputy Paul Upton ("Upton"), Upton was employed with the Somerville Police Department, not the Cambridge Police Department. RA 200.

Finally, the Plaintiff points to Commissioner Christine Elow ("Elow") using the derogatory term "crackheads" in a private conversation between herself and the Plaintiff. As the District Court noted, details "are so limited [concerning this

statement] they are not sufficient to create a material dispute of facts…" Plf. Add 032. As such, the facts Plaintiff relies on to advance his contention that the Defendants had some other motive for disciplining him is unsupported by the record and without merit.

The Defendants were not required to further publicize the Plaintiff's comment and risk disruption of its operations to determine who else was aware of the post and the Plaintiff provides no case law to support that proposition. The Defendants became aware of the Plaintiff's post by members of the public, so they had evidence that the post made it out of the Plaintiff's already large sphere of Facebook friends and raised concerns among community members.[10] For these reasons, there is no genuine dispute as to Defendants' motivation.

### B. This Court Should Not Overrule Recent Precedent and Require Actual Disruption in Political Speech Cases and the Court Properly Found the Defendants' Prediction of Disruption Reasonable.

For the first time on appeal, the Plaintiff encourages the Court to create a more restrictive test requiring an employer to show actual disruption in any case where the speech is a matter of public concern. Plf. Br. 35. This Court recently considered this issue in *MacRae* and rejected it. 106 F.4th at 138. Like in *MacRae*,

---

[10] The Plaintiff's reliance on *Fenico* is misplaced, as that case was decided at the motion to dismiss stage and the court had to accept all allegations in the plaintiffs' complaint as true, including the allegation that there was no actual or reasonable prediction of disruption. *Fenico v. City of Philadelphia*, 70 F.4th 151, 167 (2023).

the Plaintiff failed to raise this argument below, so it is waived on appeal. *Id.* (citing *Hamdallah v. CPC Carolina PR, LLC*, 91 F.4th 1, 27, n. 32 (1st Cir. 2024)).

Not only is the Plaintiff's argument waived and contrary to this Court's recent holding, the Plaintiff devoted pages of his brief to argue why the Court should adopt an actual disruption standard but failed to notice that existing case law and the current balancing test already address his concerns. *Curran*, 509 F.3d at 48 ("the stronger the First Amendment interest in the speech, the stronger the justification the employer must have.") (citing *Connick*, 461 U.S. at 150). The Plaintiff claims that "courts have been unclear on precisely when actual disruption is needed," but the cases he cites do not support his contention. Plf. Br. 31. In each case cited by the Plaintiff, the respective court weighed the employee's First Amendment right to speak with evidence of either actual or reasonable predictions of disruption of the employer's operations.[11]

---

[11] The Plaintiff cites specific cases as evidence that the circuits are divided on whether actual disruption is needed. The Plaintiff's argument is apparently hindered by citing more recent cases from each circuit and accurate representations of the holdings. For example, the Plaintiff cites *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983), but ignores *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 979 (9th Cir. 1998) (reasonable predictions of disruption sufficient). The Plaintiff also claims that the Tenth Circuit found that evidence of actual disruption must be introduced in all cases. Plf. Br. 32. But the case cited by the Plaintiff, *Melton v. City of Oklahoma City*, 879 F.2d 706, 716, n.11 (10th Cir. 1989) said no such thing. Indeed, the footnote cited by the Plaintiff states that the government had "made no showing of disruption or, for that matter, potential disruption." *Id.*

Despite the Plaintiff's argument, the Supreme Court has rightly and consistently held that employers need not wait for the disruption to occur. *Connick*, 461 U.S. at 152 ("we do not see the necessity for an employer to allow events to unfold to the extent that…the destruction of working relationships is manifest before taking action.") and *Waters v. Churchill*, 511 U.S. 661, 673 (1994) ("we have given substantial weight to the government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern…"). This is true even for political speech. *U.S. Civil Service Commission v. National Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 565 (1973) ("it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.").

Further, the Plaintiff's reliance on *Rankin v. McPherson* is misplaced. The employee in *Rankin* was a clerical worker in a constable's office with no public-facing duties and her comment was made in a private conversation to a co-worker. 483 U.S. 378, 381 (1987). There was no possibility that the comment discredited the constable's office because she had no interactions with the public and her comment was made in a place where the general public did not have access and no one from the general public heard the comment. *Id.* at 389. Here, however, the

Plaintiff made his comment on social media. His comment made it beyond his Facebook friends and into the hands of the public, namely the Cambridge NAACP, who was able to connect the Plaintiff's post with the Cambridge Police Department within a week. RA 193-94. The Plaintiff is a police officer and "[a] police officer walking the beat…is often the representative with whom the public interacts. It is not difficult to see how such an officer who expresses racist views in certain situations could damage the efficient operation of the [police department]." *Pappas v. Guiliani*, 290 F.3d 143, 156 (2nd Cir. 2002) (Sotomayor, J., dissenting).

The current standard, that the government employer demonstrates a reasonable prediction of disruption, considers a government employer's need to continue to provide necessary services to the public. As Bard noted, the Plaintiff's post "ran the risk of doing irreparable harm to the department's reputation." RA 200. Bard noted that the Cambridge Police Department spent a long time building trust with the public and "trust takes a lifetime to build and just a moment to tear down." RA 210. Therefore, because the Plaintiff's argument is waived and is contrary to even the case law he cited, the Court should decline to adopt a new standard that requires a government employer to show actual disruption in all cases in which the speech is on a matter of public concern.

Here, the Defendants' predictions of disruption were reasonable. Courts give "substantial weight to government employers' reasonable predictions of disruption,

even when the speech involved is on a matter of public concern." *Waters*, 511 U.S. at 673. Police officers "are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to the community's view of the respect that police officers…accord the members of the community." *Locurto*, 447 F.3d at 178-79. Justice Sotomayor, while on the Second Circuit, stated that a court "must consider not only the agency's mission in relation to the nature of the speech but also the employee's responsibilities in relation to that mission." *Pappas*, 290 F.3d at 156 (Sotomayor, J., dissenting). The mission of the Cambridge Police Department is partnering "with the community to solve problems and improve public safety in a manner that is fair, impartial, transparent, and consistent."[12] The Plaintiff was employed as a patrol officer, who, throughout his career, has been both a detective charged with investigating drug-related offenses and a police officer, walking a beat. "A police officer walking the beat…is often the representative with whom the public interacts." *Pappas*, 290 F.3d at 156 (Sotomayor, J., dissenting).

Here, the Cambridge Police Department was reasonable in its concern that the Plaintiff's post "ran a risk of doing irreparable harm to the department's

---

[12] The District Court took judicial notice of the Mission Statement and Core Values, City of Cambridge Police Department, https://www.cambridgema.gov/Departments/cambridgepolice/missionstatementa ndcorevalues (last visited Mar. 5, 2024). Plf. Add. 024.

reputation." Bard and DePasquale met with three members of the public, Harding, Reeves, and Barbosa, who complained about the Plaintiff's Facebook post containing disparaging comments about George Floyd and individuals with substance abuse disorders. RA 194. Reeves, in particular, was concerned with how the post reflected on the Cambridge Police Department, telling Bard that the Plaintiff's post "called into question [the department's] ability to serve in a biased-free manner that [it] purport[s] to embody." RA 197. As the District Court correctly noted, "the community complaints about the Facebook post provide the necessary evidence to justify Defendants' perception that Hussey's comments could have undermined public trust." Plf. Add. 025.

The fact that the Defendants successfully avoided widespread media publicity and a loss of public trust due to the Plaintiff's post does not make the Defendants' predictions unreasonable. Instead, it is evidence that once the Defendants learned of the post, its public nature, and that it had already been linked to the Cambridge Police Department, they took decisive action to avoid a loss of the public's trust. Understanding the environment in which the reasonable prediction took place is essential. The Plaintiff made the post only months after Floyd was murdered at the hands of a police officer, which prompted explosive attention to the issue of bias in policing. At the time of the Plaintiff's post, Floyd's murder and the problem of bias in policing had not faded from the public eye.

Additionally, the Plaintiff's post, identity, and link to the Cambridge Police Department was known to the NAACP, an organization "whose chapters advocate against bias in policing."[13] *See*, *Marquardt v. Carlton*, 21-3832, 2023 WL 395027 *4-5 (6th Cir. 2023) (employer's prediction of future disruption reasonable in part because of recent explosive media reaction, including a critical statement from the Cleveland NAACP in the local news, about related events, namely the lethal officer-involved shooting of a twelve-year-old boy). The Plaintiff's argument that the Defendants' predictions of disruption were unreasonable simply fails and the Court should not overturn its recent precedent and require actual disruption.

**CONCLUSION**

In light of the preceding, the Defendants-Appellees respectfully request that this Honorable Court affirm the judgment in their favor.

---

[13] Plf. Add. 026, n. 19. The District Court took judicial notice of the NAACP mission statement <u>Mission-Vision</u>, NAACP, <u>https://naacp.org/about/mission-vision</u> (last visited Mar. 5, 2024).

Respectfully submitted,
CITY OF CAMBRIDGE;
CHRISTINE ELOW
The Defendants-Appellees
By their attorney,

_____

Kate M. Kleimola, Bar No. 1211887
Assistant City Solicitor
City of Cambridge
495 Massachusetts Ave., 3rd Floor
Cambridge, MA 02130
(617) 349-4121
kkleimola@cambridgema.gov

Date: July 29, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,194 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman type.

_Kate M. Kleimola_

Kate M. Kleimola, Bar No. 1211887
Assistant City Solicitor
City of Cambridge
495 Massachusetts Ave., 3rd Floor
Cambridge, MA 02130
(617) 349-4121
kkleimola@cambridgema.gov

Date: July 29, 2024

# CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Harold Lichten
Jack Bartholet
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800

_____
Kate M. Kleimola, Bar No. 1211887
Assistant City Solicitor
City of Cambridge
495 Massachusetts Ave., 3rd Floor
Cambridge, MA 02130
(617) 349-4121
kkleimola@cambridgema.gov