# No. 24-1279

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

BRIAN HUSSEY,
*Plaintiff-Appellant,*

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as
Commissioner of the Cambridge Police Department,
*Defendants-Appellees,*

BRANVILLE G. BARD, JR., in his individual capacity,
*Defendant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
Case No. 1:21-CV-11868
The Honorable Angel Kelley

## REPLY BRIEF OF PLAINTIFF-APPELLANT BRIAN HUSSEY

Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
hlichten@llrlaw.com
jbartholet@llrlaw.com

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  ARGUMENT ......................................................................................4

    A.    Defendants' sole argument — that Officer Hussey's
          speech was so inherently vulgar, insulting, and defiant as
          to be devoid of First Amendment protection — is
          manifestly wrong. ..............................................................................4

          1.    Officer Hussey's post was not vulgar, insulting,
                and defiant. ..................................................................................6

          2.    Defendants' disagreement with Officer Hussey's
                political message renders it neither vulgar nor
                reasonably likely to be disruptive. .............................................13

    B.    The Pickering Balancing Test requires reversal ..................................17

          1.    Officer Hussey's and the public's strong interests
                in what all parties agree was core political speech
                plainly outweigh the government's purported
                interests in preventing equivocal, speculative, and
                unrealized predictions of ill-defined disruption. ......................17

          2.    As Officer Hussey has maintained throughout this
                litigation, actual disruption was required to
                overcome his and the public's interests in his core
                political speech .........................................................................19

    C.    Defendants' reimagining of Pickering would do violence
          to the First Amendment ......................................................................21

III. CONCLUSION..................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*,
    398 U.S. 144 (1970)......................................................................22

*Bennett v. Metro. Govt. of Nashville & Davidson Cnty., Tennessee*,
    977 F.3d 530 (6th Cir. 2020),................................................ 14, 16

*Berger v. Battaglia*,
    779 F.2d 992 (4th Cir. 1985)..........................................................27

*Brasslett v. Cota*,
    761 F.2d 827 (1st Cir. 1985) .........................................................25

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson*,
    60 F.4th 770 (4th Cir. 2023)...........................................................22

*Citizens United v. Fed. Election Commn.*,
    558 U.S. 310 (2010).......................................................................15

*City of San Diego, Cal. v. Roe*,
    543 U.S. 77 (2004).........................................................................25

*Com. v. Young*,
    96 N.E.2d 133 (Mass. 1950)..........................................................29

*Connick v. Myers,*
    461 U.S. 138 (1983)............................................................ 16, 26, 28

*Cullen v. Pinholster*,
    563 U.S. 170 (2011).......................................................................18

*Curran v. Cousins*,
    509 F.3d 36 (1st Cir. 2007) ...................................................... 13, 28

*Fed. Election Commn. v. Wisconsin Right To Life, Inc.*,
    551 U.S. 449 (2007).......................................................................15

*Feiner v. New York,*
    340 U.S. 315 (1951)..................................................................23

*Fenico v. City of Philadelphia,*
    70 F.4th 151 (3d Cir. 2023)......................................................9

*Garland v. Astrue,*
    2008 WL 867920 (E.D. Tenn. Mar. 28, 2008)..............................18

*Getty Petroleum Mktg., Inc. v. Capital Terminal Co.,*
    391 F.3d 312 (1st Cir. 2004) ....................................................25

*Iancu v. Brunetti,*
    588 U.S. 388 (2019)................................................................23

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,*
    650 F.3d 915 (3d Cir. 2011) ....................................................22

*James v. Milwaukee Cnty.,*
    956 F.2d 696 (7th Cir. 1992)....................................................19

*Karlan v. City of Cincinnati,*
    416 U.S. 924 (1974)................................................................22

*Lane v. Franks,*
    573 U.S. 228 (2014)................................................................28

*MacRae v. Mattos,*
    106 F.4th 122 (1st Cir. 2024) ..................................... 12, 14, 16, 28

*Matal v. Tam,*
    582 U.S. 218 (2017)................................................................22

*Melzer v. Bd. Of Ed. of City Sch. Dist. of City of New York,*
    336 F.3d 185 (2d Cir. 2003)) ...................................................23

*Munroe v. C. Bucks Sch. Dist.,*
    805 F.3d 454 (3d Cir. 2015), *as amended* (Oct. 25, 2019) ................. 9, 16, 23

*N.A.A.C.P. v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982)........................................................8, 11, 25

*Nichols v. Dancer*,
    657 F.3d 929 (9th Cir. 2011)) ........................................................27

*Nielsen v. Preap*,
    586 U.S. 392 (2019)........................................................................17

*Penobscot Nation v. Frey*,
    3 F.4th 484 (1st Cir. 2021) ............................................................17

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*,
    391 U.S. 563 (1968)............................................................... passim

*Pinholster v. Ayers*,
    590 F.3d 651 (9th Cir. 2009).........................................................18

*Pugin v. Garland*,
    599 U.S. 600 (2023)........................................................................17

*Pulsifer v. U.S.*,
    601 U.S. 124 (2024)........................................................................15

*Ramos v. Louisiana*,
    590 U.S. 83 (2020)..........................................................................16

*Rankin v. McPherson*,
    483 U.S. 378 (1987)................................................................. 10, 16

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
    490 U.S. 477 (1989)........................................................................16

*Rosaura Bldg. Corp. v. Municipality of Mayaguez*,
    778 F.3d 55 (1st Cir. 2015) ............................................................24

*Sacco v. Greene*,
    2007 WL 432966 (S.D.N.Y. Jan. 30, 2007)..................................18

*San Juan Cable LLC v. Puerto Rico Tel. Co., Inc.*,
    612 F.3d 25 (1st Cir. 2010) ............................................................16

*Sexton v. Martin*,
    210 F.3d 905 (8th Cir. 2000)..........................................................28

*Snyder v. Phelps*,
    562 U.S. 443 (2011)..................................................................16

*Stokeling v. United States*,
    586 U.S. 73 (2019)..................................................................19

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)..................................................................19

*United States v. Acosta-Colon*,
    741 F.3d 179 (1st Cir. 2013) ...................................................19

*United States v. Barcley*,
    452 F.2d 930 (8th Cir. 1971)....................................................14

*United States v. Benton*,
    957 F.3d 696 (6th Cir. 2020)....................................................19

*United States v. Holt*,
    2021 WL 5168891 (E.D. Wis. Mar. 12, 2021) ............................19

*United States v. Rachuy*,
    743 F.3d 205 (7th Cir. 2014)....................................................20

*United States v. Rosales-Diaz*,
    367 F. App'x 62 (11th Cir. 2010) ..............................................20

*United States v. Rose*,
    12 F.3d 1414 (7th Cir. 1994)....................................................19

*United States v. Schwimmer,*
    279 U.S. 644 S.Ct. 448, 73 L.Ed. 889 (1929) ............................22

*United States v. Swenson*,
    51 M.J. 522 (A.F. Ct. Crim. App. 1999).....................................18

*United States v. Thomas*,
    815 F.3d 344 (7th Cir. 2016)....................................................20

*United States v. Turner*,
    470 F.2d 372 (D.C. Cir. 1972) .................................................19

*United States v. Wilson*,
    351 F. App'x 94 (6th Cir. 2009) ....................................................20

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).....................................................................30

*Walker v. Dillard*,
    523 F.2d 3 (4th Cir. 1975)............................................................22

*Wooden v. United States*,
    595 U.S. 360 (2022).....................................................................19

**Statutes**

M.G.L. ch. 41 § 98 ............................................................................29

**Other Authorities**

132 CONG. REC. E3079-02, 1986 WL 794184.......................................18

134 CONG. REC. 13783 (1988) ...........................................................19

149 CONG. REC. E189-02, E190, 2003 WL 296674 ..............................18

*Drug Transit Zone Operations: Hearing Before the Subcomm. on
    Crim. Just., Drug Pol'y and Hum. Res. of the H. Comm. on
    Gov't Reform,* 109th Cong., 2006 WL 1126663 (2006) ...............18

Dwight Garner, *Need Etiquette Tips for Cannabis? For Starters, Don't
    Call It 'Marijuana' or 'Weed'*, N.Y. TIMES: BOOKS OF THE
    TIMES (July 8, 2019),
    https://www.nytimes.com/2019/07/08/books/review-higher-
    etiquette-cannabis-lizzie-post.html...............................................18

PBS NewsHour, *WATCH: Governor Ron DeSantis gives remarks as
    he signs into law Florida's "Don't Say Gay" bill*, YOUTUBE
    (Mar 28, 2022),
    https://youtu.be/IVuniz7w1bQ?si=HQacaLEAiv_pvwNi...........................30

**Rules**

Fed. R. App. P. 10(a) ........................................................................24

Fed. R. Evid. 201 ...............................................................................25

# I. INTRODUCTION

At bottom, Defendants' argument in this appeal is that the language Officer Hussey used in his private Facebook post was offensive (which they brand as vulgar), and is thus entitled to lesser protection under the *Pickering*[1] balancing test. Yet all parties agree[2] the speech at issue constitutes core public discourse, which is entitled to "the highest rung" of protection. Moreover, Defendants mistake their political viewpoints for objective vulgarity and couch disagreement with Hussey's viewpoint as a reasonable predictor of the potential to disrupt the department's operations. This imagined potential for disruption[3] — which both Commissioner

---

[1] *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968).

[2] *See* Defs.' Br. 10 (conceding "that the employee was speaking as a private citizen on a matter of public concern"); *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quotations, citations, and alterations omitted) ("This Court has recognized that expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values. Speech concerning public affairs is more than self-expression; it is the essence of self-government. There is a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.").

[3] This alleged potential for disruption had no realistic basis in fact when the discipline was imposed. There was a completely disruption-free, 8-day gap between the post (which was only up for two hours on Hussey's Facebook page, which itself was restricted to his approximately 674 Facebook friends) and Hussey's placement on administrative leave, and then another entirely disruption-free, silent two-month gap from then until Hussey's ultimate suspension. JA247, JA011.

1

Bard and Defendants' Brief describe in equivocal and speculative terms[4] — was never reasonable. And regardless, as Hussey has consistently argued throughout the entire course of this litigation and as this Court's sister Circuits have recognized pursuant to Supreme Court doctrine, when the speech at issue is core political speech, actual disruption, rather than a mere potential for disruption, is required under *Pickering*'s "sliding scale in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public."[5]

Ultimately, Defendants' troubling approach to the disruption prong of the *Pickering* analysis would dramatically expand the contours of this carefully crafted exception to the First Amendment's robust prohibition on government censorship

---

[4]    *See, e.g.*, Defs.' Br. 8 (quoting Bard's letter notifying Officer Hussey of his suspension at RA 421) (alteration in original) (emphasis added) ("The Plaintiff posted a comment to his Facebook account that 'perpetuates stigmatizing and discriminatory practices *that could be considered* insensitive' and was '*potentially damaging* to the Department, as *it appears* that [the] post represents the views, thoughts, and opinions of the majority of Cambridge Police Officers.'").
        It must be noted that Defendants have never offered any rationale or support for Bard's assumption the views expressed on a private, restricted, personal Facebook account that did not mention Officer Hussey's profession or employer and had a maximum reach of roughly 674 "friends" personally known to Hussey would "appear[]" to the general public to "represent[] the views, thoughts, and opinions of the majority of Cambridge Police Officers."

[5]    *Fenico v. City of Philadelphia*, 70 F.4th 151, 162 (3d Cir. 2023) (quoting *Munroe v. C. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015), *as amended* (Oct. 25, 2019)).

by permitting public employers to shut down <u>all manner of</u> speech on public policies by the very employees with experience in the relevant fields whenever the speech fails to align with an employer's preferred viewpoint or exactingly scholarly non-colloquial language. Indeed, the thrust of Defendants' argument is that whenever a public employer, in its sole discretion, determines that speech "could be considered," "appears" to be, "seems to" be, "could 'be interpreted'" as, or "gave 'the impression'" of going against some ambiguous department value or running "afoul of what we purport to embody,'" Defs.' Br. 5, 8, 11, the employer can forbid the political speech and punish its speakers. But this has the very real potential to shut off *most any* debate on political topics touching upon public employees' work, or at least circumscribe employees' speech to solely that which is endorsed by their employer.[6]

Accepting Defendants' conception of their own authority to declare speech contrary to their preferred viewpoint as 'potentially disruptive' would drastically

---

[6]    *But see Rankin v. McPherson*, 483 U.S. 378, 384 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."); *cf. Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.").

narrow the rights of public employees — one in eight American workers[7] — to participate in what the Supreme Court has called "the essence of self-government." *Claiborne Hardware*, 458 U.S. at 913. This, in turn, would transform a narrowly defined, sliding-scale exception to the First Amendment's robust ambit into a loophole allowing unregulated government censorship of a significant swath of the populus. This constitutionally foreign approach simply must be rejected.

## II. ARGUMENT

### A. Defendants' sole argument — that Officer Hussey's speech was so inherently vulgar, insulting, and defiant as to be devoid of First Amendment protection — is manifestly wrong.

 Defendants' only real substantive argument is that the use of the terms "druggie," "thief," and "career criminal" are somehow so intrinsically insulting and demeaning that Hussey's speech falls outside of the First Amendment's protections. But Defendants offer no support for their dubious position, other than to repeatedly quote themselves saying so. While Defendants may disagree — even profoundly disagree — with Officer Hussey's views about naming landmark police reform legislation, they cannot transform his accurate and civil political speech into vulgarity, insult, and defiance in an effort to find a convenient work-around to the *Pickering* doctrine.

---

[7] *See* Pl.'s Br. 32–33.

In reality, every possible source — dictionary definitions, federal court usages, Congressional debates, reputable newspapers' articles — makes clear these are everyday, unoffensive terms to describe someone convicted of the same offenses as Mr. Floyd. Caselaw in this area — including this Court's recent *MacRae*[8] decision — further illustrates the dramatic distance between Officer Hussey's remarks and those found vulgar, insulting, and defiant. Hussey cannot be required to use the King's English in order to participate in political discourse, and forcing adherence to some vague standard would only chill political speech. And no matter how many times Defendants quote Commissioner Bard's subjective beliefs that these terms were dehumanizing or outrageously insulting, simply declaring it so is insufficient to extinguish Officer Hussey's significant interests in being permitted to enter the public discourse on a topic for which he has considerable experience.

On the other hand, permitting public employers to punish civil discourse with which they disagree, whether couched as vulgarity or potentially disruptive, would upend the First Amendment's core purpose and inescapably constitute viewpoint discrimination. Likewise, allowing members of a vocal local interest group — backed by Cambridge's former mayor — to use their political clout to commandeer the City's authority to censor its employees under the guise of

---

[8]     *MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024).

5

preventing disruption in an effort to dictate what shall be orthodox political discourse in Cambridge is constitutionally infirm. This novel attempt at employing a heckler's veto is both foreign to the *Pickering* analysis and proscribed by the First Amendment.

### 1. Officer Hussey's post was not vulgar, insulting, and defiant.

Even if the terms "druggie," "thief," and "career criminal" are not the most genteel ways of describing Mr. Floyd's criminal history, Hussey's post is nevertheless a far cry short of being "vulgar, insulting, and defiant," *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007),[9] "offensive slur[s]," *Bennett v. Metro. Govt. of Nashville & Davidson Cnty., Tennessee*, 977 F.3d 530, 543 (6th Cir.

---

[9] The speech at issue in *Curran* included "threatening and menacing" comments like, "[Y]ou captains and deputies are gonna get shot," as well as online postings comparing superiors to Nazis and suggesting employees should assassinate them. *Curran*, 509 F.3d 40–49. The court there also noted that other parts of the speech at issue were "defamatory of the Sheriff and put pejorative labels on those who did not engage in insubordination." *Id.* Moreover, noting the time, place, manner, and content of the plaintiff's speech, the court explained that the online union forum in which he posted his comments included incredibly incendiary, violent, racist remarks and threats directed towards the police chief. *Id.* at 41 (footnote omitted) (alterations in original) ("The discussion board had earlier hosted threatening and racist messages by others directed towards Cousins, who is African–American. One posting included a picture superimposing cross hairs on the face of the Sheriff with a caption stating, 'Pull the trigger on the NIGGER!!!' Another posting referred to the Sheriff as a 'pimp' and his subordinates as 'whore[s].' One poster referred to a Department employee as a '[h]ouse slave' and the Sheriff as the 'master who thinks he's white cause he lives in whitevill.' In a posting responding to a question of whether there was anyone able to help address alleged disparities in discipline, the author responded, 'Yeah, there was someone who can [sic] help, but James Earl Ray is DEAD!'").

2020),[10] or speech done "in a mocking, derogatory, and disparaging manner," *MacRae*, 106 F.4th at 137.[11]

In reality, the terms "druggie," "thief," and "career criminal" are nothing more than descriptive terms for those who use narcotics, have been convicted of theft, and have extensive criminal records, all of which accurately described Mr. Floyd. While Officer Hussey could have used more sterile terms to make his protected political point, like "person with substance use disorder," "person convicted of theft," and "person with an extensive criminal record," the First Amendment simply does not require citizens engaging in political discourse to so carefully choose their words, nor dictate with precision what words must be chosen. "Such communication falls within the purview of the First Amendment whether phrased in the King's English or peddler's French." *United States v. Barcley*, 452 F.2d 930, 933 (8th Cir. 1971).

---

[10]    The speech at issue in *Bennett* included "perhaps the most offensive and inflammatory racial slur in English, a word expressive of racial hatred and bigotry." *Bennett*, 977 F.3d at 543 (quotations and citation omitted).

[11]    The speech at issue in *MacRae* "was clearly insulting and disparaging," mocked both particular transgender individuals as well as transgender people as a group, included comments superimposed over inappropriate and demeaning images, ridiculed a specific transgender woman and government official as not only "obese" but an "obese man who thinks he's a woman," referred to those who recognize systemic racism as "race hustlers," and otherwise taunted Black, Asian, Mexican, and undocumented communities. *MacRae*, 106 F.4th at 137.

The First Amendment permits neither Defendants nor federal courts to Monday-morning-quarterback the precise word choices of a political speaker made in the heat of the moment, nor require this Court to read over character-limited posts with a fine-tooth comb, probing each word and weighing possible alternative choices. Otherwise, "[t]he interpretive process itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable. First Amendment standards, however, 'must give the benefit of any doubt to protecting rather than stifling speech.'" *Citizens United v. Fed. Election Commn.*, 558 U.S. 310, 327 (2010) (quoting *Fed. Election Commn. v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 469 (2007)).

Of course, when speech is flagrantly vulgar, insulting, and defiant, or mocking, derogatory, and disparaging,[12] this Court has joined other Circuits in making clear such speech can have a greater potential for disruption and thus be

---

[12]     Both *Curran* and *MacRae* use the conjunctive "and," suggesting that the speech must be "vulgar" *and* "insulting" *and* "defiant" or "mocking," *and* "derogatory," *and* "disparaging" in order to be deserving of lessened protection. *See generally Pulsifer v. U.S.*, 601 U.S. 124, 139 (2024) (noting "use of the conjunctive word 'and' would reflect the needed conjunction of three requirements"). This more restrictive approach helps effectuate the Supreme Court's instruction from *Pickering* that, "to the extent that the [employer's] position here can be taken to suggest that even comments on matters of public concern that are substantially correct… may furnish grounds for [adverse action] if they are sufficiently critical in tone, we unequivocally reject it." 391 U.S. at 570.

afforded lessen protection.[13] But in addition to being markedly distinct from the more extreme examples of speech referenced above and in Plaintiff's Opening Brief, the terms "druggie," "thief," and "career criminal" are all very common and accepted parlance that do not "dehumanize[]" or "demonize[]" anyone. Defs.' Br. 13 (quoting Bard). As Hussey pointed out in his opening brief, Merriam Webster Dictionary defines "druggie" as "a person who habitually uses drugs" and omits the "usually offensive" or "often offensive" labels it reserves for offensive terms.

---

[13]      To be sure, while this Court recently referenced the Sixth Circuit's *Bennett* decision in dicta for the suggestion that "speech couched in terms of political debate was not in the 'highest rung' of protected speech in part because it used an offensive slur," *MacRae*, 106 F.4th at 137 (quoting *Bennett*, 977 F.3d at 538–39), the Supreme Court has explicitly held that "[t]he arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern,'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Rankin,* 483 U.S. at 387), and that "[s]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection" even when it uses such inappropriate or controversial language, *id.* (quotations omitted) (quoting *Connick v. Myers,* 461 U.S. 138, 145 (1983)). Of course, this Court is bound by the Supreme Court's explicit holding on the matter, *see Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part), especially given the *MacRae* decision did not mention *Synder*, *see San Juan Cable LLC v. Puerto Rico Tel. Co., Inc.*, 612 F.3d 25, 34 (1st Cir. 2010). But the Third Circuit has reconciled these doctrines by situating the role of vulgarity within the disruption prong of the *Pickering* analysis. *Munroe*, 805 F.3d at 474.

Pl.'s Br. 22–23 (quoting *Druggie*, MERRIAM-WEBSTER.COM DICTIONARY,

Merriam-Webster, https://www.merriam-webster.com/dictionary/druggie).[14]

It is not just dictionaries that confirm the non-offensiveness of these terms: Countless federal judges in their decisions, Members of Congress giving floor speeches or participating in committee hearings, and reputable newspapers have all regularly and unoffensively employed the same phrases as Hussey without intending to disparage or cause any offense.[15] They have time and time again used

---

[14] Defendants object that "Merriam Webster is not the authority for defining derogatory language that is entitled to less weight when applying the *Pickering* balancing test." Def's Br. 12-13. But neither is Defendants' sole source of support for the proposition these phrases are offensive, Commissioner Bard. And at least this Court has explained that "[d]ictionaries are useful aids in determining a word's ordinary meaning," *Penobscot Nation v. Frey*, 3 F.4th 484, 491 (1st Cir. 2021), and the Supreme Court has regularly looked to MERRIAM-WEBSTER for aid in determining the ordinary meaning and usage of terms, *e.g. Nielsen v. Preap*, 586 U.S. 392, 393 (2019); *Pugin v. Garland*, 599 U.S. 600, 604 (2023).

[15] Emphasis has been added to all quotations referenced in this paragraph.

the phrase "druggie" in this way.[16] Same, too, for "thief."[17] And likewise for

[16]     *E.g.*, *Sacco v. Greene*, 2007 WL 432966, at *6 (S.D.N.Y. Jan. 30, 2007) ("It seems to have been considered in the prior history of the case that these affiants were untruthful as a matter of law for various presumed reasons including that the affiant was a **druggie** or was related to Sacco in some way or had a criminal record or had allegedly been or bribed or induced by Sacco to execute the affidavits. Naturally, and logically, it does not automatically follow that a **druggie** or a felon or a person having an interest in the outcome of the litigation is incapable of telling the truth or that *all* of his or her statements are mendacious."); *United States* v. *Swenson*, 51 M.J. 522, 527 (A.F. Ct. Crim. App. 1999) ("We can find no purpose for the admission of this evidence other than to show that the accused was a **druggie**."); *Garland v. Astrue*, 2008 WL 867920, at *7 (E.D. Tenn. Mar. 28, 2008) ("On August 6, 2005, the plaintiff's speech was extremely pressured and rambling,…she reported being a prisoner in her home due to the **druggies** living in her apartment building."); *Pinholster v. Ayers*, 590 F.3d 651, 715 (9th Cir. 2009) (Kozinski, C.J., dissenting), *rev'd sub nom. Cullen v. Pinholster*, 563 U.S. 170 (2011) (citation omitted) ("We've held before that 'juries are unlikely to favor defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior.' Telling the jury a lot more about what a **druggie** Pinholster was would probably have hurt him rather than helped him."); Dwight Garner, *Need Etiquette Tips for Cannabis? For Starters, Don't Call It 'Marijuana' or 'Weed'*, N.Y. TIMES: BOOKS OF THE TIMES (July 8, 2019), https://www.nytimes.com/2019/07/08/books/review-higher-etiquette-cannabis-lizzie-post.html ("I've tried repeatedly, over the course of my life, to become a **druggie**. It's never taken."); 149 CONG. REC. E189-02, E190, 2003 WL 296674 (statement of Rep. Solomon P. Ortiz (D-TX)) ("Even in his retirement, he continues to work-currently with a drug task force in Kingsville….That support is vitally important to an agent whose business requires him to deprive his family of his time and attention. **Druggies** do not keep a schedule."); *Drug Transit Zone Operations: Hearing Before the Subcomm. on Crim. Just., Drug Pol'y and Hum. Res. of the H. Comm. on Gov't Reform,* 109th Cong., 2006 WL 1126663 (2006) (statement of Rep. C.A. "Dutch" Ruppersberger (D-MD), Member, H. Comm. on Gov't Reform) ("Do you know what that means? That means there's a lot more **druggies** that are going to go back on the streets again, right?"); 132 CONG. REC. E3079-02, 1986 WL 794184 (statement of Rep. Dan Lungren (R-CA)) ("I think one of the real problems we have had in this country is we have had a double standard. There has been a double standard created that we look down on the

"career criminal."[18] Far from being vulgar, insulting, and defiant, or mocking,

---

**druggie** who happens to be in the street, but if that person happens to be a high finance **druggie** or a professional **druggie**, we call it recreational use. Somehow, if you have a diploma hanging on your wall, if you have some degree behind your name that therefore you are going to be treated differently than the rest of us.").

[17]    *E.g.*, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 487 (2023) (citation omitted) ("It then explained that Hamilton had given knowing and substantial assistance to Welch's activities by helping him turn his 'stolen goods into "legitimate" wealth,' thereby intending to help Welch succeed by performing a function crucial to any **thief**."); *Stokeling v. United States*, 586 U.S. 73, 78 (2019) ("But the crime was larceny, not robbery, if the **thief** did not have to overcome such resistance."); *United States v. Acosta-Colon*, 741 F.3d 179, 191 (1st Cir. 2013) (Thompson, J.) ("Acosta tries to pour cold water on all this, noting that Serrano is a convicted **thief**, former drug addict, and paid government snitch who could not keep his story straight about whether Acosta was the seller."); *United States v. Turner*, 470 F.2d 372, 374 (D.C. Cir. 1972) (Bazelon, C.J., dissenting) ("In addition, the identifying witness was a convicted **thief** and a narcotics addict whose habit was being supported by payments from the government."); *United States v. Holt*, 2021 WL 5168891, at *6 (E.D. Wis. Mar. 12, 2021) ("Second, even if it's true that law enforcement had no previous relationship with the informant, or that she is a convicted **thief** and heroin user, her veracity is not of crucial moment here."); *United States v. Rose*, 12 F.3d 1414, 1415 (7th Cir. 1994) ("Jerry Sevik ('Sevik') was a convicted **thief** with a long criminal history."); *James v. Milwaukee Cnty.*, 956 F.2d 696, 697–98 (7th Cir. 1992) ("According to the plaintiff, non-violent inmates like James (a convicted **thief**) are more susceptible to attack by violent inmates like Hannah (a convicted rapist).").

[18]    *E.g.*, *Wooden v. United States*, 595 U.S. 360, 373 (2022) (quoting 134 Cong. Rec. 13783 (1988) (statement of Sen. Robert Byrd (D-WV)), explaining the purpose of an amendment to the "Armed Career Criminal Act") ("'[W]hat is meant by a "**career criminal**," that is, a person who over the course of time commits three or more of the enumerated kinds of felonies.'"); *United States v. Benton*, 957 F.3d 696, 704 (6th Cir. 2020) ("As the evidence presented at sentencing reflected, Benton is a **career criminal** who regrettably broke the law as a matter of course. Whether it was possessing, abusing, or trafficking drugs, carrying weapons while on probation, driving under the influence, or domestic violence, crime was

derogatory, and disparaging, these terms are simply shorthand descriptors of people with substance use disorder, criminal convictions for theft, or lengthy criminal conviction records. As such, Officer Hussey's speech cannot be entitled to less protection on the basis it is intrinsically vulgar or derogatory, lest this court determine that the Judiciary and Congress regularly employ such language.

> ### 2. Defendants' disagreement with Officer Hussey's political message renders it neither vulgar nor reasonably likely to be disruptive.

The real reason Defendants seek to brand Hussey's speech as vulgar is because they obviously disagree with the political viewpoint he espoused — that historic federal police reform legislation should not be named after Mr. Floyd. It is understandable that the NAACP might vehemently disagree with this position, but that does not transform Plaintiff's post into unprotected speech. Yet Defendants admit this is their motivation:

---

Benton's lifestyle."); *United States v. Thomas*, 815 F.3d 344, 345 (7th Cir. 2016) ("He was 67 at the time, and the judge thought him a reduced recidivism risk after a lengthy sentence, even though his record (and his age at the time of the offense) demonstrate that he is a **career criminal**."); *United States v. Rachuy*, 743 F.3d 205, 207 (7th Cir. 2014) ("By almost all accounts Gale Rachuy is a **career criminal**. Rachuy accumulated, over 40 years, nearly 30 convictions, mostly for fraud."); *United States v. Wilson*, 351 F. App'x 94, 96 (6th Cir. 2009) ("Additionally, Wilson is a **career criminal** with substantial knowledge of the consequences of a guilty plea."); *United States v. Rosales-Diaz*, 367 F. App'x 62, 64–65 (11th Cir. 2010) (quoting the district court) ("Although he doesn't qualify as a career offender as we generally think of it within the statutory context, he is a **career criminal**. That's what he is.").

Plaintiff's Facebook post used mocking, derogatory, and disparaging language to describe a homicide victim who was murdered at the hands of police and whose murder sparked a national reckoning on the biases of the country's police. The Plaintiff's mocking, derogatory, and disparaging language was focused on Floyd's criminal history and substance abuse. The Plaintiff's post gave "the impression the [Plaintiff] does not believe in rehabilitation and is disrespectful of people suffering from substance use disorder." RA 166-67.

Defs.' Br. 11. The court below, too, made its disagreement with the *political message* of Hussey's speech, rather than the intrinsic vulgarity of the language he used, the centerpiece of its analysis:

The parties dispute whether the word "druggie" is inherently derogatory, but at minimum it refers to someone who is a drug addict, and the parties agree that the term itself does not have any racial connotation….The term "druggie" may be subject to differing interpretations…. Even if the term itself is not inherently derogatory, here it was used in a derogatory fashion. The terms "thief" and "a career criminal" are similarly insulting, even though they reflect the fact that, for a ten-year period in Floyd's life from 1997 until 2007, he participated in criminal activity that included offenses related to theft and robbery. [Dkt. 43 at ¶¶ 54-55]. More relevant than the particular terms used was the fact that the thrust of the message disparaged George Floyd as being unworthy of being honored in that manner because of his past criminal conduct and substance abuse issues. It dismissed the reasons why George Floyd's life and tragic death inspired the legislation.

ADD006, ADD018-19.

But this is quintessential viewpoint discrimination. The Supreme Court's *Matal* decision makes this point explicitly:

[T]he Government asserts an interest in preventing "'underrepresented groups'" from being "'bombarded with demeaning messages in commercial advertising.'" An *amicus* supporting the Government

refs to "encouraging racial tolerance and protecting the privacy and welfare of individuals." But no matter how the point is phrased, its unmistakable thrust is this: The Government has an interest in preventing speech expressing ideas that offend. And, as we have explained, that idea strikes at the heart of the First Amendment. Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express "the thought that we hate." *United States v. Schwimmer,* 279 U.S. 644, 655, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (Holmes, J., dissenting).

*Matal v. Tam*, 582 U.S. 218, 245–46 (2017) (citations omitted).

This is why courts have regularly and strongly emphasized that open-ended regulations prohibiting speech on the basis it is "vulgar," "profane," "indecent," and the like require strict limiting constructions to avoid viewpoint discrimination. *See, e.g.*, *Karlan v. City of Cincinnati*, 416 U.S. 924, 931–32 (1974) ("There has been no limiting construction of the 'vulgar' language component…. It hardly needs stating that States are not free to penalize speech merely because it is 'coarse' or 'illbred' or 'hardly suitable.'"); *Walker v. Dillard*, 523 F.2d 3, 5 (4th Cir. 1975); *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 782–83 (4th Cir. 2023); *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 933 (3d Cir. 2011); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 199 n.7 (1970) (noting Mississippi statute prohibiting "the use of profane, vulgar, indecent, offensive, slanderous language over a telephone" was under overarching heading "Segregation" and used to enforce "separation of the races"). And the

Supreme Court's recent decision in *Iancu v. Brunetti*, 588 U.S. 388, 393–99 (2019) explains in great detail why allowing the government to determine what is "immoral" or "scandalous" inherently "results in viewpoint-discriminatory application" that is barred by the First Amendment.

Here, it is abundantly clear that Hussey was punished for his speech — and it was labeled not only vulgar, but also likely to cause disruption — because Commissioner Bard personally disagreed with his political views, as did a few members of the NAACP. But as has been discussed, the speech was not disparaging, and neither anticipated nor actualized community reactions to the political message of the speech are a proper basis for taking adverse action under the *Pickering* analysis. *Munroe*, 805 F.3d at 475 (quoting *Melzer v. Bd. Of Ed. of City Sch. Dist. of City of New York*, 336 F.3d 185, 199 (2d Cir. 2003)) (internal citation omitted) ("'[W]e acknowledge the truism that community reaction cannot dictate whether an employee's constitutional rights are protected.' The First Amendment generally does not permit the so-called 'heckler's veto,' i.e., 'allowing the public, with the government's help, to shout down unpopular ideas that stir anger.'"); *Feiner v. New York*, 340 U.S. 315, 321 (1951) (explaining no matter how provocative the speech, the government may not become "an instrument for the suppression of unpopular views.").

### B. The Pickering Balancing Test requires reversal

**1. Officer Hussey's and the public's strong interests in what all parties agree was core political speech plainly outweigh the government's purported interests in preventing equivocal, speculative, and unrealized predictions of ill-defined disruption.**

Defendants' analysis belies their inability to justify how Officer Hussey's and the public's strong interests in the core political speech at issue is outweighed by Defendants' equivocal, speculative, and unrealized predictions of amorphous disruption. Nowhere do they even attempt to engage in the balancing process to argue why Hussey's and the public's interests in engaging with the political speech is less significant than the Department's purported interests; they merely impute improper takeaways from Hussey's speech and speculate wildly about how it could have been perceived by members of the broader community.[19]

---

[19] To the extent Defendants (and their *Amicus*) seek to invoke the Department's alleged "mission statement" referencing "partner[ing] with the community to solve problems," Defs.' Br. 24; Proposed Br. of *Amicus* Massachusetts Chiefs of Police Association, Inc. at 13, such efforts are doubly inappropriate. First, this mission statement was not introduced as evidence nor part of the record in the lower court. "Appellate review concentrates on considering the factual record presented in the trial courts. *See, e.g.,* Fed. R. App. P. 10(a) (defining the record on appeal as comprising the evidence introduced in the trial court)." *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 64 (1st Cir. 2015). Instead, the district court, *sua sponte*, appears to have searched the internet and found this statement on Defendants' website, more than two years after Hussey's Facebook post. *See* ADD001, ADD024. But this mission statement is not "generally known within the trial court's territorial jurisdiction," and because there is no indication of when this mission statement was adopted or effective, its

This is because the interests on Hussey's side of the equation are stronger. The Supreme Court has emphasized that "expression on public issues," such as pending legislation or the integrity of public officials, "has always rested on the highest rung of the hierarchy of First Amendment values." *Claiborne Hardware Co*., 458 U.S. at 913 (quotations omitted). The Court has further emphasized that when, like here, a public employee seeks to enter the political discourse concerning public policy proposals falling within his or her field of professional knowledge and experience, "it is essential that they be able to speak out freely on such questions." *Pickering* 391 U.S. at 572. And it has underscored that the interest is not Hussey's alone; such speech also implicates "the **public's** interest in receiving [an] informed opinion," *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004) (emphasis added), as well as its more general interest in "unrestrained public debate," *Brasslett v. Cota*, 761 F.2d 827, 844 (1st Cir. 1985).

On the other side of the equation — now stripped of the veneer asserting these comments were so vulgar and dehumanizing as to inflame the community

---

applicability cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 321 (1st Cir. 2004) (noting that "[e]ven those courts which have more liberally construed the rules of judicial notice" do not allow admission where there are concerns over "find[ing] the correct version"). Thus, this Court cannot consider the proffered "mission statement." Yet even if it did, there is no evidence nor reasonable basis for predicting disruption to the proffered mission.

and shatter the Department's trust — there is really not much of any interest

Defendants can point to. Indeed, even accepting their empty predictions of

community blowback or distrust that never came to fruition,[20] both Defendants and

their *Amicus* seem to claim an overarching interest in Department superiors'

abilities to tightly control subordinates' political expressions. But this, of course, is

not a valid interest. And, in any event, because "[t]he degree to which speech is of

interest to the public may be relevant in determining whether a public employer

may constitutionally be required to tolerate some degree of disruption resulting

from its utterance," Defendants fall well short of satisfying *Pickering*'s balancing

test. *Connick*, 461 U.S. at 164.

> ## 2. As Officer Hussey has maintained throughout this litigation, actual disruption was required to overcome his and the public's interests in his core political speech

Confoundingly, Defendants represent that Hussey is arguing "for the first

time on appeal" that when the speech at issue under *Pickering* is solely core

political speech, Supreme Court caselaw and this Court's precedents require actual

---

[20]     These predictions were patently unreasonable at the point of the first adverse action (the placement on administrative leave) given the only evidence of any pushback was from three particularly engaged citizens who merely disagreed with the political message of the speech and waited eight days before emerging from the woodwork. They were then particularly unreasonable two months after that (when Hussey was suspended) given there was *no* disruption at all and the Department never even tried to assess the extent of disruption.

disruption rather than predictions of disruption, and claim this argument has been

"waived." Defs.' Br. 9. But this is precisely what Hussey has argued all along:

> To meet its burden, "the government cannot rely on <u>mere speculation</u> that an employee's speech will cause disruption. <u>Id.</u> (<u>Nichols v. Dancer</u>, 657 F.3d 929, 933–34 (9th Cir. 2011)) (emphasis added). "Even where the employer provides evidence of a negative reaction to speech, courts require evidence that it will disrupt the workplace." <u>Id.</u> at 910. <u>See also Berger v. Battaglia</u>, 779 F.2d 992, 1001 (4th Cir. 1985) ("[T]hreatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech.").
>
> Here, the record plainly shows that Hussey's Facebook post did not result in any impairment of discipline or harmony among co-workers in the Cambridge Police Department or impede either Hussey's performance as a police officer or the Department's ability to function as a whole….
>
> Now, having completed discovery, the Court may find as a matter of law that Hussey's First Amendment rights were violated because it is plainly apparent that his comments caused no disruption to the Cambridge Police Department.

Pl.'s Mem. Supp. Pl.'s Mot. Partial Summ. J., Dkt. 42 at 12–13 (footnote omitted)

(alterations in original); *see* Fed. R. App. P. 30(a)(2).

The reasoning proffered below remains true today. This Court explained in

*MacRae* (albeit in *dicta*, after the plaintiff there seemingly made contradictory

arguments, and after finding that her speech was not entitled to the highest rung

under the First Amendment) that "a government employer's reasonable prediction

of disruption is afforded significant weight in the *Pickering* inquiry, even if the

speech at issue is on a matter of public concern," but that "mere speculation of

disruption has never been enough" for the employer to prevail. *MacRae*, 138 (quoting *Curran*, 509 F.3d at 49). In line with that proposition and the authorities it cites, Plaintiff merely asks that this Court confirm that where (as here) the speech at issue is solely core political speech entitled to the greatest protections under *Pickering*, and where (as here) there is no non-speculative, record-based reason to anticipate specific disruptions, that the lack of *actual* disruption inherently proves the public employer's prediction of disruption was unreasonable. This best tracks the Supreme Court's instruction that "a stronger showing may be necessary if the employee's speech more substantially involve[s] matters of public concern," *Connick*, 461 U.S. at 152, and that "the employer's side of the *Pickering* scale is entirely empty" when it "do[es] not assert, and cannot demonstrate any government interest that tips the balance in their favor" because "[t]here is no evidence" of disruption, *Lane* v. *Franks*, 573 U.S. 228, 242 (2014); *accord Sexton* v. *Martin*, 210 F.3d 905, 911–12 (8th Cir. 2000) (requiring evidence of actual disruption for core political speech).

## C. Defendants' reimagining of Pickering would do violence to the First Amendment

Finally, it cannot be overstated just how troubling the consequences would be were this Court to accept the doctrinal re-write Defendants advance. Effectively, Defendants ask to singlehandedly interpret the meaning of their employees' speech, its potential for disruption, and the intrinsic vulgarity it inheres. Adopting

21

such an expansive view of the government's authority to regulate speech runs contrary to nearly every core value of the First Amendment and would empower public employers to shut off virtually *every* facet of speech on any given topic.

Here, for instance, Defendants' contentions that Hussey's speech "can be interpreted [to communicate] that the Cambridge Police have a bias against people who have committed felony crimes or have a substance use disorder," Defs.' Br. 13, could just as easily be flipped on its head to prohibit the opposite viewpoint. Under state law, "[t]he chief and other police officers of all cities and towns….shall suppress and prevent all disturbances and disorder," M.G.L. ch. 41 § 98, and "a police officer ha[s] a duty to effect the arrest of one known to have committed a recent felony," *Com. v. Young*, 96 N.E.2d 133, 135 (Mass. 1950). Thus, under Defendants' reading of the *Pickering* balancing analysis, the Department could just as well have prohibited its officers from *supporting* naming the police reform bill after George Floyd because this "could be considered," "appear[]," "seem[]," "could 'be interpreted [to],'" or "g[i]ve 'the impression'" that officers were hostile to enforcing criminal statutes against theft and narcotics use. Defs.' Br. 5, 8, 11.

Such an interpretation would also allow governments to prohibit educators from opposing proposed legislation like Florida's infamous "Don't Say Gay" bill on their private social media pages outside of school hours solely on the basis that

22

state officials view such speech as disrupting school operations by eroding parents' trust in teachers and "appear[ing]," "seem[ing]," or giving "the impression," Defs.' Br. 5, 8, 11, that the teachers support sexualizing young children.[21] Similarly, opposing naming sexual harassment legislation after Donald Trump on the basis he was found liable of sexual assault could be punishable as vulgarity or potentially disruptive.

In short, it would allow public employers to dictate what political speech is orthodox and what is verboten based on their own policy preferences. But "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

### III.    CONCLUSION

For the foregoing reasons, Officer Hussey respectfully asks this Honorable Court to reverse.

---

[21]    *See* PBS NewsHour, *WATCH: Governor Ron DeSantis gives remarks as he signs into law Florida's "Don't Say Gay" bill*, YouTube (Mar 28, 2022), https://youtu.be/IVuniz7w1bQ?si=HQacaLEAiv_pvwNi ("[Opponents of the bill] support sexualizing kids in kindergarten. They support injecting woke gender ideology into second-grade classrooms.").

Dated: August 19, 2024

Respectfully submitted,

BRIAN HUSSEY,

By their attorneys,

/s/ Harold Lichten
Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Facsimile: (617) 994-5801
hlichten@llrlaw.com
jbartholet@llrlaw.com

# UNITED STATES COURT OF APPEALS

## For the First Circuit
## Appeal No. 24-1279
_____

### Certificate of Compliance With Type-Volume Limitation,
### Typeface Requirements, and Type Style Requirements
_____

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

*/s/ Harold Lichten*
Attorney for Plaintiff-Appellant

Dated: August 19, 2024

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

---

**Certificate of Service**

---

I hereby certify that, on August 19, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

> */s/ Harold Lichten*
> Attorney for Plaintiff-Appellant

Dated: August 19, 2024