# No. 24-1279

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

BRIAN HUSSEY,
*Plaintiff-Appellant*,

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as Commissioner of the Cambridge Police Department,
*Defendants-Appellees*,

BRANVILLE G. BARD, JR., in his individual capacity,
*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
Case No. 1:21-CV-11868
The Honorable Angel Kelley

**PLAINTIFF-APPELLANT'S PETITION FOR REHEARING EN BANC**


Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
hlichten@llrlaw.com
jbartholet@llrlaw.com

## TABLE OF CONTENTS


RULE 40 STATEMENT ....................5

INTRODUCTION ....................5

REASONS FOR GRANTING THE PETITION ....................12

A. The Panel's Misconceived Application and Expansion of the Exceptional "Vulgarity Penalty" Does Violence to the *Pickering* Doctrine and Directly Conflicts with Binding Supreme Court Precedent ....................12

1. The Panel's Decision Impermissibly Decrees Hussey's Political *Ideas* Vulgar, While Essentially Conceding the Words he Used Were Not ....................12

2. The Panel's Decision Improperly Employs the "Vulgarity Penalty" to Devalue Hussey's Speech — Circumventing Binding Precent — Rather than Analyzing the Purported Vulgarity's Propensity to Cause Disruption ....................15

B. The Panel's Decision Affords Government Employers *Carte Blanche* to Punish Any Political Speech with Which They Disagree by Way of a Heckler's Veto ....................16

C. The Panel's Decision Makes Mincemeat of the *Pickering* Balancing Test's Disruption Prong ....................17

D. The Majority Usurps the Jury's Role by Itself Resolving Contested Material Factual Disputes as to Viewpoint Discrimination on Summary Judgment ....................19

CONCLUSION ....................20

## TABLE OF AUTHORITIES

**Cases**

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
830 F.2d 294 (D.C. Cir. 1987) ....................5, 18

*Berger v. Battaglia*,
779 F.2d 992 (4th Cir. 1985).................... 14, 16

*Brennan v. Norton*,
350 F.3d 399 (3d Cir. 2003)....................5, 18

*Carroll v. Trump*,
685 F. Supp. 3d 267 (S.D.N.Y.),
*aff'd in part,* 88 F.4th 418 (2d Cir. 2023)....................12

*City of San Diego, Cal. v. Roe*,
543 U.S. 77 (2004)....................17

*Connick v. Myers*,
461 U.S. 138 (1983).................... 5, 15, 18

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980)....................5

*Davignon v. Hodgson*,
524 F.3d 91 (1st Cir. 2008) ....................5

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette*,
450 U.S. 107 (1981)....................6

*Dodge v. Evergreen Sch. Dist. #114*,
56 F.4th 767 (9th Cir. 2022).................... 5, 14, 18

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................14

*Jordan v. Carter*
428 F.3d 67 (1st Cir. 2005) ....................13

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022).....5, 16

*MacRae v. Mattos*,
106 F.4th 122 (1st Cir. 2024).....13, 15

*Munroe v. C. Bucks Sch. Dist.*,
805 F.3d 454 (3d Cir. 2015).....15

*N.A.A.C.P. v. Claiborne Hardware Co.*,
458 U.S. 886 (1982).....17

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*,
391 U.S. 563 (1968).....*passim*

*Police Dept. of Chicago v. Mosley*,
408 U.S. 92 (1972).....14

*Rankin v. McPherson*,
483 U.S. 378 (1987).....5, 13, 15

*Snyder v. Phelps*,
562 U.S. 443 (2011).....5, 15

*Texas v. Johnson*,
491 U.S. 397 (1989).....5

*Zamboni v. Stamler*,
847 F.2d 73 (3d Cir. 1988).....5, 18

**Other Authorities**

Arelis R. Hernández,
*A Knee on his Neck*, WASH. POST (Oct. 26, 2020),
https://www.washingtonpost.com/graphics/2020/national/george-floyd-america/policing/.....9

Claire McAnaw Gallagher,
For-Profit, Nonprofit, and Government Sector Jobs in 2022, Bureau of Labor Statistics (Oct. 2023), https://www.bls.gov/spotlight/2023/for-profit-nonprofit-and-government-sector-jobs-in-2022/home.htm ....................6

Luis Andres Henao et al., *For George Floyd, a complicated life and a notorious death*, ASSOCIATED PRESS (June 10, 2020), https://apnews.com/article/virus-outbreak-us-news-ap-top-news-hip-hop-and-rap-houston-a55d2662f200ead0da4fed9e923b60a7 ....................9

Manny Fernandez & Audra D. S. Burch, *George Floyd, From 'I Want to Touch the World' to 'I Can't Breathe'*, N.Y. TIMES (April 20, 2021), https://www.nytimes.com/article/george-floyd-who-is.html ....................9

## RULE 40 STATEMENT

The panel's decision conflicts with several decisions of this Court,[1] the United States Supreme Court,[2] and authoritative decisions of other federal courts of appeals.[3] This case also presents issues of exceptional constitutional importance regarding First Amendment protections for core political speech of public employees.

## INTRODUCTION

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "If the marketplace of ideas is to remain free and open, governments must not be allowed to choose which issues are worth discussing or debating." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 537–38 (1980) (quotations and alterations omitted). "And as is true of all expressions of

---

1 *E.g.*, *Davignon v. Hodgson*, 524 F.3d 91 (1st Cir. 2008).

2 *E.g.*, *Connick v. Myers*, 461 U.S. 138 (1983); *Rankin v. McPherson*, 483 U.S. 378 (1987); *Snyder v. Phelps*, 562 U.S. 443 (2011); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022).

3 *E.g.*, *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 830 F.2d 294 (D.C. Cir. 1987); *Zamboni v. Stamler*, 847 F.2d 73 (3d Cir. 1988); *Brennan v. Norton*, 350 F.3d 399 (3d Cir. 2003); *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767 (9th Cir. 2022).

First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 124 (1981).

Were the panel's decision in this case to stand, these axiomatic First Amendment principles would yield to government regulation of which political speech is permissible and which is verboten for more than one-in-eight of all American workers, [4] so long as the governmental entity can point to some external person or group that would find the employee's political speech offensive. This is not what the *Pickering* doctrine has ever intended,[5] and if left unchecked, the panel's decision will mark a dangerous new approach to regulating public employees' unpopular speech.

Officer Hussey, a 27-year Cambridge Police Department veteran, expressed in a private Facebook post that it was inappropriate to name an important and needed federal police reform bill after someone with such an extensive criminal

---

[4] *See* Claire McAnaw Gallagher, For-Profit, Nonprofit, and Government Sector Jobs in 2022, Bureau of Labor Statistics (Oct. 2023), https://www.bls.gov/spotlight/2023/for-profit-nonprofit-and-government-sector-jobs-in-2022/home.htm.

[5] "The public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment—is so great…. that statements by public officials on matters of public concern must be accorded First Amendment protection." *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 573–74 (1968).

record as Mr. George Floyd, rather than the type of hero such bills are normally named after. As he told his superiors, he was horrified by what happened to Mr. Floyd and maintained that the officers involved in his murder should be fully prosecuted. Hussey simply believed that naming the bill after Mr. Floyd was inappropriate, and he expressed that on his private Facebook page.

Specifically, in February 2021, Hussey re-posted a news article on his private Facebook page. JA295. The article, entitled "House Democrats reintroduce police reform bill named in honor of George Floyd," referenced proposed federal legislation on police reform — H.R. 7120, titled the "George Floyd Justice in Policing Act of 2020." *Id*. Hussey, believing that naming this landmark legislation after someone who had a long criminal and drug history was inappropriate, posted a comment along with the article's link (featuring a preview that included its headline), writing, "This is what its come to 'honoring' a career criminal, a thief and druggie … the future of this country is bleak at best." *Id*. (ellipsis in original).

Neither the post nor Hussey's Facebook page identified him as a Cambridge police officer. JA301. The post was visible only to Hussey's Facebook "friends," who consisted of 674 individuals Hussey knew personally. JA246 ¶¶ 8–10. Hussey was off duty and at home when he made the post using his personal mobile phone. JA246–47 ¶¶ 11–14. He deleted the post after roughly two hours. JA011 ¶ 12.

Six days passed. Nobody commented on the existence of the post or discussed it in the media, with city officials, or with Hussey. JA247 ¶ 19. Then on March 3, 2021, Police Commissioner Branville Bard was contacted by a member of the Cambridge NAACP "to speak about an urgent matter." JA325 at 49:12. Bard and Cambridge City Manager Louis Depasquale then met with three NAACP members (one of whom was Cambridge's former mayor) via videoconference, during which they raised concerns about the post.

Two days after that, the Department placed Hussey on administrative leave for approximately two months. JA011. The only person interviewed as part of its investigation was Hussey—one time. JA321 at 35:16-19. No efforts were made to interview anyone else to discern the post's effects or potential effects on departmental operations or public perceptions. *Id.*; JA321 at 36:15-23.

Importantly, Hussey always maintained that he fully supported the proposals underlying the police reform bill and was horrified by the murder of Mr. Floyd; he merely opposed naming important police reform legislation after someone with Floyd's criminal record and felt that the namesake did a disservice to the spirit of the bill.[6] In the interview, Hussey expressed his heartfelt belief that "what

---

[6] At the time of his tragic murder, Mr. Floyd had a lengthy criminal record that included drug offenses, theft, and violent crimes, and "was stopped by police or charged at least 19 times in his adult life….[Some]times, the charges were serious and shaped the trajectory of his life." Arelis R. Hernández, *A Knee on his*

happened to George Floyd on May 25, 2020 should never have happened," and that he is "100% in favor of police reform" to stop such incidents. JA249. At the same time, he also expressed his belief that there "are many other people of honor who could have been memorialized in the naming of this bill." *Id*.

Other than the early March meeting with the NAACP officials, there were no other calls or complaints about the Facebook post. The only reaction from within the department appears to have been several text messages of support sent to Hussey by his fellow officers following initiation of the internal investigation. JA351–355. Despite the utter lack of any actual disruption, Defendants nevertheless placed Hussey on administrative leave for two months and then issued him a suspension. JA454.

---

*Neck*, WASH. POST (Oct. 26, 2020), https://www.washingtonpost.com/graphics/2020/national/george-floyd-america/policing/. Floyd served jail time for numerous crimes, including drug possession, theft, and trespass. Manny Fernandez & Audra D. S. Burch, *George Floyd, From 'I Want to Touch the World' to 'I Can't Breathe'*, N.Y. TIMES (April 20, 2021), https://www.nytimes.com/article/george-floyd-who-is.html. In 2007, he was charged with and pled guilty to aggravated robbery with a deadly weapon stemming from a robbery during which "[i]nvestigators said he and five other men barged into a woman's apartment, and Floyd pushed a pistol into her abdomen before searching for items to steal," ultimately serving five years in prison for this offense. Luis Andres Henao et al., *For George Floyd, a complicated life and a notorious death*, ASSOCIATED PRESS (June 10, 2020), https://apnews.com/article/virus-outbreak-us-news-ap-top-news-hip-hop-and-rap-houston-a55d2662f200ead0da4fed9e923b60a7.

There have been other instances of more concerning statements by Cambridge Police officials for which no action was taken, including derogatory references to drug users. But here, Hussey was singled out for expressing his views on pending legislation because members of the NAACP complained to the police commissioner of one of the most politically liberal cities in the United States.

Both parties moved for summary judgment. The district court granted summary judgment to Defendants, emphasizing the great public outcry that followed Mr. Floyd's tragic murder and how some might be offended by Hussey`s (truthful) assertions that Floyd had a troubling drug and criminal history and should not have a Congressional bill named after him. Hussey appealed.

In its two-to-one decision — over a vigorous dissent — the majority ruled for the Department. In so doing, the majority made four axiomatic errors.

First, by misapplying and expanding what has always been an exceptional "vulgarity penalty," the panel's decision contravenes binding Supreme Court precedent and does violence to the entire *Pickering* doctrine.

Second, the panel allowed for a heckler's veto — an external person or group's potential disagreement with the speech — to stand as the sole justification for the Department's speech-based discipline, creating a Circuit split and essentially affording governmental employers *carte blanche* to discipline *any* political speech by which the employer can find someone who is offended.

Third, the panel both misconstrued and misapplied the disruption prong of the balancing test, including by eschewing the requirement to apply a sliding scale requiring a greater showing of disruption for core political speech.

And fourth, the Court stole the jury's prerogative to decide disputed material facts on summary judgment as to Commissioner Bard's motivations for imposing the discipline.

In short, should the panel's decision be permitted to stand, government employers could shut down their employees' abilities to engage in private political speech on whatever side of the debate on controversial political topics they like, just so long as they can point to *some* theoretical offense by *some* segment of the broader community they serve. A teacher's post stating that Israel is committing a genocide could be censored, just as a post stating that Palestine supports terrorists could be, since the school district could view calling Israelis genocidaires or Palestinians terrorist supporters as "insulting" or "disparaging" — and certainly more so than calling someone a "druggie." Moreover, because *someone* in the broader community could be outraged by a teacher taking such a position, under the panel's reasoning, all debate on such a topic can be shut down for one-in-eight American workers. The same could be said for a state social worker who posts on Instagram one evening her opposition to naming a sexual violence prevention bill after President Trump on the basis that such bills should not be named after a

"rapist."[7] Surely, calling someone a "rapist" would be more "insulting" or "disparaging" than calling somebody a "druggie," "thief," or "career criminal," and there is little doubt that at least *some* Trump-supporting community members would be offended by such a post and question the trust placed in the social worker's governmental agency. Examples abound, but the thrust is clear: Government employers cannot be permitted to determine which controversial political speech is allowed and which is not. Courts should not be permitted to do so either. Accordingly, this Court should grant rehearing *en banc*.

## REASONS FOR GRANTING THE PETITION

### A. The Panel's Misconceived Application and Expansion of the Exceptional "Vulgarity Penalty" Does Violence to the *Pickering* Doctrine and Directly Conflicts with Binding Supreme Court Precedent

#### 1. The Panel's Decision Impermissibly Decrees Hussey's Political *Ideas* Vulgar, While Essentially Conceding the Words he Used Were Not

The panel majority's ultimate conclusion rests entirely on its "extension here of a tenuous rule, seldom applied in our circuit or elsewhere, to devalue Hussey's and the public's interest in his speech on the ground that the view he expressed was

---

[7] It is of no moment that such a statement is "substantially true." *See Carroll v. Trump*, 685 F. Supp. 3d 267, 273–78 (S.D.N.Y.), *aff'd in part,* 88 F.4th 418 (2d Cir. 2023). Here, it is beyond dispute that Mr. Floyd was convicted of theft and drug offenses and had an extensive criminal record. *See supra* Note 6.

substantively ‘insulting’ and ‘disparaging.’” Slip Op. at 37 (Howard, J., dissenting). Indeed, as the dissent explains, this Court “first borrowed this concept from the Eleventh Circuit in dicta, noting in *Jordan v. Carter* that ‘when public-employee expression is done in a “‘vulgar, insulting, and defiant’ manner” it is entitled to less weight in the Pickering balance.’” *Id*. (quoting 428 F.3d 67, 73-74 (1st Cir. 2005)) (alteration omitted). Then, last year, a panel of this Court extended this doctrine to include speech that it considers “mocking, derogatory, and disparaging.” Slip Op. at 16 (quoting *MacRae v. Mattos*, 106 F.4th 122, 137 (1st Cir. 2024)).[8]

Here, the panel again expands this doctrine such that the exception will swallow the rule:

---

[8] This prompted Justice Thomas to criticize this Court’s “discount[ing] the value of [a public employee’s] speech interest because her posts … spoke in what the court described as a ‘mocking, derogatory, and disparaging manner,’” *MacRae v. Mattos*, 145 S. Ct. 2617, 2618 (2025) (quoting *id.* at 137), since “‘[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern,’” *id.* at 2620 (quoting *Rankin*, 483 U.S. at 387). He further explained:

> The First Circuit accordingly should have discarded factors whose disruptive potential was purely speculative….It undermines core First Amendment values to allow a government employer to adopt an institutional viewpoint on the issues of the day and then, when faced with a dissenting employee, portray this disagreement as evidence of disruption.

*Id.* at 2620–21 (cleaned up).

> Hussey and the dissent are incorrect, however, in arguing that the specific words Hussey used needed to be intrinsically vulgar or racist for his speech to be considered insulting. Rather, we consider the words in context and assess whether the manner in which the message as a whole was conveyed 'mocks' and 'disparages.'… [e]ven [when] no individual word in the speech at issue [i]s innately offensive."

Slip Op. at 16–17 (alterations omitted) (emphasis added).

Thus, the panel effectively holds that the *words* a speaker uses need not be vulgar for the speech to be censored, so long as two judges of this Court find the *ideas themselves* to be. *See* Slip Op. at 18 (explaining this Court's view that because Hussey said the future of a country that would honor someone with Mr. Floyd's extensive criminal history "is bleak at best," the speech not only "disparaged" Mr. Floyd, but also disparaged all of "those who rallied in response to the horrific circumstances of his death," and thus would be assessed the vulgarity penalty). But "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), and government action "disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (citation omitted).[9] This Court is simply not empowered to pick winners and losers in the marketplace of ideas.

---

[9] *See also Berger v. Battaglia*, 779 F.2d 992, 999–1002 (4th Cir. 1985); *Dodge*, 56 F.4th at 785–87.

### 2. The Panel's Decision Improperly Employs the "Vulgarity Penalty" to Devalue Hussey's Speech — Circumventing Binding Precent — Rather than Analyzing the Purported Vulgarity's Propensity to Cause Disruption

At the same time, the panel held that "the disparaging nature of Hussey's speech simply means that it is not on the 'highest rung' of the First Amendment 'hierarchy' as we consider the strength of the Department's countervailing interest" and that "Hussey's and the public's First Amendment interests in Hussey's speech [are]…diminished due to its 'mocking, derogatory, and disparaging' nature." Slip Op. at 19, 35 (first quoting *Connick*, 461 U.S. at 145; then quoting *MacRae*, 106 F.4th at 137).

This directly conflicts with binding caselaw from the Supreme Court, which has explicitly held that "[t]he arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern,'" *Snyder*, 562 U.S. at 453 (quoting *Rankin,* 483 U.S. at 387), and that "[s]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection" even when it uses such inappropriate or controversial language, *id.* (quotations omitted) (quoting *Connick*, 461 U.S. at 145).[10] This, alone, requires vacatur of the panel's opinion.

---

[10] The Third Circuit has reconciled these doctrines by situating the role of vulgarity within the disruption prong of the *Pickering* analysis. *See Munroe v. C. Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015).

### B. The Panel's Decision Affords Government Employers *Carte Blanche* to Punish Any Political Speech with Which They Disagree by Way of a Heckler's Veto

The panel's decision improperly deals another body blow within this Circuit to public employees' First Amendment speech rights by expressly countenancing government employers' use of a heckler's veto to prohibit speech with which they disagree. The majority writes:

> While we agree with Hussey that there is scant evidence in the record to support a prediction of disruption to the Cambridge Police Department's internal operations, the….Department does not claim that it disciplined Hussey because his speech could potentially interfere with internal management. Rather, the Department maintains that Hussey's suspension was motivated by its concern that Hussey's post would undermine the Department's relationship of trust with the public.

Slip Op. at 23–24. But governmental agencies generally serve the public at large, and allowing *any* constituent's offense at an employee's political viewpoint to permit the government to prohibit such speech is the quintessential prohibited heckler's veto. *See Bremerton*, 597 U.S. at 543 n.8 (noting in *Pickering* case that "our Constitution does [not allow] protected speech [to]…readily give way to a 'heckler's veto'"). Worse still, the panel's holding on this point squarely creates a Circuit split. *See, e.g.*, *Berger*, 779 F.2d at 999–1002.

The panel's decision would allow hecklers' vetoes to afford public employers *carte blanche* in prohibiting speech based on any member of the

public's reactions to the speech. This Court should thus correct this adulteration of the *Pickering* doctrine.

### C. The Panel's Decision Makes Mincemeat of the *Pickering* Balancing Test's Disruption Prong

The panel's decision does further violence to the disruption prong of the *Pickering* balancing test in other ways. For starters, the panel shunned the required sliding scale framework for weighing disruption. The Supreme Court has emphasized that "speech on public issues, such as pending legislation or the integrity of public officials, occupies the highest rung on the hierarchy of First Amendment values." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quotations omitted). The Court has further emphasized that when, like here, a public employee's speech concerns public policy proposals within his field of professional knowledge and experience, the value of such speech is heightened even further for both the employee and the public. *See Pickering* 391 U.S. at 572; *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004). Thus, Hussey and the public's interests in the speech at issue here is quite literally at the very zenith described by caselaw.

Nevertheless, the panel allowed generalized and vague *predictions* of disruption to overcome the immense weight on Hussey's side of the scale, even despite there being *no* disruption in the eight days between Hussey's post and the Department placing him on leave, nor any disruption in the subsequent two months

leading up to his suspension. This plainly ignores the Supreme Court's instruction that while it does "not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," it "caution[s] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern." *Connick*, 461 U.S. at 152.[11] Here, actual disruption was required.[12] Even if it were not, the Department's predictions of disruption were not reasonable given the lack of any disruption before, during, and after the discipline was imposed.

---

[11] Contrary to the panel's decision, other Circuits have held that a showing of actual disruption is required for speech occupying the highest rung in the *Pickering* analysis. *See, e.g.*, *Zamboni*, 847 F.2d at 78 (emphasis in original) ("[W]e reject Stamler's suggestion…that a finding of *potential* disruption could be sufficient to outweigh Zamboni's interests. To the contrary, in cases such as this involving speech on matters of significant public concern, a showing of *actual* disruption is required."); *Am. Postal Workers Union*, 830 F.2d at 304 (similar); *Dodge*, 56 F.4th at 785–87 (similar).

[12] While *necessary*, actual disruption still might not have been *sufficient* to overcome Hussey and the public's interesting under *Pickering*. *See, e.g.*, *Brennan*, 350 F.3d at 413–14 (cleaned up) ("Of course, the right of expression would mean little if an employee could be silenced whenever his/her voice caused any degree of disruption or discomfort for a public employer. Therefore, the balancing cannot be controlled by a finding that disruption did or could occur. A public employee's speech no doubt may disrupt and demoralize much of the public workplace. However, the First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace. Rather, any disruption is only a weight on the balancing scale.").

### D. The Majority Usurps the Jury's Role by Itself Resolving Contested Material Factual Disputes as to Viewpoint Discrimination on Summary Judgment

Finally, the panel's decision turns the summary judgment standard on its head, misconstruing the evidence and drawing every possible inference in the *moving* party's favor in assessing the multitude of contested material facts as to whether the Department punished Hussey for his viewpoint rather than out of true concerns about disruption.

Most egregiously, the panel flatly misstates the record as to comparator instances wherein other employees referred to drug users as "crackheads" but were not disciplined. The majority writes:

> Hussey claims that the Department did not discipline Commissioner Elow for referring to drug users as "crackheads" in July 2022. But the few details in the record about this comment indicate significantly different circumstances. Most importantly, Commissioner Elow apparently made the comment in person only to Hussey, with no one else present.

Slip Op. at 33.

In actuality, Hussey testified that this conversation occurred in the middle of Central Square, mentioning several specific examples of members of the public coming up to him or being present around them. JA274–75. He mentioned this conversation with Commissioner Elow took place "maybe ten feet from a group of two or three other officers." JA276. And, most damning, he testified that "another officer walked over and joined in our conversation. And he referred to some of the

people out in the square as crack heads. And I just threw my arms up in the air." *Id.* Nevertheless, the panel takes pains to draw unsupported inferences in the Department's favor, including that "no one else [was] present" for these conversations.

Similarly, the panel dismisses the Department's failure to investigate incendiary comments posted on the police union's Twitter page solely on the basis that "Hussey has identified no evidence that the Department had the authority to investigate activity by the police union, a distinct entity." Slip Op. at 33–34. But this is nonsensical; union-sponsored speech is often the subject of *Pickering* cases, including in Massachusetts. *See, e.g.*, *Davignon*, 524 F.3d 91.

At the same time, the panel never even engaged with Hussey's arguments that the Department's lack of a meaningful investigation is enough under this Court's caselaw to establish a material factual dispute over pretext. *See id.* at 106–07. This alone defeats summary judgment.

## CONCLUSION

Accordingly, Petitioner respectfully requests this Court grant rehearing *en banc*.

Dated: August 29, 2025

Respectfully submitted,

BRIAN HUSSEY,

By his attorneys,

*/s/ Jack Bartholet*

Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
Facsimile: (617) 994-5801
hlichten@llrlaw.com
jbartholet@llrlaw.com

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

---

**Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

---

1. This brief complies with the type-volume limitation of Fed. R. App. P. 40(d)(3) because this brief contains 3,898 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with Fed. R. App. P. 40(d)(2), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

*/s/ Jack Bartholet*
Attorney for Petitioner

Dated: August 29, 2025

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

---

**Certificate of Service**

---

I hereby certify that, on August 29, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Jack Bartholet*
Attorney for Petitioner

Dated: August 29, 2025