# No. 24-1279

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

BRIAN HUSSEY,
*Plaintiff-Appellant*,

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as
Commissioner of the Cambridge Police Department,
*Defendants-Appellees*,

BRANVILLE G. BARD, JR., in his individual capacity,
*Defendant*.

―――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
Case No. 1:21-CV-11868
The Honorable Angel Kelley

―――――――――――――

## EN BANC SUPPLEMENTAL BRIEF OF
## PLAINTIFF-APPELLANT BRIAN HUSSEY

―――――――――――――

Harold Lichten, CAB # 22114
Jack Bartholet, CAB # 1211802
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone: (617) 994-5800
hlichten@llrlaw.com
jbartholet@llrlaw.com

# TABLE OF CONTENTS

I.    THE COURT'S FIRST QUESTION ..............................................................1

    A.    The Impropriety of Giving Less Weight to "Mocking, Derogatory, and Disparaging" or "Vulgar, Insulting, and Defiant" Speech on Matters of Public Concern ....................................1

    B.    How "Manner, Time, and Place" and Whether the Speech Occurred Inside or Outside the Workplace Factor into the Analysis ...............................................................................8

II.    THE COURT'S SECOND QUESTION ........................................................15

    A.    Hecklers' Vetoes and Viewpoint Discrimination.................................17

    B.    Courts' Obligations to Independently Determine the Reasonableness of Employers' Predictions of Disruption .................22

    C.    The Proportionality of Balancing.........................................................24

III.    THE COURT'S THIRD QUESTION ...........................................................26

    A.    Effects on Outcome ............................................................................26

    B.    Effects of a Different Position or Rank ...............................................27

IV.    THE COURT'S FOURTH QUESTION ........................................................29

# TABLE OF AUTHORITIES

## Cases

*Adamian v. Jacobsen*,
   523 F.2d 929 (9th Cir. 1975) ................................................................. 7

*Barr v. Am. Assn. of Political Consultants, Inc.*,
   591 U.S. 610 (2020) ............................................................................. 9

*Battle v. Mulholland*,
   439 F.2d 321 (5th Cir.1971) ............................................................... 18

*Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*,
   486 U.S. 888 (1988) ........................................................................... 16

*Berger v. Battaglia*,
   779 F.2d 992 (4th Cir. 1985) ....................................................... 17, 18

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485 (1984) ........................................................................... 22

*Brennan v. Norton*,
   350 F.3d 399 (3d Cir. 2003) ............................................................... 25

*City of San Diego, Cal. v. Roe*,
   543 U.S. 77 (2004) ....................................................................... Passim

*Connick v. Meyers*,
   461 U.S. 138 (1983) ..................................................................... Passim

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*,
   447 U.S. 530 (1980) ............................................................................. 9

*Curran v. Cousins*,
   509 F.3d 36 (1st Cir. 2007) ................................................... 1, 2, 8, 15

*Davignon v. Hodgson*,
   524 F.3d 91 (1st Cir. 2008) ................................................... 13, 24, 30

*Decotiis v. Whittemore*,
   635 F.3d 22 (1st Cir. 2011) ............................................................... 12

*Dodge v. Evergreen Sch. Dist. #114*,
    56 F.4th 767 (9th Cir. 2022) ................................................................ 19

*Fenico v. City of Philadelphia*,
    70 F.4th 151 (3d Cir. 2023) ............................................................ 2, 25

*Flanagan v. Munger*,
    890 F.2d 1557 (10th Cir. 1989) ........................................................... 20

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ............................................................... 3, 21, 23

*Givhan v. W. Line Consol. Sch. Dist.*,
    439 U.S. 410 (1979) ............................................................... 11, 13

*Gustafson v. Jones*,
    290 F.3d 895 (7th Cir. 2002) ............................................................. 24

*Hussey v. City of Cambridge*,
    149 F.4th 57 (1st Cir. 2025) ........................................................ 3, 6, 26

*Hussey v. City of Cambridge*,
    2026 WL 220297 (1st Cir. Jan. 28, 2026) ................................... Passim

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ...................................................................... 17

*Lane v. Franks*,
    573 U.S. 228 (2014) ................................................................... 4, 27

*MacRae v. Mattos*,
    106 F.4th 122 (1st Cir. 2024) .................................................. 1, 2, 8, 21

*MacRae v. Mattos*,
    145 S. Ct. 2617 (2025) ......................................................... 3, 21, 24

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) ....................................................................... 3

*Melton v. City of Forrest City, Arkansas*,
    147 F.4th 896 (8th Cir. 2025) ........................................................... 19

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ................................................................. 20

*Mihos v. Swift*,
  358 F.3d 91 (1st Cir. 2004) .................................................................... 21

*Munroe v. C. Bucks Sch. Dist.*,
  805 F.3d 454 (3d Cir. 2015),
  *as amended* (Oct. 25, 2019) ............................................................ 2, 25

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ................................................................................. 4

*Natl. Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ............................................................................... 16

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .......................................................................... 5, 29

*Noble v. Cincinnati & Hamilton Cnty. Pub. Lib.*,
  112 F.4th 373 (6th Cir. 2024) ................................................................. 6

*O'Connor v. Steeves*,
  994 F.2d 905 (1st Cir. 1993) .................................................................. 11

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*,
  391 U.S. 563 (1968) ........................................................................ Passim

*Pryor v. Sch. Dist. No.*,
  *1*, 99 F.4th 1243 (10th Cir. 2024) .......................................................... 7

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................. 9

*Rankin v. McPherson*,
  483 U.S. 378 (1987) ........................................................................ Passim

*Reges v. Cauce*,
  162 F.4th 979 (9th Cir. 2025) ........................................................... 7, 19

*Snyder v. Phelps*,
  562 U.S. 443 (2011) .......................................................................... 5, 6

iv

*Street v. New York*,
   394 U.S. 576 (1969) ................................................................... 20

*United States v. Rahimi*,
   602 U.S. 680 (2024) ................................................................... 17

*United States v. Treasury Employees*,
   513 U.S. 454 (1995) ........................................................... Passim

*Waters v. Churchill*,
   511 U.S. 661 (1994) ........................................................... Passim

*Whitney v. California*,
   274 U.S. 357 (1927) ................................................................... 14

## I.    THE COURT'S FIRST QUESTION[1]

### A.    The Impropriety of Giving Less Weight to "Mocking, Derogatory, and Disparaging" or "Vulgar, Insulting, and Defiant" Speech on Matters of Public Concern

The *Pickering*[2] balancing test requires that "the more substantially an employee's speech involves matters of public concern, the higher the state's burden will then be to justify taking action, and vice versa," because the "inquiry 'involves a sliding scale in which the amount of disruption a public employer has to tolerate is

---

[1]    The Court recounted that:

> The majority panel opinion relied on First Circuit precedent for the proposition that "speech commenting on public 'issues in a mocking, derogatory, and disparaging manner' is accorded less weight in the [Pickering] balancing test." Hussey v. City of Cambridge, No. 24-1279, Slip Op. (Aug. 15, 2025), at 16 (quoting MacRae v. Mattos, 106 F.4th 122, 137 (1st Cir. 2024), and also citing Curran v. Cousins, 509 F.3d 36, 49 (1st Cir. 2007) ("Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the Pickering balance.")).

*Hussey v. City of Cambridge*, 2026 WL 220297, at *1 (1st Cir. Jan. 28, 2026). The Court then asked the parties to first address the following questions:

> Is this precedent consistent with the Supreme Court's First Amendment jurisprudence, including but not limited to Rankin v. McPherson, 483 U.S. 378 (1987), and Connick v. Meyers, 461 U.S. 138 (1983)? Please address the propriety of giving less weight to "mocking, derogatory, and disparaging" speech on matters of public concern, and – in doing so -- please discuss how the consideration of "manner, time, and place" in the Pickering balance bears on that question. Finally, please address whether the propriety of giving less weight to "mocking, derogatory, and disparaging" speech on matters of public concern depends on whether the speech occurred within the workplace or outside the workplace.

*Id.* at 1–2.

[2]    *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968).

directly proportional to the importance of the disputed speech to the public.'" *Fenico v. City of Philadelphia*, 70 F.4th 151, 162 (3d Cir. 2023) (quoting *Munroe v. C. Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015), *as amended* (Oct. 25, 2019)).

Yet, as this Court recounted in its Order granting review en banc, this Circuit has adopted (and then creepingly expanded) a doctrine within the *Pickering* framework that expressly discounts the weight of the employer's and the public's interest in speech not based upon how substantially it involves matters of public concern, but instead based upon the tone of the speech and how offensive some group finds the speaker's ideas to be. Thus, this Court has opined that under *Pickering*, a public employee's "First Amendment interest weighs less than it normally would" when the employee speaks about "hot-button political issues in a mocking, derogatory, and disparaging manner," *MacRae v. Mattos*, 106 F.4th 122, 137 (1st Cir. 2024), and that "[s]peech done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balancing," *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007). Latching onto this general principle, the district court below held that "[t]he value of Hussey's speech is lessened by the inflammatory and insulting manner in which his post was written." ADD018 (citing *id.*). And the since-vacated panel's majority opinion expanded this doctrine even further, holding that "Hussey and the dissent are incorrect, however, in arguing that the specific words Hussey used needed to be intrinsically vulgar or racist for his speech to be considered insulting," because his

2

"post -- because of the words Hussey chose -- disparaged both George Floyd and those who rallied in response to the horrific circumstances of his death," and thus "the disparaging nature of Hussey's speech simply means that it is not on the 'highest rung' of the First Amendment 'hierarchy' as we consider the strength of the Department's countervailing interest." *Hussey v. City of Cambridge*, 149 F.4th 57, 68–69 (1st Cir. 2025), *reh'g en banc granted, opinion withdrawn,* 2026 WL 220297.[3]

But, as Justice Thomas recently pointed out,[4] these precedents directly and clearly conflict with binding Supreme Court precedent, and accordingly, they must be overruled.[5] While the tone of the speech may, in appropriate circumstances, generally affect the reasonableness of predictions of disruption on the employer's side of the balancing, *see infra*, it can never be used to discount *ab initio* the

---

[3]    Although not critical to this Court's ultimate conclusion, Plaintiff reemphasizes that his speech was not vulgar, mocking or defamatory. He truthfully asserted that Mr. Floyd, based on his long and documented history of drug abuse, theft, and other criminal activity, was a "druggie," "thief," and "career criminal," and thus not deserving of having a federal police reform bill named after him.

[4]    *See MacRae v. Mattos*, 145 S. Ct. 2617 (2025) (Statement of Thomas, J. concurring in denial of certiorari).

[5]    *See, e.g.*, *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (cleaned up) (explaining that, where a precedent of the Supreme Court has direct application, lower courts must follow the precedent even if they believe it has been "implicitly overruled" or "is in tension with some other line of decisions," as "the prerogative of overruling its own decisions" is exclusively left to the Supreme Court); *accord MacRae*, 145 S. Ct. at 2621 (Thomas, J.) (footnoted omitted) ("Lower courts are bound to apply the *Pickering-Garcetti* framework as we have articulated it. I have serious concerns about how the First Circuit applied it here.").

employer's and public's interests on the "public concern" side of the ledger.[6]

The Supreme Court, in the *Pickering* context and beyond, "has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)); *accord, e.g.*, *Lane v. Franks*, 573 U.S. 228, 235 (2014) ("Speech by citizens on matters of public concern lies at the heart of the First Amendment.").

At the same time, the Supreme Court has been equally unequivocal that, in performing the *Pickering* analysis: "**The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of**

---

[6]    This distinction matters; courts must determine if "the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had," *Waters v. Churchill*, 511 U.S. 661, 680 (1994) (plurality decision), which cannot be properly done if the speech's First Amendment value is artificially discounted. Courts are required to ensure employers' predictions of disruption are reasonable under all of the circumstances and follow appropriate procedures for investigating the potential for disruption. *Id.* at 677–78. "[W]hen government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 80 (2004) (quoting *United States v. Treasury Employees,* 513 U.S. 454, 465, 475 (1995) (*NTEU*). Thus, if an employer's predictions of disruption are based upon the tone of the speech, but such predictions are undercut by context or other countervailing factors mitigating the potential for disruption, the predictions may very well be unreasonable. "It may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available[.]" *Waters*, 511 at 678.

**public concern**. 'Debate on public issues should be uninhibited, robust, and wide-open, and may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Rankin*, 483 U.S. 378, 387 (1987) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)) (alterations omitted) (emphasis added).[7] Even *Pickering* itself was emphatic that, "to the extent that the [employer's] position here can be taken to suggest that even comments on matters of public concern that are substantially correct… may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it." 391 U.S. at 570. And, lest there be any doubt, the Roberts Court has again reaffirmed these core principles in *Snyder*:

> Speech on 'matters of public concern' is at the heart of the First Amendment's protection. The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. **Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."** *Connick v. Myers,* 461 U.S. 138, 145 (1983).…**The**

---

[7]    In *Rankin*, the district court opined that it did not think the speech at issue was a matter of public concern because the public employee's words "were something more than political hyperbole. They expressed such dislike of a high public government official as to be violent words, in context," and thus not properly on "a matter of public concern." 483 U.S. at 386 n.8. The Supreme Court emphatically rejected this notion, writing: "The District Court's sole affirmative 'finding' here, that McPherson's statement constituted 'violent words, in context,' is unintelligible in First Amendment terms." *Id.*; *see also City of San Diego,* 543 U.S. 77, 83–84 (2004) (citing *id.*) ("The Court has also recognized that certain private remarks, such as negative comments about the President of the United States, touch on matters of public concern and should thus be subject to Pickering balancing.").

arguably "**inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.**" *Rankin v. McPherson,* 483 U.S. 378, 387 (1987).

*Snyder v. Phelps*, 562 U.S. 443, 451–53 (2011) (emphasis added) (cleaned up).

Moreover, as the panel dissent pointed out, the First Circuit's discounting of the public concern interests based upon supposed vulgarity "diverge[s] from the approach in many other circuits." *Hussey*, 149 F.4th at 77 (Howard, J., dissenting) (collecting cases). And, even in more recent cases than the ones cited by Judge Howard, circuit courts have forcefully rejected using the "vulgarity penalty" to undercut the employee's and public's interests in speech touching upon matters of public concern. In *Noble v. Cincinnati & Hamilton Cnty. Pub. Lib.*, 112 F.4th 373, 378–85 (6th Cir. 2024), for example, the Sixth Circuit was confronted with a public employee who was disciplined for posting a meme in response to protests resulting from Mr. Floyd's murder that stated, "All Lives Splatter, Nobody Cares About Your Protest." While acknowledging that the "speech was highly distasteful," the Sixth Circuit nevertheless explained that "the First Amendment protects abhorrent speech, and it does so even if the speech makes others feel quite uncomfortable." *Id.* at 383. The Sixth Circuit went on to explain:

> Whether one agrees with Noble's views or not, there is no question that he spoke to a matter of public concern—namely, whether the alleged violent and destructive tactics of BLM were appropriate means to protest the deaths of George Floyd and others.
>
> That the meme communicated this message in an insensitive manner does

not affect this analysis, because "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."

*Id.* at 381 (quoting *Rankin*, 483 U.S. at 387). Likewise, in *Reges v. Cauce*, 162 F.4th 979, 999 (9th Cir. 2025), the Ninth Circuit addressed whether discipline imposed upon a professor for statements in a class syllabus mocking the school's suggested indigenous land acknowledgement ran afoul of the First Amendment under the *Pickering* test. There, the Ninth Circuit explained:

> The parodic manner of Reges's speech does not detract from its First Amendment value….Nor does the fact that some listeners may have found it disrespectful or distasteful. The First Amendment protects "a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms."

*Reges v. Cauce*, 162 F.4th 979, 999 (9th Cir. 2025) (quoting *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975)). Similarly, in *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1248 (10th Cir. 2024), the Tenth Circuit held for a public employee who "passionately—and at times profanely—criticized actors within" the school district in which he worked. The court there explained:

> Plaintiff spoke on matters of serious concern to the taxpaying public—school funding, cronyism, educational choice, and discrimination….So, Plaintiff's interest in speaking is strong….The impoliteness, passion, or profanity of his speech do not overcome his free speech interests…. And the offensive, vulgar manner of Plaintiff's speech does not deprive him of constitutional protections[.]

*Id.* at 1253.

Accordingly, this en banc Court should overrule its erroneous precedents that

7

allow for deducting from the "public concern" side of the *Pickering* scale based on the tone of the speech and instead bring this Circuit into conformity with the binding precedent of the Supreme Court.[8]

### B. How "Manner, Time, and Place" and Whether the Speech Occurred Inside or Outside the Workplace Factor into the Analysis

The Court has also asked the parties to "discuss how the consideration of 'manner, time, and place' in the *Pickering* balance bears on th[e] question" of "the propriety of giving less weight to 'mocking, derogatory, and disparaging' speech on matters of public concern," as well as whether this question "depends on whether the speech occurred within the workplace or outside the workplace." In short, neither "manner, time, and place" nor whether the speech occurred within or outside the workplace have any bearing on the impropriety of using such characterizations of the speech to discount its public concern interests.[9]

At the outset, it bears emphasis that neither "manner, time, and place," nor whether the speech occurred at the workplace consider the content — including the

---

[8]     The Court's Order notes, "The en banc court will have copies of the parties' previously filed briefs." *Hussey*, 2026 WL 220297 at *1. For this reason, Plaintiff does not repeat here the many reasons his speech is not "mocking, derogatory, and disparaging," *MacRae*, 106 F.4th at 137, nor "vulgar, insulting, and defiant," *Curran*, 509 F.3d at 49, even were this Court not to overrule such precedents.

[9]     As explained *infra*, these factors may properly be considered on the "disruption" side of the balancing, not the "public concern" side. Here, all of these factors strongly favor Hussey, as his post was on his private Facebook page (which did not identify his employer), was posted while he was at home and off-duty, and was only up for two hours.

tone — of the speech at all. The Supreme Court has long:

> emphasized that time, place, and manner regulations must be applicable to all speech irrespective of content. Governmental action that regulates speech on the basis of its subject matter slips from the neutrality of time, place, and circumstance into a concern about content. Therefore, a constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech.

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 536 (1980) (cleaned up); *accord Barr v. Am. Assn. of Political Consultants, Inc.*, 591 U.S. 610, 618 (2020); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). Thus, it would be impossible for such considerations to authorize discounting the public concern interests of speech based upon the speech's controversial nature.

Instead, in the *Pickering* context, these factors have been considered in two respects, neither of which is the weight of the employee's and public's interest in the speech as part of the balancing. First, the time, place, and manner of speech may bear upon the "threshold inquiry" of whether "the employee speaks 'as a citizen upon matters of public concern' rather than 'as an employee upon matters only of personal interest,'" which determines whether the *Pickering* test is applicable at all.[10] This is so because "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. Thus, for

---

[10]    *City of San Diego*, 543 U.S. at 83 (quoting *Connick*, 461 U.S. at 143).

example, the Supreme Court has held that an employee's interoffice distribution —

following "another round of controversy with her superiors" related to her transfer

— of "a questionnaire not otherwise of public concern does not attain that status

because its subject matter could, in different circumstances, have been the topic of a

communication to the public that might be of general interest," as "whether

discussions of office morale and discipline could be matters of public concern is

beside the point—it does not answer whether *this* questionnaire is such speech." *Id.*

at 148 n.8.[11]

The Supreme Court has also explained that speech occurring during a heightened

political climate and touching upon the recent events is strong evidence that the

speech is on a matter of public concern. In *Rankin*, for example, the Court explained:

> Considering the statement in context, as *Connick* requires, discloses that it
> plainly dealt with a matter of public concern. The statement was made in the
> course of a conversation addressing the policies of the President's

---

[11]   Likewise, in the *Pickering* context, the Court has highlighted the immense
contributions of public "employees who write for publication **in their spare time**
[and] have made significant contributions to the marketplace of ideas," like "literary
giants like Nathaniel Hawthorne and Herman Melville, who were employed by the
Customs Service; Walt Whitman, who worked for the Departments of Justice and
Interior; and Bret Harte, an employee of the Mint." *NTEU*, 513 U.S. at 464–66
(emphasis added). In so recounting, the Supreme Court explained that "the
government bears the burden of justifying its adverse employment action" because
"Respondents' expressive activities in this case fall within the protected category of
citizen comment on matters of public concern rather than employee comment on
matters related to personal status in the workplace." *Id.* This was because "[t]he
speeches and articles…were addressed to a public audience, were made outside the
workplace, and involved content largely unrelated to their government
employment." *Id.*

administration. It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President.

*Rankin*, 483 U.S. at 386 (footnotes omitted).

In other words, the manner, time, and place of the speech — though likely not dispositive — may nevertheless help shed light on whether the employee was speaking as a citizen or as an employee. *See also O'Connor v. Steeves*, 994 F.2d 905, 913–15 (1st Cir. 1993) (explaining how time, place, and manner of speech can inform whether it touched upon matters of public concern).

This is not controversial; irrespective of the content of the speech, an employee speaking about departmental policy while in uniform at a press conference and displaying a PowerPoint presentation is more likely to be speaking in his official capacity than an employee at home posting on his personal blog, just as an employee's statements during a performance review are more likely to be in an official capacity than statements made into a megaphone during a political rally.[12]

---

[12]    However, while the time, place, and manner of the speech may shed some light on this initial threshold question, it does not impact the *weight* of the public concern prong itself. *See, e.g.*, *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414–15 (1979) ("This Court's decisions in *Pickering, Perry*, and *Mt. Healthy* do not support the conclusion that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly. While those cases each arose in the context of a public employee's public expression, the rule to be derived from them is not dependent on that largely coincidental fact.... As we have noted, however, the fact that each of these cases involved public expression by the employee was not critical to the decision.");

The second place where considerations of time, place, and manner — inclusive of whether the speech occurred at the workplace — factors into the *Pickering* analysis is within the disruption prong. These factors are properly considered to determine whether the speech's "potential for disruption nonetheless stripped it of First Amendment protection[.]" *Waters*, 511 U.S. at 667; *see also Decotiis v. Whittemore*, 635 F.3d 22, 35–36 (1st Cir. 2011) (situating "time, place, and manner" considerations "[o]n the Defendant's side" to determine whether the "risk of disruption and inefficiency outweighs the important interests served by [the employee's] speech"). The Supreme Court has instructed, for example, that speech occurring within the workplace has a greater propensity for disruption than speech occurring outside of the workplace:

> Although the First Amendment's protection of government employees extends to private as well as public expression, striking the *Pickering* balance in each context may involve different considerations. When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they "in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally." *Id.*, at 572–573, 88 S.Ct., at 1737. Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.

---

*Rankin*, 483 U.S. at 387 ("The private nature of the statement does not…vitiate the status of the statement as addressing a matter of public concern.").

*Givhan*, 439 U.S. at 415 n.4 (emphasis and alteration in original); *accord Davignon*

*v. Hodgson*, 524 F.3d 91, 104 (1st Cir. 2008) (citing *Connick*, 461 U.S. at 153) ("In

evaluating the government's interest, a number of factors may be considered. Among

these are [ ] the time, place, and manner of the employee's speech… [S]peech will

likely be more disruptive if it occurs during work hours, at the office, or requires the

speaker or others to leave work stations[.]"). Indeed, the Supreme Court has gone so

far as to hold:

> that when government employees speak or write on their own time on topics
> unrelated to their employment, the speech can have First Amendment
> protection, absent some governmental justification 'far stronger than mere
> speculation' in regulating it.

*City of San Diego*, 543 U.S. at 80 (quoting *NTEU*, 513 U.S. at 465, 475); *see also*

*Rankin*, 483 U.S. at 388 ("We agree with Justice POWELL that a purely private

statement on a matter of public concern will rarely, if ever, justify discharge of a

public employee.").

At the same time, the Supreme Court — contrary to Defendants' core arguments

throughout this litigation — has reminded that a heightened political climate

*increases*, rather than lessens, the government's burden to show disruption:

> As Justice Brandeis reminded us, a "reasonable" burden on expression
> requires a justification far stronger than mere speculation about serious
> harms. "Fear of serious injury cannot alone justify suppression of free
> speech and assembly. Men feared witches and burnt women.... To justify
> suppression of free speech there must be reasonable ground to fear that
> serious evil will result if free speech is practiced."

13

*NTEU*, 513 U.S. at 475 (quoting *Whitney v. California,* 274 U.S. 357, 376 (1927)

(Brandeis, J., concurring) (alterations in original). Justice Brandeis there remarked:

> It is the function of speech to free men from the bondage of irrational fears….Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, selfreliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is the command of the Constitution.

*Whitney*, 274 U.S. at 376–77 (Brandeis, J., concurring).

Accordingly, while the time, place, and manner of the speech — including whether it occurs within or outside the workplace — can affect the reasonableness of predictions of disruption, it cannot provide license for discounting the public concern interests of the speech. Of course, "vulgar" statements occurring inside the workplace in front of the employer's customers will have a greater propensity for disruption than those occurring outside the workplace by employees not identifying their employers. Here, by contrast, as even the panel seemed to agree, the words Hussey used were not themselves vulgar, and even if vulgarity was a relevant factor,

the underlying facts deeply favor Hussey in the *Pickering* analysis.[13]

## II.  THE COURT'S SECOND QUESTION

The Court next asked the parties:

Is there a more suitable approach, also consistent with First Amendment jurisprudence, for balancing the First Amendment right of a public employee to speak on a matter of public concern against the needs of the public employer?

*Hussey*, 2026 WL 220297, at *1. Plaintiff responds that while this Court is bound by the Supreme Court's *Pickering* framework, there are four principles directly derived from Supreme Court caselaw in this area that this Court should clarify in this case, and which are entirely consistent with *Pickering*.

First, as has been explained, this Court should hold that a statement's vulgar or mocking tone is not relevant to the public concern side of the *Pickering* scale and is not some special, freestanding consideration in the analysis but instead may, under the appropriate circumstances, be considered as part of the disruption prong of the balancing test. *See supra*.

Second, this Court should make clear that neither heckler's vetoes nor viewpoint

---

[13]     *Compare* JA159 (Hussey's post) (ellipses in original) ("This is what it's come to ... 'honoring' a career criminal, a thief and druggie ... the future of this country is bleak at best[.]"); *with, e.g.*, *Curran*, 509 F.3d 40–49 (speech that "urged Department administrators to engage in insubordination and insulted their integrity," included "threatening and menacing" comments like "[y]ou captains and deputies are gonna get shot," and compared superiors to Nazis and suggested employees should assassinate them).

discrimination are proper elements of "disruption" — that is to say that community or employer opposition to political messages, no matter how inconvenient to the employer, can never be weighed in determining the disruption or potential for disruption under the balancing test.

Third, this Court should make clear that courts must independently analyze the reasonableness of the employer's predictions or proffers of disruption by closely analyzing the employer's investigative processes and ensuring predictions of disruption are concrete, evidence-based, and non-speculative.

And fourth, this Court should make clear that courts must earnestly engage in the balancing analysis, employing a sliding scale that correlates the disruptive potential to the weight on the public concern side of the scale.

Of course, to some degree, weighing the public concern interests against the disruption interests "is like being asked to decide 'whether a particular line is longer than a particular rock is heavy.'" *Natl. Pork Producers Council v. Ross*, 598 U.S. 356, 381 (2023) (quoting *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in judgment). However, by clearly enunciating these four principles, this Court could go a long way towards fortifying "legal standards that foster stability, facilitate consistency, and promote predictability," especially in an area where "courts, which are currently at sea…, need a solid anchor for grounding their constitutional pronouncements." *United*

*States v. Rahimi*, 602 U.S. 680, 746–47 (2024) (Jackson, J., concurring).

### A.     Hecklers' Vetoes and Viewpoint Discrimination

It is incumbent upon this Court to clarify that employers may not rely upon hecklers' vetoes — interest group backlash to the political message of a public employee's speech — as disruption justifying discipline for the speech. The same goes for viewpoint discrimination: Employees are free to rally political opposition to public policy, even those policies favored by their employers.

The Supreme Court expressly held, in the *Pickering* context, that "our Constitution does [not allow] protected speech [to]…readily give way to a 'heckler's veto.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022). The Fourth Circuit has strikingly illustrated why public employers cannot use hecklers' vetoes as justifications for punishing employees' speech:

> Historically, one of the most persistent and insidious threats to first amendment rights has been that posed by the "heckler's veto," imposed by the successful importuning of government to curtail "offensive" speech at peril of suffering disruptions of public order. Government's instinctive and understandable impulse to buy its peace—to avoid all risks of public disorder by chilling speech assertedly or demonstrably offensive to some elements of the public—is a recurring theme in first amendment litigation. Though this "veto" has probably been most frequently exercised through legislation responsive to majority sensibilities, the same assault on first amendment values of course occurs when, as here, it is exercised by executive action responsive to the sensibilities of a minority.

> As indicated, the special dilemma presented for the Police Department here can only excite judicial sympathy. One may well feel—as undoubtedly did the Department—that a little forbearance on the part of Berger, given the special circumstances of his public employment and the hard-earned and

presumably still tenuous trust of the black community, would be in order….Nevertheless, however real the dilemma, we think and hold that the Department—after all an agency of the state charged with enforcing the first amendment as well as with maintaining public order—could not respond as it did consistently with the first amendment, once Berger had declined to forbear and stood on his constitutional rights….

An appropriate Department response, perhaps the only one, wholly consistent with the first amendment, would have been instead to say to those offended by Berger's speech that their right to protest that speech by all peaceable means would be as stringently safeguarded by the Department as would be Berger's right to engage in it. We have no illusions that this would have been a satisfactory response, nor that it may not have led to some of the very disruption of operations and resources that the Department feared. But it would not only have been the most sound response constitutionally, it would have been an eminently practical one for any of those offended by Berger's speech….[The heckler's veto] is a device as readily seized upon by one group in society as another, and is one more readily available in most times to majority than to minority groups. There are of course many illustrations of this, but a particularly apt one for this purpose is that considered by the Fifth Circuit in *Battle v. Mulholland,* 439 F.2d 321 (5th Cir.1971). There a black police officer in a small Mississippi town had been discharged by the town officials because of the town fathers' concern, prompted by complaints, and probably justified, that his conduct would exacerbate an already tense racial situation in the town. Noting that this "type of restrictive response, based on theoretical reactions by others" to conduct protected by the first amendment had "long been condemned," the court held the discharge constitutionally impermissible. We think that the principle applied there is precisely that one applicable here, though figuratively, the shoe here is on the other foot.

*Berger v. Battaglia*, 779 F.2d 992, 1001–02 (4th Cir. 1985) (citations omitted).

Other Circuits, too, have embraced the notion that "[p]olitical speech is the quintessential example of protected speech, and it is inherently controversial," and thus "[t]hat some may not like the political message being conveyed is par for the course and cannot itself be a basis for finding disruption of a kind that outweighs the

18

speaker's First Amendment rights." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 783 (9th Cir. 2022).[14] The Eighth Circuit, too, recently dismissed hecklers' vetoes as improper considerations when weighing disruption:

> At best, the evidence of disruption is thin. As the district court pointed out, everyone agrees "that there was no disruption of training at the fire department, or of any fire service calls, because of the post or the controversy surrounding it." Instead, Mayor Williams argues that the firestorm itself is what disrupted the work environment. Several police officers and city-council members were upset and phone lines were jammed with calls from concerned citizens. A few opposed Melton's continued employment as a firefighter and did not want him coming to their house for a medical call or fire emergency. These calls seemed to be the main motivation for firing Melton.

> The problem is that there was no showing that Melton's post had an impact on the fire department itself. No current *firefighter* complained or confronted him about it. Nor did any co-worker or supervisor refuse to work with him. Granting summary judgment based on such vague and conclusory concerns, without more, runs the risk of constitutionalizing a heckler's veto.

*Melton v. City of Forrest City, Arkansas*, 147 F.4th 896, 903 (8th Cir. 2025) (cleaned up) (emphasis in original). The Sixth Circuit has likewise explained that the First Amendment does not "allow universities to discipline professors, students, and staff any time their speech might cause offense," as "[d]oing so would reduce *Pickering*

---

[14]     *Accord Reges*, 162 F.4th at 1001 (citation omitted) ("If student anxiety or outrage toward a professor's academic speech could justify restricting what a professor says, then….the tides of popular campus sentiment would drown out dissenting viewpoints, with the adverse reactions of students and staff operating as an impermissible "heckler's veto" that restricts speech based on a hostile audience reaction. If criticizing land acknowledgments creates disruption on campus and warrants investigation and reprimand, what other views would cause offense and be excluded next?").

to a shell." *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.")). And the Tenth Circuit, for its part, has explained:

> Even if disruption of *external* operations could justify defendants' actions under *Pickering* and its progeny, their justification must fail under another theory. The department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future. The Supreme Court has squarely rejected what it refers to as the "heckler's veto" as a justification for curtailing "offensive" speech in order to prevent public disorder. The record is devoid of evidence of actual or potential internal disruption caused by plaintiffs' speech. Defendants' evidence pointed only to potential problems which might be caused by the public's reaction to plaintiffs' speech. Apprehension of disturbance is not enough to overcome the right to freedom of expression. The Supreme Court's rejection of the heckler's veto lends support to our holding that the defendants have only an attenuated interest in preventing plaintiffs' speech.

*Flanagan v. Munger*, 890 F.2d 1557, 1566–67 (10th Cir. 1989) (cleaned up) (emphasis in original). Thus, community reactions disagreeing with the viewpoint of the speech — even those that cause a commotion for the employer — are not a proper basis for imposing discipline upon the speaker.

At the same time, this Court should make clear that not only are hecklers' vetoes proscribed from consideration in the disruption analysis; so too are "disruption" justifications based upon employees engendering opposition to their employers' preferred policies. This also constitutes impermissible viewpoint discrimination. It is well-established that even speech intended to rally community support in

opposition to the employer's policies is permissible. [15]

As Justice Thomas explained:

We have made clear that the core First Amendment principle of viewpoint neutrality applies in the *Pickering-Garcetti* context as elsewhere….Yet, the First Circuit cited an arguable conflict between MacRae's posts and institutional expressions of viewpoint such as Hanover's 'Core Value of 'respecting human differences'' as evidence of potential disruption. 106 F.4th at 139. It undermines core First Amendment values to allow a government employer to adopt an institutional viewpoint on the issues of the day and then, when faced with a dissenting employee, portray this disagreement as evidence of disruption. And, the problem is exacerbated in the case of an employee such as MacRae, who expressed her views only outside the workplace and before her employment.

*MacRae*, 145 S. Ct. at 2620 (Thomas, J.) (alterations omitted). Accordingly, this

Court should clarify that speech conflicting with an employer's preferred policies,

---

[15]    *See Pickering*, 391 U.S. at 565–66 (public employee's op-ed "letter constituted, basically, an attack on the School Board's handling of the 1961 bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs"); *Rankin*, 483 U.S. at 384 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."); *id.* at 391 n.17 ("We therefore reject the notion…that the Constable could discharge the employee for any expression inconsistent with the goals of a law enforcement agency."); *Connick*, 461 U.S. at 154 ("Although today the balance is struck for the government, this is no defeat for the First Amendment. For it would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here."); *Mihos v. Swift*, 358 F.3d 91, 107–08 (1st Cir. 2004) (finding, where employer's imposed discipline was retaliatory for employee's political positions that conflicted with employer's, that there was "a void on [the employer's] side of the scale and the *Pickering* scale tips decisively in favor of" the employee) (Lipez, J.).

even where it causes headaches for the employer, is not properly considered within the disruption prong of the *Pickering* balancing.

### B. Courts' Obligations to Independently Determine the Reasonableness of Employers' Predictions of Disruption

This Court should also emphasize that, while employers are entitled to some deference in their predictions of disruption, "the deference to their conclusions has never been complete." *Waters*, 511 U.S. at 677. Instead, courts must "consider[] the reasonableness of the employer's conclusions." *Id.* This means that courts:

> are compelled to examine for [them]selves the statements in issue and the circumstances under which they were made to see whether or not they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.

*Rankin*, 483 U.S. at 386 (quoting *Connick*, 461 U.S., at 150, n. 10) (alterations omitted). The Supreme Court has further instructed:

> 'In cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression."'

*Id.* (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 (1984)) (alteration omitted). Courts are further required to ensure an employer "reach[ed] its conclusion about what was said in good faith, rather than as a pretext; but it does not follow that good faith is sufficient." *Waters*, 511 U.S. at 677. And, at bottom, courts must ultimately determine that, "[s]o long as employees are speaking as citizens about matters of public concern, they [have] face[d] only those speech

22

restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006).

At the same time, courts must determine whether, using a reasonable third-party standard, the employer adequately investigated the circumstances surrounding the speech to arrive at its ultimate conclusions. *Waters*, 511 U.S. at 677–78. Investigative "procedures outside the range of what a reasonable manager would use may be condemned as unreasonable." *Id.* at 678.

> If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care.

*Id.* at 677.[16] Here, the employer conducted *no* investigation; it never sought to determine the potential disruptive effects of the speech, ascertain who screenshotted the post (which is still unknown), or interview anyone besides Hussey — who was interviewed only once.

Moreover, under binding precent, it is plainly insufficient for courts to continue their trend of merely citing "deference" to employers' predictions of disruption.

---

[16]   *See also Rankin*, 483 U.S. at 388–89 ("While McPherson's statement was made at the workplace, there is no evidence that it interfered with the efficient functioning of the office. The Constable was evidently not afraid that McPherson had disturbed or interrupted other employees—he did not inquire to whom respondent had made the remark and testified that he 'was not concerned who she had made it to,' Tr. 42. In fact, Constable Rankin testified that…he did not even inquire whether the remark had disrupted the work of the office.").

23

Instead, this Court should make clear that the lodestar is whether the employer's predictions are "reasonable," and "[t]he First Circuit accordingly should [ ] discard[] factors whose disruptive potential [i]s purely speculative." *MacRae*, 145 S. Ct. at 2620 (Thomas, J.). In so doing, this Court should lay out that, to be "reasonable," an employer's predictions of disruption must be concrete, evidence-based, particularized, and articulable. This best breathes life into the Supreme Court's command:

> that when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it.

*City of San Diego*, 543 U.S. at 80 (quoting NTEU, 513 U.S. at 465, 475); *accord Davignon*, 524 F.3d at 105 (quoting *Gustafson v. Jones*, 290 F.3d 895, 911 (7th Cir. 2002)) ("The 'mere incantation of the phrase "internal harmony in the workplace" is not enough to carry the day.'").

## C.    The Proportionality of Balancing

Finally, this Court should make clear that application of the balancing test must be paramount. It is not enough for courts to merely determine that an employer's predictions or descriptions of disruption are reasonable; they also must outweigh the speaker's and public's interests in the speech. This is often the forgotten part of the analysis. But the Supreme Court has been unequivocal: "*Pickering* unmistakably states…that the state's burden in justifying a particular [discipline] varies depending

24

upon the nature of the employee's expression," and "that a stronger showing [of disruption] may be necessary if the employee's speech more substantially involved matters of public concern." *Connick*, 461 U.S. at 150–52. This means that "the more substantially an employee's speech involves matters of public concern, the higher the state's burden will then be to justify taking action, and vice versa," because the "inquiry 'involves a sliding scale in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public.'" *Fenico*, 70 F.4th at 162 (quoting *Munroe*, 805 F.3d at 472). "In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." *Waters*, 511 U.S. at 674. And even sincere predictions of disruption may be so attenuated that, "[a]t some point, such concerns are so removed from the effective functioning of the public employer that they cannot prevail over the free speech rights of the public employee." *Rankin*, 483 U.S. at 391. It also bears emphasis that the Supreme Court has made clear that some speech may have such weighty First Amendment interests that no amount of disruption could overcome them. [17]

---

[17]    *See id.* at 388 n.13 ("[A] purely private statement on a matter of public concern will rarely, if ever, justify discharge of a public employee."); *accord Brennan v. Norton*, 350 F.3d 399, 414 (3d Cir. 2003) (cleaned up) ("Of course, the right of expression would mean little if an employee could be silenced whenever his/her voice caused any degree of disruption or discomfort for a public employer. Therefore, the balancing cannot be controlled by a finding that disruption did or

## III. THE COURT'S THIRD QUESTION

The Court next asked the parties:

How would any proposed change in approach affect the analysis and outcome in this case? Please also discuss whether, and how, the *Pickering* balancing would differ under such an approach for speech by a public employee holding a different employment position or rank than appellant Hussey.

*Hussey*, 2026 WL 220297, at \*1.

### A.     Effects on Outcome

The answer to the first part is that proper application of the *Pickering* test, as described above, would invariably result in Hussey's speech engendering First Amendment protection, as his and the public's interests would far outweigh the employer's interests. At bottom, as even the since-vacated panel opinion admitted, "there is scant evidence in the record to support a prediction of disruption to the Cambridge Police Department's internal operations[.]" *Hussey*, 149 F.4th 57, 71 (1st Cir. 2025). Instead, like the district court, the panel based its ultimate conclusions on impermissibly discounting the public concern interests, and on vague and speculative predictions of community reactions to Hussey's speech and

---

could occur. A public employee's speech no doubt may disrupt and demoralize much of the public workplace. However, the First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace. Rather, any disruption is only a weight on the balancing scale.").

viewpoints.[18] These are manifestly improper considerations, and as such, "the employer's side of the *Pickering* scale is entirely empty: Respondents do not assert, and cannot demonstrate, any government interest that tips the balance in their favor." *Lane v. Franks*, 573 U.S. 228, 242 (2014).

## B.    Effects of a Different Position or Rank

The public employee's position and rank, like many of the other factors discussed above, can come into play in the *Pickering* analysis within the disruption prong. The Supreme Court has explained:

> [I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal. We cannot believe that every employee in Constable Rankin's office, whether computer operator, electrician, or file clerk, is equally required, on pain of discharge, to avoid any statement susceptible of being interpreted by the Constable as an

---

[18]    *See* Defs.' (panel) Br. 8, 12 (first quoting Commissioner Bard's letter notifying Hussey of his suspension at JA423, then quoting the Department's Final Investigative Report at JA166–67) (emphasis added) ("The Plaintiff posted a comment to his Facebook account that 'perpetuates stigmatizing and discriminatory practices ***that could be considered*** insensitive' and was '***potentially damaging*** to the Department, as ***it appears*** that [the] post represents the views, thoughts, and opinions of the majority of Cambridge Police Officers….The Plaintiff's post ***gave 'the impression*** the [Plaintiff] does not believe in rehabilitation and is disrespectful of people suffering from substance use disorder.'…Plaintiff's post '***can be interpreted*** that the Cambridge Police have a bias against people who have committed felony crimes or have a substance abuse disorder.'").

indication that the employee may be unworthy of employment in his law enforcement agency. At some point, such concerns are so removed from the effective functioning of the public employer that they cannot prevail over the free speech rights of the public employee

*Rankin*, 483 U.S. at 390–91 (footnote omitted).

Here, it is beyond dispute that, as a "beat cop," Hussey served in no "confidential" or "policymaking" role. While his role did involve "public contact," such public contact was certainly no greater than that of the vast majority of civil servants — mail carriers, teachers, nurses, firefighters, public works personnel, government attorneys, social workers, librarians, park rangers, municipal clerks, paramedics, bus drivers, athletic coaches, judges, and the like. And while it is true that police officers must command a certain degree of trust in communities, so too must a child's teacher acting *in loco parentis*, a bus driver responsible for the lives of his or her passengers, a nurse overseeing one's medical care, and a jurist protecting defendants' liberties. This is to say that Hussey's position was an important one, but it does not meaningfully differ from scores of other critical government posts. Moreover, even if his Facebook post was widely known (which it was not), there is no reason or evidence to suggest that Cambridge residents would be reticent to be served by Hussey because he thought that naming an important piece of federal legislation after Mr. Floyd was inappropriate.

At the same time, were Hussey instead a political appointee, like the Commonwealth's Commissioner for Public Safety, the government would have had

greater leeway to curtail his speech. The Supreme Court has explained:

> The First Amendment reflects the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964). But though a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing. Even something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees.

*Waters*, 511 at 672 (citations omitted). This is because such high-ranking policymaking positions involve a far greater propensity for stakeholders to impute the employee's speech to the employer, and thus there is a greater need for tighter control over such employees' speech to prevent disruption. Here, however, where Hussey's page never identified his employer, and where he was a beat cop posting to a small audience of his personal friends, any such risks were negligible at best.

## IV. THE COURT'S FOURTH QUESTION

Finally, the Court asked the parties:

> If the proper *Pickering* inquiry considers whether the speech at issue disrupted the workplace without reducing the employee's interest in the speech, is it necessary to remand the case to the District Court? Or did the District Court already make a finding on that score?

*Hussey*, 2026 WL 220297, at *1. The answers are simple: No remand is required, and the district court's opinion itself stated there were no material disputes at issue.[19]

---

[19]    To be sure, Hussey has and does argue that there are material disputes as to the employer's motivations for imposing discipline and whether the proffered reasons

The Supreme Court has repeatedly held that "[t]he ultimate issue—whether the speech is protected—is a question of law." *Rankin*, 483 U.S. at 386 (citing *Connick*, 461 U.S. at 148, n. 7). Appellate courts determine *de novo* whether the speech is entitled to protection, and such a determination controls even where the reasoning and findings below are ambiguous. *Id.* at 391 n.16. Moreover, the Supreme Court has "repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression,'" vitiating the need for remand. *Id.* at 386.

At the same time, the district court below determined that "[s]ince only the [*Pickering* balancing] is in dispute, and because the balancing of interests is a question of law the Court must decide, there is not a triable question of fact left for a jury." ADD015. Here, the speech at issue is undisputed, and the employer's proffered predictions of disruption are well-documented. Accordingly, unless this Court determines that it needs to reach the issue of pretext, it should proceed to complete the *Pickering* analysis and provide helpful guidance for future courts.

---

were pretextual. In the event the Court's premise is flipped (i.e., that it *does* hold, contrary to Supreme Court caselaw, that Hussey's and the public's interests in the speech can be discounted by the vulgarity penalty), or if the Court further finds the employer's *proffered* interests in preventing disruption outweighed Hussey's and the public's, then remand would be not only appropriate, but required. *See Davignon*, 524 F.3d at 100 (describing *Pickering*'s balancing test as subject to *de novo* review but questions of retaliation as presenting factual questions).

Dated: February 18, 2026                    Respectfully submitted,

                                            BRIAN HUSSEY,

                                            By his attorneys,

                                            */s/ Jack Bartholet*
                                            Harold Lichten, CAB # 22114
                                            Jack Bartholet, CAB # 1211802
                                            LICHTEN & LISS-RIORDAN, P.C.
                                            729 Boylston Street, Suite 2000
                                            Boston, MA 02116
                                            Telephone: (617) 994-5800
                                            Facsimile: (617) 994-5801
                                            hlichten@llrlaw.com
                                            jbartholet@llrlaw.com

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

_____

**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

_____

1.      This brief complies with the page limitation of the Court's January 28, 2026 Order because this brief consists of 30 or fewer pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

Dated: February 18, 2026

                                        _/s/ Jack Bartholet_____
                                        Attorney for Plaintiff-Appellant

**UNITED STATES COURT OF APPEALS**

**For the First Circuit**
**Appeal No. 24-1279**

_____

**Certificate of Service**

_____

I hereby certify that, on February 18, 2026, I electronically filed the
foregoing with the Clerk of the United States Court of Appeals for the First Circuit
by using the appellate CM/ECF system, which will send a notification of such
filing to all counsel of record.

*/s/ Jack Bartholet*
Attorney for Plaintiff-Appellant