No. 24-1279

IN THE
# United States Court of Appeals for the First Circuit

BRIAN HUSSEY,

*Plaintiff-Appellant,*

*v.*

CITY OF CAMBRIDGE;
CHRISTINE ELOW, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE
CAMBRIDGE POLICE DEPARTMENT,

*Defendants-Appellees,*

BRANVILLE G. BARD, JR., IN HIS INDIVIDUAL CAPACITY,

*Defendant.*

On Appeal from the United States District Court
for the District of Massachusetts

## EN BANC BRIEF OF DEFENDANTS-APPELLEES

Kate M. Kleimola
(Cir. No. 1211887)
First Assistant City Solicitor
CITY OF CAMBRIDGE
City of Cambridge Law Dep't
795 Massachusetts Ave.
Cambridge, MA 02130
(617) 349-4121

Robert M. Loeb (Cir. No. 24190)
Elise Baranouski (Cir. No. 1222279)
Leigh E. Kramer (Cir. No. 1222278)
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 339-8400

E. Joshua Rosenkranz
(Cir. No. 103398)
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION AND SUMMARY ...................................................... 1

ARGUMENT ........................................................................................ 3

    I.    The Nature And Manner Of A Public Employee's Speech On Issues Of Public Concern, Including Whether The Speech Is "Mocking, Derogatory, And Disparaging," Are Best Considered In Assessing The Reasonableness Of The Public Employer's Assessment Of Potential Harm To Its Efficient And Effective Functioning. .................................................................................... 3

        A.    The Supreme Court's *Pickering* Cases Allow For Consideration Of The Full Context Of A Public Employee's Speech Because That Context Informs The Risk To The Public Employer's Functioning. .......... 3

        B.    The Nature And Manner Of An Employee's Speech, Including Whether It Is "Mocking, Derogatory, And Disparaging," Are Better Viewed As Context For The Government's Concerns Than As A Freestanding Basis For Devaluing The Employee's Speech Interest. ........................................... 8

    II.    This Court Should Affirm The Grant Of Summary Judgment. ...................................................................................... 14

        A.    The Full Context Surrounding Officer Hussey's Speech—Including Its Manner, Time, And Place— Amplified The Risk Of Harm To The Department's Functioning. ................................................................................ 16

            1.    The Relevant Context. ........................................ 16

            2.    The Department's Reasonable Concerns In Light Of That Context. ...................................... 19

        B.    Defendants' Concerns Were Heightened In Light Of Officer Hussey's Departmental Role. ...................... 23

i

C.    Defendants' Reasonable Prediction Of Harm Is Entitled To Significant Deference. ................................ 25

III.  There Is No Need For A Remand. ........................................ 27

CONCLUSION ........................................................................... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*,
   977 F.3d 530 (6th Cir. 2020) ............................................................... 21

*Bruce v. Worcester Reg'l Transit Auth.*,
   34 F.4th 129 (1st Cir. 2022) ................................................................ 28

*Cochran v. City of Los Angeles*,
   222 F.3d 1195 (9th Cir. 2000) ............................................................... 8

*Connick v. Myers*,
   461 U.S. 138 (1983) ................................................ 4, 5, 6, 7, 10, 11, 27

*Curran v. Cousins*,
   509 F.3d 36 (1st Cir. 2007) ........................................................... 13, 15

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ....................................................................... 1, 14

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ............................................................................ 11

*Givhan v. W. Line Consol. Sch. Dist.*,
   439 U.S. 410 (1979) .............................................................................. 5

*Harris v. Quinn*,
   573 U.S. 616 (2014) ............................................................................ 12

*Hernandez v. City of Phoenix*,
   43 F.4th 966 (9th Cir. 2022) .......................................................... 24, 27

*Hussey v. City of Cambridge*,
   149 F.4th 57 (1st Cir. 2025), *reh'g en banc granted,*
   *opinion withdrawn*, No. 24-1279, 2026 WL 220297
   (1st Cir. Jan. 28, 2026) .................................. 8, 18, 22, 24, 27

*Hussey v. City of Cambridge*,
   No. 24-1279, 2026 WL 220297 (1st Cir. Jan. 28, 2026) ...................... 13

*Jordan v. Carter,*
    428 F.3d 67 (1st Cir. 2005) ............................................. 9, 13

*Liverman v. City of Petersburg,*
    844 F.3d 400 (4th Cir. 2016) ................................................ 22

*Locurto v. Giuliani,*
    447 F.3d 159 (2d Cir. 2006) .................................... 14, 15, 23

*MacRae v. Mattos,*
    106 F.4th 122 (1st Cir. 2024) ......................................... 13, 14

*MacRae v. Mattos,*
    145 S. Ct. 2617 (2025) .................................................. 10, 26

*O'Donnell v. Barry,*
    148 F.3d 1126 (D.C. Cir. 1998) .......................................... 15

*Oladeinde v. City of Birmingham,*
    230 F.3d 1275 (11th Cir. 2000) .......................................... 15

*Pappas v. Giuliani,*
    290 F.3d 143 (2d Cir. 2002) .............................................. 24

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968) ............................................. 1, 4, 6, 16

*Porter v. Bd. of Trs.,*
    72 F.4th 573 (4th Cir. 2023) ............................................. 12

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ............................... 6, 7, 8, 9, 10, 12, 22, 23, 25, 29

*Waters v. Churchill,*
    511 U.S. 661 (1994) ....................................... 8, 12, 15, 26, 27

**Other Authorities**

Jonathan Abel, *Cop-"Like": The First Amendment, Criminal Procedure, and the Regulation of Police Social Media Speech*, 74 STAN. L. REV. 1199 (2022) ................................. 15

# INTRODUCTION AND SUMMARY

The Supreme Court has long recognized that, although public employees do not "relinquish [their] First Amendment rights" as a condition of employment, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Accordingly, speech of public employees can be subject to reasonable restrictions "necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

The Supreme Court has made clear—beginning in *Pickering*—that determining the propriety of a particular speech restriction involves a fact-intensive, highly contextual analysis. In that analysis, the manner and nature of the employee's speech (including whether it is "mocking, derogatory, and disparaging") can be relevant. If the offensive or disparaging nature of speech in a given context adds to the risk of interference with the public employer's functioning, it may support the employer's restriction of that speech. In the City's view, that is the better way to consider the tone or manner of an employee's speech within the

*Pickering* analysis—as part of the context relevant to the employer's interest in providing effective and efficient services to the public, not as a freestanding basis to discount the First Amendment value of speech on a matter of public concern. This Court, sitting en banc, should adopt that slight modification of the Circuit's approach to the *Pickering* analysis.

That proposed modification does not, however, change the result in this case. Indeed, it only strengthens and clarifies the government's interests here. Given the full context surrounding Officer Hussey's speech—including the City's substantial efforts to establish a new norm in addressing drug offenders and the uniquely charged historical moment—Defendants reasonably perceived that his speech threatened the relationship of mutual respect and trust that the Department had for years been carefully building with the community. And it risked undermining public confidence in the Department's commitment to a rehabilitative approach to drug offenses and offenders. In light of those strong law enforcement and public interests, the Department found a violation of Department policy and issued a minor reprimand (four days unpaid leave) to avoid the dangers and risks of letting Officer Hussey's disparaging language go unredressed. That judgment was reasonable,

thoughtful, and supported by the record, and it is owed deference. Thus, this Court should affirm.

## ARGUMENT

In its order granting en banc review, this Court directed the parties to address (a) the consistency of the First Circuit's precedent with *Pickering* and its progeny; (b) whether a potentially more suitable analytical approach exists; (c) the application of any modified approach in this case; and (d) whether a remand is required. Defendants answer questions (a) and (b) in Part I below, question (c) in Part II, and question (d) in Part III.

**I.     The Nature And Manner Of A Public Employee's Speech On Issues Of Public Concern, Including Whether The Speech Is "Mocking, Derogatory, And Disparaging," Are Best Considered In Assessing The Reasonableness Of The Public Employer's Assessment Of Potential Harm To Its Efficient And Effective Functioning.**

> **A.     The Supreme Court's *Pickering* Cases Allow For Consideration Of The Full Context Of A Public Employee's Speech Because That Context Informs The Risk To The Public Employer's Functioning.**

*Pickering* requires courts to "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

employees." 391 U.S. at 568. *Pickering* made clear that this balancing is highly context-dependent, making it neither "appropriate [nor] feasible to attempt to lay down a general standard against which all such statements may be judged." *Id.* at 569.

In subsequent cases, the Court further illuminated the *Pickering* framework. In *Connick v. Myers*, the Court clarified that if the employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [the court] to scrutinize the reasons" for the government's adverse employment action. 461 U.S. 138, 146 (1983); *see also id.* at 147 (contrasting speech "as a citizen upon matters of public concern" with speech "as an employee upon matters only of personal interest"). The Court explained that the inquiry into "[w]hether an employee's speech addresses a matter of public concern" is itself highly fact-dependent, and takes into account "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. Looking to the record in that case, the Court determined that one question on a questionnaire circulated by the fired employee "touched upon a matter of public concern," and so the Court proceeded to consider whether the public employer was justified in firing her. *Id.* at 149.

In assessing the public employer's countervailing interest, *Connick* recognized that "the manner, time, and place" of the speech is relevant. *Id.* at 152. That may include, for example, whether the speech happened at or away from the office and the manner in which the speech was distributed. That context may in fact be as important as the content of the speech itself in determining the threat to "the employing agency's institutional efficiency." *Id.* at 153 (quoting *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415 n.4 (1979)); *see also id.* at 159 (Brennan, J., dissenting) (agreeing with the majority that "[i]t is beyond dispute that how and where a public employee expresses his views are relevant in … determining whether the employee's speech adversely affects the government's interests as an employer"). And the Court further advised that, beyond these discrete "manner, time, and place" considerations, the broader "context in which the dispute arose is also significant" in assessing the risk to the public employer. *Id.* at 153 (considering that the speech "followed upon the heels of [the employee's] transfer notice"). Again, the Court discouraged bright-line rules, noting "the enormous variety of fact situations" in which public employers may need to respond

to employee speech, and urging sensitivity to the facts of each case. *Id.* at 154 (quoting *Pickering*, 391 U.S. at 569).

Several years later, in *Rankin v. McPherson*, the Supreme Court again stressed the importance of a fact-sensitive approach to evaluating the employer's interest in the *Pickering* balancing inquiry. 483 U.S. 378 (1987). *Rankin* involved a clerical employee who was discharged for her workplace remarks on the attempted assassination of President Reagan. The Court emphasized that an employee's statements cannot be "considered in a vacuum," but rather that "the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Id.* at 388. The Court presented these factors as bearing upon "the state interest element of the test," which "focuses on the effective functioning of the public employer's enterprise." *Id.* In other words, the Court viewed the manner, time, place, and context of the employee's speech as pertinent to the risk that "the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* The

Court specifically considered whether the speech was made to (or heard by) members of the public such that it risked "discredit[ing] the office," and whether the employee served in a "confidential, policymaking, or public contact role" such that her speech would more likely pose a "danger to the agency's successful functioning." *Id.* at 389-91. Because the speech was not heard by the public and the employee was not in a public-facing role, the Court concluded that "her rights under the First Amendment" outweighed her employer's "interest in discharging her." *Id.* at 392.

Together, these cases make clear that context matters when assessing a government employer's interest in restricting or reprimanding an employee's speech. The "manner, time, and place" of the expression impact the reasonableness of the employer's response, as does "the context" in which the expression arose. *Connick*, 461 U.S. at 153. And that is because the manner, time, place, and context of an employee's speech—just like the content of that speech—can materially inform the risks and concerns that the speech poses to the government agency's effective functioning. *See id.*

**B.     The Nature And Manner Of An Employee's Speech, Including Whether It Is "Mocking, Derogatory, And Disparaging," Are Better Viewed As Context For The Government's Concerns Than As A Freestanding Basis For Devaluing The Employee's Speech Interest.**

The Supreme Court's balancing test in public-employee speech cases calls for courts to consider the "manner" of the speech when assessing "the state interest element of the test." *Rankin*, 483 U.S. at 388. The manner of the speech can include, among other things, whether it is "mocking, derogatory, and disparaging." *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (plurality op.) (explaining that the "tone [in which speech] was delivered" is part of "the factual basis for applying the test"). The nature of the speech is properly taken into account in assessing the reasonableness of the government's concerns that the speech, if left unaddressed, will create a risk of interference with the efficiency and effectiveness of government operations. *See, e.g.*, *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000); *Hussey v. City of Cambridge*, 149 F.4th 57, 76 n.11 (1st Cir. 2025) (Howard, J., dissenting) (suggesting that "vulgarity of the speech" can "come[] into play if the employer advances a reasonable theory under which it predicts

that the vulgarity will be disruptive"), *reh'g en banc granted, opinion withdrawn*, No. 24-1279, 2026 WL 220297 (1st Cir. Jan. 28, 2026).

This Court, in prior cases, has sometimes indicated that a public employee's speech, even though addressing a matter of public concern, should be treated as having diminished value because of its demeaning or disparaging nature or tone. *See, e.g.*, *Jordan v. Carter*, 428 F.3d 67, 74 (1st Cir. 2005). The City submits that consideration of this factor is more appropriately confined to the contextual assessment of the government's interests.

Rather than treating the nature or tone of a public employee's speech on a matter of public concern as an independent basis for reducing the value of that speech in the *Pickering* balancing, it is more sensible to consider the nature or tone of that speech as it relates to the government employer's interests in fulfilling its mission, effectuating its policies, and maintaining relations with the community it serves, all within the specific context of that case. The Supreme Court's cases are consistent with this approach. In *Rankin*, a clerical employee heard of the assassination attempt on President Reagan and remarked: "If they go for him again, I hope they get him." 483 U.S. at 380. The Court acknowledged

that this speech could be viewed as "inappropriate or controversial." *Id.* at 387. But it did not discount the employee's First Amendment interest on that basis. Rather, the Court explained that the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* And once the Court established that the employee's statement, offensive though it was, "plainly dealt with a matter of public concern,"[1] it moved on to consider the employer's countervailing interest without engaging in any further valuation of the employee's speech. *Id.* at 386-88; *see also MacRae v. Mattos*, 145 S. Ct. 2617, 2619 n.1 (2025) (statement of Thomas, J., respecting the denial of certiorari) ("[O]ur *Pickering-Garcetti* cases have not treated the tone or style of an employee's speech as bearing on its First Amendment value.").

---

[1] In *Connick*, by contrast, most of the speech at issue did *not* involve matters of public concern. *See, e.g.*, 461 U.S. at 148. The Court appeared to be referencing the fact that only a small portion of the speech involved matters of public concern when it noted that the "nature" of the speech triggering the reprimand could implicate "the state's burden in justifying" its response. *Id.* at 150. The Court's opinion later makes that clearer, explaining that "a stronger showing" from the government "may be necessary if the employee's speech more substantially involve[s] matters of public concern." *Id.* at 152.

Considering the manner of the speech as part of the context for assessing the government employer's interest in a particular case also avoids unnecessary analytical difficulties inherent in assessing the abstract value of speech addressing a matter of public concern. Courts applying the *Pickering* framework already must determine, as a threshold matter, whether or not the speech relates to an issue of public concern. That is "an inquiry that, by its very nature, is a sensitive one for judges charged with interpreting a constitutional provision intended to put 'the decision as to what views shall be voiced largely into the hands of [citizens].'" *Connick*, 461 U.S. at 163-64 (Brennan, J., dissenting); *cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346 (1974) (observing, in defamation context, the difficulty of determining "which publications address issues of general or public interest and which do not" and questioning "the wisdom of committing this task to the conscience of judges" (internal quotation marks omitted)). Indeed, the threshold question of whether speech touches on an issue of public concern has divided the Supreme Court on multiple occasions.[2]

---

[2] *See, e.g.*, *Connick*, 461 U.S. at 165 (Brennan, J., dissenting) (accusing majority of "restrict[ing] artificially the concept of 'public concern'");

Requiring judges, in addition, to conduct an abstract assessment of the value of particular speech on matters of public concern, awarding points for speech on topics deemed especially important and deducting points for speech deemed vulgar or offensive, creates unnecessary risk that judges will be guided by their own subjective sensitivity and preferences. *See Porter v. Bd. of Trs.*, 72 F.4th 573, 597 (4th Cir. 2023) (Richardson, J., dissenting) (observing that "transgressions of tone tend to ring loudest when we disagree with [a] speaker's views"); *see also Waters*, 511 U.S. at 692 (Scalia, J., concurring in the judgment) (noting "the difficulties courts already encounter in … determining whether speech pertains to a matter of public concern," and urging against the creation of "yet another speech-related puzzlement").

The better approach is simply to assess whether the public employee spoke as a citizen on a matter of public concern, and, if so, to then proceed to evaluate the reasonableness of the concerns animating the government employer's response, accounting for the nature or tone of

---

*Rankin*, 483 U.S. at 394 (Scalia, J., dissenting) (accusing majority of "significantly and irrationally expand[ing] the definition of 'public concern'"); *Harris v. Quinn*, 573 U.S. 616, 675 (2014) (Kagan, J., dissenting) (disagreeing with the majority's assessment that the speech at issue was "speech of 'public concern'").

the speech only to the extent that it bears on those concerns. Whether speech as a citizen on a matter of public concern "occurred within the workplace or outside the workplace," *Hussey v. City of Cambridge*, No. 24-1279, 2026 WL 220297, at *1 (1st Cir. Jan. 28, 2026), the tone or manner of that speech does not provide an independent basis to discount its First Amendment value. This recalibration of the Circuit's approach is both analytically important and consistent with the Supreme Court's First Amendment jurisprudence. It is also relatively modest: It does not appear that it would change the outcome in any of this Court's prior cases involving public-employee speech, given the facts presented in those cases.[3] And, as detailed in the following section, it certainly would not change the outcome in this case. *See infra* Part II.

---

[3] There are just two cases where this Court clearly assessed the discount for vulgar speech that it had contemplated in dicta in *Jordan* (428 F.3d at 74): *Curran v. Cousins*, 509 F.3d 36 (1st Cir. 2007), and *MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2617 (2025). But those cases would almost certainly come out the same way without that discounting. Applying the approach the City advocates here would not change the fact that the government employers in *Curran* and *MacRae* had ample justification for responding as they did. In *Curran*, the Court found that there was "little question … that the Department's concerns about disruption were reasonable," particularly given the Department's status as "a law enforcement agency" requiring a "special degree of trust and discipline." 509 F.3d at 49-50 (internal quotation

**II. This Court Should Affirm The Grant Of Summary Judgment.**

The analytical approach suggested above does not change the conclusion that summary judgment for the City was proper here. Indeed, considering the nature of Officer Hussey's speech within the context of the exigencies faced by the Police Department only strengthens the case for summary judgment.

The Supreme Court has held that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418. Police departments and other law enforcement entities have an especially strong, recognized interest "in maintaining" both discipline among the police force and a "relationship of trust between the police … and the communities they serve" so as to ensure the effective provision of public safety services. *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006); *see*

---

marks omitted). And in *MacRae*, the Court "struggle[d] to see how Defendants' prediction of disruption was anything but reasonable," where a teacher's posts had become "the subject of substantial media coverage" and had in fact caused "extraordinary" disruption in her prior school district. 106 F.4th at 138-39.

*also, e.g.*, *O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998); *Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1293 (11th Cir. 2000). "[B]ecause of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees." *O'Donnell*, 148 F.3d at 1135; *Curran*, 509 F.3d at 50 (quoting *O'Donnell* approvingly). That strong interest can "outweigh[]" the officer's "expressive interests," *Locurto*, 447 F.3d at 183, as is the case here.[4]

As detailed below, the risks the Police Department perceived were well-grounded and reasonable. And the Department's assessment of the risks is due "substantial weight." *Waters*, 511 U.S. at 673 (plurality op.).

---

[4] Police departments may also have a uniquely strong interest in putting limited guardrails on an officer's social media statements that could be perceived as expressing bias against a segment of the community, because such statements could be used to impeach officers when called to testify in a criminal prosecution. *See* Jonathan Abel, *Cop-"Like": The First Amendment, Criminal Procedure, and the Regulation of Police Social Media Speech*, 74 STAN. L. REV. 1199, 1272-73 (2022).

**A. The Full Context Surrounding Officer Hussey's Speech—Including Its Manner, Time, And Place— Amplified The Risk Of Harm To The Department's Functioning.**

**1. The Relevant Context.**

Under the fact-intensive *Pickering* balancing test, the entire context of an employee's speech is relevant. *See supra* Part I.A. Here, that context readily supports the Department's assessment that Officer Hussey's speech could cause serious injury to its interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

The record establishes that the Department's successful functioning depends on it being "seen as trustworthy and legitimate and bias-free," JA 214, and accordingly the Department has engaged in ongoing, long-term efforts "to build up trust with members of [the Cambridge] community," JA 213; *see also* JA 209. Maintaining that hard-won community trust is the "only way" for the Department to "function properly and do [its] job." JA 214.

The speech here also arose against the backdrop of the Department's important, years-long efforts to reform its approach to drug-related offenses, based on the Department's view that individuals

with drug problems are "better served through" a more rehabilitative approach "than through … traditional criminal justice approaches." JA 209. As part of those efforts, the Department works "hand in hand with individuals who have … fallen in life and are working towards better outcomes," including those with "substance use issues." *Id.* And the Department has "made great painful strides to build up trust with members of [the] community by establishing programs that favored" this approach. JA 213-14.

That trust is vital. And the discipline and cooperation of the Department's police officers are crucial to creating and maintaining it. Emphasizing that imperative, the Cambridge Police Department Policies and Procedures state: "As a means of offsetting and preventing inappropriate perceptions of biased law enforcement, each officer is expected to adhere to following protocols whenever engaging the general public: Be courteous and act professionally at all times." JA 167. Officers are also trained "to treat people with respect and dignity." JA 341.

As a result of these significant long-term efforts, the community has come to "view[] the Cambridge Police Department as … favor[ing]

prevention, intervention, and diversion over more serious or more punitive" criminal justice methods. JA 209.

Another important piece of context here is that Officer Hussey's February 2021 Facebook post was made mere months after George Floyd's death at the hands of police officers, which led to "a public reckoning on issues of racism and policing and sparked historic protests around the world" that continued well into 2021. *Hussey*, 149 F.4th at 62-63; *see also id.* at 62 n.2 (considering evidence of unrest following Floyd's murder as part of the record on appeal). The police abuse in the George Floyd case and others like it put the relationships between police departments and the communities they serve in significant jeopardy nationwide. *See* JA 466. The same was true in Cambridge, where thousands of people took to the streets in protest. *See Hussey*, 149 F.4th at 62. During this period of intense scrutiny of law enforcement, concerns over bias in policing were prevalent, and calls for reform frequent. *See id.* at 62-63, 71-72. In this climate, the critical relationship of trust between the Department and the community hung in a precarious balance. *See* JA 209.

## 2. The Department's Reasonable Concerns In Light Of That Context.

It was during this uniquely charged moment and amid the Department's substantial reform efforts regarding drug offenders that Officer Hussey posted about George Floyd—the victim of infamous police abuse—using language that could be perceived as expressing disdain for and dehumanizing Floyd based on his criminal history and past substance use. *See* JA 305-06 ("Hussey did not treat George Floyd with respect by calling him a 'career criminal, a thief and a druggie.'").

Officer Hussey's Facebook post criticized the title of a proposed police reform bill, which had been named after Floyd. *See* JA 157. As the Police Commissioner at the time, Dr. Branville Bard (hereinafter "Commissioner Bard"), stated under oath, his "sole concern" with the post had nothing to do with Officer's Hussey's viewpoint about the proposed bill's name. JA 207. Rather, his "sole concern"—animated by the nature and language of the post—"was the damage that it did and the potential for damage that it had to threaten the trust that the City of Cambridge and citizens would have in their Cambridge Police Department." *Id.*

Officer Hussey could have communicated the same message—that he was disappointed with the name of the proposed bill—without

demeaning Floyd and individuals who have committed drug and criminal offenses more generally. Instead, he posted this:





JA 157.

As Commissioner Bard explained, the Department was reasonably concerned that this post by a "well known" officer, JA 217, presented "a risk of doing irreparable harm" to the Department's reputation within the community and undermining its prior policy efforts—"particularly in the context of a post-George Floyd America," JA 214. Commissioner Bard expressed the Department's considered view that the term "druggie" was "a derogatory term," which, when used by "a police officer[,] … dehumanizes." JA 215. He added that such dehumanization "makes it

easier … not to care about the outcomes for an individual," which can then make it "easier to perpetrate atrocities against them." *Id.* In short, it was "inappropriate for a police officer to be using that term." *Id.*; *see also* JA 305 (noting that Hussey acknowledged it would be "unprofessional" to call "people suffering from substance use disorder a 'druggie' to their face"). Especially given the tense climate in the community and the country at the time, Officer Hussey's "disparaging" and "dehumanizing" language threatened to tear "the fabric of … trust that [the Department] spent a long time building." JA 209-10. As "the old saying" goes, "trust takes a lifetime to build and just a moment to tear down." JA 210.

In this context, whether intended or not, the post created the impression that a well-known member of the Cambridge Police Department did "not believe in rehabilitation" and was "disrespectful of people suffering from substance use disorder," suggesting to the community that the Department has "a bias against people who," like Floyd, "have committed felony crimes or have a substance use disorder." JA 167; *see also Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 544 (6th Cir. 2020) ("[D]iverse constituents … need to

believe that those meant to help them in their most dire moments are fair-minded, unbiased, and worthy of their trust.").

And the fact that Officer Hussey broadcasted his speech in a forum capable of reaching a wide public audience "beyond the employment context" exponentially increased the risks to the Department. *Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (noting that speech on social media "increases the potential, in some cases exponentially, for departmental disruption"). Officer Hussey's post was disseminated to his approximately 674 Facebook friends—a "very good portion" of whom knew he was a police officer, JA 084; *see also* JA 164—who could easily share it with a much wider audience.[5] And given the hot-button nature of the post, it is unsurprising that it spread to broader reaches of the Cambridge community. *See* JA 304-05.

Given that context and the serious risks that Commissioner Bard and the Department reasonably perceived, the Department had a strong basis for finding a policy violation and issuing a minor reprimand (a four-

---

[5] The place of Officer Hussey's speech is thus readily distinguishable from cases like *Rankin*, where there was no "danger" that the employee "had discredited the office by making her statement in public." 483 U.S. at 389; *see Hussey*, 149 F.4th at 72 n.8.

day suspension without pay) to show the police force and the public that the Department disapproved of the language used in the post.

## B. Defendants' Concerns Were Heightened In Light Of Officer Hussey's Departmental Role.

It is well established that "in weighing the State's interest" in disciplining an employee "based on [a] claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency." *Rankin*, 483 U.S. at 390. Here, that consideration provides yet another critical piece of context that further weighs the *Pickering* scale in Defendants' favor.

Officer Hussey serves the Department as a well-known police officer—a "public contact role" that involves duties central to the Department's "law enforcement activity." *Id.* at 390-92. Courts have acknowledged that police officers are "quintessentially public servants" and "part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that police officers … accord the members of that community." *Locurto*, 447 F.3d at 178-79. "A police officer walking the beat, while not exercising broad policymaking authority, is often the representative with whom the public

interacts," *Pappas v. Giuliani*, 290 F.3d 143, 156 (2d Cir. 2002) (Sotomayor, J., dissenting), and as such, "police departments may permissibly consider the special status officers occupy in the community when deciding what limitations to place on officers' off-duty speech," *Hernandez v. City of Phoenix*, 43 F.4th 966, 979 (9th Cir. 2022).

Moreover, Officer Hussey spent a decade working in the Department's Special Investigations Unit investigating hundreds of drug and vice crimes, working with confidential informants, and speaking to drug users throughout the City of Cambridge. JA 060-062. Per Officer Hussey's own account, that role required him to "reassure" those individuals that he was "going to protect" and "help them," JA 066, and he had to spend a lot of time convincing the drug users with whom he spoke that they could trust him, *see* JA 067. The fact that Officer Hussey was a veteran officer with a history of "frequently interact[ing] with vulnerable community members," *Hussey*, 149 F.4th at 71, further heightened the risk that his post would create the impression that the Department does not respect those populations, thereby compromising community trust, undermining longstanding departmental policies and

goals, and hindering the Department's "successful functioning," *Rankin*, 483 U.S. at 391.

Officer Hussey's departmental role thus further supports the Department's interest in disciplining his speech. Had Officer Hussey held a different rank or position—say, as a "computer operator, electrician, or file clerk" with "no confidential, policymaking, or public contact role"— then "the danger to the agency's successful functioning" from his speech may have been significantly reduced.[6] *Id.* at 390-91 ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."). But under the facts of this case and in light of Officer Hussey's actual departmental role, the City's interests are quite strong and its reprimand even more reasonable.

## C. Defendants' Reasonable Prediction Of Harm Is Entitled To Significant Deference.

Given the totality of the context and facts, Defendants reasonably perceived a substantial risk that Officer Hussey's disparaging comments

---

[6] Even such employees are not invariably insulated from discipline, however, "where their speech … truly injures the public interest in the effective functioning of the public employer." *Rankin*, 483 U.S. at 391 n.18.

would hinder the Department's "effective operation." *Waters*, 511 U.S. at 675 (plurality op.). Although Defendants need only show a reasonable "prediction[] of harm" to "justify restriction of employee speech," *id.* at 673, the negative effects of Officer Hussey's post were concretely beginning to manifest. Mere days after his Facebook post, a senior officer of the Cambridge chapter of the NAACP contacted Commissioner Bard to discuss the matter urgently. *See* JA 166, 194-95, 216-17. Shortly thereafter, that officer and two other community leaders (including the former mayor of Cambridge) attended a meeting with Commissioner Bard and the Cambridge City Manager at which the community leaders appeared "alarmed and concerned" over Officer Hussey's post. JA 217. The former mayor expressed the view, moreover, that the post "called into question [the Department's] ability to serve in a biased-free manner." JA 197.

Far, then, from relying on "purely speculative" factors, *MacRae*, 145 S. Ct. at 2620 (statement of Thomas, J., respecting the denial of certiorari), Defendants' concerns were grounded in record evidence that Officer Hussey's speech could, and indeed imminently might, compromise the Department's hard-won community trust and undermine its long-

standing efforts to build a reputation for treating vulnerable community members, including drug users, with respect. Defendants were not required—particularly during such a charged "period of intense scrutiny of and protest against law enforcement" as existed in early 2021, *Hussey*, 149 F.4th at 71—"to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships [was] manifest before taking action," *Connick*, 461 U.S. at 152. On the contrary, their reasonable, substantiated prediction of the potential harm that Officer Hussey's post could have wrought is entitled to "substantial weight" and deference. *Waters*, 511 U.S. at 673 (plurality op.).

Affording that deference, and in light of the full context of Officer Hussey's speech and its attendant potential to undermine Defendants' "strong interest in maintaining a relationship of trust and confidence with the communities they serve," *Hernandez*, 43 F.4th at 981, the outcome of this case should remain unchanged under the City's proposed analytical approach.

## III.   There Is No Need For A Remand.

Application of this analytical approach does not require a remand. As discussed above, the summary judgment record fully supports ruling

in the City's favor under its proposed framework. The outcome of the *Pickering* inquiry is a "matter of law," *Bruce v. Worcester Regional Transit Authority*, 34 F.4th 129, 138 (1st Cir. 2022), which here turns on a straightforward record.

Notably, the district court's analysis of the summary judgment record already supports that outcome. While the court discussed the "inflammatory and insulting manner in which [Officer Hussey's] post was written" as potentially lessening the value of his speech, JA 462, it did not treat that consideration as dispositive or even as very significant. The court acknowledged that "the value of Hussey's post [was] not as diminished as it would have been had Hussey used lewd, vulgar, or obscene terms." JA 463. And the court went on to explain that "even if the Court agreed" with the Department that "Hussey's speech could be categorized as insensitive, disparaging, or dehumanizing," that "would not diminish Hussey's interest in being able to share his opinion on the topic." JA 463. The district court thus did not treat the potentially offensive nature of Officer Hussey's speech as a freestanding basis for categorically discounting its First Amendment value. Instead, it recognized that "[o]ffensive speech can still be protected speech if an

employer retaliates against the employee because of their objections to the content of that speech, rather than their concern for the speech's impact on public functions." JA 463.

In that vein, the court emphasized that it was not resolving the "right interpretation of Hussey's language," or "even whether" Officer Hussey's post was "offensive or its conclusions objectionable." JA 471. Rather, the court regarded the "language Hussey used" and "the reasonable interpretation of the implications of his words" (as potentially dehumanizing, insensitive, and biased) as relevant only insofar as those considerations formed part of the factual basis that "substantiated" Defendants' concerns that Officer Hussey's speech could "'impede[] the performance' of or 'interfere[] with the regular operation' of the Cambridge Police Department's work." JA 471-72 (quoting *Rankin*, 483 U.S. at 388).

All told, the district court already limited its consideration of the potentially insensitive manner of Officer Hussey's speech to its evaluation of the governmental interest side of the *Pickering* scale— precisely the approach the City argues for here.

That said, the City recognizes that it is advocating a slight modification to this Circuit's doctrine. While the City urges the Court to affirm the judgment and resolve this long-running case on the undisputed summary judgment record as a matter of law, it would not oppose a remand to the extent that this Court thinks it prudent to permit the district court to apply any newly clarified rule in the first instance.

## CONCLUSION

For the foregoing reasons, and those set forth in the briefs to the panel, this Court should affirm.

February 18, 2026

Respectfully submitted,

*/s/ Robert M. Loeb*

Kate M. Kleimola
(Cir. No. 1211887)
First Assistant City Solicitor
CITY OF CAMBRIDGE
City of Cambridge Law Dep't
795 Massachusetts Ave.
Cambridge, MA 02130
(617) 349-4121

Robert M. Loeb (Cir. No. 24190)
Elise Baranouski (Cir. No. 1222279)
Leigh E. Kramer (Cir. No. 1222278)
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 339-8400

E. Joshua Rosenkranz
(Cir. No. 103398)
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019

*Counsel for Defendants-Appellees*

# CERTIFICATE OF COMPLIANCE

The brief complies with the page limit set by the January 28, 2026 Order of Court, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Defendants-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on February 18, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Defendants-Appellees*