No. 24-1279

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

BRIAN HUSSEY,

*Plaintiff-Appellant*,

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as

Commissioner of the Cambridge Police Department,

*Defendants-Appellees*,

BRANVILLE G. BARD, JR., in his individual capacity,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

Case No. 1:21-CV-11868

The Honorable Angel Kelley

---

**BRIEF OF *AMICI CURIAE* FIRST AMENDMENT SCHOLARS AND ORGANIZATIONS IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

---

Jennifer Safstrom
Stanton Foundation First Amendment Clinic
Vanderbilt Law School
131 21st Ave. S
Nashville, TN 37206
jennifer.safstrom@vanderbilt.edu

## TABLE OF CONTENTS

Table of Authorities ............................................................................... ii

Corporate Disclosure Statement ........................................................... vii

Interests of *Amici Curiae* ................................................................... viii

Introduction ............................................................................................1

Argument.................................................................................................3

   I.   The First Amendment Protects Speech that Gives Offense or Is
       Controversial.................................................................................5

      A. *Pickering* Encompasses Controversial Speech to Effectively Protect
         Viewpoints Across the Ideological Spectrum. ................................6

      B. Mockery and Offensiveness Are Subjective and Changing
         Standards that Leave Their Application Vulnerable to
         Viewpoint Discrimination. ..............................................................9

  II.  Requiring Employers to Provide Concrete Evidence of Disruption
       Most Strongly Upholds Speech Protections...................................12

      A. Requiring an Evidence-Backed Showing of Disruption Prevents an
         Unchecked Heckler's Veto...........................................................13

      B. Controversy Alone Is Insufficient Evidence of Disruption. ........23

Conclusion ...........................................................................................27

## TABLE OF AUTHORITIES

### Cases

*Adams v. Austal, U.S.A., L.L.C.*,
   754 F.3d 1240 (11th Cir. 2014) ......................................................... 11

*Ayissi-Etoh v. Fannie Mae*,
   712 F.3d 572 (D.C. Cir. 2013) .................................................... 11-12

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*,
   39 F.4th 95 (3d Cir. 2022) .......................................................... 10, 16

*Anzaldua v. Ne. Ambulance and Fire Prot. Dist.*,
   793 F.3d 822 (8th Cir. 2015) ............................................................. 13

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,
   977 F.3d 530 (6th Cir. 2020) ..................................................... 11, 13

*Bethel Sch. Dist. No. 403 v. Fraser*,
   478 U.S. 675 (1986) .................................................................... 9-10

*Bible Believers v. Wayne Cnty., Mich.*,
   805 F.3d 228 (6th Cir. 2015) ..................................................... 14, 15

*City of San Diego, Cal. v. Roe*,
   543 U.S. 77 (2004) .................................................................... 18, 26

*Cohen v. California*,
   403 U.S. 15 (1971)...............................................................................9

*Connick v. Myers*,
   461 U.S. 138 (1983) .............................................................. 6, 20, 23

*Considine v. Bd. of Cnty. Comm'rs.*,
   910 F.2d 695 (10th Cir. 1990) ........................................................... 21

*Curran v. Cousins*,
   509 F.3d 36 (1st Cir. 2007) ................................................................. 5

*Dill v. City of Edmond*,
   155 F.3d 1193 (10th Cir. 1998) ........................................................ 21

*Dodge v. Evergreen Sch. Dist. #114*,
   56 F.4th 767 (9th Cir. 2022) .................................................... 15, 24

*Dougherty v. Sch. Dist. of Phila.*,
    772 F.3d 979 (3d Cir. 2014) ............................................................. 14

*Flanagan v. Munger*,
    890 F.2d 1557 (10th Cir. 1989) ....................................................... 26

*Gates v. Bd. of Educ. of the City of Chi.*,
    916 F.3d 631 (7th Cir. 2019) ........................................................... 11

*Gillis v. Miller*,
    845 F.3d 677 (6th Cir. 2017) ........................................................... 19

*Gooding v. Wilson*,
    405 U.S. 518 (1972) ........................................................................ 17

*Hussey v. City of Cambridge*,
    149 F.4th 57 (1st Cir. 2025) ........................................... 2, 3, 4, 12, 26

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988) .................................................................... 10, 23

*Iancu v. Brunetti*,
    588 U.S. 388 (2019) .......................................................................... 3

*Jordan v. Carter*,
    428 F.3d 67 (1st Cir. 2005) ............................................................... 5

*Jorjani v. N.J. Inst. of Tech.*,
    151 F.4th 135 (3d Cir. 2025) ........................................................... 25

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ........................................................................ 15

*Kent v. Martin*,
    252 F.3d 1141 (10th Cir. 2001) ................................................... 20-21

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*,
    385 U.S. 589 (1967) ........................................................................ 17

*Lindsey v. City of Orrick, Mo.*,
    491 F.3d 892 (8th Cir. 2007) ........................................................... 25

*Locurto v. Giuliani*,
    447 F.3d 159 (2d Cir. 2006) ........................................................... 26

*MacRae v. Mattos*,
    106 F.4th 122 (1st Cir. 2024) ............................................................... 1-2, 5, 24

*MacRae v. Mattos*,
    145 S. Ct. 2617 (2025) ...................................................................... 3, 4, 6, 15

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy*,
    594 U.S. 180 (2021) ................................................................................ 12, 15

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025) ...................................................................................... 15

*Matal v. Tam*,
    582 U.S. 218 (2017) ..................................................................................... 3, 6

*Melton v. City of Forrest City, Ark.*,
    147 F.4th 896 (8th Cir. 2025) .................................................................. 21, 22

*McKinley v. City of Eloy*,
    705 F.2d 1110 (9th Cir. 1983) .................................................................. 19, 20

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) .......................................................................... 25

*Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*,
    155 F.4th 499 (6th Cir. 2025) ...................................................................... 6-7

*Moore v. City of Wynnewood*,
    57 F.3d 924 (10th Cir. 1995) .......................................................................... 21

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*,
    112 F.4th 373 (6th Cir. 2024) ...................................................................... 7, 8

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ................................................................... 1, 13, 18, 23

*Pryor v. Sch. Dist. No. 1*,
    99 F.4th 1243 (10th Cir. 2024) ................................................................... 8, 9

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ............................................... 3, 6, 8, 13, 14, 15

*Reges v. Cauce*,
    162 F.4th 979 (9th Cir. 2025) ......................................................................... 7

iv

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
　515 U.S. 819 (1995) ........................................................................ 7

*Schalk v. Gallemore*,
　906 F.2d 491 (10th Cir. 1990) ...................................................... 20

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
　502 U.S. 105 (1991) ...................................................................... 10

*Snyder v. Phelps*,
　562 U.S. 443 (2011) ................................................................. 6, 23

*Street v. New York*,
　394 U.S. 576 (1969) ........................................................................ 6

*Texas v. Johnson*,
　491 U.S. 397 ..................................................................................... 3

*Vallecorsa v. Allegheny Cnty.*,
　No. 2:19-CV-1495-NR, 2022 WL 16950446 (W.D. Pa. Nov. 15, 2022) ......... 10

## Other Authorities

*All Employees, Government,* Fed. Reserve Bank of St. Louis (Feb. 11, 2026),
　https://perma.cc/D2LX-PLR4 .............................................................. 1

Leora F. Eisenstadt, *The N-Word at Work: Contextualizing Language in the
　Workplace*, 33 Berkeley J. Emp. & Lab. L. 299 (2012) ........................... 10, 11

Thomas Gordon, *Cato's Letter No. 15: Of Freedom of Speech: That the
　Same Is Inseparable from Publick Liberty,* https://perma.cc/MDG7-RM4N ...... 1

Harry Kalven, Jr., *The Negro and the First Amendment* 140 (Ohio St. Univ.
　Press 1965) .................................................................................... 14

Randy J. Kozel, *Government Employee Speech and Forum Analysis*, 1 J. Free
　Speech L. 579 (2022) ...................................................................... 17

Ruth McGaffey*, The Heckler's Veto*, 57 Marq. L. Rev. 39–63 (1973) ................. 17

Anthony N. Moshirnia, *The* Pickering *Paper Shield: The Erosion of Public
　School Teachers' First Amendment Rights Jeopardizes the Quality of
　Public Education,* 16 B.U. Pub. Int. L.J. 313 (2007) ........................... 18

Alexander Meiklejohn, *Free Speech and Its Relation to Self-Government*
68 (1948)............................................................................................23

Helen Norton*, Constraining Public Employee Speech: Government's
Control of Its Workers' Speech to Protect Its Own Expression*,
59 Duke L.J. 1 (2009) ................................................................ 16, 20

Ofer Raban, *The Free Speech of Public Employees at a Time of Political
Polarization: Clarifying the* Pickering *Balancing Test*, 60 Hous. L. Rev. 653
(2023) ......................................................................................... 16

Dahna L. Rasmussen, *The N-Word: It Doesn't Mean THAT
Anymore . . . or Does It?*, Cal. State Univ. Bakersfield (2013),
https://www.csub.edu/library/thesis/rasmussen_d_soc_sp13.pdf ...............10, 11

Lawrence Rosenthal, *Permissible Content Discrimination Under the
First Amendment: The Strange Case of the Public Employee*,
25 Hastings Const. L.Q. 529 (1998) .................................................. 18

*The Economics Daily*, Bureau of Labor Statistics, U.S. Dep't of Labor
(July 11, 2024), https://perma.cc/L5RM-PBX2 ....................................1

Eugene Volokh, *Firing Public Employees Who Publicly Praise Violent
Criminal Attacks,* Reasons (Sept. 12, 2025, 12:28PM).......................19

Lilli B. Wofsy*, Will I Get Fired for Posting This?: Encouraging the Use of Social
Media Policies to Clarify the Scope of the* Pickering *Balancing Test*,
51 Seton Hall L. Rev. 259 (2020) .................................................... 20

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P 26.1 and First Circuit Local Rule 29(a)(4)(A),

*Amici Curiae* the Foundation for Individual Rights ("FIRE"), the Woodhull

Foundation, and the Rutherford Institute are non-profit organizations. They have no

parent corporations and do not issue stock. All other *amici* are individual scholars.

## INTERESTS OF *AMICI CURIAE*

*Amici curiae* are First Amendment scholars and advocacy organizations dedicated to protecting freedom of speech and ensuring robust enforcement of the First Amendment across ideological and political lines. *Amici* have a strong interest in the consistent and faithful application of Supreme Court precedent governing public employee speech. *Amici* recognize the Court's resolution will affect not only the parties here, but also public employees throughout this Circuit who wish to engage in debate on matters of public concern without fear that controversial viewpoints or public disagreement will cost them their livelihoods. *Amici* therefore respectfully submit this brief to assist the Court in establishing the proper standards for employee speech and reaffirming robust First Amendment protections.

*Amici* include the following scholars in their individual capacity, listed with their institutional affiliation for identification purposes only:

- **Erwin Chemerinsky**, Dean and Jesse H. Choper Distinguished Professor of Law, University of California, Berkeley School of Law;

- **Alan Chen**, Thompson G. Marsh Law Alumni Professor, University of Denver Sturm College of Law;

- **Bruce Hamilton**, Director and Clinical Associate Professor, First Amendment Clinic at Tulane University School of Law;

- **David L. Hudson Jr.**, Associate Professor of Law, Belmont University School of Law;

- **Nadine Strossen**, John Marshall Harlan II Professor of Law Emerita at New York Law School and past President of the American Civil Liberties Union (1991-2008), Senior Fellow with the Foundation for Individual Rights and Expression;

- **Eugene Volokh**, Thomas M. Seibel Senior Fellow at the Hoover Institute at Stanford University and Gary T. Schwartz Distinguished Professor of Law at UCLA Law School.

Amici also include the following organizations:

- The **Foundation for Individual Rights and Expression** ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended these rights nationwide through public advocacy, targeted litigation, and *amicus curiae* filings in cases that implicate First Amendment freedoms, without regard to the speakers' views. *See, e.g.*, *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), Nos. 22-13992 & 22-13994 (11th Cir., argued June 17, 2024) (counsel for Plaintiffs); Brief of FIRE and other *Amici* in Support of Defendant-Appellees, *Bean Maine*

ix

*Lobster, Inc., et al. v. Monterey Bay Aquarium Found.*, Nos. 25-1206 & 25-1772 (1st Cir., filed Feb. 24, 2026).

FIRE has a direct interest in this case because it regularly represents public employees who suffer retaliation for exercising First Amendment rights. *See, e.g.*, *Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025) (counsel for plaintiff); *Jones v. Matkin*, 623 F. Supp. 3d 774 (E.D. Tex. 2022) (counsel for plaintiff); *Meeks v. Lawrence*, No. 3:25-cv-1431, M.D. Tenn. (counsel for plaintiff, complaint filed Dec. 10, 2025).

- The **Rutherford Institute** is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

- The **Woodhull Foundation** envisions a world that recognizes sexual freedom as the fundamental human right of all individuals to develop

x

and express their unique sexuality; to be personally autonomous with regard to bodily integrity and expression; and to enjoy sexual dignity, privacy, and consensual sexual expression without societal or governmental interference, coercion, or stigmatization.

## INTRODUCTION

"[F]reedom of speech is the great bulwark of liberty," protecting dissent and robust public discourse. Thomas Gordon, *Cato's Letter No. 15: Of Freedom of Speech: That the Same Is Inseparable from Publick Liberty*, Found. for Individual Rts. and Expression, https://perma.cc/MDG7-RM4N. Incorporating this ideal into doctrine and precedent, courts have consistently recognized that public employees do not "relinquish [their] First Amendment rights" by virtue of their employment. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). This doctrine affords protection to approximately twenty-three million Americans—roughly fifteen percent of the total active workforce—who are employed by federal, state, or local governments across the United States. *The Economics Daily*, Bureau of Labor Statistics, U.S. Dep't of Labor (July 11, 2024), https://perma.cc/L5RM-PBZ2; *All Employees, Government*, Fed. Reserve Bank of St. Louis (Feb. 11, 2026), https://perma.cc/D2LX-PLR4.

The Supreme Court created the *Pickering* balancing test to protect the free expression of public employees by prohibiting speech restrictions unless the government can demonstrate an overriding countervailing interest. Contrary to the principles undergirding the First Amendment, this Court has applied the *Pickering* test in a way that erroneously limits protection against government censorship in two respects: when the targeted speech is subjectively found to be "mocking, derogatory,

1

[or] disparaging" in tone and when the government merely speculates that there could be a hypothetical disruption to its operations. *MacRae v. Mattos*, 106 F.4th 122, 137 (1st Cir. 2024).

This case illustrates the dangers of misapplying the *Pickering* doctrine. A police officer, speaking as a private citizen on a matter of public concern, shared his view that a police reform bill should not be named after George Floyd, who he described as "a career criminal, a thief, and druggie." *Hussey v. City of Cambridge*, 149 F.4th 57, 63 (1st Cir. 2025), *reh'g en banc granted, opinion withdrawn*, No. 24-1279, 2026 WL 220297 (1st Cir. Jan. 28, 2026). The officer was terminated from his position, even though his speech was protected and there was no actual disruption resulting from his social media comment. The now-vacated panel opinion's analysis led to an unsound result that conflicts with Supreme Court precedent and permits the targeting of unpopular viewpoints. This Circuit should reconsider its application of the *Pickering* framework to conform to binding authority and uphold the important principles embedded in the First Amendment. Put simply, this Court should not allow the disfavored tone of an employee's speech as a private citizen on matters of public concern to weigh in the government's favor and should require government employers to provide specific evidence that an actual disruption occurred or that potential disruption is not merely speculative.

## ARGUMENT

The bedrock principle of First Amendment law is viewpoint neutrality—the government cannot treat speech differently because of the views it expresses. *See Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). That principle, which safeguards dissenting and minority views, protects speech that some individuals might find "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (citations omitted). Indeed, "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017).

Courts "have made clear that the core First Amendment principle of viewpoint neutrality applies in the *Pickering-Garcetti* context as elsewhere," through a three-part analysis. *MacRae v. Mattos*, 145 S. Ct. 2617, 2620 (2025) (citing *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (quotation excluded)) (Thomas, J., respecting denial of certiorari). "At step one [of the *Pickering* analysis, courts] assess whether the [individual] 'spoke as a citizen on a matter of public concern,'" rather than as an employee pursuant to their official duties. *Hussey*, 149 F.4th at 65 (internal citation omitted). "At step two, [courts] must determine 'whether, when balanced against each other, the First Amendment interests of the plaintiff and the public outweigh the government's interest in functioning efficiently.'" *Id.* (internal citation omitted). "At the third step, [courts] ask 'whether the protected speech was a 'substantial or motivating factor in the adverse employment decision.'" *Id.* at 66 (internal citation omitted). Steps one and three are undisputed by the parties—Officer Hussey spoke

as a private citizen on a matter of public concern and his speech was the basis for disciplinary action. *Id.* However, the now-vacated panel decision made two errors in applying step two.

First, the appellate panel wrongly afforded less weight to Hussey's First Amendment interest based on a subjective assessment that the tone of the speech was "mocking, derogatory, and disparaging." *Id.* at 67 (internal citation omitted). Second, the panel improperly credited the government's speculative claim of a potential disruption without any real evidence that disruption had occurred or was likely to occur. *Id.* at 69. In so doing, the panel endorsed a "heckler's veto" because of the unrealized possibility of an adverse public reaction. *Id.* at 72 n. 7. Both missteps undermine the *Pickering* framework, which "plainly forbids using the guise of protecting administrative interests to disfavor any particular view." *MacRae*, 145 S. Ct. at 2621 (citations and internal quotations omitted). Together, these errors allowed the government to sidestep viewpoint neutrality, diluting *Pickering*'s balancing test to improperly punish unpopular expression. This Court should reject that approach and reaffirm that the First Amendment does not permit discipline based on the perceived offensiveness of the employee's viewpoint or when such speech does not impede government operations.

## I.    The First Amendment Protects Speech that Gives Offense or Is Controversial.

Providing less protection for speech that is deemed offensive or disparaging unequivocally violates Supreme Court precedent and is inconsistent with sister circuits. An overly narrow application of the *Pickering* doctrine risks undermining core First Amendment protections and improperly devaluing speech in a way that wrongly skews the balancing test analysis in favor of public employers. This Circuit's precedent has singled out "[s]peech done in a vulgar, insulting, and defiant manner" and granted it "less weight in the *Pickering* balance." *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007) (citing *Jordan v. Carter*, 428 F.3d 67, 74 (1st Cir. 2005)). That is already out of step with the way the Supreme Court and sister circuits have treated critical or crass speech. However, in *MacRae*, this Circuit extended this proposition even further and gave less weight to protected speech delivered in a "mocking, derogatory, and disparaging manner." 106 F.4th at 137. This is mistaken. Because of the subjective, contextual, and evolving nature of language, tone should not be used as a pretext for censoring disfavored speech. Moreover, applying *Pickering* consistently with the Supreme Court's standards prevents *Pickering* from becoming a malleable pretense for penalizing disfavored government employee expression.

## A. *Pickering* Encompasses Controversial Speech to Effectively Protect Viewpoints Across the Ideological Spectrum.

The Supreme Court has not exempted speech from First Amendment protection based on the speaker's tone. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). "The inappropriate or controversial character of a statement" has not stripped the employee's speech of its constitutional protection. *Rankin*, 483 U.S. at 378–80; *see also id.* at 386–87 (recognizing, without qualification, that a "remar[k], after hearing of an attempt on the life of the President, 'If they go for him again, I hope they get him,'" "dealt with a matter of public concern").

This is consistent with broader First Amendment doctrine. "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969); *see also Matal*, 582 U.S. at 244 (collecting cases). "Accordingly, [the Supreme Court] has declined to 'affor[d] less than full First Amendment protection' even for speech that we have deemed 'particularly hurtful.'" *MacRae*, 145 S. Ct. at 2619 (quoting *Snyder v. Phelps*, 562 U.S. 443, 454–56 (2011)). "When the [government] bars offensive remarks but not flattering ones, it necessarily picks and chooses between opposing perspectives. This act of selection . . . [is] an 'egregious form of content discrimination' that is 'presumed to

6

be unconstitutional.'" *Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 516 (6th Cir. 2025) (Thapar, J., concurring) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995)).

Consistent with Supreme Court precedent, the majority of federal appellate courts do not discount First Amendment protection based on the tone of the challenged speech. In *Reges v. Cauce*, the Ninth Circuit held "[t]he parodic manner of Reges's speech does not detract from its First Amendment value." 162 F.4th 979, 999 (9th Cir. 2025). Reges, a college professor, "included a parody land acknowledgment in his syllabus to comment on the propriety of land acknowledgments." *Id.* at 998. While the tone of the speech was clearly mocking and disparaging, the Ninth Circuit reasoned the speech should be protected because Reges spoke "about a matter of public concern both within the U[niversity of] W[ashington] community and more broadly." *Id.* "The First Amendment protects a [speaker]'s freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Id.* (citations and internal quotations omitted).

The Sixth Circuit has deemed other controversial speech to be equally worthy of protection. In *Noble*, the employee reposted a meme with the text "ALL LIVES SPLATTER, Nobody Cares About Your Protest" with an "offensive graphic of a vehicle running over protestors." *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*,

112 F.4th 373, 378–79 (6th Cir. 2024) (emphasis in original). Even while the meme could be construed as patently offensive, the Sixth Circuit held that Noble "spoke on a matter of public concern," explaining that communicating a message "in an insensitive manner does not affect this analysis, because '[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Id.* at 381 (quoting *Rankin*, 483 U.S. 378, 387).

The Tenth Circuit takes the same approach. In *Pryor v. School District No. 1*, the school district stripped the plaintiff "of his volunteer position" after he "passionately—and at times profanely—criticiz[ed]" school administrators when "advocat[ing] for change within the District." 99 F.4th 1243, 1248 (10th Cir. 2024). A principal from another school alleged that the plaintiff called her several "derogatory names such as 'plantation builder.'" *Id.* And the plaintiff made several comments containing expletives: "'Watch out for the Black folks trying to Whitesplain this bullshit' (in a Facebook comment related to a post criticizing [the principal] for hiring decisions); and 'Stay the fuck away from me' (in a phone conversation with the District's Regional Instructional Superintendent after [the p]laintiff learned she had canceled a planning meeting for the school he founded)." *Id.* at 1249. Despite the comments' tone, the Tenth Circuit found the "[p]laintiff spoke on matters of serious concern," making the "[p]laintiff's interest in speaking . . . strong." *Id.* at 1253. And it definitively held "[t]he offensive, vulgar

8

manner of [the] [p]laintiff's speech does not deprive him of constitutional protections." *Id.*

These Supreme Court and circuit court cases thus reinforce that speech does not lose constitutional protection simply because it sparks controversy or people find its tone insensitive or offensive.

**B. Mockery and Offensiveness Are Subjective and Changing Standards that Leave Their Application Vulnerable to Viewpoint Discrimination.**

Language evolves, and so does society's sense of what is offensive. Even at any given point in time, different members of society disagree about what language is considered vulgar, derogatory, or disparaging. This is hardly a novel concept for courts. In *Cohen v. California*, the Supreme Court reversed a conviction based upon the defendant wearing a jacket displaying the words "Fuck the Draft" in a public place. 403 U.S. 15, 16–17 (1971). The Court warned against imposing such subjective judgments on speech and what that would lead to, expressing that "[s]urely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." *Id.* at 25. Noting the difficulty of applying such a standard, the Court stated that it is "often true that one man's vulgarity is another's lyric." *Id.*

As an example of standards changing over time, in *Bethel School District No. 403 v. Fraser*, Justice Stevens noted that the once shocking line from *Gone with the Wind*—"Frankly, my dear, I don't give a damn"—had, over the decades, lost its

9

power to offend. 478 U.S. 675, 691 (1986) (Stevens, J., dissenting). "That some could view . . . speech as offensive is irrelevant as it pertains to the level of protection afforded to the speech, because the First Amendment does not permit viewpoint discrimination, including in the context of *Pickering*." *Vallecorsa v. Allegheny Cnty.*, No. 2:19-CV-1495-NR, 2022 WL 16950446, at *6 (W.D. Pa. Nov. 15, 2022) (unpublished) (citing *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022)). The Supreme Court has unambiguously held "'the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.'" *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55 (1988)).

The task of assessing offense is further complicated by the context in which the language is used. Some words, for example, may be "deemed acceptable or off-limits based upon the identity of the speaker." Leora F. Eisenstadt, *The N-Word at Work: Contextualizing Language in the Workplace*, 33 Berkeley J. Emp. & Lab. L. 299, 311 (2012); *see also* Dahna L. Rasmussen, *The N-Word: It Doesn't Mean THAT Anymore . . . or Does It?*, Cal. State Univ. Bakersfield, 26–27 (2013), https://www.csub.edu/library/thesis/rasmussen_d_soc_sp13.pdf (discussing the use of a racial epithet by members of the Black community and noting individual's

10

varying positive and negative perspectives of its use). The use of some terms may sometimes be "decidedly derogatory and racist" or "benign in other contexts." Eisenstadt, *The N-Word at Work*, *supra* at 311. Racial, sexist, or homophobic terms when used by the so-called "in-group" may be endearing in the appropriate context. *Id.* at 311–12; *see also* Rasmussen, *The N-Word*, *supra* at 26–27 (describing the notion of linguistic reclamation of previously derogatory terms). To determine linguistic meaning, context is indispensable and depends on "factors [like] time, place, identity of the parties, and tone of voice." Eisenstadt, *The N-Word at Work*, *supra* at 314.

Of course, the answer is sometimes clear. In *Bennett*, for example, an emergency call center employee derogatorily used a racial epithet in a Facebook comment while discussing voters of minority backgrounds in the presidential election, and the Sixth Circuit upheld the employee's termination. *Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 977 F.3d 530, 533 (6th Cir. 2020). "When used in the workplace, courts often have found that [racial epithets] offer[] evidence of a racially hostile environment in violation of Title VII." *Id.* at 552 (Murphey, J., concurring) (citing *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 638–40 (7th Cir. 2019) and *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251–53 (11th Cir. 2014)). This is because of "our country's long and brutal struggle

to overcome racism and discrimination against African-Americans." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring).

But Hussey's post referring to Mr. Floyd's criminal record, which included drug-related offenses, was made in a context that did not require further scrutiny. *Hussey*, 149 F.4th at 63. Providing less weight to Hussey's speech regarding police reform legislation because it was critical of a popular figure would run counter to "the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 190 (2021) (internal citation omitted). More importantly, it undercuts the broad protections afforded to government employees to express their perspectives as private citizens on matters of public concern, particularly when they cut against the majority's—or the government's—preferred sentiment.

## II. Requiring Employers to Provide Concrete Evidence of Disruption Most Strongly Upholds Speech Protections.

The First Amendment does not permit the government to suppress speech simply because there is an abstract possibility some listeners may react negatively to it. At its core, the *Pickering* doctrine recognizes that constitutional protections would be hollow if officials could silence controversial expression based on the anticipated unpopularity of the speech or the speaker's divergence from the employer's stance. The government's assertion of disruption must be supported by particularized evidence in categories identified by the Supreme Court in *Rankin* and

12

refined into multi-factor tests by some circuit courts.[1] Accordingly, this Circuit should adopt the most protective speech standard and hold the government accountable by rejecting speculative claims of potential disruption. This Circuit should adopt a test that requires evidence of internal or external hindrance to the employer's operations and scrutinizes the government's assertion of disruption.

## A. Requiring an Evidence-Backed Showing of Disruption Prevents an Unchecked Heckler's Veto.

By failing to require any evidence of disruption, this Circuit's doctrine allows the government to skirt its obligations under *Pickering* and use hypothetical opposition to limit public employees' expression. "[T]he threat of dismissal from public employment is nonetheless a potent means of inhibiting speech," *Pickering*,

---

[1] *Rankin*, 483 U.S. at 388 (listing factors to consider, including whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationship for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise"); *see, e.g.*, *Bennett*, 977 F.3d 539–40 (examining "whether the statement (a) impairs discipline by superiors or harmony among co-workers, (b) has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, (c) impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer" (internal citations and quotation marks removed)); *Anzaldua v. Ne. Ambulance and Fire Prot. Dist.*, 793 F.3d 822, 835 (8th Cir. 2015) (balancing government's interest in efficiency against employee's interest in speech while considering "(1) the need for harmony in the work place; (2) whether the government's responsibilities require a close working relationship; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his or her duties").

391 U.S. at 574, and "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384. Courts must independently evaluate the facts to determine whether the government's predicted or asserted disruption is *actually* reasonable, and not just speculation used to pretextually censor the inconvenient or disfavored beliefs of their employees. *See, e.g.*, *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 991 (3d Cir. 2014) (assessing disruption by evaluating "whether the speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise'" (internal citation omitted)). By tethering this Circuit's test to specific, ascertainable factors, this Court can provide predictability to public employees, reducing the chilling effect that can exist absent this framework and ensuring that a bare minimum threshold of disruption is met.

If the government suppresses protected speech in response to merely predicted public hostility, it is engaging in a classic heckler's veto. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 278 n.1 (6th Cir. 2015) (citing Harry Kalven, Jr., *The Negro and the First Amendment* 140 (Ohio St. Univ. Press 1965) (coining the

14

term "heckler's veto")). In essence: "If the speaker's message does not fall into one of the recognized categories of unprotected speech"—such as obscenity, defamation, fighting words, or incitement—"the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it. Simply stated, the First Amendment does not permit a heckler's veto." *Bible Believers*, 805 F.3d at 252. The Supreme Court has clearly stated that "protected speech" does not "readily give way to a 'heckler's veto.'" *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (citations omitted); *see also Mahanoy Area Sch. Dist.*, 594 U.S. at 206 (Alito, J., & Gorsuch, J., concurring) ("[E]ven if such speech is deeply offensive to members of the school community and may cause a disruption, the school cannot punish the student who spoke out; 'that would be a heckler's veto.'").

Without vigilance and robust requirements demonstrating a credible disruption to government operations, viewpoint discrimination follows. *See Rankin*, 483 U.S. at 384; *see also Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 786 (9th Cir. 2022) (holding that *Pickering*, among other cases, "clearly establish that disagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that [public employee's] viewpoint") (collecting cases). It applies even more so when *Pickering* "is used under 'the guise of protecting administrative interests' to 'disfavor any particular view.'" *MacRae*, 145 S. Ct. at 2621 (Thomas, J., respecting denial of certiorari) (first quoting *Dodge*,

56 F.4th at 786, then citing *Mahmoud v. Taylor*, 606 U.S. 522, 590–91 (2025) (Thomas, J., concurring)).

"[P]ublic employers do not have a free hand to engage in viewpoint discrimination toward their employees," nor should they be able to engage in that same invidious discrimination against employees by selectively enforcing isolated complaints on opinions with which they disagree. *Amalgamated Transit Union Loc. 85*, 39 F.4th at 109. This is essential in the context of government employee speakers who "would refrain from expressing themselves for fear of retaliatory dismissal even though their speech is protected." Ofer Raban, *The Free Speech of Public Employees at a Time of Political Polarization: Clarifying the* Pickering *Balancing Test*, 60 Hous. L. Rev. 653, 690 (2023); *see also* Helen Norton, *Constraining Public Employee Speech: Government's Control of Its Workers' Speech to Protect Its Own Expression*, 59 Duke L.J. 1, 61 (2009) ("Without some showing of specific harm . . . government's concerns that the public will simply think less of an agency that employs an individual who engages in objectionable off-duty expression does not constitute the sort of substantial threat to government expression sufficient to justify control of employees' off-duty speech."). That risk lies in this case and is likely to result in a broader stifling of protected expression: any public employee's statement could lead to punishment as a result of a single complaint—without any real accompanying disruption.

Allowing employers to rely on listeners' reactions to protected speech as justification for adverse action against the speaker risks eroding "fundamental constitutional precepts, articulated and defended over the course of generations." Randy J. Kozel, *Government Employee Speech and Forum Analysis*, 1 J. Free Speech L. 579, 580 (2022). By "[t]ethering constitutional protection" to public reaction, as opposed to the impact on government operations, opinions contrary to prevailing attitudes face sanction, "counter to th[e] core principle of expressive liberty." *Id.* at 590; *see also* Ruth McGaffey, *The Heckler's Veto*, 57 Marq. L. Rev. 39, 61–63 (1973) (highlighting the importance of protecting First Amendment rights, even in the face of potential disturbances to the peace). Allowing employers to discipline employee speakers because of a heckler's veto gives the government license to farm out to the public the invidious viewpoint discrimination that employers are barred from engaging in and to penalize unorthodox opinions the First Amendment exists to protect. *See* Kozel, *Government Employee Speech and Forum Analysis*, *supra* at 590–91.

After all, a public employee "may well refrain from exercising their rights" if they fear retaliation for voicing their opinion. *Gooding v. Wilson*, 405 U.S. 518, 521 (1972). And when uncertainty is present, like there is when applying the arbitrary and vague standard of public outrage, "[t]he danger of that chilling effect upon the exercise of vital First Amendment rights" is ever present. *Keyishian v. Bd. of Regents*

*of Univ. of State of N. Y.*, 385 U.S. 589, 604 (1967); *see also* Lawrence Rosenthal*, Permissible Content Discrimination Under the First Amendment: The Strange Case of the Public Employee*, 25 Hastings Const. L.Q. 529, 558 (1998) ("Even an employee who wishes to speak out on matters of public concern in a non-disruptive manner will pause if she is not sure whether it will cost her her job."). Moreover, such chilling effects on government employee speech may harm the overall government mission. *See, e.g.*, Anthony N. Moshirnia, *The* Pickering *Paper Shield: The Erosion of Public School Teachers' First Amendment Rights Jeopardizes the Quality of Public Education*, 16 B.U. Pub. Int. L.J. 313, 332 (2007) (arguing that overly extending the government's ability to regulate speech results in harm by "dissuad[ing] talented, creative individuals from entering the [ ] profession"). Without the ability to speak on matters of public concern, "the community would be deprived of informed opinions on important public issues." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 82 (2004). The Supreme Court in *Pickering* recognized this "potent" ability to chill public employees' speech and sought to avoid it. 391 U.S. at 574.

Under *Pickering*, the government may restrict an employee's off-the-clock speech only if it can show, with specific evidence or a reasonable factual basis, that the speech risks impairing public services. *Id.* at 567. It cannot punish speech simply to sidestep controversy or criticism. *Id.* Yet the panel decision equates public outrage

with disruption, effectively endorsing viewpoint discrimination and rewarding the "would-be cancellers, if they only speak out often enough and with enough outrage." Eugene Volokh, *Firing Public Employees Who Publicly Praise Violent Criminal Attacks*, Reason (Sept. 12, 2025, 12:28PM), https://reason.com/volokh/2025/09/12/firing-public-employees-who-publicly-praise-violent-criminal-attacks/. Such an approach sanctions an improper heckler's veto and undermines public employees' ability to speak freely as private citizens on matters of public concern. The *en banc* Court can chart a different course that more closely aligns with *Pickering*. *See, e.g.*, *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017) (performing a detailed analysis into the "the manner, time and place the speech was uttered, as well as the context in which the dispute arose" to determine if there was a reasonable expectation of disruption (internal quotation marks omitted)).

In *McKinley v. City of Eloy*, the Ninth Circuit emphasized that the more speech involves a matter of public concern and is politically unpopular, the higher standard of disruption the government must show to justify suppressing it. 705 F.2d 1110, 1114 (9th Cir. 1983). Given the danger of invidious viewpoint discrimination and the importance of public employees' First Amendment rights, speculative disruption is simply too low a standard to adequately protect employees' rights. *See id*. The court expressed concern that otherwise this doctrine could be used "as a pretext for stifling legitimate speech or penalizing public employees for expressing

19

unpopular views. Moreover, the majority emphasized that in *Connick*, employers would be required to make an even 'stronger showing' of disruption when the speech dealt more directly with issues of public concern." *Id.* at 1115 (quoting *Connick*, 461 U.S. at 1692); *see also* Norton, *Constraining Public Employee Speech*, *supra* at 48 ("To prevent the imposition of a certain orthodoxy of expression as a condition of public employment, attention to First Amendment values requires that the circumstances under which government should be permitted to control the off-duty speech of its workers to protect its own expression should be rare and well-examined."). The Ninth Circuit recognized that the more politically contentious a matter is, the higher the likelihood the government may engage in viewpoint discrimination; thus, employers should have to demonstrate concrete evidence of disruption. *McKinley*, 705 F.2d at 1115.

The Tenth Circuit joined this view in *Schalk v. Gallemore*, requiring the government to demonstrate concrete evidence of disruption to provide predictability to public employees as to what speech is actually protected. *See* 906 F.2d 491, 496 (10th Cir. 1990) (holding that "government must produce evidence of an actual disruption of services which results from the employee's speech"); *see also* Lilli B. Wofsy, *Will I Get Fired for Posting This?: Encouraging the Use of Social Media Policies to Clarify the Scope of the* Pickering *Balancing Test*, 51 Seton Hall L. Rev. 259, 267 (2020). In *Kent v. Martin*, when a county clerk was fired for making

statements to a newspaper about the head of the office, the court found that *Pickering* weighed in the clerk's favor due to a lack of specific evidence of disruption. 252 F.3d 1141, 1142 (10th Cir. 2001). Despite the government's prediction of potential disruption, the circuit court concluded that, given the six-month investigation conducted between the statements occurring and the termination, "it is nonsensical to rely ex post facto on a 'prediction' of disruption to tip the balance in favor of an employer's interest in an efficient workplace." *Id.* at 1146.

A similar result arose in *Dill v. City of Edmond*, where the Tenth Circuit held the government had failed to meet its burden of showing a disruption occurred. 155 F.3d 1193, 1203 (10th Cir. 1998). The court emphasized that although they "have consistently given 'deference to government predictions of harm,'" the government "neither predicted harm nor articulated *specific* concerns about the effects of Plaintiffs['] speech." *See id.* (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995)) (emphasis added); *see also Considine v. Bd. of Cnty. Comm'rs.*, 910 F.2d 695, 701 (10th Cir. 1990) (requiring the government to show how an employee's statement negatively impacted the individual's ability to perform their job, impaired discipline, or impeded regular operations).

The Eighth Circuit's approach is similarly protective of employee speech rights. In *Melton v. City of Forrest City, Arkansas*, the court reversed a grant of summary judgment to a city that terminated a firefighter for reposting an image on

Facebook depicting "a silhouette of a baby in the womb with a rope around its neck" with the caption, "I CAN'T BREATHE!" 147 F.4th 896, 900 (8th Cir. 2025). The mayor fired the employee in response to the "huge firestorm" of complaints, as some members of the public found the image racist. *Id.* The Eighth Circuit found the record insufficient to show either actual disruption or potential disruption. Evidence of actual disruption was "thin," as there was no internal disruption to the fire department—only police officers, city council members, and citizens voiced concerns. *Id.* at 903. The Eighth Circuit noted that "[g]ranting summary judgment based on such 'vague and conclusory' concerns, without more, runs the risk of constitutionalizing a heckler's veto." *Id.* (citations omitted). "Enough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time." *Id.* (citation omitted).

Evidence of potential disruption fared no better. The Eighth Circuit required more than the mayor's "vague statement" "about what could happen" for there to be a "reasonable prediction" of potential disruption. *Id.* "When the record and the prediction do not match, it will usually be up to the jury to resolve the discrepancy and determine whether the prediction was reasonable enough to be entitled to 'substantial weight.'" *Id.* (citation omitted). To that end, the district court erred in automatically giving the mayor's belief "considerable judicial deference" absent evidence of disruption in the record. *Id.*

22

Requiring a particularized evidentiary showing of disruption prevents public employers from improperly using the heckler's veto to censor unpopular viewpoints held by public employees. The First Circuit should adopt a multi-factor framework to robustly assess government's purported disruption in the *Pickering* balancing test.

## B. Controversy Alone Is Insufficient Evidence of Disruption.

The Supreme Court has recognized that public discourse is not confined to measured or polite expression, but rather includes the protection of caustic political rhetoric. *See Hustler Mag.*, 485 U.S. at 50–51. The government may not constitutionally restrict speech simply because some find it upsetting or outrageous. *Snyder*, 562 U.S. at 458. Indeed, the First Amendment "does not balance intellectual freedom against public safety." Alexander Meiklejohn, *Free Speech and Its Relation to Self-Government* 68 (1948).

Pursuant to *Connick*, courts must balance the employee's interest "as a citizen, in commenting upon matters of public concern" against the government's interest "in promoting the efficiency of the public services it performs through its employees." 461 U.S. at 142 (quoting *Pickering*, 391 U.S. at 568). The decision reflects a sliding scale of required disruption: When "the employee's speech more substantially involve[s] matters of public concern," "a stronger showing" of "disruption of the office" and "the destruction of working relationships" may be necessary. *Pickering*, 391 U.S. at 570. This Circuit's precedent at times has been too deferential to the

23

government's determination of potential disruption, often failing to hold the government to its burden of establishing that disruption is more than merely speculative. *MacRae*, 106 F.4th at 140. This has allowed the government to run roughshod over the constitutional rights of its employees by merely alleging disruption, without any actual investigation into the likelihood disruption would materialize.

Other circuits have faithfully applied the Supreme Court's precedent, rejecting the notion that controversy is adequate evidence of substantial disruption sufficient to justify infringements on public employees' speech rights. The Ninth Circuit's decision in *Dodge*, for example, is particularly instructive. 56 F.4th at 772. There, a middle school teacher was fired after colleagues reported feeling "intimidated, shocked, upset, angry, scared, frustrated, and [unsafe]" upon learning the teacher wore a Make America Great Again hat to a training session. *Id.* at 782 (cleaned up). Although the district court upheld the termination, the Ninth Circuit reversed, finding that the district had shown no evidence of disruption beyond what naturally accompanies controversial speech. *See id.* at 782–83. As the court emphasized, mere discomfort with a political message "is par for the course" and cannot, by itself, constitute the kind of disruption that outweighs an employee's First Amendment rights. *Id.* at 783. Simply put, outrage or controversy, without more, is not enough. *See id.*

24

The Third Circuit came to a similar conclusion. In *Jorjani v. New Jersey Institute of Technology*, the college argued that "pointed letters denouncing [the plaintiff] published by faculty in the pages of the student newspaper" amounted to disruption, holding "that is precisely the sort of reasoned debate that distinguishes speech from distraction." 151 F.4th 135, 143 (3d Cir. 2025). The Sixth Circuit has voiced similar concerns, stating that "to discipline professors, students, and staff any time their speech might cause offense" would "reduce *Pickering* to a shell." *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (noting the government was unable to show how the employee's "conduct interfered with or denied . . . any educational benefits or opportunities" (internal quotation marks omitted)). In *Lindsey v. City of Orrick, Missouri*, the Eighth Circuit similarly found that, while the defendant demonstrated evidence of city council members disliking the plaintiff, such dislike did not impair the plaintiff's ability to carry out his duties and was therefore not a disruption. *See* 491 F.3d 892, 900–01 (8th Cir. 2007) (rejecting the public employer's reasons for termination because "[m]ere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient" absent a specific showing of how "the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired the working relationships").

Although governments may have an interest in a "positive relationship with the public to function effectively," speculation regarding "the public's perception of [an] employee's expressive acts [to] determin[e] whether those acts are disruptive to [employer] operations" allows for pretextual application and the targeting of disfavored perspectives. *Hussey*, 149 F.4th at 72 n.7 (quoting *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006)). Many circuits agree. For instance, the Tenth Circuit rejected a police department's effort to fire several officers for their ownership of an adult video store.[2] *Flanagan v. Munger*, 890 F.2d 1557, 1567 (10th Cir. 1989). According to the department, the public's confidence would be undermined if it learned of officers' involvement with the store and would, therefore, interfere with the department's mission. *Id.* at 1566. The Tenth Circuit rejected that reasoning, finding that "[t]he department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiffs' speech offensive and for that reason may not cooperate with law enforcement officers in the future." *Id.* The Tenth Circuit emphasized that the heckler's veto had been squarely rejected by the Supreme Court. *Id.*

---

[2] The result might differ today because *City of San Diego v. Roe*, which suggests that participation in distributing pornography may not constitute speech on public concern. 543 U.S. at 84. But the underlying logic of *Flanagan* remains valid as to the sort of disruption necessary to justify termination of public employees based on protected speech.

The First Amendment mandates tolerance of controversy. Public employers, therefore, may not punish controversial speech absent a specific of showing of real disruption to their operations.

### CONCLUSION

In order to avoid the sort of viewpoint discrimination prohibited by the First Amendment, this Court should adopt two standards that comply with Supreme Court precedent and align with the majority of the federal circuit courts. First, speech delivered in a mocking, subjectively offensive, or vulgar tone should not be afforded less weight in the *Pickering* balance. Second, the government's interest under *Pickering* must find support in concrete evidence of non-speculative disruption to its operations so that protected speech does not fall victim to the heckler's veto. By adopting these standards, this Circuit can ensure that vigorous debate by government employees is not hampered by public employers who wish to silence disfavored or controversial viewpoints. The First Amendment otherwise becomes an aspirational idea, rather than a constitutional command.

Dated: February 25, 2026          Respectfully submitted,

/s/ Jennifer Safstrom
Jennifer Safstrom
Vanderbilt Law School
Stanton Foundation First Amendment Clinic
131 21st Ave South
Nashville, TN 37203-1181
Telephone: (615) 322-4964
jennifer.safstrom@vanderbilt.edu

* John R. Neal, Jr., Alexander McGrail, and
Ryan Riedmueller substantially assisted with
the development of this brief

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitation set forth in the en banc Court's order dated January 28, 2026, because it is under 30 pages long.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 25, 2026                      Respectfully submitted,

                                              /s/ Jennifer Safstrom
                                              Jennifer Safstrom

**CERTIFICATE OF SERVICE**

The undersigned certifies that on February 25, 2026, an electronic copy of this brief was filed using the CM/ECF system and that service of the brief will be accomplished by the electronic filing system.

Dated: February 25, 2026                    Respectfully submitted,

                                            /s/ Jennifer Safstrom
                                            Jennifer Safstrom