No. 24-1279

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

BRIAN HUSSEY,
PLAINTIFF-APPELLANT,
v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, in her official capacity as Commissioner of the Cambridge Police Department,
DEFENDANTS-APPELLEES.

ON REHEARING EN BANC

**[PROPOSED] EN BANC BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MAINE, AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, AMERICAN CIVIL LIBERTIES UNION OF PUERTO RICO, AND AMERICAN CIVIL LIBERTIES UNION OF RHODE ISLAND, IN SUPPORT OF NEITHER PARTY (SUPPORTING VACATUR AND REMAND)**

Jessie J. Rossman No. 1161236
Rachel Davidson No. 1197867
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
rdavidson@aclum.org

Brian Hauss No. 1183865
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

*Additional counsel listed on next page*

Fermín L. Arraiza-Navas No. 73810
AMERICAN CIVIL LIBERTIES UNION
PUERTO RICO CHAPTER
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
(787) 753-9493
farraiza@aclu.org

Carol Garvan No. 1145471
Zachary L. Heiden No. 99242
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
P.O. Box 7860
Portland, ME 04112
(207) 619-6224
cgarvan@aclumaine.org
zheiden@aclumaine.org

Gilles R. Bissonnette No. 123868
Henry Klementowicz No. 1179814
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

Lynette Labinger No. 23027
Cooperating Counsel
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF RHODE ISLAND
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* hereby certify that they have no parent corporations and that no publicly held company owns 10% or more of their stock.

## AUTHORITY TO FILE

*Amici Curiae* are simultaneously filing a motion for leave to file this brief, consistent with this Court's order of January 28, 2026.

# TABLE OF CONTENTS


RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........ i

AUTHORITY TO FILE ........ i

TABLE OF AUTHORITIES ........ iii

INTERESTS OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 5

I. This Court should hold that mocking, derogatory, or disparaging speech on matters of public concern does not receive less weight in the first half of the *Pickering* balance ........ 7

A. A message's controversial or offensive character is irrelevant to the First Amendment weight afforded to the employee's speech ........ 10

B. Civility is an improper yardstick for gauging the First Amendment value of speech on matters of public concern ........ 12

II. In the second half of the *Pickering* balance, the government may show that a message's controversial or offensive character implicated its interest in preventing workplace disruption ........ 17

CONCLUSION ........ 23

CERTIFICATE OF COMPLIANCE ........ 26

CERTIFICATE OF SERVICE ........ 27

# TABLE OF AUTHORITIES

**Cases**

*Bond v. Floyd*,
385 U.S. 116 (1966) ........ 11

*Bruce v. Worcester Regional Transit Authority*,
34 F.4th 129 (1st Cir. 2022) ........ 17

*Connick v. Myers*,
461 U.S. 138 (1983) ........ *passim*

*Curran v. Cousins*,
509 F.3d 36 (1st Cir. 2007) ........ *passim*

*Decotiis v. Whittemore*,
635 F.3d 22 (1st Cir. 2011) ........ 17

*Fabiano v. Hopkins*,
352 F.3d 447 (1st Cir. 2003) ........ 22

*Fenico v. City of Philadelphia*,
70 F.4th 151 (3d Cir. 2023) ........ 7, 11

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ........ 1, 5, 6

*Givhan v. Western Line Consolidated School District*,
439 U.S. 410 (1979) ........ 9

*Hardy v. Jefferson Community College*,
260 F.3d 671 (6th Cir. 2001) ........ 20

*Haskell v. Harris*,
745 F.3d 1269 (9th Cir. 2014) ........ 22

*Hughes v. Region VII Area Agency on Aging*,
542 F.3d 169 (6th Cir. 2008) ........ 22

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988) ........ 13, 14

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ........ 16

*Jerri v. Harran*,
625 F. App'x 574 (3d Cir. 2015) ........ 22

*Lane v. Franks*,
573 U.S. 228 (2014) .......... 1, 5, 6, 8

*Lawson v. Union County Clerk of Court*,
828 F.3d 239 (4th Cir. 2016) .......... 22

*Locurto v. Giuliani*,
447 F.3d 159 (2d Cir. 2006) .......... 12, 18, 19

*MacRae v. Mattos*,
106 F.4th 122 (1st Cir. 2024) .......... *passim*

*Matal v. Tam*,
582 U.S. 218 (2017) .......... 15, 16

Melton v. City of Forrest,
147 F.4th 896 (8th Cir. 2025) .......... 12, 21

*Melzer v. Board of Education of City School District of City of New York*,
336 F.3d 185 (2d Cir. 2003) .......... 8

*Munroe v. Central Bucks School District*,
805 F.3d 454 (3d Cir. 2015) .......... 8, 11, 13, 19

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 11

*Noble v. Cincinnati & Hamilton County Public Libr*ary,
112 F.4th 373 (6th Cir. 2024) .......... 12

*Organization for a Better Austin v. Keefe*,
402 U.S. 415 (1971) .......... 15

*Pickering v. Board of Eduation.*,
391 U.S. 563 (1968) .......... 6

*Rankin v. McPherson*,
483 U.S. 378 (1987) .......... *passim*

*Reges v. Cauce*,
162 F.4th 979 (9th Cir. 2025) .......... 12

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 6, 14, 15

*Waters v. Churchill*,
511 U.S. 661 (1994) .......... 18

**Other Authorities**

Charles Press,
The Political Cartoon (1981) .................................................................................... 13

Syndey Ember,
*The Onion's Las Vegas Shooting Headline Is Painfully Familiar*, N.Y. Times, Oct. 3, 2017.......................................................................................................................... 13

## INTERESTS OF *AMICI CURIAE*[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. The ACLU of Maine, the ACLU of Massachusetts, the ACLU of New Hampshire, the ACLU of Puerto Rico, and the ACLU of Rhode Island are state and territorial affiliates of the ACLU. Since its founding in 1920, the ACLU and its affiliates have appeared before the Supreme Court and this Court in numerous free speech cases, both as direct counsel and as *amicus curiae*, including in cases that have helped define the free speech rights of public employees. *See, e.g.*, *Lane v. Franks*, 573 U.S. 228 (2014) (*amicus*); *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (*amicus*).

## INTRODUCTION

Plaintiff-Appellant Brian Hussey, an officer with the Cambridge Police Department, asserts that he was unconstitutionally disciplined for sharing on his personal Facebook page an article titled "House Democrats Reintroduce Police Reform Bill in Honor of George Floyd," with the following comment: "This is what it's come to ... 'honoring' a career criminal, a thief and druggie ... the future of this

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), *Amici Curiae* certify that this brief was not written in whole or in part by counsel for any party, and no person or entity other than *Amici* and their counsel has made a monetary contribution to the preparation and submission of this brief. The parties have consented to the filing of this amicus brief. *See* Fed. R. App. 29(a)(2).

country is bleak at best." Add. 5. *Amici* do not opine on the final disposition of Hussey's claim, but rather write to articulate the proper First Amendment test that should apply to all public-employee speech, including Hussey's. In both this case and others, scrupulous attention to the correct standard is essential to ensure that public-employee speech receives appropriate constitutional protection.

When a public employee claims that they were disciplined in violation of the First Amendment, courts apply a three-step test to decide whether the discipline was unconstitutional. First, they inquire whether the employee was speaking as a private citizen on a matter of public concern. Second, they balance the weight of the First Amendment interest in the employee's speech against the government's interest in preventing workplace disruption. And third, they inquire whether the discipline was substantially motivated by the employee's speech.

Here, the parties agree that Hussey spoke as a private citizen on a matter of public concern and that his discipline was substantially motivated by his Facebook post. The second step of the test, known as the *Pickering* balance, is therefore the only one at issue here. It requires the court to a) weigh the First Amendment interest in the employee's speech by ascertaining the degree to which it addressed matters of public concern; and then b) balance the First Amendment interest against the government's interest in preventing workplace disruption. The stronger the First Amendment interest inherent in the speech is, the heavier the government's burden

in showing workplace disruption will be. Here, the district court held that the "inflammatory and insulting" tone of Hussey's post "lessened" its First Amendment value, which was ultimately outweighed by the department's interest in preventing disruption of its public services. Add. 18. A panel of this Court affirmed by a 2-1 majority, agreeing with the district court that "speech commenting on public 'issues in a mocking, derogatory, and disparaging manner' is accorded less weight in the [*Pickering*] balancing test." Panel Op. 16. That analysis was wrong.

First, as Appellees themselves now recognize, it is improper to reduce the First Amendment weight of employee speech on public issues just because the communication's tone is mocking, derogatory, or disparaging. The First Amendment value of public-employee speech depends on the extent to which it addresses public issues, rather than its adherence to inherently subjective standards of civility. Thus, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). From the cartoons of Thomas Nast to the headlines in the Onion, mocking, derogatory, and disparaging speech has often played a pivotal role in public discourse. And the Supreme Court has emphasized repeatedly over the decades that the constitutional value of speech on public issues cannot be gauged according to judicially prescribed standards of acceptability. Because Hussey's post about police-reform legislation addressed a core issue of public concern, it carries

robust First Amendment weight in the *Pickering* balance, requiring a stronger countervailing showing of actual or potential workplace disruption.

Second, the more suitable approach, applied by several other circuits, asks whether the offensive or outrageous character of the employee's speech exacerbated the risk of workplace disruption. When evaluating the government's interest in preventing workplace disruption, courts review the whole record and consider a variety of factors, including whether the employee had a public-facing role, the speech's notoriety, and whether the speech was communicated at work during business hours. The tendency of the employee's speech to generate workplace disruption, such as by mocking coworkers or denigrating members of the public served by the employee, is a legitimate consideration in this fact-bound analysis. But courts must keep in mind that the central question at this stage is whether, and to what extent, the speech threatened *workplace* disruption, rather than stirring public controversy more generally.

While *Amici* do not express a view as to the strength of the government's interest under the specific facts of this case, they respectfully submit that vacatur and remand is warranted so that the district court may conduct the appropriate analysis under the correct legal standard.

## ARGUMENT

Cases like this one require courts to balance the public employee's First Amendment right to participate in public debate against the government employer's interest in preventing workplace disruption. On the one hand, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). This special protection extends to the private speech of government employees. "[A] citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict . . . the liberties employees enjoy in their capacities as private citizens." *Garcetti v. Ceballos*, 547 U.S.410, 419 (2006). On the other hand, the government has a "countervailing interest in controlling the operation of its workplaces" to "ensure the efficient provision of public services." *Lane v. Franks*, 573 U.S. 228, 236 (2014).

This Court applies a three-step analysis to reconcile these competing interests. *MacRae v. Mattos*, 106 F.4th 122, 133 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2617 (2025). First, as a threshold matter, the court must "determin[e] whether the employee spoke as a citizen," rather than as an employee, "on a matter of public

concern." *Id.* (alteration in original) (quoting *Garcetti*, 547 U.S. at 418).[2] If so, "then the possibility of a First Amendment claim arises." *Id.* (quoting *Garcetti*, 547 U.S. at 418). Second, the court must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "This balancing act is commonly referred to as *Pickering* balancing." *MacRae*, 106 F.4th at 133. If the balancing favors the employee, the court proceeds to the third step, which asks "whether the employee's protected speech 'was a substantial or motivating factor in the adverse employment decision.'" *Id.* (quoting *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007)).

Because the first and third steps are uncontested here, this case turns on the second step, namely, whether *Pickering* balance favors the First Amendment interest in Hussey's speech or the police department's interest in preventing workplace disruption. To resolve that question, the district court and the panel majority partly relied on this Court's decisions holding that public-employee speech that comments on public issues "in a mocking, derogatory, and disparaging manner" receives less

---

[2] "Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (some internal quotation marks omitted) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

First Amendment weight in the *Pickering* balance. Panel Op. 16 (quoting *MacRae*, 106 F.4th at 137). As discussed below, those holdings are inconsistent with Supreme Court precedent and should be overruled.

## I. This Court should hold that mocking, derogatory, or disparaging speech on matters of public concern does not receive less weight in the first half of the *Pickering* balance.

The *Pickering* balance can be divided into two parts. The first half requires the court to ascertain how much First Amendment weight the employee's speech deserves. This analysis focuses on the connection between the employee's speech and matters of public concern, "because the Supreme 'Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" *MacRae*, 106 F.4th at 137 (quoting *Connick*, 461 U.S. at 14). But "not all speech of some public concern has equal value under the First Amendment. Far from it. Rather, under the 'sliding scale' approach to *Pickering* balancing, the *degree* of public concern raised" determines how much First Amendment weight it receives in the *Pickering* balance. *Fenico v. City of Philadelphia*, 70 F.4th 151, 164 (3d Cir. 2023) (emphasis added). And the strength of the First Amendment interest in the employee's speech "dictates the government's burden to show likely disruption" in the second half of the *Pickering* balance. *Id.* "The more speech touches on matters of public concern, the greater the level of disruption the government must show." *Melzer v. Bd. of Educ. of*

*City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 197 (2d Cir. 2003); *accord Curran*, 509 F.3d at 48 ("[T]he stronger the First Amendment interests in the speech, the stronger the justification the employer must have." (citing *Connick*, 461 U.S. at 150)).

The degree to which "an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. In some cases, such as when an employee is testifying about official malfeasance, these factors will underline the speech's First Amendment value. *See Lane*, 573 U.S. at 241 ("The content of Lane's testimony—corruption in a public program and misuse of state funds—obviously involves a matter of significant public concern. And the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion." (citation omitted)). In others, such as a lengthy diatribe about workplace grievances that only glancingly mentions public issues, they will undercut the speech's constitutional significance. *See, e.g.*, *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 469–472 (3d Cir. 2015) (although school teacher's blog occasionally touched on questions of education policy, it served mostly to vent personal grievances and daily frustrations, including those involving her students).

Here, the content, form, and context of Hussey's Facebook post mark it as core speech on a matter of public concern. The post addressed a public issue of national importance, a congressional police-reform bill, and did not intermix

Hussey's commentary on this issue with personal details; it was published on Hussey's personal Facebook page, rather than a work-related account; and it did not arise from any personal employment dispute. In *Connick*, by contrast, the Supreme Court concluded that the employee's speech "touched upon matters of public concern in only a most limited sense," and therefore deserved relatively little First Amendment weight in the *Pickering* balance, because her questionnaire mostly addressed private workplace disputes, it was prepared and distributed at the office, and it arose from her objection to an internal transfer. *See* 461 U.S. at 152–54.[3]

The district court and the panel majority nonetheless ruled that Hussey's post should receive reduced First Amendment weight because it addressed a serious public issue in a "mocking, derogatory, and disparaging manner." Panel Op. 16; Add 18–19. Both decisions relied on this Court's precedents holding that such speech "is accorded less weight in the [*Pickering*] balancing test." Panel Op. 16. (citing *MacRae*, 106 F.4th at 137; *Curran*, 509 F.3d at 49). Applying these precedents, the district court and the panel majority reasoned that Hussey's speech did not rest on

[3] Whether the contested communication occurred in the workplace, and whether it was addressed to the employee's coworkers, may provide clues about the degree to which the communication was addressed to public issues rather than workplace issues. *See Connick*, 461 U.S. at 148–150. But it is not dispositive, and even controversial or offensive speech in the workplace may carry robust First Amendment weight as commentary on public issues. *See Rankin*, 483 U.S. at 386 n.11 (citing *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 414–16 (1979)).

the highest rung of the hierarchy of First Amendment values, because Hussey's characterization of George Floyd as "'a career criminal,' 'a thief,' and a 'druggie,'" and Hussey's assertion "that 'the future' of a country that would honor Floyd by naming legislation after him 'is bleak at best[,] . . . disparaged both George Floyd and those who rallied in response to the horrific circumstances of his death." Panel Op. 18; Add. 18–19. Hussey's post undoubtedly disparaged George Floyd, and *Amici* do not agree with his message, but that is no basis for reducing his speech's First Amendment weight in the first half of the *Pickering* balance.

**A. A message's controversial or offensive character is irrelevant to the First Amendment weight afforded to the employee's speech.**

The Supreme Court has expressly instructed that "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387. In *Rankin*, a clerical employee in a constable's office was fired for telling a coworker, immediately after learning of a failed assassination attempt on President Reagan, "if they go for him again, I hope they get him," citing the Reagan Administration's opposition to social welfare programs. Although the employee's statement was highly provocative, the Court noted that it "plainly dealt with a matter of public concern," and that it was not a true threat. *Id.* at 386–87. The Court emphasized that public employees' "statements criticizing public policy and the implementation of it" must enjoy robust First Amendment protection against unnecessary discipline, in order to keep

"[d]ebate on public issues . . . uninhibited, robust, and wide-open." *Id.* at 387 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *Bond v. Floyd*, 385 U.S. 116, 136 (1966)). Instead, the Court addressed the speech's inflammatory potential in evaluating the strength of the *government's interest* in preventing workplace disruption, under the second half of the *Pickering* balance. *Id.* at 388–91. *See infra* Section II.

Following *Rankin*, other circuits have recognized that a statement's mocking, derisive, or derogatory character does not lessen its First Amendment weight in the *Pickering* balance. For instance, in *Fenico*, which concerned a large number of bigoted Facebook posts by a dozen police officers, the Third Circuit held that "the 'inappropriate or controversial nature' of the speech is not relevant to whether it touches on matters of public concern—it is only a factor in evaluating its disruptiveness during *Pickering* balancing." 70 F.4th at 165 (quoting *Munroe*, 805 F.3d at 470). "[E]ven the most deeply troubling speech may be of concern to the public and warrant First Amendment protection—depending on the facts of the case," the court explained. *Id.*

Similarly, in *Locurto v. Giuliani*—which concerned the termination of New York police officers and firefighters for their participation in a Labor Day parade in blackface, as part of a float contingent featuring highly offensive and mocking stereotypes of Black people—the Second Circuit held that the officers' speech

deserved "not insubstantial" First Amendment weight, because "commentary on race is, beyond peradventure, within the core protections of the First Amendment." 447 F.3d 159, 183 (2d Cir. 2006) (holding, in the second half of the *Pickering* balance, that the government's interest in preventing disruption nonetheless overpowered this First Amendment interest).

And in *Melton v. City of Forrest*, the Eighth Circuit held that a firefighter's anti-abortion Facebook post, featuring a fetus in the womb with a noose and the phrase "I can't breathe," carried substantial First Amendment weight as speech on core public issues, including abortion, irrespective of its offensive or controversial character. 147 F.4th 896, 902 (8th Cir. 2025) (citing *Rankin*, 483 U.S. at 387). *See also, e.g.*, *Reges v. Cauce*, 162 F.4th 979, 999 (9th Cir. 2025) (the mocking tone of professor's speech parodying indigenous land acknowledgements did "not detract from its First Amendment value"); *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 381 (6th Cir. 2024) (public employee's meme mocking Black Lives Matter protests and George Floyd was entitled to full First Amendment weight as speech on a matter of public concern, notwithstanding its "insensitive manner").

### B. Civility is an improper yardstick for gauging the First Amendment value of speech on matters of public concern.

The mocking, derogatory, or disparaging nature of a particular message does not necessarily reduce that message's salience to public discussion. In some circumstances, it may even elevate it. "After all, humor, satire, and even 'personal

invective' could be used in order to make or embellish a point about a matter of political, social or other concern to the community." *Munroe*, 805 F.3d at 470. Jonathan Swift's *A Modest Proposal* blithely recommended that poor people in Ireland could alleviate their economic hardship by selling their children to English landowners as food, in order to satirize Great Britain's exploitation of the Irish. Thomas Nast's political cartoons skewering Boss Tweed and Tammany Hall were so influential precisely "because of the emotional impact of [their] presentation. [They] continuously [went] beyond the bounds of good taste and conventional manners." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988) (quoting Charles Press, The Political Cartoon 251 (1981)). And the Onion's repeated publication of the article, "'No Way to Prevent This,' Says Only Nation Where This Regularly Happens," after mass shootings has become a cultural touchstone for the way it mocks political paralysis in the face of gun violence. *See* Syndey Ember, *The Onion's Las Vegas Shooting Headline Is Painfully Familiar*, N.Y. Times, Oct. 3, 2017, at B3.[4]

From Aristophanes to Dave Chappelle, mocking, derogatory, and disparaging comments have often been at the heart of democratic debate. "From the viewpoint of history it is clear that our political discourse would have been considerably poorer without them." *Hustler*, 485 U.S. at 55. Of course, the vast majority of "mocking,

---

[4] *Available at* https://www.nytimes.com/2017/10/03/business/media/the-onion-las-vegas-headline.html.

derogatory, or disparaging" public commentary "is at best a distant cousin" of the above examples, "and a rather poor relation at that." *Id.* "If it were possible by laying down a principled standard to separate the one from the other, public discourse would probably suffer little or no harm." *Id.* But the Supreme Court in *Hustler* expressed "doubt that there is any such standard," citing the "inherent subjectiveness" of yardsticks like "outrageousness," which give too much leeway to the adjudicator's personal "tastes or views, or perhaps . . . their dislike of a particular expression." *Id.* The Court accordingly concluded that a parody advertisement suggesting that Rev. Falwell had committed incest with his mother in an outhouse was entitled to full First Amendment protection against liability for intentional infliction of emotional distress and defamation. *Id.* at 57.

Likewise in *Snyder v. Phelps*, the Supreme Court held that the First Amendment protected protesters who carried offensive signs while picketing near a military funeral against liability for intentional infliction of emotional distress and other torts. 562 U.S. 443 (2011).[5] The Court reasoned that the protesters' speech was "entitled to 'special protection' under the First Amendment" because it addressed "a matter of public concern." *Id.* at 458. Reaffirming *Rankin*'s holding that "[t]he

[5] The signs read "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Fag Troops," "Semper Fi Fags," "God Hates Fags," "Maryland Taliban," "Fags Doom Nations," "Not Blessed Just Cursed," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," and "God Hates You." *Id.*

arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern,'" *id.* at 453 (citing *Rankin*, 483 U.S. at 387), the Court explained that although the protesters' "messages may fall short of refined social or political commentary, the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy—are matters of public import," *id.* at 454.

*Hustler* and *Snyder* are consistent with the Supreme Court's longstanding refusal to differentiate the First Amendment value of speech on matters of public concern according to "standards of acceptability." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). Indeed, the Court recently held that laws penalizing offensive speech are viewpoint discriminatory. In *Matal v. Tam*, the Court unanimously struck down the Lanham Act's provision denying trademark registration to "disparaging" marks, though they divided equally over particulars not relevant here. 582 U.S. 218 (2017). Justice Alito reasoned that even if the rule "evenhandedly prohibits disparagement of all groups," it nonetheless violates the principle against "viewpoint discrimination" because "[g]iving offense is a viewpoint." *Id.* at 243. Or, as Justice Kennedy put it: "[A]n applicant may register a positive or benign mark but not a derogatory one. The law thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the

essence of viewpoint discrimination." *Id.* at 249 (Kennedy, J., concurring). A couple years later, in *Iancu v. Brunetti*, the Supreme Court extended this principle to hold that the Lanham Act's provision restricting "immoral or scandalous" marks was similarly viewpoint discriminatory, because it "allow[ed] registration of marks when their messages accord with, but not when their messages defy, society's sense of decency or propriety." 588 U.S. 388, 394 (2019).

The Supreme Court's repeated admonition against imposing civility codes on speech cannot be reconciled with the notion that "mocking, derogatory, or disparaging" remarks by public employees deserve less First Amendment weight in the first half of the *Pickering* balance than other speech on matters of public concern. Reducing the First Amendment value of this speech licenses the government to discriminate against the expression of offensive or controversial views, without showing that the speech threatened to disrupt the workplace. It usurps the public's right to decide for itself which speech on public issues is most worthy of attention. And it places courts in the untenable position of deciding—according only to their own intuitions and biases, rather than a factual record regarding disruption—which particular messages on matters of public concern are too uncouth to merit constitutional protections. All these considerations support *Rankin*'s instruction that

a message's controversial or offensive character is irrelevant to its First Amendment weight in the *Pickering* balance.[6]

## II. In the second half of the *Pickering* balance, the government may show that a message's controversial or offensive character implicated its interest in preventing workplace disruption.

Although *Rankin* requires courts to disregard the inflammatory nature of the employee's speech in weighing the First Amendment interest, that does not mean it is irrelevant to the ultimate outcome. Instead, the First Amendment interest must be "balanced against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 138 (1st Cir. 2022) (quoting *Decotiis v. Whittemore*, 635 F.3d 22, 35 (1st Cir. 2011)). And in weighing this government interest, courts do not require the employer to "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152. Rather, they give "substantial weight to government employers' *reasonable* predictions of [workplace] disruption" in the *Pickering* balance. *Waters v. Churchill*, 511 U.S. 661,

[6] Although the Supreme Court has said that "many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees," *Waters v. Churchill*, 511 U.S. 661, 672 (1994), *Rankin* expressly applied the principle at issue here to public-employee speech.

673 (1994) (emphasis added); *see also MacRae*, 106 F.4th at 138 ("[M]ere speculation of disruption has never been enough.").

The reasonableness of the employer's prediction of disruption is a question of law for the court, but it is nonetheless grounded in the specific factual circumstances presented by the record. *See MacRae*, 106 F.4th at 138 & n.17. In *Rankin*, for instance, the employee's clerical duties, the confidential nature of the disputed remarks, the absence of any actual workplace disruption, and the employer's lack of interest in the speech's disruptive potential all undermined the government's interest in disciplining the employee for her speech. *Rankin*, 483 U.S. at 388–392. In *Locurto*, by contrast, the Second Circuit held that the public-facing role of the plaintiff police officers and firefighters, the fact that their parade float was featured extensively in print and broadcast media (including being labeled "Racist Float" on the evening news), and the inflammatory nature of the plaintiffs' expression collectively supported the government's decision to fire them. 447 F.3d at 180–83.

As *Locurto* shows, courts often consider the provocative character of the contested speech—in conjunction with other factors, such as the employee's role, the speech's notoriety, and the speech's connection to the workplace—when analyzing the reasonableness of projected workplace disruption. In other words, "[w]hile the inappropriate tone of the speech may be irrelevant to the 'public concern' inquiry, such considerations could play a critical role in ascertaining the

existence and likelihood of disruption." *Munroe*, 805 F.3d at 474 (citation omitted). For instance, "it would seem more likely that an employee's comments about his or her supervisors and coworkers would impair discipline or employee harmony if they are phrased in less 'elevated'—and more 'opprobrious'—terms." *Id.* at 474; *see also Curran*, 509 F.3d at 49–50 (finding "little question . . . that the [Sheriff] Department's concerns about disruption were reasonable" where the corrections officer compared his supervisors to Nazis, urged insubordination, and advocated their violent overthrow).

To take another example, "invective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations." *Munroe*, 805 F.3d at 474; *see id.* at 476 (holding that a teacher's "various expressions of hostility and disgust against her students would disrupt her duties as a high school teacher and the functioning of the School District"); *Locurto*, 447 F.3d at 182 (finding it "obvious" that "police officers and firefighters who deliberately don 'blackface,' parade through the streets in mocking stereotypes of African–Americans and, in one firefighter's case, jokingly recreate a recent vicious hate crime against a black man, might well damage the relationship between the NYPD and FDNY and minority communities").

In some cases, such as *Locurto* and *Curran*, the prospect of workplace disruption is so readily apparent from the character of the message itself, as well as other contextual factors, that the *Pickering* scales tip decisively in the employer's favor even before anyone complains. In others, even the fact that the speech caused public complaints or controversy may not indicate a risk of workplace disruption sufficient to justify adverse action against the employee. Take *Hardy v. Jefferson Community College*, for example. 260 F.3d 671 (6th Cir. 2001). There, a community-college instructor used a number of epithets, including the n-word and "bitch," as part of a class discussion on social deconstructivism. *Id.* at 674. The lecture particularly upset one student; she complained to her minister, who requested corrective action against the instructor, and the school complied by declining to reengage him. *Id.* at 675. But in applying the *Pickering* balance, the court found "no indication that the lecture undermined [the instructor's] working relationship within his department, interfered with his duties, or impaired discipline." *Id.* at 681. The court concluded that the college administrators' "undifferentiated fear" of controversy, stemming from the minister's complaint, could not overcome the instructor's free expression interests. *Id.* at 681–82.

The Eighth Circuit reached a similar conclusion in *Melton*. There, the employee's provocative anti-abortion Facebook post caused a "firestorm" of complaints from the public, leading to his termination, but "there was no showing

that [his] post had an impact on the fire department itself. No current *firefighter* complained or confronted him about it. Nor did any co-worker or supervisor refuse to work with him." 147 F.4th at 903. The court cautioned that giving too much weight to public complaints, "without a showing of how [the controversy] *actually* affected the government's ability to deliver 'public services' . . . runs the risk of constitutionalizing a heckler's veto . . . Enough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time." *Id.* (citation omitted). The court reserved for resolution at trial whether the mayor's predictions of workplace disruption, in light of what had already transpired, were reasonable under the circumstances. *Id.*

In sum, courts can (and often do) consider a contested message's controversial or offensive character when weighing the government's interest in preventing workplace disruption. But they address this issue in light of the whole record, including the employee's role and responsibilities, the message's notoriety, whether the speech promoted conflict within the workplace or denigrated members of the public served by the employee, and any actual disruption caused by the speech. The touchstone is whether, and to what degree, the employee's speech threatened to undermine the employer's ability to perform its public function, not simply whether the speech itself was offensive or controversial.

While *Amici* do not express a view on the ultimate outcome of this case or the strength of the government's interest under the specific facts at issue here, they respectfully submit that vacatur and remand is warranted so that the district court may conduct the appropriate analysis under the correct legal standard. As discussed above, the government's burden of showing actual or potential workplace disruption varies depending on the First Amendment weight of the employee's speech. *See Curran*, 509 F.3d at 48. Because the district court in this case improperly "lessened" the First Amendment weight of Hussey's speech, Add. 18, in reliance on this Court's precedent, it held the government to a lower burden of justification with respect to workplace disruption than the Constitution requires.

Given the "fact-intensive" nature of the *Pickering* analysis, *MacRae*, 106 F.4th at 136 (quoting *Fabiano v. Hopkins*, 352 F.3d 447, 457 (1st Cir. 2003)), the district court should apply the correct test in the first instance. *See Jerri v. Harran*, 625 F. App'x 574, 579 (3d Cir. 2015) (vacating and remanding) ("[W]e deem it prudent to remand to the District Court to weigh the *Pickering* balance in the first instance, as 'we are a court of review, not first view.'" (quoting *Haskell v. Harris*, 745 F.3d 1269, 1271 (9th Cir. 2014))); *accord, e.g.*, *Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 256 (4th Cir. 2016), as amended (July 8, 2016); *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008).

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court hold that "mocking, derogatory, or disparaging" messages do not receive less First Amendment weight in the *Pickering* balance than other speech on matters of public concern, vacate the district court's summary judgment order, and remand with instructions to apply the correct standard.

Date: February 25, 2026

Respectfully submitted,

/s/ Brian Hauss
Brian Hauss No. 1183865
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

Jessie J. Rossman No. 1161236
Rachel Davidson No. 1197867
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
rdavidson@aclum.org

Gilles R. Bissonnette No. 123868
Henry Klementowicz No. 1179814
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NEW HAMPSHIRE
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org

Fermín L. Arraiza-Navas No. 73810
AMERICAN CIVIL LIBERTIES UNION PUERTO RICO CHAPTER
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
(787) 753-9493
farraiza@aclu.org

Carol Garvan No. 1145471
Zachary L. Heiden No. 99242
AMERICAN CIVIL LIBERTIES UNION OF
MAINE FOUNDATION
P.O. Box 7860
Portland, ME 04112
(207) 619-6224
cgarvan@aclumaine.org
zheiden@aclumaine.org

Lynette Labinger No. 23027
Cooperating Counsel
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF RHODE ISLAND
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Times New Roman in 14-point type.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 5,403 words, excluding the parts of the brief exempted under Rule 32(f), according to the count of Microsoft Word. Lastly, this brief complies with the Court's January 28, 2026, Order because it does not exceed thirty pages.

Dated: February 25, 2026

/s/ *Brian Hauss*
Brain Hauss

## CERTIFICATE OF SERVICE

I certify that on February 25, 2026, the foregoing Amici Curiae Brief was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system

Dated: February 25, 2025

/s/ *Brian Hauss*
Brian Hauss