No. 24-1279

# In the United States Court of Appeals for the First Circuit

BRIAN HUSSEY,

*Plaintiff-Appellant*,

v.

CITY OF CAMBRIDGE; CHRISTINE ELOW, IN HER OFFICIAL CAPACITY AS
COMMISSIONER OF THE CAMBRIDGE POLICE DEPARTMENT,

*Defendants-Appellees,*

BRANVILLE G. BARD, JR., IN HIS INDIVIDUAL CAPACITY,

*Defendant.*

On Appeal from the United States District Court
for the District of Massachusetts, No. 1:21-cv-11868-AK
The Honorable Angel Kelley

## BRIEF *AMICUS CURIAE* OF
## THE BECKET FUND FOR RELIGIOUS LIBERTY
## IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

ADÈLE A. KEIM
  *Counsel of Record*
LUKE W. GOODRICH
JORDAN T. VARBERG
BENJAMIN A. FLESHMAN
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006
(202) 955-0095
*akeim@becketfund.org*

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the *Amicus Curiae* has no parent corporation, nor does it issue any stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF THE *AMICUS CURIAE* .................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................. 3

ARGUMENT ........................................................................................ 5

    I.  Giving less weight to "mocking, derogatory,
       and disparaging" speech conflicts with core
       First Amendment principles. ........................................................ 5

       A. *Pickering* does not license viewpoint
          discrimination or a heckler's veto. ......................................... 5

       B. Devaluing "mocking, derogatory, and
          disparaging" speech invites viewpoint
          discrimination and a heckler's veto. ...................................... 7

       C. The "mocking, derogatory, and disparaging"
          standard also chills core protected religious speech. ............... 12

    II. The "mocking, derogatory, and disparaging"
       nature of speech should be considered, if at all,
       only on a limited basis as part of the government's
       side of the *Pickering* scale. ........................................................ 18

CONCLUSION ..................................................................................... 23

CERTIFICATE OF COMPLIANCE ......................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) .................................................................... 1-2, 14

*Amalgamated Transit Union v. Port*
    *Auth. of Allegheny Cnty.,*
    39 F.4th 95 (3d Cir. 2022) ............................................................ 5, 20

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985) ............................................................ 11

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) .......................................................................... 14

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ............................................................................ 1

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995) .......................................................................... 13

*Catholic Charities Bureau, Inc. v. Wis.*
    *Lab. & Indus. Rev. Comm'n,*
    605 U.S. 238 (2025) ..................................................................... 1, 17

*Cohen v. California,*
    403 U.S. 15 (1971) .............................................................................. 6

*Connick v. Myers,*
    461 U.S. 138 (1983) ............................................................................ 4

*Curran v. Cousins,*
    509 F.3d 36 (1st Cir. 2007) ............................................................... 7

*Damiano v. Grants Pass Sch. Dist. No. 7,*
    140 F.4th 1117 (9th Cir. 2025) ........................................................ 15

*Davignon v. Hodgson*,
   524 F.3d 91 (1st Cir. 2008) ................................................................ 20

*De Ritis v. McGarrigle*,
   861 F.3d 444 (3d Cir. 2017) ................................................................ 9

*Decotiis v. Whittemore*,
   635 F.3d 22 (1st Cir. 2011) ................................................................ 18

*Dodge v. Evergreen Sch. Dist. #114*,
   56 F.4th 767 (9th Cir. 2022) ........................................................ 9, 20

*Fenico v. City of Philadelphia*,
   70 F.4th 151 (3d Cir. 2023) ........................................................ 18, 20

*Flanagan v. Munger*,
   890 F.2d 1557 (10th Cir. 1989) ..................................................... 7, 12

*Forsyth County v. Nationalist Movement*,
   505 U.S. 123 (1992) ............................................................................ 7

*Fowler v. Rhode Island*,
   345 U.S. 67 (1953) ............................................................................ 17

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021) ............................................................................ 1

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ..................................................................... 5, 12

*Good News Club v. Milford Cent. Sch.*,
   533 U.S. 98 (2001) ............................................................................ 6

*Groff v. DeJoy*,
   600 U.S. 447 (2023) .......................................................................... 19

*Gustafson v. Jones*,
   290 F.3d 895 (7th Cir. 2002) ............................................................ 20

*Heffernan v. City of Paterson*,
   578 U.S. 266 (2016) ............................................................................ 2

iv

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ........................................................................ 1

*Hosanna-Tabor Evangelical Lutheran*
    *Church & Sch. v. EEOC,*
    565 U.S. 171 (2012) ........................................................................ 1

*Hurley v. Irish-Am. Gay, Lesbian &*
    *Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ...................................................................... 14

*Hussey v. City of Cambridge,*
    149 F.4th 57 (1st Cir. 2025) .................................................. *passim*

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ........................................................................ 6

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) .............................................................. 6, 13, 14

*L.M. v. Town of Middleborough,*
    145 S. Ct. 1489 (2025) .................................................................. 10

*Little Sisters of the Poor Saints Peter &*
    *Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) ........................................................................ 1

*MacRae v. Mattos,*
    106 F.4th 122 (1st Cir. 2024) ........................................................ 7

*MacRae v. Mattos,*
    145 S. Ct. 2617 (2025) ............................................................ *passim*

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ........................................................................ 1

*Masterpiece Cakeshop, Ltd. v.*
    *Colo. C.R. Comm'n,*
    584 U.S. 617 (2018) ...................................................................... 14

*Matal v. Tam*,
  582 U.S. 218 (2017) ......................................................................... 2, 8

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ............................................................................ 9

*Melton v. Forrest City*,
  147 F.4th 896 (8th Cir. 2025) ..................................................... 11, 12

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................ 15

*Mihos v. Swift*,
  358 F.3d 91 (1st Cir. 2004) ............................................................... 20

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) .......................................................................... 13

*Nichols v. Dancer*,
  657 F.3d 929 (9th Cir. 2011) ............................................................ 20

*Noble v. Cincinnati & Hamilton*
  *Cnty. Pub. Libr.*,
  112 F.4th 373 (6th Cir. 2024) ........................................................... 11

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) .......................................................................... 13

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ............................................................................ 1

*Pickering v. Bd. of Educ. of*
  *Township High Sch. Dist.*,
  391 U.S. 563 (1968) .................................................................. *passim*

*Police Dep't of Chi. v. Mosley*,
  408 U.S. 92 (1972) .............................................................................. 5

*Rankin v. McPherson*,
  483 U.S. 378 (1987) ......................................................... 5, 6, 11, 19

*Reges v. Cauce,*
162 F.4th 979 (9th Cir. 2025) ...................................................... 9, 12

*Scarbrough v. Morgan Cnty. Bd. of Educ.,*
470 F.3d 250 (6th Cir. 2006) ..................................................... 14, 17

*Shurtleff v. City of Boston,*
596 U.S. 243 (2022) .................................................................. 2, 10

*Snyder v. Phelps,*
562 U.S. 443 (2011) ........................................................................ 6

*St. Dominic Acad. v. Makin,*
744 F. Supp. 3d 43 (D. Me. 2024) ...................................................... 1

*Texas v. Johnson,*
491 U.S. 397 (1989) ..................................................................... 5, 6

*Town of Greece v. Galloway,*
572 U.S. 565 (2014) ....................................................................... 16

*United States v. Schwimmer,*
279 U.S. 644 (1929) ......................................................................... 6

*United States v. Stevens,*
559 U.S. 460 (2010) ......................................................................... 7

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ................................................................... 13, 14

*Waters v. Churchill,*
511 U.S. 661 (1994) ........................................................................ 19

*Watson v. City of Memphis,*
373 U.S. 526 (1963) ......................................................................... 7

*Wooley v. Maynard,*
430 U.S. 705 (1977) ........................................................................ 13

*Zubik v. Burwell,*
578 U.S. 403 (2016) ......................................................................... 1

## Other Authorities

Mark Chaves et al., *Congregations in 21st
    Century America* 31 (2021) ................................................ 16

John D. Inazu, *Liberty's Refuge: The Forgotten
    Freedom of Assembly* (2012) ............................................. 18

Skylar Laird, *Clemson professor fired over
    Charlie Kirk post will get paid but won't
    teach*, S.C. Daily Gazette (Jan. 8, 2026) ............................ 12

Asma T. Uddin, *The UN Defamation of Religions
    Resolution and Domestic Blasphemy Laws:
    Creating a Culture of Impunity* (July 14, 2011) ................. 15

## INTEREST OF THE *AMICUS CURIAE*[1]

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm that protects the free expression of all religious faiths. Becket has represented agnostics, Buddhists, Christians, Hindus, Jains, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, including as merits counsel in the U.S. Supreme Court and in this Court. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Holt v. Hobbs*, 574 U.S. 352 (2015); *Zubik v. Burwell*, 578 U.S. 403 (2016); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020); *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021); *Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238 (2025); *Mahmoud v. Taylor*, 606 U.S. 522 (2025) *see also St. Dominic Acad. v. Makin,* 744 F. Supp. 3d 43 (D. Me. 2024), No. 24-1739 (1st Cir. argued Jan. 7, 2025).

Becket has also participated in numerous Supreme Court free speech cases as amicus counsel. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S.

---

[1]   All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amicus*—contributed money that was intended to fund preparing or submitting the brief.

570 (2023); *Shurtleff v. City of Boston*, 596 U.S. 243 (2022); *Matal v. Tam*, 582 U.S. 218 (2017); *Heffernan v. City of Paterson*, 578 U.S. 266 (2016).

Becket submits this brief in response to this Court's January 28 order. This Circuit's "disparagement" standard is not consistent with the Supreme Court's First Amendment jurisprudence because it invites impermissible viewpoint discrimination and facilitates a heckler's veto. The disparaging nature of the speech should be considered, if at all, as part of the "time, place, and manner" analysis in the government's part of the *Pickering* balancing test.

Any approach adopted by the en banc court must be especially solicitous of government employees' private religious speech. A rule that allows government employers to punish employees for engaging in "disparaging" religious speech outside of the workplace will inevitably entangle federal judges in deciding religious questions in a way that both the Establishment and Free Exercise Clauses forbid.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The panel agreed that Officer Hussey's short-lived Facebook post about a federal police-reform law named for George Floyd was speech that "touched on important political issues." *Hussey v. City of Cambridge*, 149 F.4th 57, 67 (1st Cir. 2025). And it acknowledged that "normally" this kind of political speech occupies the "highest rung of the hierarchy of First Amendment values." *Id.* But, relying on the standard this Court announced in *MacRae v. Mattos* and *Curran v. Cousins*, it swept all that away because Officer Hussey's words about George Floyd were too "mocking, derogatory, and disparaging" to qualify for "special protection." *Id.* at 67-69. Even the City now confesses that the standard the Court applied was wrong and urges the Court to "recalibrat[e]" its caselaw. City's En Banc Br. at 12-13.

This Court's disparagement standard has earned its retirement. It should be overruled for at least three reasons. First, the standard's devaluing of core political speech upsets the balance carefully struck in *Pickering* between the workplace-related needs of government employers and the free speech rights of their employees. Second, the standard invites governments to engage in rank viewpoint discrimination; indeed, the Supreme Court unanimously recognized in *Matal v. Tam* and *Iancu v. Brunetti* that a ban on "disparaging" speech discriminates by viewpoint. Third, the standard vests government employers with excessive power that may be used to control employees' private speech on

virtually any topic, including important political and even religious matters. That power will lead to infringements of not only the Free Speech Clause, but also the Religion Clauses.

History teaches that the disparagement standard will not bear good fruit. *Pickering*'s rule protecting speech by public employees arose in response to "the widespread efforts in the 1950s and early 1960s to require public employees … to swear oaths of loyalty to the state and reveal the groups with which they associated." *Connick v. Myers*, 461 U.S. 138, 144 (1983). These laws restricted employees' political speech and association. *Id.* And they allowed employees to be punished even if their membership in such "subversive" organizations was a thing of the past. *Id.* at 144-45.

Against this background, *Pickering* and the cases that followed made it clear that government employees could *not* be punished for engaging in core protected speech in their capacity as private citizens. The disparagement standard departs from this consensus, enables viewpoint discrimination and a heckler's veto, and opens the door to future abuses. In particular, it makes it easier for governments to punish employees' religious speech, which frequently offers a minority viewpoint.

This Court should reverse the district court, overrule *MacRae* and *Curran* in relevant part, and make clear that the disparaging nature of protected speech may be considered, if at all, only on a limited basis as a part of the government's side of the *Pickering* analysis.

4

## ARGUMENT

I. **Giving less weight to "mocking, derogatory, and disparaging" speech conflicts with core First Amendment principles.**

A. *Pickering* **does not license viewpoint discrimination or a heckler's veto.**

As this Court knows, *Pickering* is meant to balance the government's interest in "efficient provision of public services" with the free speech rights of public employees. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). But *Pickering* is also meant to operate consistently with core First Amendment principles—not displace them. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *Amalgamated Transit Union v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022). Two core principles are particularly relevant here: the First Amendment's prohibition on viewpoint discrimination and its antipathy toward a heckler's veto.

The rule that the government may not punish speech based on its "viewpoint" is a "bedrock principle" of free speech law. *Texas v. Johnson*, 491 U.S. 397, 413-14 & n.9 (1989). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). Unsurprisingly, then, courts have recognized that "public employers do not have a free hand to engage in viewpoint discrimination toward their employees." *Amalgamated Transit Union*, 39 F.4th at 109; *see MacRae v. Mattos*, 145 S. Ct. 2617, 2620

(2025) (Thomas, J., concurring) ("We have made clear that the core First Amendment principle of viewpoint neutrality applies in the *Pickering-Garcetti* context[.]"). Nor may "public employers … use authority over employees to silence discourse … simply because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384.

When the government "disfavor[s] 'ideas that offend[,]'" it commits the "essence of viewpoint discrimination." *Iancu v. Brunetti*, 588 U.S. 388, 393, 396 (2019). That speech may be "offensive or disagreeable" is no reason to punish it—in fact, some of the Supreme Court's proudest free speech precedents involved highly offensive expression. *Texas*, 491 U.S. at 414 (citing over a dozen cases). Whether it is activists who desecrate the American flag, *id.* at 397, or picketers near military funerals who "Thank God for Dead Soldiers," *Snyder v. Phelps*, 562 U.S. 443, 448 (2011), or dissidents whose apparel proclaims "F*** the Draft," *Cohen v. California*, 403 U.S. 15, 16 (1971), the rule the Court applies is the same: The First Amendment protects both "the thought that we hate" and the one we hail. *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting).

Similarly critical is the rule that "heckler[s]" cannot confer discretion on the government to discriminate by viewpoint. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022). As the Supreme Court has repeatedly held, "constitutional rights may not be denied simply because

of hostility to their assertion or exercise." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963). After all, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). The Supreme Court has therefore "squarely rejected what it refers to as the 'heckler's veto' as a justification for curtailing 'offensive' speech in order to prevent public disorder." *Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989).

### B. Devaluing "mocking, derogatory, and disparaging" speech invites viewpoint discrimination and a heckler's veto.

*MacRae* and *Curran* contradict these core First Amendment principles. By giving less weight to "mocking, derogatory, and disparaging" speech, they grant governments wide discretion to punish employees for their viewpoints or for the anticipated reactions of offended listeners. *MacRae v. Mattos*, 106 F.4th 122, 137 (1st Cir. 2024); *see Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007) ("vulgar, insulting, and defiant"). This disparagement standard is flatly inconsistent with the Free Speech Clause. *Cf. United States v. Stevens*, 559 U.S. 460, 470 (2010) (deeming it "startling and dangerous" to suggest that freedom of speech "extend[s]" only to "speech that survive[s] an ad hoc balancing of relative social costs and benefits"). *Pickering* itself "unequivocally reject[ed]" the "position … that even comments on matters of public concern that are substantially correct … may furnish grounds for dismissal if they are sufficiently critical in tone." *Pickering v. Bd. of Educ. of Township High*

*Sch. Dist.*, 391 U.S. 563, 570 (1968). And the Supreme Court has plainly said that even when a rule "evenhandedly prohibits disparagement," it still discriminates by viewpoint because "[g]iving offense is [itself] a viewpoint." *Matal*, 582 U.S. at 243 (plurality op.). It reiterated the same point two years later in *Iancu*, noting that "all the Justices agreed" that the "disparagement bar" in *Matal* "was viewpoint-based." 588 U.S. at 392-93.

The disparagement standard's broad grant of discretion is exacerbated by its subjectivity. As even the City is forced to concede, the disparagement standard "creates unnecessary risk that judges will be guided by their own subjective sensitivity and preferences." City's En Banc Br. at 12. Whether a statement is deemed "mocking, derogatory, and disparaging" depends largely on the listener's agreement or disagreement with its substance. This Court's standard thus not only licenses viewpoint discrimination, but it confers significant power on those who disagree with the message, thereby encouraging what the First Amendment is designed to discourage—a heckler's veto.

This case presents those dangers. Hussey's comments were posted "during a period of intense scrutiny of and protest against law enforcement" and "touched on important political issues" relating to "police reform and racial inequity." *Hussey*, 149 F.4th at 67, 71. "[A]larmed and concerned" by Hussey's comments—which had been deleted six days earlier—NAACP representatives and "community

activists" contacted the police department to raise concerns. *Id.* at 63, 74. And in response to those viewpoint-based concerns, the police department disciplined Hussey. The panel then held that this Court's precedents permitted the discipline—reasoning that Hussey admitted he could have shared his views more charitably, *id.* at 64, 68 n.5, and that the community leaders' outcry portended the deterioration of "the Department's relationship of trust with the public," *id.* at 71.

The First Amendment cannot tolerate that reasoning. Political speech like Hussey's is at the "core" of what the First Amendment protects. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). So even when, as here, "some may not like the political message being conveyed," that "is par for the course and cannot itself be a basis for finding disruption of a kind that outweighs the speaker's First Amendment rights." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 783 (9th Cir. 2022); *see also Reges v. Cauce*, 162 F.4th 979, 999 (9th Cir. 2025) (cannot punish speech just because "some listeners may have found it disrespectful or distasteful"). Likewise, even when the employee speaks with "personal invective," his remarks "can make a point about a matter of public concern"—the "tone of the communications" is thus "irrelevant." *De Ritis v. McGarrigle*, 861 F.3d 444, 455 (3d Cir. 2017). Indeed, a public employee retains the "freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Reges*, 162 F.4th at 999.

The panel nevertheless allowed the City to engage in viewpoint discrimination here. This is not an isolated event. In fact, three times in the past four years, Justices of the Supreme Court have criticized decisions of this Court for allowing viewpoint discrimination to survive First Amendment scrutiny. First, in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022), Justice Breyer wrote a unanimous opinion reversing this Court's decision to allow Boston to engage in viewpoint discrimination against a religious group. Second, in *L.M. v. Town of Middleborough*, Justice Alito dissented from the denial of certiorari in a student speech case, and charged this Court with "limiting the application of [the Supreme Court's] viewpoint-discrimination cases" and "rob[bing] a great many students of that core First Amendment protection." 145 S. Ct. 1489, 1493 (2025) (Alito, J., dissenting). And third, in *MacRae v. Mattos*, Justice Thomas, concurring in the denial of certiorari, faulted this Court for missing "that the core First Amendment principle of viewpoint neutrality applies in the *Pickering-Garcetti* context" and for its "deeply flawed" suggestion that "tone" is relevant to the "First Amendment interest." 145 S. Ct. at 2619-20 (Thomas, J., concurring). The same is true of the panel's decision here.

Hussey's speech was mild compared to public employee speech that other courts have protected. For example, in two cases similarly arising during the George Floyd demonstrations, the Sixth and Eighth Circuits protected controversial employee Facebook posts, with one depicting a

car trampling over protesters and crowing "All Lives Splatter: Nobody Cares About Your Protest," and the other showing "a silhouette of a baby in the womb with a rope around its neck" and the caption, "I can't breathe!" *See Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 378, 383 (6th Cir. 2024); *Melton v. Forrest City,* 147 F.4th 896, 900, 902 (8th Cir. 2025) (reversing summary judgment for employer and remanding for trial). In another case involving a police officer, the Fourth Circuit held that a police department could not prevent the officer from performing off-duty in blackface, despite the protests and racial tensions his prior performances had ignited. *Berger v. Battaglia*, 779 F.2d 992, 994-1001 (4th Cir. 1985). And the Supreme Court has also allowed inflammatory speech to survive *Pickering* balancing; one of its leading *Pickering* precedents shielded comments by an employee who said she wished that President Reagan's would-be assassin had been successful. *Rankin*, 483 U.S. at 380.

To these courts, it made little difference that the offensive speech had triggered a "huge firestorm" in the community, *Melton*, 147 F.4th at 901, or "widespread outrage," *Berger*, 779 F.2d at 995, or "wounded feelings" among "co-workers," *Noble*, 112 F.4th at 384. As one explained, the "threat[ of] disruption by others reacting to public employee speech simply" cannot "serve as justification for public employer disciplinary action," *Berger*, 779 F.2d at 1001—even if it means "some members of the public … may not cooperate with law enforcement officers in the future,"

*Flanagan*, 890 F.2d at 1566. "First Amendment protection that rises and falls depending on how upset [the public] become[s] at [an employee's] message is little protection at all." *Reges*, 162 F.4th at 1004. Were it otherwise, a court would "run[] the risk of constitutionalizing a heckler's veto." *Melton*, 147 F.4th at 903.

Just so. *Melton* warned that "[e]nough outsider complaints could prevent government employees from speaking on any controversial subject, even on their own personal time;" that is exactly what happened here. *Melton*, 147 F.4th at 903. The effect of this Court's disparagement standard is to silence civil servants, despite "the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. A viewpoint-neutral rule, by contrast, will protect speech equally no matter the political circumstances. A rule that protects Hussey's controversial social media post about George Floyd in 2020 may protect a different employee's posts about Charlie Kirk in 2025. *See, e.g.*, Skylar Laird, *Clemson professor fired over Charlie Kirk post will get paid but won't teach*, S.C. Daily Gazette (Jan. 8, 2026), https://perma.cc/X5LW-TPZX. The First Amendment requires no less.

## C. The "mocking, derogatory, and disparaging" standard also chills core protected religious speech.

Political speech is not the only core speech protected by the First Amendment; religious speech is core speech too. *Murdock v.*

*Pennsylvania*, 319 U.S. 105, 115 (1943) (noting that "[f]reedom of press, freedom of speech, freedom of religion are in a preferred position" within the constitutional hierarchy); *accord W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). As the Supreme Court has emphasized, "the First Amendment doubly protects religious speech." *Kennedy*, 597 U.S. at 523. "Indeed, in Anglo–American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).[2]

This Court's rule devaluing "disparaging" speech puts religious people working for the government in a particularly vulnerable place. Many religious people have beliefs that differ from the social consensus on social issues such as marriage, gender, and sexuality. *See Obergefell v. Hodges*, 576 U.S. 644, 672, 679 (2015) (recognizing that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious … premises" and observing that "[t]he First Amendment ensures that religious … persons are given proper protection as they seek to teach the[se] principles"). Some who disagree

---

[2] For a more detailed discussion of the history of the First Amendment and the Framers' intent to protect religious speech in particular, see the Br. Amicus Curiae of the Becket Fund for Religious Liberty, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (No. 21-476), https://perma.cc/5WMK-9NWQ.

with those views might even consider them "disparaging" and seek to stamp them out. *See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 635 (2018) (ruling against government officials who described the plaintiff's religious beliefs as "despicable pieces of rhetoric"). But as the Supreme Court has said time and again, when governments seek to punish speech—particularly religious speech—that conflicts with prevailing public opinion, the First Amendment must prevail. *See, e.g.*, *303 Creative*, 600 U.S. 570; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Barnette*, 319 U.S. 624; *cf. Masterpiece Cakeshop*, 584 U.S. 617; *Kennedy*, 597 U.S. 507.

To be sure, this clear constitutional command has not stopped government employers from *trying* to censor their employees over their private religious speech. Like the City, these employers have frequently invoked the possibility of disruption as a justification for their unconstitutional actions. But other circuits have appropriately rejected such speculation and protected the rights of religious employees, even when their speech either had caused or was likely to cause offense. *See, e.g.*, *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 253, 258-59 (6th Cir. 2006) (school board that did not "condone homosexuality" could not punish employee who agreed to speak at a church "with a predominantly homosexual congregation" on his own time, outside of work); *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1147

(9th Cir. 2025) (reversing grant of summary judgment for school district that punished religiously motivated, outside-of-work speech by teachers condemning district's policy of concealing gender transitions from parents); *compare Meriwether v. Hartop*, 992 F.3d 492, 499-501 (6th Cir. 2021) (extending such protection to the employee's on-the-job religious objection to using a student's preferred pronouns).

In the opposite direction, this Court's disparagement standard also leaves those employees who sharply *criticize* religion in a precarious place. A government employee who calls belief in God a "delusion" (à la Richard Dawkins), or says that another person's religious belief is "despicable" (*cf. Masterpiece Cakeshop*), can certainly be accused of "disparaging" religious beliefs. Yet when government employees make off-the-job remarks like these, the First Amendment ought to robustly protect their expression, too. Indeed, laws preventing the "disparagement" of religion are a hallmark of speech-repressive regimes worldwide, and have been rightly condemned by the international human rights community. Asma T. Uddin, *The UN Defamation of Religions Resolution and Domestic Blasphemy Laws: Creating a Culture of Impunity* (July 14, 2011), https://perma.cc/K227-MJRE; *see also* Br. Amicus Curiae of the Becket Fund for Religious Liberty, *Matal v. Tam*, 582 U.S. 218 (2017) (No. 15-1293), https://perma.cc/V8FF-AE8Z (explaining how these principles apply in First Amendment cases).

This Court's rule could also pit religious groups against each other. Is it "disparaging" to Catholics if a Protestant police officer posts a sermon to YouTube in which he criticizes Catholics for following the Pope and praying to Mary? Is it "disparaging" to Muslims if a postal worker shows images of the Prophet Muhammed while giving a talk on world religions at the public library? Does the answer change if the neighborhood where the speech takes place is largely Catholic, or largely Muslim, and community leaders take offense? Constitutionally, the answer is no. *Cf. Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014) (holding that it did not violate the Establishment Clause for a town council to open its meetings with prayer, even though the plaintiffs said that the prayers "gave them offense and made them feel excluded and disrespected").

These questions are not hypothetical. Many religious communities in the United States rely on leaders who are bi-vocational—that is, they balance secular employment with their religious duties. *See* Mark Chaves et al., *Congregations in 21st Century America* 31 (2021), https://perma.cc/3TUT-7GXQ (35% of clergy in the U.S. are bi-vocational). Sometimes this is for theological reasons, other times financial. Yet the disparagement standard suggests that if enough members of other religious groups take offense at what a government employee says while they lead their own congregations, they are vulnerable to losing their secular employment. This Court's standard would thus require judges to decide which religious teachings—when

communicated by government employees to their own religious communities, outside of work—are too "disparaging" to enjoy the full protection of the First Amendment. In other words, courts would be called upon to "approve, disapprove, classify, regulate, or … control sermons delivered at religious meetings"—something that is far beyond "the competence of courts under our constitutional scheme." *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953).

Indeed, the likelihood that courts will be required to police the contents of sermons and other religious speech has ramifications beyond just the Free Speech Clause. *See, e.g.*, *Scarbrough*, 470 F.3d at 253, 259-60 (punishing government employee for agreeing to speak "at a convention sponsored by a church with a predominantly homosexual congregation" violated both Free Speech and Free Exercise Clauses). As Justice Sotomayor wrote last term for the unanimous Court, "the clearest command of the Establishment Clause is that the government may not officially prefer one religious denomination over another" or "interfere in the competition between sects." *Catholic Charities Bureau*, 605 U.S. at 247-48 (cleaned up). This prohibition on denominational favoritism is "'inextricably connected with the continuing vitality of the Free Exercise Clause,' too." *Id.* at 248. Thus, when applied to a government employee's

*religious* speech outside of work, this Circuit's disparagement standard risks violating three separate clauses of the First Amendment.[3]

For all these reasons, this Court should make it clear that core protected speech—whether political or religious—does not lose its special status simply because it is "disparaging."

## II. The "mocking, derogatory, and disparaging" nature of speech should be considered, if at all, only on a limited basis as part of the government's side of the *Pickering* scale.

As the City now concedes, City's En Banc Brief at 12-13, to the extent the tenor of an employee's speech should be considered at all in a *Pickering* analysis, it should factor in the weight of the government's interests, not the value of the employee's speech. *See, e.g.*, *Fenico v. City of Philadelphia*, 70 F.4th 151, 165 (3d Cir. 2023) ("'[T]he inappropriate or controversial nature' of the speech is not relevant to whether it touches on matters of public concern—it is only a factor in evaluating its disruptiveness during *Pickering* balancing."). Indeed, this Court already considers "the time, place, and manner of the employee's speech" when "assessing the *government's* interest in allaying disruption and inefficiencies in the workplace." *Decotiis v. Whittemore*, 635 F.3d 22, 35

---

[3] Because so much religious speech takes place in assemblies with other co-religionists, the disparagement rule burdens the oft-forgotten First Amendment right of assembly, too. *See* John D. Inazu, *Liberty's Refuge: The Forgotten Freedom of Assembly* (2012); Br. Amicus Curiae of the Becket Fund for Religious Liberty, *Heffernan v. City of Paterson*, 578 U.S. 266 (2016) (No. 14-1280), https://perma.cc/WQ78-GZUH.

(1st Cir. 2011) (emphasis added). Under some—albeit limited—circumstances, speaking in a mocking, derogatory, or disparaging manner may materially affect workplace efficiency or harmony. *Cf. Waters v. Churchill*, 511 U.S. 661, 680-81 (1994) (plurality op.) (recognizing that employee's "complaining" and "unkind and inappropriate" comments could, "if not dealt with, threaten[] to undermine management's authority"). Thus, a government employer might have more flexibility to prevent such speech in that narrow class of cases. *Cf. Groff v. DeJoy*, 600 U.S. 447, 472 (2023) (other employees' hostility towards a religious practice is never by itself a justification for failing to accommodate that practice).

Even in those cases, however, the *Pickering* analysis must be sensitive to the significant risk of inviting viewpoint discrimination. *See, e.g., Rankin*, 483 U.S. at 384 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."). To justify punishing speech based on its viewpoint, government employers could easily exaggerate the likelihood of disruption caused by demeaning or derogatory speech. To alleviate the risk of inappropriate exaggeration, this Court should emphasize that the "mere incantation of the phrase 'internal harmony in the workplace'"—or, here, "impaired community relations," *Hussey*, 149 F.4th at 70, 72—"is not enough to carry the day."

19

*Davignon v. Hodgson*, 524 F.3d 91, 105 (1st Cir. 2008) (quoting *Gustafson v. Jones*, 290 F.3d 895, 911 (7th Cir. 2002)). Rather, where the suppression of an employee's speech appears to discriminate based on viewpoint or to give effect to a heckler's veto, this Court should require government employers to shoulder a more substantial burden to justify their actions. *See, e.g.*, *Amalgamated Transit Union*, 39 F.4th at 108 ("So if the ban had been viewpoint discriminatory, the government's burden of justification would have been even heavier.").

That burden should include providing evidence that the punished speech either has caused or is reasonably certain to cause disruption *in the workplace*, and that this level of disruption goes "beyond the disruption that necessarily accompanies controversial speech." *Dodge*, 56 F.4th at 782 (cleaned up). Where the government claims that the tone of the speech affects its potential for disruption, the government should be required to support that argument with concrete evidence, not "rank speculation or bald allegation." *Nichols v. Dancer*, 657 F.3d 929, 934 (9th Cir. 2011); *accord Fenico*, 70 F.4th at 166 ("[A]n employer must still establish likely disruption through record support, and courts have long required more than 'unadorned speculation as to the impact of speech.'").

Were the rule more forgiving, government employers would be able to use supposed risk of disruption as a pretext for the suppression of unwanted or unpopular viewpoints. *See, e.g.*, *Mihos v. Swift*, 358 F.3d 91, 103 (1st Cir. 2004) ("[I]f Swift fired Mihos in a retaliatory fit of pique

because she disagreed with his vote and wished to punish him, she would have no legitimate governmental interests on her side of the scale."); *see also MacRae*, 145 S. Ct. at 2620 (Thomas, J., concurring) ("It undermines core First Amendment values to allow a government employer to adopt an institutional viewpoint on the issues of the day and then, when faced with a dissenting employee, portray this disagreement as evidence of disruption.").

It should likewise go without saying that the government cannot use the potential for "disruption" *outside* the workplace as an excuse to discriminate by viewpoint *within* it. When an outside group disagrees with a public employee's personal speech and threatens to be disruptive unless the government punishes the employee for his views, the government must decline the invitation to engage in viewpoint discrimination against its employee. To do otherwise would revive the McCarthyite practices that *Pickering* and *Connick* appropriately rejected. *See supra* at 4.

This case is a prime example of the dangers of failing to hold the government to a robust burden. Despite the strong evidence that Hussey was disciplined for the views he expressed, *see* Pl.'s Opening Br. at 27-31, the City has insisted that it reasonably predicted that Hussey's quickly deleted Facebook post would damage the police department's ability to operate within the community. *See* City's En Banc Br. at 26-27. But by the time Hussey was suspended, his two-month-old, private Facebook

post had long since been deleted and the department had "successfully avoided widespread media publicity and a loss of public trust due to [Hussey's] post." *Hussey*, 149 F.4th at 80 (Howard, J., dissenting). Neither the City nor the panel identified any evidence of actual disruption at the department or any evidence supporting the prediction that a fleeting, deleted Facebook post would undermine the department's relationship with the community.

Instead, even in its en banc brief, the City strongly suggests that it disciplined Hussey because it was concerned that members of the public would agree with the NAACP and find his post upsetting—that is, the City justified its viewpoint discrimination by pointing to hypothetical *future* hecklers. *See, e.g.*, City's En Banc Br. at 18-21 (detailing fears about the "tense climate in the community and the country at the time" and a loss of "trust that … citizens would have in their Cambridge Police Department"). This it cannot do.

In response to all this, the City suggests that this Court should still give "substantial weight and deference" to the government's "reasonable prediction of harm." City's En Banc Br. at 25-27 (cleaned up). But this Court cannot defer to a government engaged in viewpoint discrimination. And it should be more concerned with the *actual* disruption that the panel's ruling caused to foundational constitutional norms than with the *potential* disruption the City used to justify that discrimination.

## CONCLUSION

This Court should (1) overrule *MacRae* and *Curran* to the extent they assign less First Amendment value to "mocking, derogatory, and disparaging" public-employee speech and (2) reverse the judgment of the district court.

Respectfully submitted,

/s/ Adèle A. Keim
ADÈLE A. KEIM
  *Counsel of Record*
LUKE W. GOODRICH
JORDAN T. VARBERG
BENJAMIN A. FLESHMAN
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006
(202) 955-0095
*akeim@becketfund.org*

*Counsel for* Amicus Curiae

February 25, 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the length limitation set forth in the en banc Court's order dated January 28, 2026, because it is under 30 pages long.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Adèle A. Keim
Adèle A. Keim

Dated: February 25, 2026